17MAG8611

Approved: _____
DOUGLAS S. ZOLKIND/THOMAS McKAY/DANIEL C. RICHENTHAL/
SHANE T. STANSBURY, Assistant United States Attorneys

_____
DAVID A. LAST, Trial Attorney, Criminal Division

Before:   THE HONORABLE KEVIN N. FOX
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :      **SEALED COMPLAINT**
                                  :
     - v. -                       :      Violations of
                                  :      18 U.S.C. §§ 2, 371,
CHI PING PATRICK HO,              :      1956; 15 U.S.C.
  a/k/a "Patrick C.P. Ho," and    :      §§ 78dd-2, 78dd-3
CHEIKH GADIO,                     :
                                  :      COUNTY OF OFFENSE:
                  Defendants.     :      NEW YORK
                                  :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     THOMAS P. McNULTY, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

**COUNT ONE**
(Conspiracy to Violate the Foreign Corrupt Practices Act)

     1.   From at least in or about the fall of 2014, up to and
including in or about January 2017, in the Southern District of
New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P.
Ho," and CHEIKH GADIO, the defendants, and others known and
unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
offenses against the United States, to wit, to violate Title 15,
United States Code, Sections 78dd-2 and 78dd-3.

     2.   It was a part and an object of the conspiracy that CHI
PING PATRICK HO, a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the
defendants, and others known and unknown, being a domestic
concern and an officer, director, employee, and agent of a

domestic concern and a stockholder thereof acting on behalf of
such domestic concern, would and did willfully and corruptly
make use of the mails and a means and instrumentality of
interstate commerce in furtherance of an offer, payment, promise
to pay, and authorization of the payment of money, and offered,
gifted, promised to give, and authorized the giving of a thing
of value to a foreign official, and to a person, while knowing
that all and a portion of such money and thing of value would be
offered, given, and promised, directly and indirectly, to a
foreign official, for purposes of: (A)(i) influencing an act and
decision of such foreign official in his official capacity,
(ii) inducing such foreign official to do and omit to do an act
in violation of the lawful duty of such official, and
(iii) securing any improper advantage, and (B) inducing such
foreign official to use his influence with a foreign government
and instrumentality thereof to affect and influence any act and
decision of such government and instrumentality, in order to
assist such domestic concern in obtaining and retaining business
for and with, and directing business to, a person, in violation
of Title 15, United States Code, Section 78dd-2(a)(1) & (a)(3),
to wit, HO and GADIO agreed to pay and offer money and other
things of value to foreign officials in Africa, including (as to
HO and GADIO) the President of Chad and (as to HO) the
individual defined below as the "Ugandan Foreign Minister," to
secure an improper advantage and to induce such foreign
officials to use their influence with the governments of Chad
and Uganda, as applicable, to obtain business for the company
defined below as the "Energy Company."

     3.   It was a further part and an object of the conspiracy
that CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," and CHEIKH
GADIO, the defendants, and others known and unknown, would and
did, while in the territory of the United States, willfully and
corruptly make use of the mails and a means and instrumentality
of interstate commerce and do an act in furtherance of an offer,
payment, promise to pay, and authorization of the payment of
money, and offered, gifted, promised to give, and authorized the
giving of a thing of value to a foreign official, and to a
person, while knowing that all and a portion of such money and
thing of value would be offered, given, and promised, directly
and indirectly, to a foreign official, for purposes of:
(A)(i) influencing an act and decision of such foreign official
in his official capacity, (ii) inducing such foreign official to
do and omit to do an act in violation of the lawful duty of such
official, and (iii) securing any improper advantage, and
(B) inducing such foreign official to use his influence with a

foreign government and instrumentality thereof to affect and
influence any act and decision of such government and
instrumentality, in order to assist in obtaining and retaining
business for and with, and directing business to, a person, in
violation of Title 15, United States Code, Section 78dd-3(a)(1)
& (a)(3), to wit, HO and GADIO agreed to pay and offer money and
other things of value to foreign officials in Africa, including
(as to HO and GADIO) the President of Chad and (as to HO) the
Ugandan Foreign Minister, to secure an improper advantage and to
induce such foreign officials to use their influence with the
governments of Chad and Uganda, as applicable, to obtain
business for the Energy Company.

Overt Acts

4.    In furtherance of the conspiracy and to effect the
illegal objects thereof, the following overt acts, among others,
were committed and caused to be committed in the Southern
District of New York and elsewhere:

a.    In or about October 2014, CHI PING PATRICK HO,
a/k/a "Patrick C.P. Ho," the defendant, met at the United
Nations ("UN") in New York, New York with CHEIKH GADIO, the
defendant.

b.    On or about October 19, 2014, HO met at the UN in
New York, New York with the Ugandan Foreign Minister.

c.    On or about November 19, 2014, GADIO advised HO
by email to "reward" the President of Chad with a "nice
financial package."

d.    In or about January 2015, HO caused a pledge of
$2 million to be extended by the Energy Company to the President
of Chad.

e.    On or about March 12, 2015, HO met at the UN with
the Ugandan Foreign Minister.

f.    On or about March 25, 2015, HO caused a payment
of $200,000 to be wired from Hong Kong, through New York, New
York, to an account in Dubai designated by GADIO.

3

g.    On or about July 3, 2015, HO caused a payment of $200,000 to be wired from Hong Kong, through New York, New York, to an account in Dubai designated by GADIO.

h.    On or about August 2, 2015, the Ugandan Foreign Minister appointed the Chairman of the Energy Company as a "Special Honorary Advisor" to the President of the UN General Assembly.

i.    On or about May 6, 2016, HO caused a payment of $500,000 to be wired from Hong Kong, through New York, New York, to an account in Uganda designated by the Ugandan Foreign Minister.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
(Violation of the Foreign Corrupt Practices Act:
Domestic Concern – Chad Scheme)

5.    From at least in or about the fall of 2014, up to and including in or about January 2017, in the Southern District of New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the defendants, being a domestic concern and an officer, director, employee, and agent of a domestic concern and a stockholder thereof acting on behalf of such domestic concern, willfully and corruptly made use of the mails and a means and instrumentality of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, and offered, gifted, promised to give, and authorized the giving of a thing of value to a foreign official, and to a person, while knowing that all and a portion of such money and thing of value would be offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (A)(i) influencing an act and decision of such foreign official in his official capacity, (ii) inducing such foreign official to do and omit to do an act in violation of the lawful duty of such official, and (iii) securing any improper advantage, and (B) inducing such foreign official to use his influence with a foreign government and instrumentality thereof to affect and influence any act and decision of such government and instrumentality, in order to assist such domestic concern in obtaining and retaining business for and with, and directing business to, a person, in violation of Title 15, United States Code, Section 78dd-2(a)(1) & (a)(3), to wit, HO and GADIO paid and offered money and other things of

value to foreign officials in Chad, including the President of
Chad, to secure an improper advantage and to induce such foreign
officials to use their influence with the government of Chad to
obtain business for the Energy Company.

(Title 15, United States Code, Sections 78dd-2(a)(1)(A), 78dd-
2(a)(1)(B), 78dd-2(a)(3)(A), 78dd-2(a)(3)(B), 78dd-2(g)(2)(A);
Title 18, United States Code, Section 2.)

**COUNT THREE**
(Violation of the Foreign Corrupt Practices Act:
Domestic Concern – Uganda Scheme)

6.      From at least in or about the fall of 2014, up to and
including in or about January 2017, in the Southern District of
New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P.
Ho," the defendant, being a domestic concern and an officer,
director, employee, and agent of a domestic concern and a
stockholder thereof acting on behalf of such domestic concern,
willfully and corruptly made use of the mails and a means and
instrumentality of interstate commerce in furtherance of an
offer, payment, promise to pay, and authorization of the payment
of money, and offered, gifted, promised to give, and authorized
the giving of a thing of value to a foreign official, and to a
person, while knowing that all and a portion of such money and
thing of value would be offered, given, and promised, directly
and indirectly, to a foreign official, for purposes of:
(A)(i) influencing an act and decision of such foreign official
in his official capacity, (ii) inducing such foreign official to
do and omit to do an act in violation of the lawful duty of such
official, and (iii) securing any improper advantage, and
(B) inducing such foreign official to use his influence with a
foreign government and instrumentality thereof to affect and
influence any act and decision of such government and
instrumentality, in order to assist such domestic concern in
obtaining and retaining business for and with, and directing
business to, a person, in violation of Title 15, United States
Code, Section 78dd-2(a)(1) & (a)(3), to wit, HO paid and offered
money and other things of value to foreign officials in Uganda,
including the Ugandan Foreign Minister, to secure an improper
advantage and to induce such foreign officials to use their

influence with the government of Uganda to obtain business for
the Energy Company.

(Title 15, United States Code, Sections 78dd-2(a)(1)(A), 78dd-
2(a)(1)(B), 78dd-2(a)(3)(A), 78dd-2(a)(3)(B), 78dd-2(g)(2)(A);
        Title 18, United States Code, Section 2.)

## COUNT FOUR
(Violation of the Foreign Corrupt Practices Act:
Within the United States – Chad Scheme)

7.    From at least in or about the fall of 2014, up to and
including in or about January 2017, in the Southern District of
New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P.
Ho," and CHEIKH GADIO, the defendants, while in the territory of
the United States, willfully and corruptly made use of the mails
and a means and instrumentality of interstate commerce and did
an act in furtherance of an offer, payment, promise to pay, and
authorization of the payment of money, and offered, gifted,
promised to give, and authorized the giving of a thing of value
to a foreign official, and to a person, while knowing that all
and a portion of such money and thing of value would be offered,
given, and promised, directly and indirectly, to a foreign
official, for purposes of: (A)(i) influencing an act and
decision of such foreign official in his official capacity,
(ii) inducing such foreign official to do and omit to do an act
in violation of the lawful duty of such official, and
(iii) securing any improper advantage, and (B) inducing such
foreign official to use his influence with a foreign government
and instrumentality thereof to affect and influence any act and
decision of such government and instrumentality, in order to
assist in obtaining and retaining business for and with, and
directing business to, a person, in violation of Title 15,
United States Code, Section 78dd-3(a)(1) & (a)(3), to wit, HO
and GADIO paid and offered money and other things of value to
foreign officials in Chad, including the President of Chad, to
secure an improper advantage and to induce such foreign
officials to use their influence with the government of Chad to
obtain business for the Energy Company.

(Title 15, United States Code, Sections 78dd-3(a)(1)(A), 78dd-
3(a)(1)(B), 78dd-3(a)(3)(A), 78dd-3(a)(3)(B), 78dd-3(e)(2)(A);
        Title 18, United States Code, Section 2.)

6

**COUNT FIVE**
(Violation of the Foreign Corrupt Practices Act:
Within the United States – Uganda Scheme)

8.     From at least in or about the fall of 2014, up to and
including in or about January 2017, in the Southern District of
New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P.
Ho," the defendant, while in the territory of the United States,
willfully and corruptly made use of the mails and a means and
instrumentality of interstate commerce and did an act in
furtherance of an offer, payment, promise to pay, and
authorization of the payment of money, and offered, gifted,
promised to give, and authorized the giving of a thing of value
to a foreign official, and to a person, while knowing that all
and a portion of such money and thing of value would be offered,
given, and promised, directly and indirectly, to a foreign
official, for purposes of: (A)(i) influencing an act and
decision of such foreign official in his official capacity,
(ii) inducing such foreign official to do and omit to do an act
in violation of the lawful duty of such official, and
(iii) securing any improper advantage, and (B) inducing such
foreign official to use his influence with a foreign government
and instrumentality thereof to affect and influence any act and
decision of such government and instrumentality, in order to
assist in obtaining and retaining business for and with, and
directing business to, a person, in violation of Title 15,
United States Code, Section 78dd-3(a)(1) & (a)(3), to wit, HO
paid and offered money and other things of value to foreign
officials in Uganda, including the Ugandan Foreign Minister, to
secure an improper advantage and to induce such foreign
officials to use their influence with the government of Uganda
to obtain business for the Energy Company.

(Title 15, United States Code, Sections 78dd-3(a)(1)(A), 78dd-
3(a)(1)(B), 78dd-3(a)(3)(A), 78dd-3(a)(3)(B), 78dd-3(e)(2)(A);
Title 18, United States Code, Section 2.)


**COUNT SIX**
(Conspiracy to Commit Money Laundering)

9.     From at least in or about the fall of 2014, up to and
including in or about January 2017, in the Southern District of
New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P.
Ho," and CHEIKH GADIO, the defendants, and others known and
unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to violate
Title 18, United States Code, Section 1956(a)(2)(A).

