**KRIEGER KIM & LEWIN** LLP

500 Fifth Avenue　　　　　　　　　　　　　　　　　　　　　　　　　　Telephone: (212) 390-9550
New York, NY 10110　　　　　　　　　　　　　　　　　　　　　　　　　　www.KKLllp.com

January 5, 2018

By ECF

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

          Re:    *United States v. Chi Ping Patrick Ho*, **17 Cr. 779 (KBF)**

Dear Judge Forrest:

      We represent Dr. Patrick Ho, who is scheduled to be arraigned before Your Honor on January 8, 2018 at 12:00 p.m. Dr. Ho is currently being held at the Metropolitan Correctional Center ("MCC"), where he has been since November 18, 2017. At arraignment, we intend to respectfully request that Dr. Ho be released from pretrial detention on strict conditions.

      As set forth below, Dr. Ho is neither a danger to the community nor a flight risk. He is a respected international figure who has spent a quarter of his life in this country. He has no criminal history, and he is charged with non-violent offenses. He has every incentive to defend this case and clear his name.

      The conditions we propose are strict, and they will reasonably assure Dr. Ho's appearance in court. Specifically, we propose that Dr. Ho be subject to home incarceration in the Southern District of New York, with electronic monitoring. His release would be secured by a personal recognizance bond of $10 million that would be co-signed by five financially responsible persons and secured by $2 million in cash. Dr. Ho is also prepared to sign a global waiver of extradition. In light of the value of the proposed bond, if Dr. Ho were to flee, he, his wife, and his co-signers would be financially ruined.[1] The government's contention at the initial bail hearing that Dr. Ho would be willing to jeopardize the welfare of his family and friends to avoid prosecution in this highly defensible case is baseless. If he is released, Dr. Ho will appear.

---

[1] At the initial bail hearing, we proposed a personal recognizance bond of $1 million, to be secured by $250,000 in cash. While we respectfully submit that those conditions were adequate, we have increased our proposed package to address the concerns articulated by Chief Magistrate Judge Debra Freeman.

## I. BACKGROUND

### A. Relevant Facts

Dr. Ho is sixty-eight-years old. He was born in Hong Kong in 1949, and he resided there most recently until his arrest in this case. Over the course of his long and distinguished career, Dr. Ho has worked as an eye surgeon, a Cabinet-level government official in Hong Kong, and the leader of a non-governmental organization recognized by the United Nations. Until his arrest in this case, he had no encounters with the criminal justice system.

Dr. Ho has longstanding ties to the United States. He first moved here in 1968 to attend Stetson University, where he completed his undergraduate studies. He then attended Vanderbilt University for medical school. After graduating from Vanderbilt, Dr. Ho practiced medicine in the United States for almost a decade, first at Massachusetts Eye and Ear, a teaching hospital of Harvard Medical School, and then in the San Francisco Bay area within the Kaiser hospital system. Dr. Ho made many lifelong friends during his time in the United States, including Dr. Lily Chen and Dr. John Yap, who are among the five individuals who have offered to serve as co-signors and have written letters on Dr. Ho's behalf. *See* Exhibit A.[2]

In 1984, Dr. Ho returned to Hong Kong to teach eye surgery at the Chinese University of Hong Kong, where he served as a professor of ophthalmology and eventually as head of the Eye Department. In addition to his teaching work, Dr. Ho entered private practice as a physician in 1994. In 1996, he became a member of the Preparatory Committee for the Hong Kong Special Administrative Region, the official body established to shepherd Hong Kong's transition from British to Chinese sovereignty. In 1997, he became a member of Hong Kong's Urban Council, which was responsible for municipal services in Hong Kong until it was disbanded in 1999. Between 2002 and 2007, Dr. Ho served as Hong Kong's Secretary for Home Affairs, a Cabinet-level position. In 2007, Dr. Ho was awarded the Gold Bauhinia Star—the Hong Kong government's second highest honor—in recognition of his service.

After leaving government service, Dr. Ho became the Deputy Chairman and Secretary General of the China Energy Fund Committee ("CEFC"), a Hong Kong-based non-governmental organization that has Special Consultative Status with the United Nations Economic and Social Council.[3] In connection with his work with the CEFC, Dr. Ho has lectured all over the world.

### B. Procedural History

On November 16, 2017, Dr. Ho was charged by complaint with violations of the Foreign Corrupt Practices Act and money laundering offenses. *See generally* Compl., ECF No. 1. Two

---

[2] Although Dr. Ho has not resided in the United States since 1984, he is a frequent visitor. In the five years preceding his arrest, he visited the United States approximately forty times.

