

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 1, 2018

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Chi Ping Patrick Ho*,
             17 Cr. 779 (KBF)

Dear Judge Forrest:

      The Government respectfully submits this letter in advance of the bail appeal requested by the defendant and scheduled in the above-captioned matter for this Monday, February 5, 2018, at 12:00 p.m., and in response to the defendant's letter motion dated January 5, 2018 (Docket Entry No. 29) ("Def. Ltr."). As explained in detail below, the defendant presents an extreme risk of flight. For this reason, Pretrial Services was right to recommend detention, Chief Magistrate Judge Freeman was right to order detention, and this Court should do the same.

      I.    <u>The Charges</u>

      Chi Ping Patrick Ho, a/k/a "Patrick C.P. Ho," a/k/a "He Zhiping" ("Ho"), the defendant, has been charged with violating the Foreign Corrupt Practices Act, engaging in money laundering, and conspiring to commit these crimes. These charges relate to two bribery schemes to pay high-level officials of African countries in exchange for business advantages.

      The allegations against Ho are set forth in a detailed, 54-page complaint (the "Complaint"), enclosed herewith as Exhibit A, and docketed as 17 Mag. 8611. The Complaint quotes extensively from emails and reports sent to and from Ho, his co-conspirators, and other individuals involved in the charged conduct. In brief, Ho is the Secretary-General of a non-governmental organization ("NGO") based in Hong Kong and Virginia (the "Energy NGO"), which holds "Special Consultative Status" with the United Nations ("UN") Economic and Social Council ("ECOSOC"), and which is funded by a Chinese oil and gas conglomerate (the "Energy Company").

      In the first scheme (the "Chad Scheme"), Ho caused a $2 million bribe to be pledged to the President of Chad, for the purpose of securing business advantages for the Energy Company in its efforts to obtain oil rights from the Chadian government. In exchange, the President of Chad

provided the Energy Company with, among other things, an opportunity to acquire particular oil rights in Chad without facing competition. Cheikh Gadio, who is a former Foreign Minister of Senegal and a lawful permanent resident of the United States, played an instrumental role in the Chad Scheme by, among other things, connecting Ho with the President of Chad and conveying the Energy Company's $2 million offer to him. In exchange for Gadio's efforts, Ho caused $400,000 in payments to be wired to Gadio's firm, which payments were sent through a bank in New York, New York.[1]

In the second scheme, Ho caused a $500,000 bribe to be wired, through a bank in New York, New York, to a bank account in Uganda designated by the Foreign Minister of Uganda, who had recently completed his term as President of the UN General Assembly (the "Ugandan Foreign Minister"). Ho also provided the Ugandan Foreign Minister, as well as the President of Uganda (who is the Ugandan Foreign Minister's relative), with gifts and promises of future benefits, including offering to let both officials share in the profits of a potential joint venture in Uganda involving the Energy Company and the officials' family businesses. The payment of $500,000 and the promises of future benefits were made for the purpose of obtaining business advantages for the Energy Company in Uganda's financial and energy sectors, beginning with the potential acquisition of a Ugandan bank.

II. The Defendant

Ho is a Chinese national and resident of Hong Kong, and the former Secretary for Home Affairs of Hong Kong. In recent years, he has leveraged his high-level connections and traveled around the globe to further the interests of the Energy Company. Ho has traveled to, among other places, Uganda, Chad, Russia, Iran, Indonesia, and Turkey.

In addition to his deep connections to the multi-billion dollar Energy Company, as described in the Pretrial Services Report, Ho has significant personal wealth in China.

Ho has no family in the United States, no property or assets in the United States, and no permanent legal status in the United States.

III. Procedural History

Ho was arrested at John F. Kennedy International Airport on November 18, 2017. He was presented on November 20, 2017, and ordered detained on consent.

On December 1, 2017, Ho made an application for bail before Chief Magistrate Judge Debra Freeman. Citing his lack of ties to the United States, his strong ties to other countries, and his means to flee, among other factors, Pretrial Services recommended that Ho be detained.

---

[1] Gadio was charged in the Complaint but has not yet been indicted.

