

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 27, 2018

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Chi Ping Patrick Ho*,
               17 Cr. 779 (KBF)

Dear Judge Forrest:

      The Government respectfully submits this letter in advance of the bail hearing scheduled in the above-captioned matter for Wednesday, May 2, 2018, at 1:00 p.m., and in response to the defendant's renewed request for bail, made by letter dated April 16, 2018 (Docket Entry No. 65, refiled in un-redacted form as Docket Entry No. 72) ("Def. Ltr."). As previously discussed with the Court and set forth in the Government's prior bail submission (Docket Entry No. 40), the defendant presents an extreme risk of flight. Pretrial Services was right to recommend detention, Chief Magistrate Judge Freeman was right to order detention, this Court was right to deny the defendant's appeal of that order, and this Court should deny the defendant's renewed request.

    I.    <u>The Charges</u>

      Chi Ping Patrick Ho, a/k/a "Patrick C.P. Ho," a/k/a "He Zhiping" ("Ho"), the defendant, has been charged with violating the Foreign Corrupt Practices Act ("FCPA"), engaging in money laundering, and conspiring to commit both of these crimes. These charges relate to two bribery schemes to pay high-level officials of African countries in exchange for business advantages for a Chinese energy company.

      The allegations against Ho are set forth in a detailed, 54-page complaint (the "Complaint"), previously submitted to the Court, enclosed herewith as Exhibit A, and docketed as 17 Mag. 8611. The Complaint quotes extensively from emails and reports sent to and from Ho, his co-conspirators, and other individuals involved in the charged conduct. In brief, Ho is the Secretary-General of a non-governmental organization ("NGO") based in Hong Kong and Virginia (the "Energy NGO"), which holds "Special Consultative Status" with the United Nations ("UN") Economic and Social Council, and is funded by a massive, multi-billion dollar Chinese oil and gas conglomerate based in Shanghai (the "Energy Company").

In the first scheme (the "Chad Scheme"), Ho offered a $2 million bribe to the President of Chad for the purpose of securing business advantages for the Energy Company in its efforts to obtain oil rights from the Chadian government.

In the second scheme, Ho caused a $500,000 bribe to be wired to a bank in New York, New York and then from that bank to a bank account in Uganda designated by the Foreign Minister of Uganda, who had recently completed his term as President of the UN General Assembly (the "Ugandan Foreign Minister").  Ho also provided the Ugandan Foreign Minister, as well as the President of Uganda (who is the Ugandan Foreign Minister's relative), with gifts and promises of future benefits, including offering to let both officials share in the profits of a potential joint venture in Uganda involving the Energy Company and the officials' family businesses.  The payment of $500,000 and the promises of future benefits were made for the purpose of obtaining business advantages for the Energy Company in Uganda's financial and energy sectors.

II.   The Defendant

Ho is a Chinese national and resident of Hong Kong, and the former Secretary for Home Affairs of Hong Kong.  In recent years, he has leveraged his high-level connections and traveled around the globe to further the interests of the Energy Company.  As indicated in his passport, a copy of which previously was submitted to the Court and is enclosed herewith as Exhibit B, Ho has traveled to, among other places, Uganda, Chad, Russia, Iran, Indonesia, and Turkey.

In addition to his deep connections to the multi-billion dollar Energy Company, Ho has significant personal wealth abroad.

Ho has no family in the United States, no property or assets in the United States, and no permanent legal status in the United States.

III.   Procedural History

Ho was arrested at John F. Kennedy International Airport on November 18, 2017.  He was presented on November 20, 2017, and ordered detained on consent.

On December 1, 2017, Ho made an application for bail before Chief Magistrate Judge Debra Freeman.  Citing his lack of ties to the United States, his strong ties to other countries, and his means to flee, among other factors, Pretrial Services recommended that Ho be detained.