10.   It was a part and an object of the conspiracy that CHI
PING PATRICK HO, a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the
defendants, and others known and unknown, would and did
knowingly transport, transmit, and transfer, and attempt to
transport, transmit, and transfer, a monetary instrument and
funds from a place in the United States to and through a place
outside of the United States and to a place in the United States
from and through a place outside of the United States, with the
intent to promote the carrying on of specified unlawful
activity, to wit, (a) the violations of the Foreign Corrupt
Practices Act charged in Counts Two through Five of this
Complaint, and (b) an offense against a foreign nation (as to
HO, Uganda and Chad; and as to GADIO, Chad) involving bribery of
a public official and the misappropriation, theft, and
embezzlement of public funds by or for the benefit of a public
official, in violation of Title 18, United States Code, Section
1956(a)(2)(A), to wit, HO and GADIO agreed to transmit and cause
to be transmitted funds from China to and through the United
States, and from the United States to foreign countries, in
furtherance of a scheme to pay and offer money and other things
of value to foreign officials in Africa, including (as to HO and
GADIO) the President of Chad and (as to HO) the Ugandan Foreign
Minister, to secure an improper advantage and to induce such
foreign officials to use their influence with the governments of
Chad and Uganda, as applicable, to obtain business for the
Energy Company.

(Title 18, United States Code, Section 1956(h).)

**COUNT SEVEN**
(Money Laundering: Chad Scheme)

11.   From at least in or about the fall of 2014, up to and
including in or about January 2017, in the Southern District of
New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P.
Ho," and CHEIKH GADIO, the defendants, knowingly transported,
transmitted, and transferred, and attempted to transport,
transmit, and transfer, a monetary instrument and funds from a
place in the United States to and through a place outside of the
United States and to a place in the United States from and
through a place outside of the United States, with the intent to
promote the carrying on of specified unlawful activity, to wit,
(a) the violations of the Foreign Corrupt Practices Act charged

8

in Counts Two and Four of this Complaint, and (b) an offense
against a foreign nation (Chad) involving bribery of a public
official and the misappropriation, theft, and embezzlement of
public funds by or for the benefit of a public official, in
violation of Title 18, United States Code, Section
1956(a)(2)(A), to wit, HO and GADIO transmitted and caused to be
transmitted funds from China to and through the United States,
and from the United States to foreign countries, in furtherance
of a scheme to pay and offer money and other things of value to
foreign officials in Chad, including the President of Chad, to
secure an improper advantage and to induce such foreign
officials to use their influence with the government of Chad to
obtain business for the Energy Company.

    (Title 18, United States Code, Section 1956(a)(2)(A) and 2.)

### COUNT EIGHT
(Money Laundering: Uganda Scheme)

    12.   From at least in or about the fall of 2014, up to and
including in or about January 2017, in the Southern District of
New York and elsewhere, CHI PING PATRICK HO, a/k/a "Patrick C.P.
Ho," the defendant, knowingly transported, transmitted, and
transferred, and attempted to transport, transmit, and transfer,
a monetary instrument and funds from a place in the United
States to and through a place outside of the United States and
to a place in the United States from and through a place outside
of the United States, with the intent to promote the carrying on
of specified unlawful activity, to wit, (a) the violations of
the Foreign Corrupt Practices Act charged in Counts Three and
Five of this Complaint, and (b) an offense against a foreign
nation (Uganda) involving bribery of a public official and the
misappropriation, theft, and embezzlement of public funds by or
for the benefit of a public official, in violation of Title 18,
United States Code, Section 1956(a)(2)(A), to wit, HO
transmitted and caused to be transmitted funds from China to and
through the United States, and from the United States to foreign
countries, in furtherance of a scheme to pay and offer money and
other things of value to foreign officials in Uganda, including
the Ugandan Foreign Minister, to secure an improper advantage
and to induce such foreign officials to use their influence with
the government of Uganda to obtain business for the Energy
Company.

    (Title 18, United States Code, Section 1956(a)(2)(A) and 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

13.   I have been a Special Agent with the FBI for approximately eight years, and I have been personally involved in the investigation of this matter.

14.   This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my review of email correspondence[1] and publicly available websites, my analysis of bank and financial records, my examination of documents and reports by others, my interviews of witnesses, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.[2]

---

[1]   All emails described in this Complaint were obtained pursuant to one or more judicially-authorized search warrants. The users of particular email accounts have been determined based on a combination of, among other things, the subscriber information produced by the account providers; the signature block of emails; the content of emails, including the greetings/salutations and sign-offs; the frequency of communications with related individuals; and the email addresses themselves.

[2]   Where emails and other documents are quoted herein, the quotations are generally verbatim, with alterations denoted with brackets and ellipses, as appropriate.  However, certain emails and other documents were written entirely in uppercase; and where those documents are quoted herein, standard capitalization is used.  Further, as noted herein, where documents were written in Chinese or French, I have reviewed -- and, as appropriate, quoted from -- draft translations of such documents.

**INTRODUCTION**

15.   This case involves two bribery schemes to pay high-level officials of African countries in exchange for lucrative business advantages.  At the center of both schemes is CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," the defendant.  HO is the head of a non-governmental organization ("NGO") based in Hong Kong and Virginia (the "Energy NGO"), which holds "Special Consultative Status" with the United Nations ("UN") Economic and Social Council ("ECOSOC"), and which is funded by a Chinese oil and gas conglomerate (the "Energy Company").  HO furthered both schemes while present in New York, New York, and also caused wire transfers in furtherance of both schemes to pass through New York, New York.

16.   In the first scheme (the "Chad Scheme"), defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," caused a $2 million bribe to be pledged to the President of Chad, for the purpose of securing business advantages for the Energy Company in its efforts to obtain valuable oil rights from the Chadian government.  In exchange, the President of Chad provided the Energy Company with, among other things, an exclusive opportunity to acquire particular oil rights in Chad without facing international competition.  CHEIKH GADIO, the defendant, who is the former Foreign Minister of Senegal and a lawful permanent resident of the United States, played an instrumental role in the Chad Scheme by, among other things, connecting HO with the President of Chad and conveying the Energy Company's $2 million bribe offer to him.  In exchange for GADIO's efforts to facilitate the bribery of the President of Chad, HO caused $400,000 in payments to be wired to GADIO's firm, which payments were sent through a bank in New York, New York.

17.   In the second scheme (the "Uganda Scheme"), defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," caused a $500,000 bribe to be wired, through a bank in New York, New York, to a bank account in Uganda designated by the Foreign Minister of Uganda, who had recently completed his term as President of the UN General Assembly (the "Ugandan Foreign Minister").[3]  HO also provided the Ugandan Foreign Minister, as well as the President

---

[3]   I will refer to the "Ugandan Foreign Minister" throughout this Complaint for the sake of clarity.  However, during the year that he served as President of the General Assembly, he did not simultaneously serve as the Foreign Minister of Uganda.

of Uganda (who was the Ugandan Foreign Minister's relative),
with gifts and promises of future benefits, including offering
to let both officials share in the profits of a potential joint
venture in Uganda involving the Energy Company and the
officials' family businesses.  The payment of $500,000 and the
promises of future benefits were made for the purpose of
obtaining business advantages for the Energy Company in Uganda's
financial and energy sectors for the Energy Company, beginning
with the potential acquisition of a Ugandan bank.

<u>**RELEVANT ENTITIES AND INDIVIDUALS**</u>

*PATRICK HO, The Energy NGO, and the Energy Company*

18.  Based on my review of publicly available information,
including press reports, websites, and documents obtained from
the Commonwealth of Virginia and State of New York, I know the
following, in substance and in part:

a.  The Energy NGO, which has offices in Hong Kong
and Virginia, describes itself on its website as "a non-
governmental, non-profit civil society organization" that
"serves as a high-end strategic think tank engaged in energy
strategy research, energy and public diplomacy, as well as
global energy cooperation and cultural exchanges."  Its website
identifies CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," the
defendant, as the Deputy Chairman and Secretary-General of the
Energy NGO.

b.  The Energy NGO's website states prominently that
the Energy NGO has "Special Consultative Status" with the UN's
ECOSOC branch.[4]  Publicly available ECOSOC materials confirm that
the Energy NGO has been registered with ECOSOC as an NGO with
Special Consultative Status since 2011, and that the Energy NGO
has sponsored and/or participated in multiple meetings and
events, many held at the UN's headquarters in New York, New
York.  The Energy NGO's website reflects that HO led and/or
attended various of these meetings and events.

---

[4]   According to a UN website, NGOs with "consultative status,"
such as the Energy NGO, are "granted the privilege of
participating in a wide variety of United Nations-sponsored
meetings and activities.  In return, they are expected to
contribute . . . to support the development aims of [ECOSOC] and
the United Nations at large."

c.    The Energy NGO's website and records from the
State Corporation Commission of Virginia reflect that the Energy
NGO is registered in Virginia as a charitable organization under
Section 501(c)(3) of the Internal Revenue Code.  In the Energy
NGO's annual reports for 2014, 2015, 2016, and 2017, filed with
the State Corporation Commission of Virginia, HO was listed as
both a director and an officer, with the title Deputy Chairman.
Thus, from at least 2014 to 2017, the Energy NGO was a "domestic
concern" and HO was an officer, director, employee, and agent of
a domestic concern, within the meaning of the Foreign Corrupt
Practices Act ("FCPA").

d.    According to the Energy NGO's website, the Energy
NGO is fully funded by the Energy Company, which, as noted
above, is a Chinese oil and gas conglomerate.  Based on my
review of the Energy NGO's U.S. bank records, I believe that it
in fact receives substantial financial support from the Energy
Company.  The Energy Company's website states that it is
headquartered in Shanghai, China; that it is a "private
collective enterprise with energy and financial services as its
core business"; and that its revenue in 2015 exceeded RMB 263.1
billion (*i.e.*, approximately $39 billion).  Furthermore, based
on my review of bank records, emails, and documents obtained
from the New York State Department of State, I have learned that
an affiliate of the Energy Company is incorporated in New York
State and maintains an office in New York, New York.
Accordingly, this affiliate is itself a "domestic concern" under
the FCPA.

e.    The websites of the Energy NGO and the Energy
Company reflect that they share various executives, including
the Chairman of both organizations (the "Chairman").  HO,
however, is not listed as having any position at the Energy
Company.

### CHEIKH GADIO and the Gadio Firm

19.    Based on my review of publicly available information,
emails, and records from the Department of Homeland Security, I
know the following, in substance and in part:

a.    CHEIKH GADIO, the defendant, was the Minister of
Foreign Affairs of Senegal from approximately 2002 to 2009.
GADIO has been a lawful permanent resident of the United States

since in or about 2000.  Thus, he is a "domestic concern" within the meaning of the FCPA.

　　　　b.  GADIO founded and served as chief executive officer of a consulting company based in Dakar, Senegal (the "Gadio Firm").  GADIO's son served as the Managing Director of the Gadio Firm.  GADIO's son has been a lawful permanent resident of the United States since in or about 2000.

　　　　c.  The Gadio Firm described itself on its website as an "international consulting & advisory firm providing consulting/advisory services, local agricultural production and food trading."[5]  Its website promotes the company's ability to open doors for businesses in Africa, stating that "the founder . . . has more than 20 year[s] experience of involvement in international affairs among which ten years as a high ranking public official operating in international relations and cooperation.  The Founder and his Managing Director and team of experts have a broad network, strategic connections, and strong relationships they will put to the service of Africa's development and to the business interests of their strategic partners. . . ."

### *The Ugandan Foreign Minister*

20.  Based on my review of publicly available information, I know that the Ugandan Foreign Minister was the elected President of the UN General Assembly ("PGA") during its 69th Session, serving in that role from September 2014 to September 2015.  Prior to becoming PGA, he served as the Minister of Foreign Affairs of Uganda from in or about 2005 to in or about September 2014.[6]  Since completing his term as PGA, he has resumed as Uganda's Minister of Foreign Affairs since in or about November 2015.[7]

---

[5]  Law enforcement saved a screenshot of this website when it was publicly available, and I have reviewed the screenshot.  The website is no longer publicly accessible.

[6]  The Minister of Foreign Affairs of Uganda is the cabinet minister in charge of Uganda's foreign policy and relations.  The position is equivalent to the Secretary of State of the United States.