[3] Other organizations with Special Consultative Status include the American Bar Association, the Salvation Army, and the World Jewish Congress.

days later, he was arrested after he arrived on a commercial flight at John F. Kennedy International Airport while on a business trip. On November 20, 2017, Dr. Ho was presented before Magistrate Judge Andrew J. Peck and ordered detained on consent without prejudice. On December 1, 2017, a bail hearing was held before Chief Magistrate Judge Debra Freeman. In advance of the hearing, Dr. Ho was interviewed by Pretrial Services, which recommended detention based on Dr. Ho's purported lack of ties to the United States and his net worth, which was estimated to be approximately $7 to $8 million.[4] At the hearing, defense counsel asked Judge Freeman to approve a bail package consisting of a personal recognizance bond of $1 million, secured by $250,000 and co-signed by five financially responsible persons, with home incarceration and electronic monitoring.

While Judge Freeman ultimately ordered Dr. Ho detained, she noted that the decision was not an easy one. *See* Bail Hr'g Tr. at 40:5–25, ECF No. 22. In reaching her decision, Judge Freeman found that Dr. Ho lacked ties to the United States, had ties "to Hong Kong and possibly elsewhere," and possessed substantial resources that could be used to fund his flight and make his co-signers whole for the financial loss that his flight would inevitably cause them to incur. *See id.* at 35:19–24, 36:12–19, 37:5–23.

On December 18, 2017, the case was indicted and assigned to Your Honor. Dr. Ho now seeks *de novo* review of Judge Freeman's detention order pursuant to 18 U.S.C. § 3145(b).

## II. ARGUMENT

### A. Legal Standard

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "Because the law . . . generally favors bail release, the government carries a dual burden in seeking pre-trial detention." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). The government must first "establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight." *Id.* If this burden is satisfied, "the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." *Id.*

"[I]n determining whether there are conditions of release that will reasonably assure the appearance of" a defendant, courts consider four factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of any danger posed. 18 U.S.C. § 3142(g). "In applying the factors to any particular case, the court should bear in mind that it is only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quotation marks omitted). Detention is only appropriate if "no conditions or combination of

---

[4] Pretrial Services appears to have based its detention recommendation in part on the inaccurate assertion that Dr. Ho continued to possess his passport. However, there is no dispute that Dr. Ho's passport was seized at the time of his arrest.

conditions will reasonably assure the appearance of the [defendant] as required," 18 U.S.C. § 3142(e), and when imposing conditions, courts must select "the least restrictive . . . condition, or combination of conditions, that [the court] determines will reasonably assure" the defendant's appearance, *id.* § 3142(c)(1)(B). "Only in rare cases should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015).

### B.     If Released, Dr. Ho Will Appear

#### 1.     Dr. Ho Has Every Incentive to Face the Charges in this Case

Dr. Ho's career and livelihood are built on his reputation, and both would be destroyed if he fled. Given Dr. Ho's prominence, the charges against him have become known to Dr. Ho's colleagues and friends around the world. To flee would be tantamount to an admission of guilt and would dishonor Dr. Ho and his family, and would destroy his career even more than would a conviction following trial. He would not be able to work, and his travel would be restricted to the limited number of countries that do not recognize Interpol Red Notices. His life as he knows it would be destroyed. Moreover, were Dr. Ho to flee, it would financially ruin his wife and his five U.S.-based co-signers. Dr. Ho's overriding concern in connection with this case is to clear his name.

Dr. Ho's incentive to fight the charges against him is especially compelling in light of the significant deficiencies in the government's case. We anticipate substantial pretrial motion practice related to a number of flaws in the government's charging theories. However, even accepting the allegations set forth in the Complaint, it is notable that the alleged bribes appear to have been offered or paid for projects that never materialized.

Dr. Ho will be at a significant disadvantage if he is not released, particularly in a case in which the government represents that the discovery will be "voluminous." *See Barker v. Wingo*, 407 U.S. 514, 533 (1972) ("[I]f a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense."); *United States v. Bodmer*, No. 03 Cr. 947 (SAS), 2004 WL 169790, at *3 (S.D.N.Y. Jan. 28, 2004) ("It will be far easier for [the defendant] to assist his counsel in reviewing and responding to discovery if counsel has regular, uninterrupted access to him."). The review of documents, at least some of which may be written in Chinese, will be extraordinarily difficult if he is confined to the MCC.

#### 2.     Dr. Ho Has Sufficiently Meaningful Ties to the United States

The presumption of bail applies to citizens and non-citizens alike. As noted above, the factors to be considered in determining whether to detain a defendant are set forth in 18 U.S.C. § 3142(g). These factors do not include immigration status, and alienage certainly cannot be dispositive in a bail determination. *See Santos-Flores*, 794 F.3d at 1090.