After hearing lengthy oral argument and considering a written submission by Ho, Chief Magistrate Judge Freeman agreed with the recommendation of Pretrial Services and ordered that Ho be detained. *See* Transcript of 12/1/17 Bail Hearing ("Tr."), enclosed as Exhibit B to Ho's motion for bail, at 40. In so ruling, Chief Magistrate Judge Freeman explained:

> The first thing we look at is are there ties here and are there ties elsewhere and how strong are they in each place. I think it correct Mr. Ho does not have the kind of community ties here, living in the community, having a spouse here, having children here, having parents here, having other family members here, having a home here, having a business here, you know, and having a job that's rooted here. I think it's correct that he does not have those kinds of ties to the community that we generally look for.

Tr. 36-37. Chief Magistrate Judge Freeman further found that Ho "has ties elsewhere, at least to Hong Kong and possibly elsewhere, where he could go." Tr. 37.

In response to Ho's argument—also now presented to this Court—that Ho's proposed co-signors would be financially ruined if Ho fled, Chief Magistrate Judge Freeman explained:

> Mr. Ho seems to be a man of substantial resources. And it seems to be a reasonable point that the government's making, that if he were to flee and be able to tap into substantial resources, that those supporting him may not have that much reason to fear that they would be in, as you put it, financial ruin.

Tr. 35; *see also* Tr. 37 (Ho "seems to have means"). Chief Magistrate Judge Freeman also noted that Ho is a "seasoned traveler" and that he did not have citizenship or lawful resident status in the United States. *Id.*[1]

Ultimately, Chief Magistrate Judge Freeman concluded that "I'm not seeing a lot of factors that unequivocally tip in favor of his being likely to stick around." Tr. 38. She explained that although "electronic monitoring can certainly be helpful," on balance she found that the Government had met its burden to show by a preponderance of the evidence that no condition or

---

[1] In this and other respects, Chief Magistrate Judge Freeman distinguished Ho's case from that of his co-defendant, Cheikh Gadio, who was granted bail. She noted, among other things, that Gadio's wife is a United States citizen; that Gadio is a lawful permanent resident of the United States; that Gadio's wife owns a residence in Maryland where Gadio could be subject to home incarceration (and now is); that Gadio is alleged to be a facilitator in the criminal activity, not a leader like Ho; that Gadio had far more limited assets than Ho; and that Pretrial Services had recommended bail for Gadio, unlike Ho. *See* Tr. 30.

combination of conditions could reasonably assure Ho's appearance. Tr. 40. She therefore accepted the recommendation of Pretrial Services and ordered Ho detained.

On December 18, 2017, a grand jury indicted Ho and the case was assigned to this Court.

On January 5, 2018, Ho submitted a letter indicating that he would appeal Chief Magistrate Judge Freeman's order at the initial appearance before this Court on January 8, 2018. The evening before that proceeding, Ho's counsel emailed the Court's deputy to say that Ho would not be moving forward with his bail appeal at the initial appearance. On January 26, 2018, Ho's counsel indicated that they were prepared to proceed with Ho's bail appeal at the next conference, scheduled for this Monday, February 5, 2018.

IV.     Applicable Law

Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the officer shall order the defendant detained pending trial. 18 U.S.C. § 3142(e). In seeking detention, the Government bears the burden of establishing risk of flight by a preponderance of the evidence or dangerousness by clear and convincing evidence. *Id.* § 3142(f). The Government is not bound by the rules of evidence in discharging its burden, *see id.*, and may proceed by proffer, *see, e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).

In considering the defendant's application for bail, the Court must consider (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

Where, as here, an appeal is taken from a decision to detain a defendant, the district court reviews the decision *de novo*. *E.g.*, *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

V.      Discussion

As described at length during the bail argument in front of Chief Magistrate Judge Freeman, Ho is a wealthy, sophisticated businessman with deep connections in China, no current (or even recent) ties to the United States, no property or other assets in the United States, the means to flee, the incentive to flee, and close ties to powerful foreign individuals. He presents a severe risk of flight. As both Pretrial Services recommended and Chief Magistrate Judge Freeman found, Ho should be detained.