After hearing lengthy oral argument and considering a written submission by Ho, Chief Magistrate Judge Freeman ordered that Ho be detained.  *See* Transcript of 12/1/17 Bail Hearing ("Tr."), enclosed herewith as Exhibit C, at 40.  In so ruling, Judge Freeman explained:

> . . . Mr. Ho does not have the kind of community ties here, living in the community, having a spouse here, having children here, having

> parents here, having other family members here, having a home here, having a business here, . . . and having a job that's rooted here.

Tr. 36-37.  In response to Ho's argument—thereafter presented to this Court, and now presented to this Court yet again (Def. Ltr. 2)—that Ho's proposed co-signors allegedly would be financially ruined if Ho fled, Judge Freeman explained:

> Mr. Ho seems to be a man of substantial resources. And it seems to be a reasonable point that the government's making, that if he were to flee and be able to tap into substantial resources, that those supporting him may not have that much reason to fear that they would be in, as you put it, financial ruin.

Tr. 35; *see also* Tr. 33-34, 37.  Judge Freeman also noted that Ho is a "seasoned traveler" who "seems to have strong ties elsewhere," and that he did not have citizenship or lawful resident status in the United States.  Tr. 37.

Ultimately, Judge Freeman concluded that although "electronic monitoring can certainly be helpful," the Government had met its burden to show by a preponderance of the evidence that no condition or combination of conditions could reasonably assure Ho's appearance.  Tr. 40.  She therefore accepted the recommendation of Pretrial Services and ordered Ho detained.

On December 18, 2017, a grand jury indicted Ho, and the case was assigned to this Court.

On January 5, 2018, Ho submitted a letter indicating that he would appeal Judge Freeman's order at the initial appearance before this Court.  The evening before that proceeding, Ho's counsel emailed the Court's deputy to say that Ho would not be moving forward with his bail appeal at the initial appearance.  On January 26, 2018, Ho's counsel indicated that they were prepared to proceed with Ho's bail appeal at the next conference.

On February 5, 2018, after hearing lengthy argument, this Court denied Ho's appeal.

IV. <u>Applicable Law</u>

Title 18, United States Code, Section 3142(e) provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the officer shall order the defendant detained pending trial.  18 U.S.C. § 3142(e). In seeking detention, the Government bears the burden of establishing risk of flight by a preponderance of the evidence or dangerousness by clear and convincing evidence.  *Id.* § 3142(f).  The Government is not bound by the rules of evidence in discharging its burden, *see id.*, and may proceed by proffer, *see, e.g.*, *United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).

In considering a defendant's application for bail, the Court must consider (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

V. <u>Discussion</u>

As described at length during the bail argument before Judge Freeman, and again before this Court earlier this year, Ho is a wealthy, sophisticated businessman with deep connections in China, no current or recent ties to the United States, no property or other assets in the United States, the means to flee, the incentive to flee, and close ties to powerful foreign individuals. And the evidence of his guilt is overwhelming. In short, Ho presents a severe risk of flight. Nothing in his renewed bail request warrants reconsideration of this Court's decision that he should be detained pending trial, which is scheduled to commence in just over six months.

A. <u>Ho Has No Meaningful Ties to the United States, Extraordinarily Strong Ties Abroad, A Powerful Incentive To Flee, And The Means And Connections To Do So</u>

In light of prior briefing and argument before this Court, the Government does not repeat herein all of the many reasons why Ho presents an extreme risk of flight. In sum:

- He has no meaningful ties to the United States whatsoever—and has not in years.
    - He does not live in the United States, and has not in more than three decades.
    - He has no family in the United States.
    - He has no property in the United States.
    - He has no other assets in the United States.
    - He is not a United States citizen and has no lawful resident status.
    - He is an international businessman who travels to the United States (along with many other countries) a few times a year for business trips—including in furtherance of the extremely serious offenses which he is charged. (*See* Ex. B (Ho's passport).)