[7]  Both in his capacity as PGA and as Foreign Minister of

## THE CHAD SCHEME

### *Overview*

21.   As set forth in greater detail below:

a.   The Chad Scheme began in or about October 2014, when CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the defendants, met at the UN in New York, New York.  At that time, the Energy Company wanted to expand its oil operations to Chad, and to do so, it wanted to enter into a joint venture with a Chinese government-owned oil and gas company (the "Chinese State Oil Company") that was already operating in Chad.  Earlier that year, the Chinese State Oil Company had been fined $1.2 billion by the government of Chad for environmental violations.  HO enlisted GADIO -- who had a personal relationship with the President of Chad -- to assist the Energy Company in gaining access to the President of Chad, with the initial goal of resolving the dispute between the government of Chad and the Chinese State Oil Company, and the ultimate goal of obtaining lucrative oil opportunities in Chad for the Energy Company.

b.   GADIO successfully connected HO and the Energy Company to the President of Chad and to other Chadian officials.  HO, acting on GADIO's advice, then caused the Energy Company to pledge a $2 million bribe to the President of Chad, in what was characterized as a "donation" for charitable causes.  Notably, GADIO later argued to HO that GADIO's firm should be paid at least $500,000 since the President of Chad had been compensated with a "gift" of $2 million.

c.   The $2 million "donation" was in fact a bribe intended to influence the award of oil rights in favor of the Energy Company.  Following the Energy Company's promise to pay the President of Chad $2 million, the Energy Company obtained a business advantage in its negotiations to acquire oil rights in

_____

Uganda, the Ugandan Foreign Minister was a "foreign official" under the FCPA.  Similarly, the President of Uganda and the President of Chad, who are discussed below, were both "foreign officials" under the FCPA during the time period of the events described in this Complaint.

Chad, in particular, certain oil rights that the government of
Chad offered exclusively to the Energy Company without
international competition.  Ultimately, the Energy Company did
not complete this acquisition, but instead purchased other oil
rights in Chad from a Taiwanese company.  In exchange for
GADIO's efforts to facilitate the bribery of the President of
Chad, HO caused the Energy NGO/Company[8] to pay GADIO's firm
$400,000 through two wires that were transmitted through a bank
in New York, New York.

### Chad Fines the Chinese State Oil Company $1.2 Billion

22.  Based on my review of press reports, I know that
(i) in or about March 2014, it was reported that Chad had fined
the Chinese State Oil Company $1.2 billion for environmental
violations; and (ii) in or about August 2014, it was reported
that Chad had withdrawn or canceled the Chinese State Oil
Company's oil exploration licenses in Chad.

### HO Enlists GADIO to Obtain "Special Attention and Support" for the Energy Company From the President of Chad

23.  Based on my review of emails, I know, in substance and
in part, that in or about October 2014, (i) CHI PING PATRICK HO,
a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the defendants, met
at the UN in New York, New York; (ii) HO asked GADIO to obtain
(as HO put it in a report to the Chairman) "special attention
and support" from the President of Chad regarding "the issues
that the Chinese energy companies are facing in Chad"; and
(iii) GADIO agreed to promptly meet with the President of Chad
and arrange for a meeting between the President and a delegation
from the Energy Company.  In particular:

a.  On or about September 30, 2014, HO exchanged
emails with an individual who appears, based on the content of
the emails, to be a mutual acquaintance of HO and GADIO.  This
individual stated, "I can report after several follow up
discussions that this is what Gadio has outlined as his plan.

---

[8]   The Energy NGO and the Energy Company are often referred to
by the exact same English acronym, and the context of certain
emails reflects that they are often referred to interchangeably.
Accordingly, where it is unclear whether a reference should be
to the Energy NGO or the Energy Company or both, I will refer to
the "Energy NGO/Company."

He is going to see the big man on 12 October.  This is
confirmed.  Assuming the man agrees to meet us, Gadio will . . .
fly back to the big man's country where we would join him for a
meeting. . . . Apparently, there won't be a visa issue if the
big man oks the meeting."  HO replied that he would check with
"SH" -- which I believe is a reference to Shanghai, the
headquarters of the Energy Company -- "about the delegation and
let you know."  Based on my participation in this investigation,
I believe the term "big man" in the aforementioned email is a
reference to the President of Chad.

       b.   On or about October 14, 2014, HO emailed an
Energy NGO employee ("CC-1"), whose email signature reflects
that she is an officer of the Energy NGO.  HO stated that he
would be meeting with the Chairman and that he wanted to provide
the Chairman with various reports, including "Chad President
Report."  In a subsequent email to CC-1 the same day, HO
attached a document summarizing, among other things, the key
points to include in the report to the Chairman: "A[t] the UN
gatherings, met an old friend, former foreign minister of
Senegal . . . . His name is Dr. Gadio.  I met in confidence with
Dr. Gadio and related to him our involvement with the Chinese
Company in Chad and wished to seek the help of the President in
resolving the matter.  Dr. Gadio agreed to help.  He called the
President on the phone and got an appointment to meet with the
President . . . . Immediately after his meeting with the
President, Gadio will call me to confirm the date of our meeting
with the President in Chad, which will be probably during the
middle part of next week."

       c.   On or about October 16, 2014, CC-1 sent an email,
copying HO, to an account at the Energy Company that I know,
based on my review of this and other emails, to be an account
designated for emails directed to the Chairman (the "Chairman
Account").[9]  CC-1 attached multiple Chinese documents to her
email.  Based on my review of a draft translation, I know that

---

[9]      In particular, on or about April 23, 2014, an employee of
the Energy NGO, whose email signature reflects that the employee
is HO's secretary ("HO's secretary"), forwarded to HO an email
from the Energy Company, which attached a Chinese document.
Based on my review of a draft translation, I know that the
document stated, in substance and in part, "Per direction of the
[C]hairman . . . All documents requiring approval/review by the
[C]hairman shall be sent to [the Chairman Account]."

one of the attachments was a report from HO to the Chairman
titled, "A report about the visit to Chad."  In the report, HO
stated that GADIO was the former Foreign Minister of Senegal and
was a close friend and ally of the President of Chad; that HO
met with GADIO in New York while GADIO was attending the 69th UN
General Assembly; that HO gave GADIO "a detailed account of the
issues that the Chinese energy companies are facing in Chad, and
informed Gadio of China's preliminary plans and ideas, hoping
for his help to receive special attention and support from [the
President of Chad]"; that GADIO "was very warm and agreed to
help" and called the President of Chad "right away"; and that
the President of Chad agreed to meet with GADIO, after which
GADIO would contact HO to arrange a meeting between the
President of Chad and a delegation from the Energy Company.

### GADIO Meets With the President of Chad and Conveys HO's Offer of "Secret or Very Confidential Financial Assistance"

          24.  Based on my review of emails, I know, in substance and
in part, that in or about late October 2014, defendant CHEIKH
GADIO met with the President of Chad and conveyed the offer of
defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," to
provide the President of Chad with (as GADIO put it) "secret or
very confidential financial assistance for his political
campaigns."  GADIO reported that, in exchange, the President of
Chad said he was "ready to reconsider" his decision to cancel
the Chinese State Oil Company's permit in Chad.  In particular:

          a.  On or about October 21, 2014, GADIO emailed HO
with the subject line, "URGENT," and stated, "As promised, here
we go dear friend."  GADIO attached a document titled, "Meeting
Report from Encounter with [the President of Chad]."  In the
report, GADIO stated that he had a "successful" meeting with the
President of Chad and reported the following points, among
others:

               i.   GADIO told the President that HO "flew
all the way from Hong Kong to New York to see [GADIO] face to
face in hopes that [GADIO] can take [HO] to [the President of
Chad]."

               ii.  The President of Chad was "impressed"
when GADIO told him about HO's "offer to him, being the
following: Cutting a deal to reduce and lessen the outstanding
fine in place . . . Make [the President of Chad] politically
your key ally in the most strategic region of Africa . . .

Secret or very confidential financial assistance will be
provided to him for his political campaigns in his country . . .
Establishing a trust fund to support his social programs,
infrastructure development, military equipment, etc."

   iii. The President of Chad stated that he
"had already made the decision to officially cancel" the oil
permit held by the Chinese State Oil Company because it had
failed to pay the $1.2 billion fine, which was imposed based on
the company's infliction of damage on the environment and on
several Chadian employees.  However, the President stated that
he was "ready to reconsider [his] decision" based on his meeting
with GADIO.

   iv. The President of Chad offered to meet
with the Energy Company delegation in the capital of Chad, but
GADIO suggested meeting in a "village in the middle of the
desert" so that "enemies and lobbyists" would not interfere and
prevent them from "cut[ting] a good deal."

  b. On or about October 22, 2014, HO and GADIO
exchanged several emails.  HO stated, "Thank you for a very
thorough report . . . .  Please be well assured that we remember
and appreciate help from good friends. . . . At this point, our
preliminary plan is to depart from Hong Kong Friday morning
. . . to pick you up . . . then proceed onto the Boss's village
Friday afternoon.  We hope to cut the deal that evening or
Saturday morning."  GADIO replied, "The Boss called me . . . to
request that we arrive to his village Saturday. . . . If he
wants your trip to be handled discreetly, he may give special
instructions to waive your visa issues . . . ."  HO replied,
"The [Energy Company] would like to thank you" and "consider you
as a strategic partner and close friend in Africa" and "would
honor and extend to you our appreciation for your effort, and
when this deal is done, even more appreciation will follow."
GADIO replied, suggesting that they meet in Ethiopia and fly
straight to the President of Chad's village, as this would
"avoid [the capital of Chad] altogether to safeguard the
confidentiality of our meeting."

### *Chad Resolves Its Dispute With the Chinese State Oil Company, and HO Seeks a Meeting With the President of Chad to Obtain Business for the Energy Company*

  25. Based on my review of emails and press reports, I
know, in substance and in part, that (i) in late October 2014,

the government of Chad resolved its dispute with the Chinese
State Oil Company, and (ii) defendant CHI PING PATRICK HO, a/k/a
"Patrick C.P. Ho," thereafter had defendant CHEIKH GADIO arrange
a meeting between the President of Chad and executives of the
Energy Company for the purpose of pursuing oil opportunities in
Chad for the Energy Company.  In particular:

      a.   On or about October 22, 2014, HO emailed GADIO,
stating, "New development and surprises.  Just as we are
preparing for the trip, our partner, [the Chinese State Oil
Company] informed us that their problem in Chad has been largely
resolved!  The Chad Government has made and signed an agreement
with them to settle the issues."  HO explained that the Energy
Company would be "coming on board with [the Chinese State Oil
Company] in the project in Chad."  HO said that since "the
urgency of going to Chad is relieved," they could instead meet
first in Hong Kong to "fortify our relationship" before meeting
with the President of Chad.  HO assured GADIO that the Energy
Company still "treasure[s] an opportunity to meet and befriend
the President in confidence."

      b.   On or about October 23, 2014, GADIO replied,
"This is absolutely strange. . . . I am afraid someone is
playing game with you or with me."  On or about the same date,
HO replied, explaining that the Energy Company had been asked by
the Chinese State Oil Company "to join hand in developing the
oil projects in Chad.  They also told us about their local
problems which are attracting a big fine and see if we could
help them out.  And I was charged with that task."  HO stated
that "[u]nbeknownst to us was that they, [the Chinese State Oil
Company], had also been working on it on their own with the Chad
Government."  HO asked GADIO to delay the meeting with the
President of Chad for approximately one week, and requested that
GADIO meet with the Energy NGO/Company in China beforehand "to
fortify our understanding and long term working relationship."

      c.   According to press reports, or about October 27,
2014, the government of Chad entered into a settlement with the
Chinese State Oil Company, in which the Chinese State Oil
Company agreed to pay $400 million (rather than $1.2 billion)
for environmental violations and agreed to give the Chadian
state a 10% share in its active oilfields in Chad, as well as a
25% stake in future productive fields; and in return, Chad
agreed to drop its arbitration case against the Chinese State
Oil Company.

d.    On or about November 3, 2014, HO emailed GADIO with the subject line, "Confidential message for Dr. Gadio," and sent the email using an account that HO did not typically use when corresponding with GADIO.  The email attached a report, explaining why the Energy Company's planned meeting with the President of Chad had been cancelled.  HO's report stated, in substance and in part, that the Energy Company had been "called in to assume" many projects of the Chinese State Oil Company, which was mired in a corruption scandal, including projects in Chad.  HO's report went on to explain that the Energy Company did not want to interfere with the Chinese State Oil Company's strategy in resolving the fine levied on it by the Chadian government, but would nonetheless "like to help out in the Chad Projects" and wanted to meet with the President of Chad after the dispute had been resolved to "to salvage whatever is left with the situation."