In fact, instances in which non-citizens in white collar cases have been granted bail are too numerous to exhaustively list. The government has argued that Dr. Ho's wealth, lack of citizenship, and residence outside of the United States make this the type of rare case where bail

should be denied. However, a review of relevant precedent from this Court and others demonstrates otherwise. Courts routinely grant bail to defendants like Dr. Ho.

The most strikingly similar case from this district is *United States v. Bodmer*, in which a wealthy Swiss national who was charged with bribery and money laundering offenses in connection with Azerbaijani oil transactions was granted bail over the government's objection. 2004 WL 169790. Bodmer was permitted to reside with friends in the District of Columbia in advance of his trial. *Id.* at *1. Similarly, in *United States v. Benhamou*, a wealthy French national who was charged with insider trading was granted bail over the government's objection. *See* Exhibit B at 4:6–7:25, 23:25.[5] Benhamou did not have a place to stay in New York City, so he was ordered to rent a suitable apartment. *Id.* at 24:18–23. Neither of these defendants was a U.S. resident, and both were citizens of countries that did not extradite their own nationals.[6]

In *United States v. Chan*, a wealthy Taiwanese national who resided in Singapore was granted bail over the government's objection in an accounting fraud case, despite the fact that he had not visited the United States in sixteen years prior to the trip during which he was arrested. *See* Exhibit C at 9:25–10:1, 23:6–8, 25:9–22. Chan had to buy an apartment in New York in which to stay. *See id.* at 11:16–21. Dr. Ho cannot afford to buy an apartment in New York, but he will rent one if he is granted bail. In *United States v. Rosenthal*, a former Honduran cabinet official charged with money laundering was granted bail despite the fact that there was no lawful basis for his presence in the United States at the time of the bail application. *See* Exhibit D at 1.

Courts outside of this district also routinely grant bail to similarly situated defendants. For example, in *United States v. Hansen*, the Sixth Circuit affirmed a district court order releasing a defendant charged with bulk cash smuggling who was a citizen and resident of Denmark. 108 F. App'x 331 (6th Cir. 2004). The defendant was permitted to stay in Denmark during the pendency of the case. *Id.* In *United States v. Gadola*, *United States v. Bagios*, *United States v. Lack*, and *United States v. Weil*, Swiss bankers who were charged with tax offenses in the Southern District of Florida were granted bail despite lacking ties to the United States. *See* Exhibit E; Exhibit F at 13:17–20, 59:23–24; Exhibit G at 4:8–5:1; Exhibit H at 38:11–12.

In the ongoing Fédération Internationale de Football Association ("FIFA") corruption case in the Eastern District of New York, the vast majority of the eighteen defendants who have appeared have been granted bail, and nearly all of those defendants are foreign nationals. *See generally United States v. Webb*, No. 15 Cr. 252 (PKC) (E.D.N.Y.).

Dr. Ho has more significant ties to the United States than many of these defendants. He was educated here and began his professional career here. During his years in the United States, he lived in Florida, Tennessee, Massachusetts, and California. He has known more of this country than many Americans, and the strength of his ties here is demonstrated by the

---

[5] Exhibits B, C, and F through H are excerpts from transcripts. The complete transcripts are available upon request.

[6] By contrast, and as discussed below, Hong Kong's extradition treaty with the United States permits the extradition of Chinese nationals.

willingness of his co-signers to stake their financial welfare on his commitment to appear and face the charges against him. *See* Exhibit A.

        3.      <u>Even If He Wanted to Flee, Dr. Ho Would Have No Plausible Refuge</u>

Dr. Ho has nowhere to run. If he were to somehow leave the United States, a Red Notice would follow him wherever he went, putting him at risk of arrest in every country in which he could plausibly live. Further, as stated above, Dr. Ho is prepared to execute a global waiver of extradition, which means that he will consent, in advance, to being extradited to the United States on these very charges.

Returning to Hong Kong would not be an option. For reasons already discussed, he would have no ability to hide there. He would likely be detained and would face a significant risk of extradition. The United States and Hong Kong have an extradition treaty, and extradition proceedings are currently pending against a Chinese national who was recently arrested in Hong Kong on charges filed in this district. *See* Exhibit I.[7] There is every reason to believe that Dr. Ho would face the same fate.

China is an equally implausible refuge. Dr. Ho has never lived or worked in mainland China, nor does he have the legal right to do so. Dr. Ho possesses a Chinese entry card that allows him to visit mainland China, but not live or work there.[8]

One of the government's central arguments before Judge Freeman was that Dr. Ho's wealth would allow him to travel freely. This is not true now, and would certainly not be true if the proposed bail conditions were imposed. Much of Dr. Ho's net worth is tied up in illiquid real estate. And while he holds other assets in accounts that would be considered liquid under ordinary circumstances, Dr. Ho's personal accountant has confirmed that accounts containing a significant portion of these assets were recently frozen, apparently in connection with this case.