A. <u>Ho Has No Meaningful Ties to the United States and Extraordinarily Strong Ties Elsewhere</u>

Ho has no meaningful ties to the United States of any kind. He does not live in the United States and has not in more than three decades. He has no family in the United States. He has no property in the United States. He has no other assets in the United States. He is not a citizen and has no lawful resident status. He is an international businessman who travels to the United States (along with many other countries) a few times a year for business trips—including in furtherance of the serious offenses which he is charged. *See* Ex. B (Ho's passport).[2]

The letters provided by Ho's potential co-signors, enclosed as Exhibit A to Ho's motion, are in accord. Each letter indicates on its face that the writer met Ho decades ago—in most instances, during the period when he was studying in the United States—and that the writer and Ho keep in touch remotely, in some instances, getting together in person when Ho is in the United States on occasional business.[3] Friends from decades ago are not the sort of ties, like family, children or loved ones, that establish meaningful ties to the community.

In contrast, Ho has very close, long-standing ties to other jurisdictions, including those from which, as discussed below, extradition is either not possible at all or extremely unlikely. Ho is a resident of Hong Kong, where he was formerly a senior official. He also has powerful connections in mainland China (and authorization to travel from Hong Kong to mainland China). Indeed, as set forth in the Complaint, the offense conduct was designed to and did benefit a massive Chinese energy conglomerate.

---

[2] This exhibit was provided to Chief Magistrate Judge Freeman in connection with the initial bail proceeding, marked as GX 1.

[3] *See, e.g.*, Letter of Steven Chan ("Patrick and I were good friends *in high school*. . . . Though we lived on different continents, we stayed in touch, meeting occasionally when I traveled to Hong Kong or when Patrick stopped by in San Francisco."); Letter of Lily Chen and John Yap ("We became close friends with Patrick and his wife during the two years (*1978-1980*) when he was an Ophthalmology Department resident and chief resident. We have kept in touch since.); Letter of Joseph Chu ("After Grade 12, we went to separate schools . . . . Since then we have remained in contact and occasionally got together when he was practicing medicine in San Francisco Bay Area [which was before 1984]. Even after he left for Hong Kong [in 1984], we still managed to get together . . . *though less frequently*, when he traveled through San Francisco."); Letter of Peter Kwok ("Dr. Ho and I grew up as teen-hood best friends. . . . Our respective career paths did take different turns after college and post-grad professional training days, but throughout the years, we had maintained close contact, not only via phone calls & email messages, but also had enjoyed getting together whenever we could.") (all emphases added).

B. <u>Ho Has A Powerful Incentive to Flee</u>

Ho also has an extremely powerful incentive to flee. He is facing charges that, in total, carry a statutory maximum sentence of more than 80 years in prison. Under the United States Sentencing Guidelines, his advisory Guidelines range—based on the presently charged conduct alone—is expected to exceed 10 years in prison. And the evidence of Ho's guilt is overwhelming, as documented in the detailed 54-page Complaint, which quotes extensively from emails sent by Ho himself, his co-conspirators, and other individuals involved in the charged conduct. These emails set out the corrupt scheme in chapter and verse, and many of the corrupt payments involved in the scheme are also expressly documented by bank and wire transfer records. Moreover, since the Complaint was signed and Ho was arrested, the evidence of his guilt has only become stronger, as the Government has interviewed witnesses, executed search warrants (including for the Virginia office of the Energy NGO), and obtained documents from third parties.

Given the weight of the evidence and the expected length of the potential sentence, any individual would be highly incentivized to flee; with Ho's lack of ties to the United States and his especially strong ties abroad, the incentive is even greater.