- He has very close, longstanding ties to other jurisdictions, including those from which extradition is not possible at all or is extraordinarily unlikely.
    - He is a resident of Hong Kong, where he was formerly a senior official.
    - He has powerful connections in mainland China (and authorization to travel from Hong Kong to mainland China).
    - The offenses he committed were designed to and did benefit a massive Chinese energy conglomerate with operations and interests in multiple countries.

- He has an extremely powerful incentive to flee.
    - He is facing charges that, in total, carry a statutory maximum of more than 80 years in prison.
    - Under the United States Sentencing Guidelines, his advisory Guidelines range—based on the presently charged conduct—is expected to exceed 10 years in prison.
    - The evidence of his guilt is overwhelming, as documented in the detailed 54-page Complaint, which quotes extensively from emails sent by Ho himself and other individuals involved in the conduct. These emails set out the corrupt scheme in chapter and verse, and many of the corrupt payments involved in the scheme are also documented by bank and wire records. Moreover, since Ho was arrested, the evidence of his guilt has become stronger, as the Government has interviewed witnesses, executed search warrants (including for the Virginia office of the Energy NGO), and obtained documents from third parties.

- He has the means and connections to flee.
    - As both the Complaint and the stamps in his passport make clear, and as Judge Freeman recognized, Ho is a seasoned, sophisticated traveler. In recent years, he has traveled to more than two dozen countries, including Iran and Russia. But Ho is no mere tourist. And Ho himself is a former senior official in Hong Kong. It is difficult to overstate how well-connected he is. Indeed, according to the media reports, the Energy Company, the business of which Ho sought to further through bribery, has recently been taken over, at least in large part, by an investment agency controlled by the Chinese government.
    - He has considerable personal wealth at his disposal. In the Pretrial Services Report, Ho reported between seven and eight million dollars in assets and an annual income in excess of $400,000. All of his assets are abroad, and Ho has never filled out a financial affidavit or otherwise described his assets in any detail. Nor does he do so in his renewed application, despite claiming that the Court should find that the bail package that he proposes provides "financial deterrence" to his flight (Def. Ltr. 2).
    - Moreover, as part of its ongoing investigation, the Government recently learned that—notwithstanding the impression that Ho previously appeared to give that his assets are both in China and largely illiquid and/or frozen (*see* Docket Entry No. 29, at 6, 7)—through a company in the Bahamas and a trust in Jersey, Channel Islands, Ho has an open account with UBS Switzerland that was worth more than $1.2 million at the end of 2017 (and is presently worth more than $700,000, given a decline in the value of investments). (*See* Ex. D.)
    - As Judge Freeman found, Ho has both the means to flee *and* the means to make whole his proposed co-signors should he flee. *See* Tr. 35.

- o He is also backed by a massive Chinese energy conglomerate—with which he remains in regular contact, and that appears to be playing a role in retaining and funding Ho's representation in this case.[1]

B. Nothing In Ho's Application Warrants Reconsideration Of This Court's Decision

In seeking bail again, Ho presents five arguments that he asserts warrant reconsideration of this Court's decision. None has merit.

*First*, Ho contends that he has materially strengthened his proposed bail package by offering to secure a bond by "two familial properties." (Def. Ltr. 2.) He has done no such thing. As Ho acknowledges, both of these properties are in Hong Kong. (*Id.*) The Government has confirmed with both the Department of Justice's Office of International Affairs and the United States Attorney's Office's Money Laundering and Asset Forfeiture Unit that Ho's offer is meaningless. A "lien" for foreign property (*id.*) is an invention of Ho—who tellingly does not cite a single case, in any district, for the proposition that the Government may "readily" (*id.*) forfeit property abroad, much less property held in China. The Government cannot. *See, e.g.*, *United States v. Pon*, No. 3:14-cr-75-J-39, 2014 WL 3340584, at *10 (M.D. Fla. May 29, 2014) (rejecting bail package that included investments in two Chinese ventures, given "vagaries" as to how the government could "effectuate forfeiture in the event of flight"). Rhetoric aside, Ho's bail package is unchanged. It remains woefully insufficient.