e.    On or about November 4, 2014, GADIO forwarded the above email to his son -- who I know, based on my review of emails, serves as Managing Director of the Gadio Firm -- stating, "Let me know what do you think!!!"  On or about the same date, GADIO's son replied, stating that it seems like the Energy Company is in competition with the Chinese State Oil Company, and "wants to use [the Energy Company's] connections – which is you basically" to obtain "market share in that country and throughout Africa."  GADIO's son stated that this "is fine with me as long as they pay up and invest where we tell them it's required."  On or about the same date, GADIO replied, "I agree with you. . . . We can . . . build a strategic partnership with them and be their trusted door openers, advisers and partners."

f.    On or about November 4, 2014, GADIO emailed HO, stating, "I got your confidential message. . . . These key information will be safe and protected. . . . My son heard on . . . TV yesterday that Chad and [the Chinese State Oil Company] have agreed on a settlement of 400 million US$. . . . I will still make our offer to the President of a more holistic and comprehensive partnership.  I will get from him a date for your visit."

g.    On or about November 5, 2014, HO's secretary emailed GADIO, attaching a spreadsheet listing the members of the delegation that would be traveling to Chad, and attaching copies of their passports.  The list included HO and an

executive of the Energy Company ("Executive-1"), among other
Energy Company employees.

h.    On or about November 7, 2014, GADIO emailed HO,
stating, "[W]hen you arrive we need a preparatory meeting before
we go and sit with the President.  He told me very sensitive
things that I do not believe should be said on email."  GADIO
stated that the President spoke to him about the deal with the
Chinese State Oil Company and "exposed me the real package."
GADIO further stated that "[t]his is just a glimpse of what I
discussed with the President.  The rest I will keep until you
get here . . . . All that I can say is that prospects are
excellent for you, and I hope they will be for me too."

i.    On or about November 9, 2014, GADIO's son emailed
GADIO, stating, "I hope [our] friends make a very interesting
offer and some deals are cut between them and the gov't and you
are compensated rightly for your work 1 or 2 million is not
enough . . . ."

### HO Meets With the President of Chad, and
### the President Offers to Ensure Personally
### the Sale of Certain Oil Rights to the Energy Company

26.    Based on my review of emails, I know, in substance and
in part, that (i) in mid-November 2014, CHI PING PATRICK HO,
a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the defendants, and
executives from the Energy Company met in Chad with the
President of Chad, (ii) they asked for the President's support
in the Energy Company's negotiations to buy shares of the
Chinese State Oil Company's operations in Chad, and (iii) the
President of Chad offered the Energy Company the opportunity to
obtain certain oil rights in Chad directly from the President,
without dealing with Chad's energy department or other
government officials.  In particular:

a.    On or about November 13, 2014, an Energy Company
employee emailed HO, stating, "Please see the photos with [the
President of Chad] attached."  The email attached multiple
photographs, including a photograph of the President of Chad
with HO, GADIO, Executive-1, and two other individuals.

b.    On or about November 14, 2014, CC-1 emailed the
Chairman Account, blind carbon copying ("bcc'ing") HO and
attaching a Chinese document.  Based on my review of a draft
translation, I know that the attachment was a report from HO to

the Chairman, titled "Report in regards to visiting [the President of Chad]," which stated the following, among other things:

          i.     HO and the Energy Company delegation met with the President of Chad for approximately two hours on the evening of November 11, 2014.  The meeting was facilitated by GADIO, whom the Chairman met in Shanghai in early November. Both sides regarded the meeting as a success.

          ii.     The Chinese State Oil Company and the Chad government had resolved their dispute.  HO told the President of Chad that the Energy Company was in discussions to buy shares of the Chinese State Oil Company's operations in Chad, and that the Energy Company wanted the President's support for this project.  The President was excited to hear about the Energy Company's desire to participate in this project.

          iii.     The President of Chad was eager to begin extracting oil from the "H Block" area in the Northeast part of Chad.  At one point, this oilfield was included in the Chinese State Oil Company's contract, but the President of Chad said that he removed it during recent revisions.

          iv.     The President of Chad stated that he was under pressure to give the "H Block" rights to Brazil because Brazil already "bribed" those in charge of this matter. However, the President said he was personally willing to give this oilfield project to the Energy Company instead.

          v.     After the delegation left Chad, the President of Chad communicated to HO that the Energy Company should contact the President through GADIO directly in regard to the "H Block" issue.  The President said he would handle the matter personally and that the Energy Company would not have to work through Chad's Energy Department or other government officials.

### *GADIO Advises HO to "Reward" the President of Chad With a "Nice Financial Package"*

    27.  Based on my review of emails, I know, in substance and in part, that after CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the defendants, met with the President of Chad, (i) GADIO advised HO to "reward" the President of Chad

with a "nice financial package" so that the President "make[s]
the decision to allocate [the 'H Block' rights] to [the Energy
Company] right away"; (ii) GADIO and his son discussed advising
the President of Chad on how much he should request as a bribe;
and (iii) HO offered $100,000 to GADIO, ostensibly as a
contribution to an NGO meeting in Senegal.  In particular:

   a. On or about November 18, 2014 -- one week after
their meeting with the President of Chad -- HO emailed GADIO,
thanking him for his "contribution in making the last trip to
Chad so successful" and asking if he had "heard any feedback
from the President lately after we left?"  HO asked GADIO to
call the President of Chad to tell him that (i) "We would be
most grateful if the President could make known to [the Chinese
State Oil Company] in Chad that the President knows us well, is
a dear friend of [the Energy Company], and would like to see
[the Energy Company] participating in [the Chinese State Oil
Company] projects in Chad," and (ii) the Energy Company wants to
meet with the President of Chad again in about a week-and-a-
half.

   b. On or about November 19, 2014, GADIO replied to
HO, stating:

> I believe that [the President of Chad] had
> been overly kind and generous with us
> . . . in terms of his time and willingness
> to help [the Energy Company] enter the
> African business market through his
> country and with my facilitation. At this
> stage, our reaction should not be another
> trip for more discussion but rather we
> should carefully craft our offer to him so
> that he will not think that we are all
> about talk and not actions. . . . I have
> never heard a President, on the spot . . .
> make such a bold move by offering you
> without pre-conditions or any bargaining
> a bloc of oil wells. . . . [E]verybody is
> fighting for [this bloc], but he could
> make the decision to allocate it to you
> ([the Energy Company]) right away.
>
> Therefore, I strongly suggest that the
> only right moves [the Energy Company] have
> to make at this juncture is to:

24

1. Prepare a mission of a technical team which will go to Chad to collect all the characteristics of this offer . . . .

2. Make a financial offer to the president for the allocation of this huge bloc

3. Reward him with a nice financial package as an entry ticket in the Chadian oil market and later gas market and other key business oppor[t]unities (the package should include money for his social projects for instance a significant donation for his refugee camps of Chadians displaced by the Central African crisis + one major big investment: like a hospital or a building, something of that nature...).

   c.   On or about November 23, 2014, CC-1 emailed the Chairman Account, bcc'ing HO and attaching multiple Chinese documents. Based on a draft translation, I know that one of the attachments was a report from HO to the Chairman titled, "Report on follow-up matters to the visit to [the President of Chad," and attached to this report was a copy of GADIO's above-quoted November 19, 2014 email. In the report, HO stated, among other things, that (i) on November 18, 2014, Executive-1 called HO and conveyed the Chairman's instructions to "forge closer contact with [the President of Chad], and possibly visit [him] again later in the month"; (ii) HO then contacted GADIO and asked him to relay the information to the President of Chad; and (iii) the next evening, GADIO sent HO a letter (i.e., the above-quoted November 19, 2014 email).

   d.   On or about November 25, 2014, HO emailed GADIO, stating that he and Executive-1 wished to meet with the President of Chad in early December. HO also stated that he had received GADIO's invitation to attend an NGO meeting in Senegal in mid-December, but that he could not attend due to prior commitments. However, HO said that the Energy NGO would be willing to provide $100,000 to support the meeting and "[i]f you decide to accept this offer of support, please let us know soon so that our logo and title could be printed onto the final

program for the Meeting, and we would make good this offer when we meet in Chad."

      ·  e.  On or about November 25, 2014, GADIO forwarded the above email to his son, asking, "Your reaction to this?"  On or about the same date, GADIO's son replied to GADIO, "[W]e need to strategically come up with what we recommend as a good proposal for what we think they should offer the [President of Chad] (not telling [the Energy Company] of[] course . . . till we meet in [C]had) and then tell the President to tell them that at the second meeting with us present.  You can have a side conversation when he comes to Dakar on what he should ask [the Energy Company] (advise him) . . . ."

      f.  On or about November 26, 2014, GADIO replied to HO's email of the prior day, thanking HO for the $100,000 contribution to the NGO meeting, and further stating, "[L]et me suggest a trip to Chad between Dec 3 and 5 . . . . We want to protect the President's decision to allocate Bloc H to us and time may be of essence because he reminded us that several companies are knocking at his door including American and Australian aggressive businessmen!"  GADIO also suggested that an agreement be finalized between the Energy Company and the Gadio Firm.  He continued, "Considering what has already been accomplished I leave it to you to allocate to us (if possible during the [Chad] trip) some cash fund that will compensate not only our expenses and various travels to Chad . . . but more importantly the effort, time, diplomacy, energy and hard work put forth by us to open wide the doors of the most attractive African President today who happens to be the leader of the strategic Sahel region and the President of a country of 1,3 million square kilometers full of oil, gas, uranium and other minerals."

      g.  On or about November 26, 2014, GADIO's son emailed GADIO, stating, "We need to strategize on what we can get out of this deal for us.  For the facilitation already accomplished let[']s see what they propose but anywhere from 300 to 500k sounds reasonable.  For our stake in what [the Energy Company] will propose for Bloc H we should ask for a percentage of what they offer to the Boss, I suggest we start with 5 percentage and negotiate, let them bargain to bring it down to 2 to 3 percent and for the remaining projects we work along the same lines, a percentage of what they offer."

      h.   On or about December 13, 2014, HO emailed an Energy NGO employee, who I believe, based on my review of emails, serves as a deputy to HO at the Energy NGO ("HO's deputy").  HO forwarded an email chain concerning GADIO's request for a formal contract and for payment "for works completed at the formative stages," and stated, "[P]lease help me with this:  Gadio is the former Foreign Minister from Senegal . . . , and . . . a close friend of the President of Chad in Africa.  When [the Chairman] and [Executive-1] were desperate about their prospective joint venture with [the Chinese State Oil Company] in Chad, they went all out asking me to gain access to the President and cultivate a friendly relationship with him. These were all accomplished through Gadio and now Gadio wanted [r]emunerations for work done and future work in liaising with the President . . . ."