---

[7] During the hearing before Judge Freeman, the government claimed that Dr. Ho would not be extraditable in his home country because there is no extradition treaty between the United States and Hong Kong. *See* Bail Hr'g Tr. at 14:14–15:9. Even if the government were correct in asserting that Hong Kong does not extradite to the United States, "[t]he bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition." *Hansen*, 108 F. App'x at 332; *see also Bodmer*, 2004 WL 169790, at *2 (granting bail to a Swiss national and rejecting the government's argument that he should be detained because of the Swiss government's refusal to extradite its citizens "because if [the argument were] taken to its logical conclusion, no Swiss national would ever be eligible for bail").

[8] During the hearing before Judge Freeman, the government also asserted—incorrectly—that Dr. Ho possessed the necessary documentation permitting him to live in China. *See* Bail Hr'g Tr. at 15:12–15.

### 4. The Government's Arguments to the Contrary Are Fanciful at Best

The government's argument before Judge Freeman that the Chinese energy company that funds the CEFC (the "Energy Company") might be willing to finance Dr. Ho's flight and subsequent life in exile is speculative at best, and one for which the government has offered no evidence. *See* Bail Hr'g Tr. at 6:16–24. Many white collar defendants are charged with crimes that they have allegedly committed for the benefit of entities that employ them. It does not follow that these entities are prepared to help them escape justice, especially where, as here, the entity is an international company which stands to lose significant business opportunities by defying the U.S. government. To assist Dr. Ho in fleeing would cause tremendous reputational damage. Furthermore, the Energy Company would have nothing to gain. There is no hope of preventing allegations of misconduct from coming to light; the alleged misconduct has already been painstakingly detailed in a 54-page complaint. The remote possibility that the Energy Company *could* make the illogical decision to help him flee is simply not a valid consideration here. *See Bodmer*, 2004 WL 169790, at *3 (rejecting the government's argument that the defendant likely had "vast financial resources in undisclosed offshore accounts" as speculation); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985) ("[T]he standard is *reasonably assure* appearance, not 'guarantee' appearance, and . . . detention can be ordered on this ground only if 'no condition or combination of conditions will reasonably assure the appearance.'" (quoting 18 U.S.C. § 3142(e)); *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985) ("[T]he burden on the government . . . would be lessened considerably if the government need only show . . . by a preponderance of the evidence that no condition could 'guarantee' a defendant's appearance."); *United States v. Montoya-Vasquez*, No. 08 Cr. 3174, 2009 WL 103596, at *4 (D. Neb. Jan. 13, 2009) ("Speculation is not evidence, much less preponderating evidence.").

Equally fanciful is the government's argument before Judge Freeman that Dr. Ho would be able to reimburse his co-signors for the value of the personal recognizance bond if he fled. *See* Bail Hr'g Tr. at 9:15–17. This is so for two reasons. First, the government would almost certainly be able to detect and prevent any attempt by Dr. Ho to do such a thing, and much of Dr. Ho's liquid assets have already been frozen. Second, the value of the new proposed bond—$10 million—guarantees that Dr. Ho would face financial ruin if he fled. Thus, if Dr. Ho fled, his co-signors would be irreparably damaged.

### C. The Proposed Conditions Will Reasonably Assure Dr. Ho's Appearance

Even if the Court concludes that Dr. Ho is a flight risk, he must be released so long as there are conditions that will reasonably assure his appearance. 18 U.S.C. § 3142(e); *see also United States v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986) ("[M]any courts have set bail for defendants despite their propensity to flee."). The proposed conditions will do that.

In addition to the financial conditions discussed above, Dr. Ho will sign a global waiver of extradition and is prepared to submit to home incarceration in this district with electronic monitoring. Home incarceration with electronic monitoring is an extraordinarily burdensome form of "release" with a very high success rate, particularly among white collar defendants. In this district, defendants who are released pending trial almost always return to court. In the twelve-month period ending September 30, 2017, defendants in 1,880 cases were released

pending trial, many of whom were released under much less severe restrictions than we propose for Dr. Ho.  *See* Exhibit J.  There were failure-to-appear violations in only thirteen of those cases (0.69%).  *See id.*  This is not one of the rare cases where detention is appropriate or necessary.  Dr. Ho should be released under the proposed conditions.

                                                Respectfully submitted,
                                                KRIEGER KIM & LEWIN LLP

                              By: _____
                                                Edward Y. Kim
                                                Paul M. Krieger
                                                Jonathan F. Bolz

Encls.

cc:     AUSA Douglas S. Zolkind
        AUSA Thomas McKay
        AUSA Daniel C. Richenthal