C. <u>Ho Has The Connections and Means To Flee and To Frustrate Any Potential Extradition</u>

Ho also has both the connections and means to flee and the ability, once gone, to frustrate any potential extradition. As both the Complaint and the stamps in his passport make plain, Ho is a seasoned traveler. In recent years, he has traveled to more than two dozen countries, including Iran and Russia. But Ho is no mere tourist: He has developed high-level connections in multiple countries. Indeed, he is charged in this case with bribing the President of Chad and the Foreign Minister of Uganda (and with doing the former with the assistance of a former Foreign Minister of Senegal). Moreover, Ho did these things for the benefit of the Energy Company, a massive Chinese energy conglomerate. And Ho himself is a former senior official in Hong Kong. It is difficult to overstate how well-connected Ho is.

Further, Ho has considerable personal wealth as his disposal—even assuming, contrary to common sense, that none of his connections was able or interested in assisting him. In the Pretrial Services Report, Ho reported between seven and eight million dollars in assets and an annual income in excess of $400,000. It may well be greater, but all of his assets are abroad.[4] As Chief

---

[4] Ho's letter asserts that his foreign accounts have been frozen. (Def. Ltr. 6). Assuming that is true—and Ho offers nothing but his say-so and no details as to which accounts are frozen, nor does he attempt to reconcile this assertion with his proposal to post $2 million "in cash" (*id.* 1)—it was not at the direction of the Government, and the Government cannot prevent these accounts from being unfrozen or otherwise monitor or prevent others from using foreign accounts to transfer money to Ho.

Judge Freeman found, Ho thus has both the means to flee *and* the means to make whole his co-signors should he flee. *See* Tr. 35.

Notwithstanding the foregoing, Ho claims that, if he were to flee, he would "have no plausible refuge." (Def. Ltr. 6). But, as noted, Ho has high-level ties to countries with which the United States has no extradition treaty, including, but not limited to, China, Chad, and Uganda.

With respect to Hong Kong, a special administrative region of China, Ho claims that, if he were to return, "[h]e would likely be detained and would face a significant risk of extradition." (*Id.* 6). This is plainly incorrect, and the very case cited by Ho illustrates why. Referring to *United States v. Iat Hong*, Ho claims that "extradition proceedings are currently pending against a Chinese national who was recently arrested in Hong Kong on charges filed in this district." (*Id.*). But the defendant in *Hong* was arrested in December 2016. The Government has since pursued a lengthy, cumbersome extradition application, which required first-party affidavits for all witnesses—even document custodians. After nearly 10 months of extradition proceedings in Hong Kong, the Government's extradition application was *denied*. Hong thus has not been—and it appears never will be—extradited. Ho offers no reason to suggest that the outcome would be different in his case. Given Ho's extraordinary connections, one would expect that the odds of a successful extradition of Ho would be far lower, not greater.

As the *Hong* case illustrates, the theoretical possibility of extradition does not support release, because extradition is never guaranteed (and is typically lengthy, complicated, and expensive). That is particularly so where, as here, the applicable treaty contains numerous exceptions that might be cited (regardless of their merit) to deny an extradition request, and the defendant is a well-known and well-connected former senior official. *See* Ex. C (Agreement With Hong Kong for the Surrender of Fugitive Offenders (the "Agreement")). For example, the Agreement provides that Hong Kong may refuse to surrender nationals of China where "[t]he requested surrender relates to the defence, foreign affairs, or essential public interest or policy of [China]." Agreement, Art. 3(3)(a). Similarly, surrender may be refused "if the offence of which that person is accused or was convicted is an offense of a political character." Agreement, Art. 7(1). To be clear: Any claim that this case is of a "political character" is frivolous. But that has not stopped several media outlets in Hong Kong and mainland China from so speculating. Only days after Ho's arrest, a piece in the South China Morning Post—titled "Patrick Ho may be a pawn in the great game of nations"—reported that "[s]ome mainland newspapers have speculated about a political motive for the Americans" and stated that "[i]t would not be the first time an undeclared American foreign policy goal is linked to the prosecution of foreign nationals." A piece in the Beijing Global Times, titled "Firm denies Chinese heads major bribery scheme in Africa," reported that a "high-level source" in the Energy Company stated that "there are deep international political motives behind the arrest." And a commentator in China Daily, in a piece titled "Patrick Ho arrest by US raises some important questions," declared that "[t]he US will do anything necessary to secure its domination of international energy production," and rhetorically asked, "Was the US action genuinely intended to safeguard fairness and justice or merely a move to head off a