*Second*, Ho suggests that because two opinion pieces in English-language newspapers and one article in a Hong Kong economic journal appear to "reject[] the characterization of this case as political" (Def. Ltr. 2 n.2), this Court erred to the extent that it expressed concern at the prior hearing—as the Government had—that Hong Kong might decline to extradite Ho, were he to flee, on the ground that this case allegedly is "political" (*id.* 2), a ground for declination expressly provided for in the Agreement With Hong Kong for the Surrender of Fugitive Offenders. This suggestion should be dismissed. As the Government stated previously, any claim that this case is "political" is frivolous. But it unfortunately appears that the two English-language opinion pieces and one economic journal article cited by Ho, which were published in November, are outliers in Hong Kong and mainland China. Moreover, it appears that Ho himself (whatever his true view) has sought to advance the proposition that his case is, at least in large part, political. Since his arrest, in multiple emails—including with officers or employees of the Energy Company or its affiliate, the Energy NGO—Ho has suggested that his case is not principally, or at all, about what he is alleged to have done, but about the reputation of the Energy Company, or more generally, China. In one email, for example, he stated:

> [T]his is a battle of honor and for clearing the [Energy NGO's] name.

---

[1] As set forth below, before proceeding to consider Ho's renewed application on the merits, the Court should hold a *Curcio* proceeding to confirm that Ho knowingly and voluntarily waives the potential conflict raised by the Energy Company arranging and/or paying for his counsel.

> . . .
>
> Prepare a press release in Chinese and in English: key words: public diplomacy, energy diplomacy, helping Chinese enterprises "going Out", in accordance to the Belt and Road Initiative and its spirit.[2]

In another email, Ho stated: "Please tell SH [*i.e.*, Shanghai, the headquarters of the Energy Company], if we are on the same line, with their support, I will fight to the very end. For it is not only HO who is on trial, it is [the Energy NGO], the Company, Country and Chinese values are on trial." More recently, he asked an individual to "set up blogs: such as 'Belt and Road by HO' with all my speeches ppts, articles and publications on OBOR [*i.e.*, One Belt, One Road, another way of describing the Belt and Road Initiative]; [and] set one blog up on 'Sino-US dialog by HO' and upload all speeches . . . ." (*See* Ex. E.)

Ho has also made similar statements in calls since his arrest. In one call, for example, Ho stated that "they," apparently referring to the Government, are using him to get to the "big tiger," and to discredit "The Belt and Road." (*See* Ex. F (summary translation of 12/10/17 call[3]).) The suggestion in these and other communications that this case is not really about whether Ho engaged in bribery and money laundering, but about something else, is meritless. But the fact that Ho appears repeatedly to have promoted this meritless view should give this Court great pause before assuming that he and his well-connected supporters would not press the Hong Kong government— of which Ho is a former senior member—to take the same meritless view. It also undermines Ho's claim that if he fled to Hong Kong, he would be "viewed as a criminal" (Def. Ltr. 3). It appears, unfortunately, that he would be viewed very differently, at least by those with whom he is close.[4]

*Third*, Ho suggests that even if he is convicted, he faces little time in prison, because those convicted of similar offenses allegedly received an average sentence of only approximately 18 months. (*See* Def. Ltr. 3 and Def. Ex. D.) That suggestion is false. Ho does not distinguish sentences of cooperating defendants from those of non-cooperating defendants—and at least *five* of the sentencings on his purportedly objective chart were of cooperators. By limiting the timeframe of his chart, Ho also omits sentences imposed after trial. And Ho omits the most recent foreign bribery-related sentencing in this very district.

---

[2]  The "Belt and Road Initiative" is an initiative of the Chinese government. *See, e.g.*, http://english.gov.cn/beltAndRoad/ (last visited Apr. 27, 2018).