### HO Causes the Energy Company to Pledge a $2 Million Bribe to the President of Chad

      28.   Based on my review of emails, I know, in substance and in part, that (i) in or about December 2014, defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," composed a letter to the President of Chad expressing the Energy Company's desire to make a $2 million "donation" to the President that would be "at [his] personal disposal" to support "social and other programs as [he] see[s] fit"; and that (ii) in January 2015, defendant CHEIKH GADIO revised this letter and transmitted it to the President of Chad after Executive-1 signed it.  In particular:

      a.   On or about December 11, 2014, HO emailed an Energy Company employee who appears, based on emails, to be Executive-1's assistant, and provided the following text to be included in a letter to the President of Chad:  "Your Excellency Mr. President.  We, [the Energy Company], are very much impressed by your able leadership in your country and the way that you care for your people.  To express our admiration and pledge support to your cause, and as a token of our sincerity in building a strategic partnership with your good self and our long term friendship, we wish to make a donation of USD Two Million to the people of Chad at your personal disposal to support your social and other programs as you see fit.  We would be most honored and grateful if our wish could be accommodated."

      b.   On or about December 11, 2014, HO emailed Executive-1's assistant, stating, "The donation letter, when translated into French, can be sent to Gadio[]s to pass onto the

President." HO further stated, "[j]ust for [Executive-1's] information," "our MOU is also to be passed to Gadio's to relay to the President." Based on my review of this email and other emails, I believe that the reference to an "MOU" referred to a Memorandum of Understanding between the government of Chad and the Energy Company concerning a potential oil transaction in Chad.

        c.   On or about December 18, 2014, HO's secretary emailed GADIO, copying HO and others, with the subject line, "Signed letter by [Executive-1] of [the Energy Company]." The email attached a letter, in French, addressed to the President of Chad and signed by Executive-1. Based on my review of a draft translation, I know that the letter stated the following, among other things:

> In its capacity as a good friend of the Chadian government and people, [the Energy Company] expresses its sincere wish and its support for the development of Chad. In order to do this, we would like to make a donation of 2 million US $ to the government of Chad from us for a development fund, in order to demonstrate the deep friendship between us and Chad and with the ardent hope and trust that we are constructing towards the development of Chad. This fund will be arranged giving full power to Your Excellency Mister President for the development of the national economy and the well being of the people in a variety of fields. We hope that Your Excellency Mister President will accept this donation on behalf of the government and the people of Chad.

        d.   On or about December 20, 2014, GADIO replied to HO's secretary, copying HO, GADIO's son, and others, stating, "If I may give an advise, this letter is not well written. If you need help we can provide." On or about December 26, 2014, GADIO again replied to HO's secretary, copying HO, GADIO's son, and others, stating, "The Presidency of Chad called me yesterday. They want to know what happened to the letter about the donation?" On or about the same date, HO forwarded this email to his secretary, stating, "Follow this up urgently. Tell him that we sent him a draft of the letter and waiting for him

to give us the way or address so that a formal hard copy can be
sent to the President." HO's secretary thereafter replied to
GADIO, stating, "Please give me a way or an address so that a
formal hard copy can be sent to the President."

    e. On or about December 29, 2014, GADIO replied to
HO's secretary, copying HO, GADIO's son, and others, stating
that he would suggest certain "corrections" to the letter. He
said that if the Energy Company signs it and emails it back, he
can "make sure it will reach the right person who will hand [i]t
over to the President. This scanned letter [w]ill be good
enough for the President to send the donation to refugees and
other Humanitarian causes as [i]t was agreed on!"

    f. On or about January 5, 2015, GADIO replied to
HO's secretary, copying HO, GADIO's son, and others, and
attaching an "amended version of the letter." On or about the
same date, HO forwarded this email to his secretary, stating,
"[D]o what he suggested. Work with him and [Executive-1's]
office in [Beijing]. Keep [Executive-1] in the picture at all
times."

    g. On or about January 12, 2015, HO's secretary
emailed GADIO, copying HO, GADIO's son, and others, and
attaching the signed, amended version of the letter, in French,
from Executive-1 to the President of Chad. Based on my review
of a draft translation, I know that this letter was a verbatim
copy of the version sent by GADIO on January 5, 2015, and that
it stated the following, among other things:

> In our desire to cement friendly relations
> with the Chadian people and government,
> [the Energy Company] would like to express
> its sincere support of your policies of
> development by putting **a donation of two
> million US dollars** [*emphasis in original*]
> at your disposal, intended for your social
> actions favoring the most vulnerable
> strata (children, handicapped people,
> refugees and others). The distribution
> of these resources among these vulnerable
> groups comes within the competency of your
> sovereign and discretionary decision, it
> being a given that you know better than
> anyone the urgencies and pressing needs of
> your populations. This donation

represents a symbol of the sincere commitment of [the Energy Company] to you and to the Chadian People, and expresses our trust in the promising future of your country, a future to which we would like to contribute through an exemplary partnership and cooperation, one that is mutually beneficial and respectful of our commitments to you and your beautiful country.

h.   On or about January 12, 2015, GADIO emailed an individual who I believe, based on my review of emails and publicly available information, is a Chadian cabinet minister. GADIO attached the above-referenced letter signed by Executive-1.  Based on my review of a draft translation of GADIO's cover email, which was in French, I know that he stated, "Here is the letter from our friends.  Give me a postal address to send the original.  But with this copy I think you can already go forward.  Ask the Boss when I might pass by to see him as agreed."

### GADIO Demands Additional Compensation From HO, Arguing He Should Receive At Least 25% of the $2 Million "Gift" Given to the President of Chad

29.   Based on my review of emails, I know, in substance and in part, that after defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," caused the Energy Company to offer $2 million to the President of Chad, (i) HO proposed to pay defendant CHEIKH GADIO a total of $400,000 ($100,000 of which would be a so-called "donation" for GADIO's political activities, in lieu of the $100,000 "donation" HO had originally offered for a forum in Senegal; $100,000 of which would be for GADIO's work "in the formative stages" of the Chad project; and $200,000 of which would be for GADIO's continuing work); (ii) GADIO responded by arguing that he should be paid at least $500,000 for the initial Chad work since "[i]t is difficult to comprehend a 2 million dollar gift to the President and only one hundred thousand dollar to the facilitator who made all of this possible"; and (iii) GADIO ultimately accepted HO's offer after HO's deputy assured GADIO that this was "only the beginning of our relationship."  In particular:

a.   On or about February 3, 2015, HO's secretary emailed GADIO, copying HO and HO's deputy, stating, "Attached

please find the letter of appointment 2015." Attached to this
email was a letter addressed to GADIO and signed by HO's deputy.
The letter stated that the Energy NGO would be appointing GADIO
and the Gadio Firm as a consultant for the year of 2015, and
would be paying GADIO as follows: (1) "an immediate payment of
US$100,000 to you as donation to support your activities towards
the formation of an African Union and similar purposes," (2) "an
additional US$100,000 in recognition of the work you have
contributed during the formative stages of our relationship,"
and (3) "a further sum of US$200,000 to be disbursed to you in
two installments during 2015." The letter stated that "[w]e
anticipate you and your Company would provide us . . . with
advice and service to promote the interests of [the Energy
Company] in Chad and in Africa . . . and help to construct an
amicable relationship with the President of Chad
Republic . . . ."

        b.    On or about February 4, 2015, GADIO forwarded the
above-referenced email to GADIO's son and exchanged emails with
him regarding GADIO's compensation. GADIO asked, "What is your
take on this?" GADIO's son replied, "This is typical Chinese
strategy, they will test us to see how little amount of money
they can pay us and see if we accept a low offer . . . We need
to be compensated justly! Getting them access to an African
President by itself, plus getting them blocks of oil regardless
if the oil industry is in declining is worth more than 100,000
dollars, seriously! In my opinion we should request and deserve
no less th[a]n 500,000 USD. . . . They need to pay us a
percentage of the pre-negotiated lump sum they will offer the
President for the blocks of oil. . . . They are trying to be
clever with us, when you are the reason they are getting the
blocks of oil, as the President is not giving them one block but
several." GADIO replied, "I agree with you that the fees of
100.000 $ for their introduction to the President is ridiculous.
The wide access they get to the President cannot be translated
into a donation of 2 million dollars to the President and a
100.000 to us. This I have to make clear to them and ask them
to raise it to 500.000. . . . A 100.000 or 200.000 $ donation
cannot compensate our work to get them a potential multi-billion
dollar contract."

        c.    On or about February 5, 2015, GADIO replied to
HO's secretary, copying HO, HO's deputy, and GADIO's son,
stating, "Please find attached our reply to your letter of
appointment . . . ." Attached to GADIO's email was a letter

signed by GADIO, in which he stated the following, among other things:

> I must confess that I am very surprised by your proposed US$100,000 for the initial accomplishments our consultancy has made for [the Energy Company] in the 'Chad operations.' . . . [T]he results of our encounters with the President have surpassed expectations . . . since our consultancy's hard work has enabled [the Energy Company] to be offered blocks of [o]il for exploration and exploitation purposes and other potential opportunities . . . Therefore, I believe we should be compensated for now a fair amount of at least US $500,000, as the total opportunity value being given to [the Energy Company] due to [the Gadio Firm] is in the multi-millions of dollars . . . . Also, It is difficult to comprehend a 2 million dollar gift to the President and only one hundred thousand dollar to the facilitator who made all of this possible . . . .

    d.   On or about February 5, 2015, HO's deputy replied to GADIO, copying GADIO's son, suggesting, in substance, that GADIO agree to the initial offer and keep their relations "friendly" so as to "giv[e] both sides maximum flexibility" going forward, and noting that this was "only the beginning of our relationship . . . ."

    e.   On or about February 18, 2015, GADIO emailed HO's secretary, copying HO, HO's deputy, and GADIO's son, attaching a letter that generally accepted the Energy Company's offer but noted that GADIO "await[ed] feedback from your board on . . . how to best structure our compensation arrangement for the future."

    f.   On or about March 25, 2015, HO's secretary emailed GADIO, attaching a receipt reflecting a wire of $200,000 to the Gadio Firm, and stating, "Please let us know the available time for the President to meet the [Energy Company] delegation."

30.   Based on my review of bank records, I know that on or
about March 25, 2015, the Energy NGO/Company wired $200,000 from
a bank account in Hong Kong, through a bank in New York, New
York, to an account in the name of the Gadio Firm at a bank in
Dubai.   The wire transfer details matched the information
provided by defendant CHEIKH GADIO.

### *The Energy Company Signs a Non-Disclosure Agreement With Chad,*<br>*Obtains Confidential Information, and*<br>*Obtains a Business Advantage in Negotiations*

31.   Based on my review of emails, bank records, press
reports, and postings on the Energy Company's website, I know,
in substance and in part, that between in or about the spring of
2015 and January 2017, including during an in-person meeting
with the President of Chad, the Energy Company negotiated with
the government of Chad over a potential oil rights acquisition,
benefiting (as defendant CHEIKH GADIO put it) from the lack of
any "international bidding process."   Although the Energy
Company did not ultimately reach an agreement with the
government of Chad, it paid approximately $110 million to a
Taiwanese oil company for a share of its oil and gas rights in
Chad.   In particular:

a.   Following the $200,000 wire to the Gadio Firm in
March 2015, HO and HO's secretary exchanged emails with GADIO,
GADIO's son, and others concerning the Energy Company's plans to
send a delegation to Chad to meet with the President of Chad and
other Chadian officials.   In an email to HO on or about March
26, 2015, GADIO stated that the President of Chad "has insisted
that because of the war situation and the need of extreme
confidentiality he wants to meet a very small delegation,
ideally you and me only or a maximum of three."   Emails reflect
that a delegation, including HO, arrived in Chad on or about
March 30, 2015, and returned to China on or about the next day.

b.   Following the trip to Chad, HO, GADIO, and others
exchanged emails concerning efforts to finalize a deal for
certain Chadian oil rights.   In an email on or about April 11,
2015, GADIO stated to HO and others, "President of Chad has
informed today me that he is ready to finalize negotiations
. . . . He was very clear: 'Decision about this deal will be
made only between you and me and our Chinese friends'.   This
means that ministers and other officials will not impact the

final deal." In an email on or about April 23, 2015, GADIO
stated to HO, "Could you please use your influence to strongly
suggest to your leader to rapidly deliver the military help
promised to the President. In turn [the President of Chad] will
consider this as a gesture of friendship and will accelerate the
signing of our oil deal and further business prospects with his
country." In an email on or about May 1, 2015, GADIO stated to
Executive-1, HO, and others, "[T]he President has given me a
very important message for you [Executive-1] and [the Chairman].
He wants me to go to China and person[]ally deliver the message
and its confidential component."

       c. On or about May 5, 2015, HO's secretary replied
to GADIO, stating, "As Dr. Ho has currently moved into other
projects and this project is in the hand of [Executive-1], the
decision and related issues of this project are made by
[Executive-1]." Emails reflect that after this point,
Executive-1 and another Energy Company official ("Executive-2")
became the main points of contact for the Chad-related
discussions with GADIO, and HO became less involved.

       d. Over approximately the next two months, GADIO
exchanged emails with Executive-2 and others concerning the
potential Chad transaction. For example:

            i. In an email on or about June 2, 2015,
Executive-2 stated to GADIO, "To be very frank[] with you, there
are a lot of oil and gas projects available on the international
market . . . it is very easy to buy one with a reasonable price,
if our Chadian friends still have a very high price in their
mind, then we are indeed wasting our time."

            ii. On or about the same date, GADIO
replied to Executive-2, "A lot of oil at a cheap price may be
available today in the market, but as a great businessman you do
know that oil price is volatile and also such an access to Chad
and to all its riches is not easy or cheap. It took hard work
to conquer the status [the Energy Company] got today with the
President of Chad."

            iii. On or about June 22, 2015, an Energy
Company employee emailed GADIO's son, attaching a
Confidentiality and Non-Disclosure Agreement (the "NDA"), which
the government of Chad had proposed, and which Executive-2
signed on behalf of the Energy Company. The NDA reflected that