perceived threat to its hegemony?" The speculation has not ceased since Ho was indicted. Two days ago, a piece in a Hong Kong paper, The Standard, titled "Expert tells of US pressure on Patrick Ho," favorably quoted a lawyer who said, with respect to this case, "Of course it is politically motivated." Such assertions are baseless, but they might nevertheless be invoked to frustrate Ho's extradition from Hong Kong. They also undermine Ho's claim that, if he fled back home, his reputation would be "destroyed." (Def. Ltr. 4). Other exceptions might also be invoked (regardless of their merit) to deny any extradition. *See* Agreement, Art. 2 (surrender may be denied if offense is not a crime in both jurisdictions); Art. 7 (surrender may be denied in case of exceptionally serious consequences relating to age or health).

Ho's offer to sign a so-called "a global waiver of extradition" (Def. Ltr. 6) provides no additional assurance whatsoever. Numerous courts have recognized that such purported waivers are unenforceable and effectively meaningless. *See, e.g.*, *United States v. Morrison*, No. 16-MR-118, 2016 WL 7421924, at *4 (W.D.N.Y. Dec. 23, 2016); *United States v. Kazeem*, No. 15 Cr. 172, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015); *United States v. Young*, Nos. 12 Cr. 502, 12 Cr. 645, 2013 WL 12131300, at *7 (D. Utah Aug. 27, 2013); *United States v. Cohen*, No. C 10-00547, 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010); *United States v. Bohn*, 330 F. Supp. 2d 960, 961 (W.D. Tenn. 2004); *United States v. Stroh*, No. 396 Cr. 139, 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000); *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985). For very good reason: Any defendant who signs such a purported waiver and then flees will assuredly contest the validity and/or voluntariness of the waiver, and will get to do so in the jurisdiction of his choosing (*i.e.*, the one to which he chose to flee). The Department of Justice's Office of International Affairs is unaware of any country anywhere in the world that would consider an anticipatory extradition waiver binding.

> D. That Bail Was Granted In Certain Other Cases Is Not A Basis to Grant Bail—Any More Than That Bail Was Denied In Certain Other Cases Is A Basis To Deny Bail

Ho also writes that "instances in which non-citizens in white collar cases have been granted bail are too numerous to exhaustively list," and then cites several such cases. (Def. Ltr. 4-5). This is irrelevant. Ho's detention is merited not on the sole basis that he is a non-citizen in a white collar case, but on the bases that he is a non-citizen who, for the myriad reasons discussed herein, presents a substantial flight risk.

Indeed, as Chief Magistrate Judge Freeman correctly observed, "foreign nationals, just like U.S. nationals, are sometimes granted bail and sometimes not granted bail. . . . So you can give examples of those who were and you can give examples of those who are not." Tr. 23; *see also* Tr. 32 ("[E]very case has to be looked at individually anyway."). The class of potentially comparable cases is not, as Ho conclusorily asserts, "non-citizens in white collar cases." (Def. Ltr. 4). It is non-citizens who have no ties to the United States; who have substantial ties and high-level connections to countries from which extradition is impossible or exceedingly unlikely; who have the means to flee; and who are facing lengthy prison sentences and overwhelming evidence.

* * *

      For the foregoing reasons, no condition or combination of conditions can reasonably assure Ho's appearance in Court. As recommended by Pretrial Services and ordered by Chief Magistrate Judge Freeman, he therefore should remain detained.

      Respectfully submitted,

      GEOFFREY S. BERMAN
      United States Attorney

By:    s/ Daniel C. Richenthal
        Daniel C. Richenthal
        Douglas S. Zolkind
        Thomas McKay
        Assistant United States Attorneys
        (212) 637-2109/2418/2268

        SANDRA MOSER
        Acting Chief, Fraud Section
        Criminal Division

By:    s/ David A. Last
        David A. Last
        Paul A. Hayden
        Trial Attorneys
        (202) 616-5651/9370

Enclosures

cc:    (by ECF)

      All Counsel of Record