[3]  The Government expects to have a full translation of this call soon.

[4]  Ho also instructed an officer of the Energy NGO and an affiliate of the Energy Company, who lives in New York, and who was one of the individuals to whom he sent an email described above, falsely to tell the Federal Bureau of Prisons ("BOP") that he was a family friend visiting Ho from China, so as to bypass otherwise-applicable BOP limitations. (*See* Ex. G.)

Among the relevant sentencings not included:

- In *United States v. Kay, et al.*, No. 01 Cr. 914 (S.D. Tex.), the former president and vice-president of a publicly-held corporation were sentenced after trial to terms of imprisonment of 63 months and 37 months, respectively, for their roles in an FCPA scheme and cover-up involving bribes to reduce duties and taxes on rice exports to Haiti.

- In *United States v. Esquenzi, et al.*, No. 09 Cr. 21010 (S.D. Fla.), the former president and vice-president of a private telecommunications company were sentenced after trial to terms of imprisonment of 180 months and 84 months, respectively, for their roles in an FCPA and money laundering conspiracy involving transmitting approximately $890,000 to shell companies used to pay bribes to Haitian officials.

- In *United States v. Jumet*, No. 09 Cr. 397 (E.D. Va.), the defendant was sentenced, after pleading guilty, to 87 months' imprisonment for paying approximately $200,000 in bribes to Panamanian government officials to secure contracts.

- In *United States v. Thiam*, No. 17 Cr. 47 (S.D.N.Y.), Judge Cote sentenced the defendant, a former Minister of Mines and Geology of the Republic of Guinea, to 84 months' imprisonment, after he was convicted at trial of laundering bribes paid to him by executives of a Chinese conglomerate.

In any event, even if Ho's chart provided a fair representation of sentences in other cases—and it does not—Ho makes no attempt whatsoever to compare his case to other cases. That is unsurprising, given the multiple factors here that militate strongly in favor of a substantial sentence, including that Ho was a leader or organizer of the bribery schemes, that he engaged in two different bribery schemes, that those schemes involved more than $2 million, that he sought to bribe senior officials (including the President of Chad), and that he cloaked his conduct in the guise of the work of a purportedly charitable organization.

*Fourth*, Ho argues that the evidence against him is not as strong as the Government explained at the prior hearing. This argument does not withstand even passing examination. Ho asserts that the Complaint "cites an email dated November 14, 2014, as if it were an admission that [he] discussed a Brazilian bribery scheme with the president of Chad," but the Government purportedly "failed to disclose, however, that the document reflects that the President of Chad was joking about supposed Brazilian attempts to bribe others and that the passage explicitly reflects that it was said in jest." (Def. Ltr. 5 (citing Complaint ¶ 26(a)(iv)).) As an initial matter, the Government's draft translation does not reflect that the statement was a joke. (The Government is now in the process of obtaining a certified translation of this and other documents for trial.) In any event, this sentence refers to a one-off statement allegedly made by the President of Chad, not a "discuss[ion]" between Ho and the President of Chad about "a Brazilian bribery scheme," much less one that remotely calls into question the Complaint's demonstration that Ho engaged in two bribery and money laundering schemes. Indeed, that Ho focuses his attack on the Government's case on a random, isolated statement—rather than on the voluminous evidence showing that he

schemed to and offered money and benefits for business advantages—is revealing. This sentence alone is what Ho chooses to try to put into "context" (Def. Ltr. 5), not the numerous communications that make crystal clear that he was engaged in bribery and money laundering.