"[the government of Chad] owns and is to own various interests
in the upstream oil and gas sector in Chad and wishes to
transfer some of them to [the Energy Company], in particular a
10% participation first to be acquired by [the government of
Chad] from [the Chinese State Oil Company and another entity]."
Following the signing of this NDA, on or about July 1, 2015,
GADIO emailed Executive-2, stating, "The Oil Minister of Chad
sent me these documents for your information.  They constitute
the field development plan of the 7 oil fields being offered as
part of the 10% proposed to [the Energy Company]."  Attached to
GADIO's email were three documents of the Chinese State Oil
Company concerning the development of oil fields in Chad.

          e.   Bank records reflect that on or about July 3,
2015, the Energy NGO/Company wired $200,000 from a bank account
in Hong Kong, through a bank in New York, New York, to an
account in the name of the Gadio Firm at a bank in Dubai.
Emails reflect that this payment was initially wired on or about
June 25, 2015 but had to be re-transmitted approximately one
week later.

          f.   Between in or about July 2015 and in or about
January 2017, the Energy Company engaged in negotiations with
the government of Chad concerning a potential oil transaction.
Throughout the negotiations, GADIO and GADIO's son emphasized
that the Energy Company enjoyed a business advantage relative to
other potential buyers.  For example, on or about July 15, 2015,
GADIO emailed Executive-2, copying GADIO's son, stating, "I
don't know where you got the information that Chad is planning
an 'open international bidding'.  We never heard of it.  The
President had been consistent: he followed your recommendation
and agreed to offer the Government's 10% shares to [the Energy
Company] in the fields operated by [the Chinese State Oil
Company].  The fact that other oil operators are showing
interest for the 10% is true, but the President never changed
his view since November 2014, he wants to do business with [the
Energy Company] on bigger business projects and is ready to
start with the 10%.  Let me state this as strongly as possible:
There is of now no plan to open an 'international bidding
process'!  The only plan we know of is the process with [the
Energy Company]."

          g.   Emails reflect that the Energy Company and the
government of Chad were ultimately unable to reach a deal
regarding the potential 10% transaction.  On or about January 2,
2017, GADIO's son emailed Executive-2, copying GADIO, stating,

35

"I wanted to inform you that the 10% acquisition is no longer available for the moment as the government of Chad has decided to retain its assets due to the fact that negotiations have not concluded favorably after two years, the economic global situation, and the current price of oil."

        h.    Press reports and postings on the Energy Company's website reflect that prior to the termination of negotiations between the Energy Company and the government of Chad, the Energy Company separately entered into an agreement with a Taiwanese company (the "Taiwanese Oil Company") to purchase certain rights to other oil and gas blocks in Chad. According to a press release posted on the Energy Company's website, in December 2015, the Energy Company and the Taiwanese Oil Company signed an "Equity Transfer Agreement on Oil and Gas Blocks in Chad," and as of late January 2016, the transaction had been "approved by relevant authorities in Taiwan and [was] expected to get approval by the end of February 2016 from the Chad government." According to multiple press reports, the transaction closed in or about early September 2016, with the Energy Company paying approximately $110 million for 35% of the Taiwanese Oil Company's exploration rights in certain oil blocks in Chad.

## THE UGANDA SCHEME

### *Overview*

    32.    As described in greater detail below:

        a.    The Uganda Scheme began in or about October 2014, when defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," met at the UN in New York, New York with the Ugandan Foreign Minister, who had recently begun his term as PGA. HO, purporting to act on behalf of the Energy NGO, met with the Ugandan Foreign Minister and began to cultivate a relationship with him. During the year that the Ugandan Foreign Minister served as PGA, HO and the Ugandan Foreign Minister discussed a "strategic partnership" between Uganda and the Energy Company for various business ventures, to be formed once the Ugandan Foreign Minister completed his term as PGA and returned to Uganda.

        b.    In or about February 2016 -- after the Ugandan Foreign Minister had resumed his role as Foreign Minister of

Uganda, and his brother-in-law[10] had been reelected as the
President of Uganda -- the Ugandan Foreign Minister solicited a
payment from HO, purportedly for a charitable foundation that he
wished to launch.  HO caused the Energy NGO/Company to wire
$500,000 to an account in Uganda designated by the Ugandan
Foreign Minister, through a bank in New York, New York.  In his
communications, HO variously referred to this payment as a
"donation" to the reelection campaign of the President of Uganda
(who had already been reelected) and as a "donation" to
"support" the Ugandan Foreign Minister.

       c.    In reality, this payment was a bribe to obtain
business advantages for the Energy Company in its efforts to
secure contracts and ventures in Uganda's financial and energy
sectors.  HO also provided the Ugandan Foreign Minister, as well
as the President of Uganda, with promises of future benefits,
including proposing to partner with both officials' families in
potentially lucrative joint ventures.  In exchange, the Ugandan
Foreign Minister assisted the Energy Company in obtaining
business in Uganda, including by facilitating the Energy
Company's interest in potentially acquiring a bank.

### During the Ugandan Foreign Minister's Term as PGA, HO Lays the Groundwork for Future Business in Uganda

    33.    Based on my review of publicly available information,
I know that, in or about September 2014, the Ugandan Foreign
Minister began his one-year term as PGA for the 69th Session of
the UN General Assembly.

    34.    Based on my review of emails, I know, in substance and
in part, that (i) almost immediately after the Ugandan Foreign
Minister became PGA, defendant CHI PING PATRICK HO, a/k/a
"Patrick C.P. Ho," sought and obtained a meeting with him at the
UN in New York, New York, ostensibly on behalf of the Energy
NGO; (ii) HO thereafter cultivated a relationship with the
Ugandan Foreign Minister, focusing on the Ugandan Foreign
Minister's ability to connect HO and the Energy Company to the
President of Uganda and thereby to assist the Energy Company in
obtaining lucrative energy and financial opportunities in

---

[10]    Although the Ugandan Foreign Minister referred to the
President of Uganda as his "brother-in-law," press reports and
websites variously describe them either as brothers-in-law
and/or as related through other familial relationships.

Uganda; and (iii) shortly before the Ugandan Foreign Minister's
term as PGA ended and he resumed as Foreign Minister of Uganda,
the Ugandan Foreign Minister traveled to China, appointed the
Chairman of the Energy Company as a "Special Honorary Advisor"
to the PGA, and obtained a promise that the Energy Company would
provide a so-called "donation" to support the reelection
campaign of his brother-in-law, the President of Uganda.   In
particular:

      a.   On or about September 29, 2014, HO emailed an
individual who, based on my review of emails and a UN website, I
have learned was the Chef de Cabinet, that is, chief of staff,
in the PGA office of the Ugandan Foreign Minister (the "Chief of
Staff").   HO introduced himself as Deputy Chairman and Secretary
General of the Energy NGO, noting that the Energy NGO is a
"Chinese think tank registered in Hong Kong and also in the USA
as a public charity" and that it has been "granted special
consultative status from UN's Economic and Social Council."   HO
requested a meeting with the Ugandan Foreign Minister "to
introduce ourself to the PGA, and to extend to His Excellency
personally our invitation to him to visit with us in Hong[]Kong
and in China."   On or about the next day, the Chief of Staff
responded that "[w]e will make arrangements for the meeting" and
provided his cellphone number.

      b.   On or about October 10, 2014, HO emailed the
Chief of Staff, stating, "Thank you for arranging the luncheon
meeting with the PGA today. . . . I introduced the background
and the past work of [the Energy NGO], especially its
collaborations and cooperations with the UN."   HO further
reported that he had "extended an invitation to the PGA to join
the high level Steering Committee [of a UN-related award that
the Energy NGO sponsors] and the PGA kindly accepted," and that
he had invited the PGA to visit the Energy NGO/Company in China.
HO also stated that he and the Ugandan Foreign Minister had
"exchanged views on the importance of energy development for
Africa, and we agreed that there could be tremendous potential
of investment joint ventures to develop Uganda's hydro power
with a consideration of implementing a smart super-grid to share
electricity throughout the Region."   HO informed the Chief of
Staff that HO would be in New York City the following month and
would provide the PGA with an "update of the above discussed
items and initiatives."

      c.   On or about November 21, 2014, CC-1 emailed HO
and attached multiple Chinese documents.   Based on my review of

a draft translation, I know that one of the attached documents was a report from HO to the Chairman, titled "Report on the meeting with 69[th PGA] [Ugandan Foreign Minister]," in which HO stated the following, in substance and in part:

       i.    On October 19, 2014, HO met for nearly three hours with the Ugandan Foreign Minister in his PGA office in New York, New York.

       ii.    HO persuaded the Ugandan Foreign Minister to make an official PGA trip to China during his one-year term.  The Ugandan Foreign Minister also agreed to stay an extra day to visit the Energy Company, the Energy NGO, and the Chairman.

       iii.    The Ugandan Foreign Minister is the incumbent Foreign Minister of Uganda, and is also the brother-in-law of the President of Uganda.  During their meeting, the Ugandan Foreign Minister told HO that "if [the Energy Company] wish[es] to form a long term strategic partnership with Uganda in its energy, hydroelectric, and financial industries, [the Ugandan Foreign Minister] is more than happy to assist in bringing the two sides together and can arrange a meeting with [the President of Uganda] in the shortest possible time."

       d.    On or about November 23, 2014, CC-1 sent an email, bcc'ing HO, to the Chairman Account.  CC-1's email attached multiple Chinese documents.  Based on a draft translation, I know that one of the attachments was a final version of the report described above.

       e.    Approximately three months later, on or about March 12, 2015, CC-1 emailed the Chairman Account, copying HO and attaching a Chinese document.  Based on my review of a draft translation, I know that the attached document was a report from HO to the Chairman, in which HO stated the following, in substance and in part:

       i.    HO met several times with the PGA, (*i.e.*, the Ugandan Foreign Minister) in New York, New York, including at the PGA office and at the Ugandan Foreign Minister's residence.

       ii.    On March 12, 2015, HO met with the Ugandan Foreign Minister at the PGA office in New York, New York.  During the meeting, the Ugandan Foreign Minister stated

that he would support the Energy NGO's activities at the UN,
including a forum on China that the Energy NGO wished to host.
The Ugandan Foreign Minister also stated that he was planning to
visit China in April 2015.   The Energy NGO/Company would
"coordinate all of [the Ugandan Foreign Minister's] unofficial
activities, which include a visit to [the Energy Company] in
Shanghai and one to [the Energy NGO] in Hong Kong."   The Ugandan
Foreign Minister's wife would be accompanying him on his trip to
China.

                iii.    The Ugandan Foreign Minister "extended
his invitation to engage [the Chairman] as a special advisor to
the [PGA]."

                iv.    The Ugandan Foreign Minister "expressed
willingness in assisting [the Energy Company] to form a
strategic partnership with Uganda if [the Energy Company]
intends to make investments in Uganda's four known oil fields,
national bank, hydro-power grid, highway and railway
construction, and . . . [the Ugandan Foreign Minister] can make
an arrangement on short notice for [the Chairman] to meet with
[the President of Uganda] . . . who is [the Ugandan Foreign
Minister's] brother-in-law."

        f.    On or about March 17, 2015, the Ugandan Foreign
Minister's wife emailed HO, stating, "Dear Patrick . . . It was
so nice to have such quality time to talk and discuss about
different opportunities of investing in East Africa and in
Uganda in particular.   Thank you so much, we enjoyed having
you."   She then described a "recap on what concerns me,"
including the following:

                i.    "[W]e talked about banking sector with
possibility of acquiring a bank and also engaging Bank of Uganda
in a deeper reflection about creating a direct link between our
currencies, a project for which I would be happy to facilitate
and we should discuss this further when we meet in HK."

                ii.    "I expressed the strong wish" to meet
with a particular Chinese company, which offers a mobile payment
service, "to discuss the possibility of franchising their
technology in Uganda or find any other arrangement for my
company to use their system to provide e-ticketing to the

transportation system."[11]   In addition, "I . . . have asked if you could help my company find an investor."

              iii.    The Ugandan Foreign Minister's wife closed by saying, "I hope and wish that my message finds you well and thank you again for your time, the gifts and willingness to help me."

35.  Based on my review of the Energy NGO's website, I know that, on or about April 20, 2015, the Energy NGO organized a conference at the UN in New York, New York, which was moderated by defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," and was officiated by the Ugandan Foreign Minister in his capacity as PGA.