Ho also asserts that "the emails referenced in the indictment and the complaint are replete with charitable references to the charitable intent and focus of [Ho], the Energy NGO and the Energy Company," and claims that he accordingly must have had that intent. (*Id.*) This is self-interested nonsense. As described at length and in detail in the Complaint, the emails that Ho cherry-picks (and the excerpts that he then cherry-picks within those emails) were self-evidently designed to cover up what Ho and his co-conspirators were doing. Ho simply ignores the overwhelming evidence that his actions principally, if not entirely, were driven by a desire to obtain business advantages for the Energy Company, and that he was more than willing to pay bribes to obtain and secure such advantages. To choose only a few of many examples:

- Complaint ¶ 24(a) (email from Gadio to Ho reflecting that Ho wanted the President of Chad to "reduce and lessen" the $1.2 billion fine that Chad had imposed on a Chinese state-owned oil company (the "Chinese State Oil Company"));
- *id.* ¶ 26(b)(ii) (report from Ho stating that he "told the President of Chad that the Energy Company was in discussions to buy shares of the Chinese State Oil Company's operations in Chad, and that the Energy Company wanted the President's support for this project");
- *id.* ¶ 26(b)(v) (report from Ho reflecting that he was in discussions with the President of Chad about the Energy Company acquiring specific oil rights in Chad);
- *id.* ¶ 40(c) (email from Ugandan Foreign Minister's wife to Ho, copying Ugandan Foreign Minister, requesting a "contribution to [the Ugandan Foreign Minister's] Foundation" and, in same email, advising of a "great opportunity in banking sector");
- *id.* ¶ 40(f) (email from Ho to Ugandan Foreign Minister stating that the Chairman of the Energy NGO/Company "will make good his pledge of donation to support [the Ugandan Foreign Minister]" and, in same email, saying, "Just give me a list of all the major projects, from infrastructure, energy, agriculture, to finance and banking, and we will bring the relevant heads to your country to kickstart each project."); and
- *id.* ¶ 40(g) (email from Ho to Ugandan Foreign Minister's wife, stating: "The size of the [Energy Company] entourage is actually dependent on the number of projects the President and [the Ugandan Foreign Minister] want to engage China with. It can be anything from energy, agriculture, infrastructures, tourism, banking and finance, to stock market. . . . [O]ur company is now holding interests in all of these fields and sectors. . . . What can come out of this occasion can only be limited by what can be imagined.").

Ho's assertion that because cherry-picked statements within cherry-picked communications contain "references" to "charitable intent" (Def. Ltr. 5), a jury will conclude that he had such intent, is no more persuasive than a defendant charged with distributing heroin pointing to statements that do not mention heroin, while ignoring that he contemporaneously engaged in conversations about distributing heroin. And again, it is revealing that Ho makes no effort whatsoever to challenge these emails, or the abundant other evidence in the Complaint, which show that his actions in both Chad and Uganda were motivated by business interests, not

charitable desires. If anything, the documents cited in Ho's letter, read as a whole, bolster the Government's case. As reflected above, Ho cannot seriously argue that he did not intend to further the business interests of the Energy Company in both Chad and Uganda through payments to and at the direction of senior officials. That he tried to cloak his corrupt payments in the trappings of alleged charitable donations is not evidence of innocence; it is evidence of consciousness of guilt.

*Finally*, Ho argues that bail should be granted because he will more easily be able to meet with counsel if he is granted bail. (Def. Ltr. 6.) This argument has no basis in the Bail Reform Act or the record of this case. As the Court explained at the prior hearing:

> . . . I understand, of course, that if an individual has the kind of restrictions that exist at the MCC that there are some logistical issues that arise from that, that impact how counsel interacts with Mr. Ho. But, nevertheless, it is done all the time that people make discovery available on computers. Counsel can go, even have a paralegal go and sit there day, after day, after day working with the defendant. So there are ways in which cases are everyday prepared for trial, even complex cases, with a fair amount of financial information with the restraints imposed by institutional entities such as the MCC.

Transcript of 2/5/18 Bail Hearing (Docket Entry No. 55), at 36. The Court's ruling was manifestly correct, particularly given the detailed complaint in this case, which provides a guide to the evidence; that the Government is using a vendor to produce all discovery in electronic, keyword searchable form; and that the Government has also provided an index to that discovery.