36.  Based on my review of emails, I know that on or about July 29, 2015, defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," emailed the Chief of Staff in the office of the PGA, stating that "we are all very excited about the PGA's impending visit to Hong Kong . . . . One of the important purposes of this visit is for the PGA to meet and discuss with our Chairman . . . about further collaborations between Uganda and [the Energy NGO/Company] and many other more exciting projects, and it is important that adequate time is allotted to this meeting."  HO stated that he was "dismayed" to learn that the Ugandan Foreign Minister's delegation would be arriving later than expected, and he asked the Chief of Staff to "please implore the PGA to consider coming to Hong [Kong] a bit earlier as this meeting . . . will be crucial to plan for important things ahead."

37.  Based on my review of a printout from the Energy Company's website, I know that the Energy Company posted a press

---

[11]    Based on my review of emails and publicly available information, I know, in substance and in part, that when the Ugandan Foreign Minister's wife referred to "my company," she was referring to a Ugandan company for which she serves as Chief Executive Officer.  According to its website, this company offers a "cashless mobile financial platform."  Based on my review of emails, I have also learned that, pursuant to the request by the Ugandan Foreign Minister's wife, HO and other Energy NGO employees arranged for the Ugandan Foreign Minister's wife to meet with representatives of the Chinese company whose technology she was interested in using.

release headlined, "UN General Assembly President Appoints [the
Chairman] As Special Honorary Advisor."[12]  The release stated
that on August 2, 2015, the Chairman and other executives of the
Energy Company met with the Ugandan Foreign Minister and his
Chief of Staff, and "talked to great length on investment
cooperation in East Africa's energy and finance sectors."  It
further noted, "Appointing [the Chairman] as Special Honorary
Advisor to UN General Assembly, [the Ugandan Foreign Minister]
noted he would welcome and support [the Energy Company's]
investment cooperation focused on energy and financial sectors
in Uganda and the 'Five Countries in East Africa.'"[13]

     38.  Based on my review of the Energy NGO's website, I know
that, while in Hong Kong, the Ugandan Foreign Minister met with
CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," the defendant.  In
particular, the Energy NGO posted a press release on its website
headlined, "President of the UN General Assembly Visits Hong
Kong at the Invitation of the [Energy NGO]," and stating that on
August 3, 2015, the Ugandan Foreign Minister attended a luncheon
hosted by the Energy NGO and HO.

### After Resuming as Foreign Minister, the Ugandan Foreign Minister Solicits a Bribe from HO, Promising Access to the President of Uganda and Lucrative Business Advantages

     39.  Based on my review of publicly available information,
I know that the Ugandan Foreign Minister completed his term as
PGA in or about mid-September 2015, and that in or about
November 2015, he resumed his former position as the Minister of
Foreign Affairs of Uganda.

     40.  Based on my review of emails, I know, in substance and
in part, that in or about February 2016, the Ugandan Foreign
Minister (aided by his wife) solicited from defendant CHI PING
PATRICK HO, a/k/a "Patrick C.P. Ho," a bribe, which he

---

[12]  Law enforcement saved a printout of this press release when
it was publicly available, and I have reviewed the printout.
The website is no longer publicly accessible.

[13]  As set forth below, based on my review of emails, I have
also learned, in substance and in part, that during this meeting
in China, the Chairman promised the Ugandan Foreign Minister
that the Energy Company would provide a "donation" in support of
the reelection campaign of the President of Uganda.

characterized as a "donation/contribution" for a "foundation" that the Ugandan Foreign Minister wished to launch.  The Ugandan Foreign Minister linked this request to a promise by the Chairman, during the Ugandan Foreign Minister's visit to China in August 2015, that the Energy Company would support the reelection campaign of the President of Uganda.  In agreeing to make this payment, HO, in substance and in part, emphasized that the Energy Company expected assistance from the Ugandan Foreign Minister with respect to "major projects, from infrastructure, energy, agriculture, to finance and banking" in Uganda.  The Ugandan Foreign Minister and his wife assured HO that the President of Uganda would meet with Energy Company officials and that the Ugandan government would "work together" with the Energy Company on various projects, including the potential sale of a Ugandan bank to the Energy Company.  In particular:

       a.   On or about February 24, 2016, the Ugandan Foreign Minister's wife emailed HO, copying the Ugandan Foreign Minister, with the subject line, "Reconnection."  In the email, she stated that the Ugandan presidential election had taken place on February 18, 2016 and that the President of Uganda was reelected.  She continued, "We can now relax and reprogram the projects we discussed about with your Chairman when we were in Hong Kong last August.  [The Ugandan Foreign Minister] would like in particular to catch up with you regarding his foundation which he wishes to launch as soon as possible and would appreciate to receive the contribution/donation promised by the Chairman."  The Ugandan Foreign Minister's wife then provided wiring instructions for a bank account in Uganda in the name of a charitable foundation (the "Ugandan Foundation").

       b.   On or about February 28, 2016, HO replied to the Ugandan Foreign Minister's wife, copying the Ugandan Foreign Minister and CC-1, stating, "The Chairman and I want to congratulate [the Ugandan Foreign Minister] and your President on the reelection . . . .  We want to reconnect and catch up with you and renew our friendship as well as our mutual agreement and commitments."  With respect to the requested payment, HO wrote, "I think it would be a wonderful gesture if an invitation could be sent to the Chairman to be a VIP guest at the inaugural or similar ceremony when the President ascends into a new term, with a note of thanks to the Chairman for the support which he will then make good.  This is only my personal suggestion to facilitate the exchange."

c.    On or about February 29, 2016, the Ugandan Foreign Minister's wife replied to HO, copying the Ugandan Foreign Minister and CC-1, asking, "Would it be possible for you to confirm the contribution to his Foundation so that he can launch it not so late after the campaign.  It was one of our commitment to job creation for youth in our constituency and as you know, youth are impatient."  The Ugandan Foreign Minister's wife also stated, "By the way, [a multinational bank (the "Global Bank")] in Africa . . . is soon qu[itt]ing the continent. . . . Considering the growing trade between China and Africa, this is a great opportunity in banking sector in Africa."  On or about the same day, HO replied only to CC-1, "Write a report and invitation to [the Chairman]."

d.    On or about March 1, 2016, CC-1 emailed the Chairman Account, copying HO and attaching two Chinese documents.  Based on my review of a draft translation, I know that one of the attachments was a report from HO to the Chairman "regarding support of the President of Uganda[']s re-election campaign."  The report stated the following, among other things:

i.    On August 2, 2015, the Chairman met with the Ugandan Foreign Minister.  During the meeting, the Chairman accepted the Ugandan Foreign Minister's invitation to be an "honorary consultant" for the PGA.  The Chairman also expressed support for the reelection campaign of the President of Uganda and agreed to contribute $500,000 toward his reelection campaign.

ii.    The Ugandan Foreign Minister has completed his term as PGA and is now the Minister of Foreign Affairs of Uganda.  The Ugandan Foreign Minister recently sent a letter mentioning the Chairman's contribution promise and inviting the Chairman, on behalf of the President of Uganda, to attend the President's inauguration in May 2016.

iii.    The President of Uganda is looking forward to the Energy Company's investment in the energy and financial industries of Uganda and the five countries of central Africa.

e.    On or about March 7, 2016, the Chairman Account emailed CC-1 and an Energy Company employee, attaching a Chinese document.  Based on my review of a draft translation, I know that the document stated that the Chairman approved the report from HO regarding the reelection campaign of the President of

Uganda.  On or about the same date, CC-1 forwarded this email to
HO.

    f.    On or about March 26, 2016, HO emailed the
Ugandan Foreign Minister's wife, copying the Ugandan Foreign
Minister and bcc'ing CC-1, and stated, "Yes, the Chairman will
make good his pledge of donation to support [the Ugandan Foreign
Minister]."  HO further stated that "we are all awaiting news of
the VIP invitations to witness the President's inauguration in
May, as the Chairman and I need to make travelling plans.  We
will also bring an entourage of CEOs to Uganda to directly
dovetail with your heads of businesses.  Just give me a list of
all the major projects, from infrastructure, energy,
agriculture, to finance and banking, and we will bring the
relevant heads to your country to kickstart each project.  If
that happens, we would expect to be received warmly by [the
Ugandan Foreign Minister] and other heads of the Government,
including the President."

    g.    On or about March 27, 2016, the Ugandan Foreign
Minister's wife replied to HO, copying the Ugandan Foreign
Minister, stating, "I need some more days to work on possible
available project in your area of interest."  She also asked for
the "details of the people in entourage of the Chairman."  On or
about the same day, HO replied, "The size of the entourage is
actually dependent on the number of projects the President and
[the Ugandan Foreign Minister] want to engage China with.  It
can be anything from energy, agriculture, infrastructures,
tourism, banking and finance, to stock market. . . . [O]ur
company is now holding interests in all of these fields and
sectors. . . . What can come out of this occasion can only be
limited by what can be imagined."

    h.    On or about April 20, 2016, the Ugandan Foreign
Minister's wife emailed HO, copying the Ugandan Foreign
Minister, attaching invitations to the inauguration of the
President of Uganda.  In the cover email, the Ugandan Foreign
Minister's wife stated, "Regarding other team to bring for
investment purpose, [the Ugandan Foreign Minister] suggests that
we organise ourselves later when the new cabinet is put in place
end May.  He suggest that during the audience with the President
you express your investment interest in area of your choice so
that he can invite you later to participate.  Now there will be
no commitment no firm commitment."

i.   On or about the same date, HO emailed CC-1 and another Energy NGO employee, with a response directed to the Ugandan Foreign Minister's wife:  "The entire purpose of the visit for us is to meet privately with [the Ugandan Foreign Minister], and his closest counsels, meet privately with the President, and attend his ceremony.  Please also prepare a list of project which the President wishes China to invest in cooperative ventures.  [The Energy Company] has most recently signed deals in Czech amounting in excess of 1.8 Billion USD, and acquired controlling shares of [a particular bank], a few historic buildings in Prague, it[]s football team, it[]s airline, a local tourism company, a TV and radio station, a media group, a beer manufacturing company, contract to build a nuclear power station in Czech, and wholesale representation of top name Czech exports to China . . . [W]e wish to engage Uganda as our first stop in Africa."

j.   On or about April 24, 2016, CC-1 emailed the Chairman Account, copying HO and attaching multiple documents. One of the attachments contained the invitations to the inauguration of the President of Uganda.  Another attachment was in Chinese, and based on my review of a draft translation, I know that it was a report from HO to the Chairman, titled "Report on the Attendance of the Ugandan President's Re-election Ceremony on May 12th."  In the report, HO stated that the Ugandans were looking forward to the Chairman's visit and that they would arrange for a meeting and private dinner between the Chairman and the President of Uganda.  HO also stated that "the Ugandan side indirectly mentioned that [the Chairman] had previously said he would fund $500,000 USD to [the President of Uganda's] election campaign funds, and so if [the Chairman] doesn't mind traveling to [Uganda], HO suggests for [the Chairman] to give the money in cash to the president's representatives directly."

### HO Causes a $500,000 Bribe to be Wired to the Ugandan Foreign Minister's Purported "Foundation"

41.   Based on my review of emails and bank records, I know, in substance and in part, that after receiving assurances from the Ugandan Foreign Minister and his wife that the Ugandan government would support the Energy Company's interests in investing in particular sectors of Uganda's economy, including acquiring a bank, CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," the defendant, caused the Energy NGO/Company to wire $500,000, through a bank in New York, New York, to an account in Uganda,

purportedly for the benefit of the Ugandan Foreign Minister's charitable foundation.  In particular:

       a.  On or about May 5, 2016, HO emailed CC-1, stating, "Note bank info."  This email forwarded the wiring information for the Ugandan Foundation, which the Ugandan Foreign Minister's wife had sent by email on or about February 24, 2016.

       b.  On or about the same date, CC-1 exchanged emails in Chinese with another Energy NGO employee.  Based on a draft translation, I know that CC-1 asked the employee to wire $500,000 to the Ugandan Foundation and provided a screenshot of the wiring instructions that the Ugandan Foreign Minister's wife had sent.  The employee replied to CC-1, asking if the money should be filed under "Administrative: Other Expenses – Unpredictable Expenses."  CC-1 replied, copying HO, stating that the money should be filed under "Other Professional Fees."

       c.  Bank records reflect that on or about May 6, 2016, a wire transfer of $500,000 was sent from an account held by the Energy NGO/Company at a bank in Hong Kong to an account held in the name of the Ugandan Foundation at a bank in Kampala, Uganda, through a bank in New York, New York.  The account details for this transaction matched the instructions provided by the Ugandan Foreign Minister's wife.