Nor is there any merit to Ho's suggestion that bail is nevertheless warranted because "many of the documents are not in English" (Def. Ltr. 6). While more than one-third of the emails obtained by search warrant and produced in discovery are not in English, the Complaint provides a guide to the evidence, including draft translations of certain pertinent emails; all of Ho's communications with Gadio, all of his communications with Ugandan officials, all financial records, all tax records, and all incorporation records are in English; and many of the documents not in English are in Chinese, a language in which Ho is fluent (as he is in English), and his sizable team of lawyers includes those from a firm with offices in both Hong Kong and Beijing. Whatever the merits of a similar argument pressed by an indigent defendant, or one in a case defended by a solo practitioner with few resources, the argument is not persuasive in this case. Indeed, Ho's renewed bail application includes multiple professional translations. It is apparent that his incarceration does not hinder his team's ability to translate and understand documents.

### C. Ho Is Not Entitled To Proceed *Ex Parte*

Ho also requests that, if the Court might otherwise be inclined to deny his renewed motion, he should be permitted to make an *ex parte* submission. (Def. Ltr. 4, 7.) The Court should deny this extraordinary, extra-legal request. Contrary to the suggestion that Ho makes in a footnote (*id.* 5 n.4), he does not cite any case, in any district, in which a court has permitted a defendant to make

such a submission. For good reason, the law is to the contrary. "[D]ue process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." *United States v. Abuhamra*, 389 F.3d 309, 322 (2d Cir. 2004) (remanding decision to deny bail based on *ex parte* submission); *see also United States v. Davis*, 845 F.2d 412, 415 (2d Cir. 1988) ("a clear record" of a bail determination, "which may be embodied in a transcript of the proceedings," should be made). Moreover, if this Court grants Ho's request (and it should not), it should permit the Government also to make an *ex parte* submission.

> D. The Court Should Conduct A *Curcio* Hearing Concerning The Energy Company's Apparent Retention And Payment Of Defense Counsel

Based on its review of emails sent to and from Ho and calls made by Ho since his arrest, the Government has learned that the Energy Company appears to have played a central role in both choosing and funding at least certain of Ho's counsel. This fact bears on Ho's suggestion that he somehow has only limited resources or support. (*See* Def. Ltr. 2-3, 6.) In any event, before proceeding to consider Ho's renewed application for bail on the merits, the Court should hold a *Curcio* proceeding to confirm that Ho knowingly and voluntarily waives the potential conflict raised by the Energy Company—the interests of which may or may not be aligned with the interests of Ho—arranging and/or paying for his counsel.[5]

\* \* \*

For the foregoing reasons, no condition or combination of conditions can reasonably assure Ho's appearance in Court. As recommended by Pretrial Services, ordered by Chief Magistrate Judge Freeman, and previously ordered by this Court, he should remain detained pending trial. And before proceeding to the merits of his renewed application, the Court should conduct a *Curcio* proceeding.

---

[5] Prior to filing this letter, the Government advised defense counsel that the Government had learned that the Energy Company appeared to have arranged and/or paid for Ho's counsel, and that the Government believed that a *Curcio* proceeding accordingly should be held. Defense counsel declined to provide details about the relationship between the Energy Company and the retention and compensation of counsel, but did not object to the Government's request.

         Respectfully submitted,

         GEOFFREY S. BERMAN
         United States Attorney

By: <u>s/ Daniel C. Richenthal</u>
   Daniel C. Richenthal
   Douglas S. Zolkind
   Thomas McKay
   Assistant United States Attorneys
   (212) 637-2109/2418/2268

   SANDRA MOSER
   Acting Chief, Fraud Section
   Criminal Division

By: <u>s/ David A. Last</u>
   David A. Last
   Paul A. Hayden
   Trial Attorneys
   (202) 616-5651/353-9370

Enclosures

cc: (by ECF)

   All Counsel of Record