### HO Meets with the President of Uganda and Other Ugandan Officials, Provides Gifts, and Seeks Business Advantages

    42.  Based on my review of emails, I know, in substance and in part, that after defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," caused the $500,000 bribe to be wired, HO and Energy Company executives traveled to Uganda, brought gifts for the President of Uganda and the Ugandan Foreign Minister, and attended private meetings with the President and other high-level officials, including officials with the Ugandan central bank and the Ugandan Ministry of Energy and Mineral Development, in an effort to secure business for the Energy Company.  In particular:

       a.  On or about May 8, 2016, an Energy NGO employee emailed HO, stating that "Shanghai wants us to suggest what kind of gift to the President, [the Ugandan Foreign Minister], China Ambassador and other for spare, then they will purchase tomorrow."  HO replied, suggesting that they meet the next day.

Based on my review of emails and involvement in this investigation, I believe the reference to "Shanghai" refers to the Energy Company's headquarters.

b.   On or about May 8, 2016, HO emailed the Ugandan Foreign Minister's wife, stating that the Chairman was sending "his most able deputy and general managers" to Uganda and that HO had "been asked to lead the team which is empower to represent the Company." HO continued, "We looking forward to discussing in details with [the Ugandan Foreign Minister] in confidence about the various ways we can bring our two countries together through joint ventures and development, and also look forward to meeting and discussing with the President how [the Energy Company] can play a major role in the future development of Uganda."

c.   On or about May 9, 2016, an Energy NGO employee emailed the Ugandan Foreign Minister and his wife, copying HO and CC-1, describing the delegation's travel plans and stating that HO would be "present[ing] two gifts to President and [Ugandan Foreign Minister]." In another email the same day to the Ugandan Foreign Minister's wife, copying the Ugandan Foreign Minister, HO, and CC-1, the employee stated, "This is first time to bring the business peoples to [the capital of Uganda], both [the Chairman] and [HO] are highly expect the delegation can meet some key persons at energy and financial sectors."

d.   On or about May 9, 2016, HO emailed an individual, copying the Ugandan Foreign Minister's wife, with the subject line, "Urgent request." HO stated, "As we are about to board the plan to Uganda, we are preparing to bring with us some very 'nice' gifts to your President and to [the Ugandan Foreign Minister] to celebrate the occasion. We shall require special assistance with your customs procedure. Please assist in whatever way you can otherwise we will have to make other plans." After sending this email, HO forwarded the email to the Ugandan Foreign Minister. The Ugandan Foreign Minister's wife then replied to HO, "We will be there at your arrival."

e.   On or about May 15, 2016, CC-1 sent multiple emails to HO (some of which emails were also addressed to individuals at the Energy Company). These emails attached photographs that appear to reflect meetings and events that HO and others attended during their trip to Uganda. Based on these emails and photographs, I have learned that during the trip, among other things, HO and Energy Company executives visited the

offices of the Ugandan Foreign Minister's wife's company; attended the inauguration of the President of Uganda; and attended private meetings with various Ugandan government officials, including the President of Uganda, the Ugandan Foreign Minister, and officials with the Ugandan Ministry of Energy and Mineral Development.  One photograph, for example, shows HO and others examining a map of Ugandan oil fields. Certain photographs also reflect that HO and his delegation provided gifts to the President of Uganda and to the Ugandan Foreign Minister and his wife.

### *HO Offers Foreign Officials Benefits in Exchange for Business Opportunities by Proposing to "Partner" with the Families of the Ugandan Foreign Minister and the President of Uganda in Acquiring a Bank*

43.  Based on my review of emails, I know, in substance and in part, that shortly after returning from his trip to Uganda, in May 2016, defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," communicated with the Ugandan Foreign Minister and his wife regarding forming a partnership between the Energy Company and the "family businesses" of the Ugandan Foreign Minister and the President of Uganda in order to acquire the Global Bank's Africa subsidiary. In particular:

a.   On or about May 15, 2016, HO emailed CC-1 with the subject line, "Main points of Uganda possibilities."  HO set forth various investment opportunities for the Energy Company, including the following: "1) Energy:  still some blocks to be licensed out . . . ; Energy Industrial Park can be given to us ([]suggest to include real estates, airport, second refinery etc.) . . . 2) Infrastructures: roads, high speed rails . . . 3) Finance:  possibility of acquiring [the Global Bank] Africa . . . 4) Agriculture . . . 5 Tourism:  rebuild Uganda Airline, agreed to give us a piece of land by the lake, or an island in the lake to develop into a resort area with hotels, shopping centers, casino, recreation parks, and a China-Town; boosting tourism from China."

b.   On or about May 16, 2016, CC-1 emailed the Chairman Account, copying HO and attaching two documents.  Based on my review of a draft translation, I know that one of the attachments was a report from HO to the Chairman summarizing the trip to Uganda.  In the report, HO stated, among other things, that the delegation consisted of eight people, including various executives of the Energy Company; that the Ugandan Foreign

Minister's wife accompanied the delegation throughout the visit;
and that the meeting at the Ministry of Energy and Mineral
Development included a discussion of "issues related to the
distribution and development of [Ugandan] oil industry,
especially that of oil exploration, bidding, oil pipeline
construction, refinery, etc."

        c.  On or about May 21, 2016, the Ugandan Foreign
Minister's wife emailed HO, stating, among other things, "Let me
seize this opportunity to convey our gratitude to the chairman
for his contribution to our Foundation.  The official letter of
thanks is waiting [the Ugandan Foreign Minister] to be back for
signature by Monday."

        d.  On or about May 26, 2016, HO emailed the Ugandan
Foreign Minister and his wife, bcc'ing CC-1.  HO thanked them
for hosting the visit to Uganda and stated, among other things,
"We . . . are very enthusiastic about the prospect of joint-
ventures in Uganda.  In particular, in working with you and the
[Ugandan Foreign Minister's] family.  We would like to be
considered by you as a partner in business ventures that you
would like us to join in, such as in the areas of infrastructure
building, airport, and agriculture.  We are particularly
interested in the possibility of acquiring controlling shares of
[the Global Bank] Africa in Uganda, and would like very much to
request your assistance in going about doing so.  If this very
first step is successful, the doors are widely open for any
future undertakings in the country and in the Region.  This will
be our first priority and please work with us to accomplish
this."

        e.  On or about May 27, 2016, the Ugandan Foreign
Minister's wife replied to HO, copying the Ugandan Foreign
Minister, stating, "We appreciate your interest in Uganda and
are excited to work together."

        f.  On or about May 27, 2016, HO replied to the
Ugandan Foreign Minister's wife, stating, "Please allow me to
reiterate our decision and strategies re Africa.  [The Energy
Company] would like to partner with the [Ugandan Foreign
Minister's family] enterprise and would like to invest through
you and with your family businesses (and the President's) who
can be the local operators.  The key is to get the Bank in
Uganda up and running to become the first offshore Reminbi
(Chinese Money) Exchange Center in Africa.  Then we can
establish relationship through this Bank in Uganda with other

Banks in China and [a certain bank] in Europe, and this route of
cash flow to Africa would enable us to invest in a host of
ventures.  Please relay this to [the Ugandan Foreign Minister]
and to the President.  Please look into the opportunity with the
[Global Bank]."

        g.   On or about June 6, 2016, an Energy NGO employee
emailed the Ugandan Foreign Minister's wife thanking her for her
hospitality in Uganda, stating that "our team is following up
for the second step," and asking for an "acknowledgement of the
received for the sponsor sum."  On or about June 8, 2016, the
Ugandan Foreign Minister's wife replied, promising to obtain an
acknowledgement letter and stating, "I am following up with [the
Global Bank] and may be able to communicate with [HO] by
Monday."

### The Ugandan Foreign Minister Secures for the Energy Company the Opportunity to Acquire a Ugandan Bank

      44.   Based on my review of emails and press reports, I
know, in substance and in part, that in or about mid-October
2016, the Ugandan Foreign Minister's wife contacted CHI PING
PATRICK HO, a/k/a "Patrick C.P. Ho," the defendant, to present
him with the opportunity to acquire a particular Ugandan bank
(the "Ugandan Bank") and to guide him through the "very
confidential and urgent process."[14]  In particular:

        a.   On or about October 13, 2016, the Ugandan Foreign
Minister's wife emailed HO with the subject line, "Opportunity
to invest in Banking Sector."  She stated, "The Central Bank
official you met during your visit has contacted us to inform
you about the possible acquisition of a local Bank but as you
know, selling a bank is a very confidential and urgent process."
She provided the website of the Ugandan Bank and instructed HO
to express the Energy Company's interest by sending a letter to
the Vice Governor of the Bank of Uganda.  She continued, "[I]t
is imperative that that letter is sent by close of the business
today through email . . . . In the mean time I would love to
talk to you on phone."  On or about the same day, HO forwarded
this email to an Energy NGO employee and instructed him to write
a letter to the Vice Governor as directed.  On or about the next
day, the Energy NGO employee sent this letter, on behalf of HO,

---

[14]   I know from publicly available sources that the Ugandan
Bank ultimately was not acquired by the Energy Company.

to the Vice Governor, copying HO and the Ugandan Foreign
Minister's wife.

        b.    According to press reports, on or about October
20, 2016, the central bank of Uganda took over the Ugandan Bank,
which until then had been partly owned by a bank headquartered
in England.

        c.   On or about October 24, 2016, the Ugandan Foreign
Minister's wife emailed HO, copying the Vice Governor, stating,
"I tried your number . . . in vain.  Please try to contact [the
Vice Governor] as soon as you can."  She provided the Vice
Governor's cellphone number and stated, "It is quite urgent,
thank you."  HO then emailed the Vice Governor, stating, "Please
send me whatever you have through this mail."

        d.   On or about October 25, 2016, HO received an
email from a Ugandan central bank official who inquired whether
the Energy Company was still interested in acquiring a bank in
Uganda.  On or about the same date, HO forwarded this email to
CC-1, asking her to convey the message the Chairman's office or
another employee's office.  CC-1 then forwarded the email to an
Energy Company employee.

        e.   According to press reports, in or about January
2017, a Ugandan commercial bank (*i.e.*, a company other than the
Energy Company) ultimately acquired the Ugandan Bank.

### The Ugandan Foreign Minister Signs a Back-Dated Letter Thanking HO for the $500,000 Payment

    45.   Based on my review of emails, and as further described
below, I have learned the following, in substance and in part:

        a.   On or about October 27, 2016 -- *i.e.*, while the
negotiations regarding the Energy Company's potential
acquisition of the Ugandan Bank were ongoing -- the Ugandan
Foreign Minister's wife emailed an Energy NGO employee, copying
defendant CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho."

        b.   In the cover email, the Ugandan Foreign
Minister's wife stated that she "got the letter signed."
Attached to her email was a letter to HO, signed by the Ugandan
Foreign Minister, on letterhead of the Ugandan Foundation.  The
letter thanked the Energy NGO for its $500,000 contribution to

the Ugandan Foundation.  The cover email also stated that the
Energy Company "has to make a decision if you want to buy all
the branches [of the Global Bank] before we do more research."

   c. Although the letter from the Ugandan Foreign
Minister was sent on or about October 27, 2016 -- nearly six
months after the wire of $500,000 was transmitted -- the letter
was backdated to June 10, 2016.

   d. The letterhead included a purported email address
for the Ugandan Foundation.  However, based on my review of
publicly available Internet sources, I know that the domain name
of this email address is currently unregistered.

   e. The letterhead also included a physical address
for the Ugandan Foundation in Kampala, Uganda.  I have
communicated with a fellow member of the FBI who visited this
location in or about November 2017, and who reported, in
substance and in part, that (i) he did not observe any signage
or other indication on the exterior of the building or the
interior hallways indicating that the Ugandan Foundation
maintains an office at that address, and (ii) he spoke with an
individual who identified himself/herself as a security guard
and who said he/she had worked at the building for approximately
two years and had never heard of the Ugandan Foundation.

  46. Based on my review of a website of the Uganda
Registration Services Bureau, I have learned that an
organization bearing the name of the Ugandan Foundation was
registered in or about July 2015.  However, I have run multiple
searches on the Internet and have found no website of the
Ugandan Foundation.

53

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of CHI PING PATRICK HO, a/k/a "Patrick C.P. Ho," and CHEIKH GADIO, the defendants, and that they be imprisoned or bailed, as the case may be.

_____
Thomas P. McNulty
Special Agent
Federal Bureau of Investigation

Sworn to before me this
16th day of November 2017

_____
THE HONORABLE KEVIN N. FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK