```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:
                                     :
UNITED STATES OF AMERICA,               Docket #17mj08611
                                     : 1:17-mj-08611-UA
                Plaintiffs,
                                     :
           - against -
                                     :

HO, et al.,                          :  New York, New York
                                        December 1, 2017
                Defendants.          :

---------------------------------:


                     PROCEEDINGS BEFORE
                THE HONORABLE DEBRA C. FREEMAN
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          UNITED STATES ATTORNEY'S OFFICE
                         BY:  DANIEL CHARLES RICHENTHAL, ESQ.
                              DOUGLAS SAMUEL ZOLKIND, ESQ.
                         One Saint Andrew's Plaza
                         New York, New York 10007
                         (212) 637-2268


For Defendants:          KRIEGER KIM & LEWIN, LLP
                         BY:  EDWARD KIM, ESQ.
                              PAUL KRIEGER, ESQ.
                         500 Fifth Avenue, 34th Floor
                         New York, New York 10110
                         (212) 390-9554



Transcription Service:   Carole Ludwig, TranscriptionServices
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|
| None | | | | |

3

1

2          THE CLERK:   United States versus Chi Ping Patrick

3   Honesty.  Counsel,  please state your name for the record?

4          MR. DANIEL RICHENTHAL:   Good afternoon, Your

5   Honor, Daniel Richenthal and Douglas Zolkind for the

6   government.

7          HONORABLE DEBRA C. FREEMAN (THE COURT):  Good

8   afternoon.

9          MR. EDWARD KIM:   Good afternoon, Your Honor,

10  Edward and Paul Krieger from Krieger Kim & Lewin, and we

11  represent the defendant Chi Patrick Ho.

12         THE COURT:   All right.  Good afternoon.  Have a

13  seat.  So hang on a second.  Let's let the grand jury

14  return.  Are we still on the rec' for this?  We should've

15  been on.  All right.  Do we have an interpreter for these

16  proceedings, or no?

17         MR. KIM:   Your Honor, we don't think one is

18  necessary at least with respect to the defendant.

19         THE COURT:   Okay.  Someone tell me the history

20  here.  There was a prior presentment and bail was put over,

21  or is this --

22         MR. RICHENTHAL:   Yes, Your Honor.  Mr. Ho was

23  arrested on November 18th.  He was presented on November

24  20th and he was ordered detained on consent without

25  prejudice for future application.  Yesterday his counsel

                                                                    4

1

2   informed us that he intended to make that application and

3   that's why we're here.  He was interviewed this morning and

4   a Pretrial Service report was prepared for him.

5            THE COURT:   I have a letter from defense counsel.

6            MR. RICHENTHAL:   That's right, Your Honor, I was

7   actually just going to ask about that.

8            THE COURT:   I had it, and I read it, and for some

9   reason it doesn't seem to be in this collection, which means

10  I may have left it on my desk in chambers.  Oh no, wait.

11  I've got it.  I've got it.  Okay.  It just got attached to

12  something else.  So I have that.  I also have something

13  that's been handed up, looks like a bunch of exhibits from

14  the government.

15           MR. RICHENTHAL:   Yeah, it's one exhibit, Your

16  Honor.  It's a photocopy of the defendant's passport.  I may

17  refer to that in my remarks, so I thought I would get it

18  copied.  The defendant has provided that a couple days ago.

19           THE COURT:   So I gather you don't have agreement

20  on this.  The government is seeking detention.

21           MR. RICHENTHAL:   That's correct, Your Honor.

22           THE COURT:   Now I gather defendant is seeking

23  release, so let me hear first from the government.

24           MR. RICHENTHAL:   So we agree with the

25  recommendation of Pretrial Services that there's no

5

1
2   condition or combination of conditions that can reasonably

3   assure defendant will return to court.  Let me start with

4   the offenses and the proof and then I want to talk about the

5   defense letter, which we have read.  We did receive a copy

6   of it.  I've not had a chance to respond to, but I'm happy

7   to do that orally.

8           So let's start with the charges.  This is a, as

9   the Court is aware, a 54-page extraordinarily detailed

10  complaint describing in many ways, including the defendant's

11  own words, two schemes to bribe high-level officials in

12  Africa.  The proof is overwhelming, and as I said, it

13  includes the defendant's own descriptions of what he did and

14  other people's descriptions of what they did, corroborated

15  by bank records, financial records, and other kinds of

16  evidence.  That's why it's 54 pages long, and that is not

17  all of the evidence, it's just a part in the complaint.

18          For what the defendant did -- and let me be very

19  clear -- he is the lead defendant, not be he's listed first,

20  but because he was the leader of the charged conduct.

21  That's very clear from the allegations in the complaint,

22  although the investigation is ongoing.

23          For what the defendant did, he faces an advisory

24  guideline for each in excess of a decade in prison, and

25  rightfully so.  So he faces extremely severe penalties.  He

```
 1                                                          6
 2  faces overwhelming proof of guilt.  That gives him an
 3  incentive to flee.  And he also has massive ability to do so
 4  in multiple ways, including those set forth in the Pretrial
 5  report and other ones that I'll touch on this afternoon.
 6           Let's start first with the defending incident.  He
 7  estimates in the Pretrial report itself that he's worth 7 to
 8  $8 million.  He estimates that his annual income is in
 9  excess of $400,000.  Those are significant resources to
10  flee.  And let me note that because the defendant resides in
11  China, his financial resources are in China, and perhaps
12  elsewhere.  We don't have access to them.  We can't freeze
13  them.  We don't even have knowledge of all of them.  So
14  there's nothing we can do to prevent him from using those
15  resources and others to flee.
16           But the defendant's own resources are not the only
17  story here, because what the defendant did, as set forth in
18  great detail in the complaint, is he acted on behalf of a
19  massive, incredibly powerful Chinese oil and energy
20  conglomerate.  That company, and persons associated with it,
21  will have every incentive to help the defendant flee if he
22  even needed their help at all, given his own resources, and
23  probably wouldn't, but they would have every incentive to
24  help him.
25           So would multiple foreign officials he bribed.
```

7

There are a lot of people who would rather not see the
investigation with republican (indiscernible) as ongoing,
continue.  They'd rather not see what the defendant did
there in great detail court.  So they have every incentive
and ability to assist him.

        That, in our judgment, would probably be enough to
warrant detention, but it's not all we have.  Because here's
what else we know, and this is undisputed.  The defendant
and his entire family reside abroad.  The defendant resides
and has resided for decades, in a country with which we have
no extradition treaty.  He bribed officials of multiple
countries again, with which we have no extradition treaty,
and he did it on behalf of a massive Chinese energy
conglomerate in a country that, again, we have no
extradition treaty with.

        So it's not just his personal resources, it's not
just the resources of the people behind him.  It's if he
were to make it back to China, or for that matter, Uganda or
Chad, the countries in which he committed the bribery
offenses, we can never get him back.  And he knows that,
because he's a well-educated, credentialed man.  So his
incentive to flee is massive.  His ability to do so is
massive.

        So then the question is, why would he stay.  So

8

commonly people talk about what's on the other side.  That's
what bail is about, it's a balance.  There is nothing on the
other side that is remotely material.  Mr. Ho lived in the
United States 33 years ago.  Since that time, he returns a
handful of times a year, typically four to ten times a year,
for a handful of days at a time.  He does that to do
business.

But that business, at least in recent years, is
tied to the charged offenses.  I'm going to get back to that
in a moment.  But I want to return for a second to what I
started with, which is the lack of connections to the United
States.  He has no family here.  He has no property here.
He has no lawful status here, other than a visa, which he
was paroled into the United States and then arrested.  So
that's not going to, at least as I understand, Department of
Homeland Security policy.  That's it.

His other connections to the United States are
twofold.  One is the business, which I'm about to talk
about, and two is handful of friends, some of whom have
written letters to this Court.  Now, as Your Honor knows, it
is common, in fact it would be unusual if it weren't the
case, that someone charged with these kinds of crimes, who
moved in these kinds of circles, with his kind of resources,
would have well-credentialed people, people who support him,

people who think he's a good person.  That's not unusual.
That's not a reason to give him bail.

        The letters, quite candidly, appear to acknowledge
they rarely, if ever see him in person.  They generally see
him in China, so in person, I mean in the United States, or
they communicate with him electronically.  He has friends
here, at least the handful of people who wrote letters.
That's not a reason he'd remain, when he sees them so
infrequently, and in light of everything else that I said.
There's no reasonable assurance whatsoever that there's a
connection between those individuals, and he is sufficiently
close that he would remain simply so they're not on the hook
for a bond.

        And by the way, the proposed bond is a very small
percentage of his net wealth.  He could personally pay them
back, easily.  It wouldn't be that big a deal.  It's a $1
million bond.  He's worth $7 million and that's irrespective
of the company behind him, so could the company pay them
back.  That's it.  Those are his connections -- occasional
business, a handful of friends.

        And let me talk about the business.  The defense,
as I said, submitted a letter this morning.  If you read the
four corners of the letter, you'd have an impression of Mr.
Ho as it says, as an internationally renowned nonprofit

10

leader.  Those are my words; the letter uses some similar
ones.  And he comes here and gives speeches, and he comes
here and goes to events.  That is true to a point.  It is
ultimately an illusion.  It's the same illusion that allowed
him to commit the crimes.  Because what that letter sets
forth is a very small part of his life.  That's the part he
wanted the public to see.

        The NGO referred to in that letter was the NGO
through which he committed the charged crimes.  It was the
illusion of caring in the -- acting in the public interest.
It was the illusion of acting on behalf of a nonprofit.  In
reality --

        THE COURT:   NGO for a nongovernmental
organization?

        MR. RICHENTHAL:   NGO as a nongovernmental
organization, yes, Your Honor.  That illusion, that
intentional illusion, is not a reason to give him bail.
It's actually the opposite.  It's what allowed him to commit
the crime because the truth is, he wasn't acting in any
material sense on behalf of the public interest or
nongovernmental organization.  He was acting, as charged in
extraordinary detail, on behalf of a massive Chinese energy
conglomerate.  That's set forth in the complaint.  It's also
set forth in what we marked as Exhibit 1, scan of Mr. Ho's

1

2 passport.

3          If Your Honor looks through that, you will see

4 dozens of trips all over the world, and there's something in

5 common with those trips.  They are, to a large degree, to

6 energy-rich or oil-rich nations -- Russia, Iran, other

7 places in the Middle East, in addition to Uganda and Chad,

8 the countries in which he committed the charged defenses.

9 And those countries are not just countries that have that

10 characteristic.  They're also countries in which the Chinese

11 energy conglomerate either has or wants to have -- this is

12 publicly known -- operations.  Because that's what Mr. Ho

13 was doing.  He didn't act on behalf of an NGO.  He acted on

14 behalf of a Chinese oil company.  The illusion in the letter

15 is the illusion of the crime.

16          Now the letter also talks about various speeches

17 he was invited to give or has given.  And I think the

18 suggestion essentially is, regardless of the unfortunate

19 charges he faces, there's another side to this man.  And we

20 all have multiple sides; no one disputes that.  But these

21 speeches, these conferences, these are part of a same

22 illusion.  The reference to a conference at the National

23 Press Club, for example, which the defense talks about as

24 where he would've gone had he not been arrested.  That's

25 true, but what's left out of the letter is that a Hong Kong

```
 1                                                              12
 2   bank account in the name of the conglomerate or the NGO
 3   wired $350,000 to that think tank.  It's not a surprise,
 4   therefore, they might permit the head of it to speak or that
 5   the head of it would want to speak.
 6           Also left out of the letter, the same Hong Kong
 7   bank account wired at least $20,000 to the president of that
 8   think tank personally, not the think tank, the man.  Why?
 9   Because they want to create the illusion that Mr. Ho and his
10   NGO are real.  That they're partnering with lawful, good
11   organizations to do good work, because that illusion is what
12   let him get away with the crimes.  That's not a reason to
13   bail him.  At most, it's a reason to detain him or it's just
14   the fact of the case.  It's not a reason for release.
15           At the end of the day, what we have here is
16   actually a pretty straightforward case.  You have an
17   extraordinary wealthy, extraordinarily well-connected
18   businessman, lives in the country, as does his entire family
19   that we have no extradition with, faces a 54-page, detailed
20   complaint outlining multiple bribery schemes, faces well
21   over a decade in prison, has no connection of any meaningful
22   way to the United States, other than people he occasionally
23   e-mails with or sees outside of the United States, and he
24   asked to be bailed to an apartment that he doesn't have.
25           There's a reason the defense doesn't tell you
```

13

1

2  where he's going to live, not knocking the defense.  It's

3  because he doesn't have any property in the United States.

4  He has to go purchase one in order to live there if Your

5  Honor were to bail him.  That's inappropriate.  The only

6  defendant I'm aware of in this courthouse who was granted

7  mail on anything remotely like this situation, is a man

8  called Ying Labh Singh (phonetic), who was only granted bail

9  over our objection, despite connections to China a wealth,

10  because he was granted bail into the hands of armed security

11  guards surrounding him 24 hours a day, that he paid for.

12          And let me be very clear.  We don't think it's

13  appropriate for people to be bailed because they can afford

14  a private security team.  I said that personally at the bail

15  argument for Mr. Ying and I lost.  But that's the only case

16  that's even close to what we're looking at here.  There is

17  no reason Mr. Ho would stay in the United States.  There's

18  every reason he would leave the United States.  We cannot

19  get him back if he does so.  We cannot seize his assets to

20  prevent him from doing so.

21          Pretrial Services doesn't often recommend

22  detention in a white-collar case.  Your Honor knows that.

23  They've recommended it here.  They recommended it

24  appropriately.  Mr. Ho should be detained.

25          THE COURT:   Counsel?

```
 1                                                    14
 2              MR. KIM:   Thank you, Your Honor, and if I may,
 3    I'd like to start with two misstatements that Mr. Richenthal
 4    made and not material.  The first is that the government
 5    claims that Dr. Ho resides in China.  That is incorrect.  He
 6    resides in Hong Kong and that's important because it leads
 7    to the second misstatement that the government made, which
 8    is that there's not extradition treaty between the place of
 9    residence of Dr. Ho in the United States.  Also incorrect.
10              Hong Kong and the United States do have an
11    extradition treaty and in fact the U.S. Attorney's Office is
12    in the process of extraditing a Chinese natural from Hong
13    Kong in the case U.S. v. Iathland, I-A-T-H-L-A-N-D.
14              THE COURT:   Before you go further, does the
15    government have a response to that?
16              MR. RICHENTHAL:   Well I have multiple responses.
17    One is, as I understand it, we don't have a treaty.  We have
18    what's called a mutual legal assistance agreement.  There's
19    a very big legal distinction between it.  It is true that on
20    occasion China will cooperate with the United States.  It is
21    not obligated to do so.  I've had personal experience in
22    which it declines to do so.  The fact that it sometimes
23    chooses to, does not mean it --
24              THE COURT:   Are you talking about Hong Kong in
25    particular?
```

```
 1                                              15
 2          MR. RICHENTHAL:   Again, it's a mutual legal
 3  assistance agreement, MLAA, not MLAT, and there's an
 4  important distinction, as I said, that it's essentially
 5  discretionary.  And we've had experience with it in related
 6  cases.  And that's true for mainland China, it's true for
 7  Hong Kong, which is a Special Administrative Region of
 8  China.  It's also true of Macau, another Special
 9  Administrative Region of China.
10          THE COURT:   All right.  Let me go back to defense
11  counsel.
12          MR. RICHENTHAL:   Mr. Ho has the right to live in
13  mainland China.  He has a mainland China ID card.  It's true
14  he chooses to reside in Hong Kong but he could easily cross
15  the border.
16          THE COURT:   Okay.  All right.  I'll come back to
17  you.
18          MR. KIM:   Your Honor, I have a copy of the
19  extradition treaty.  It is in fact an extradition treaty.  I
20  can hand it up.  And the case I cited, just based on U.S.
21  Attorney's Office's own public statements, I'll give the
22  Court the docket number.  It's IShong (phonetic).
23          THE COURT:   I'm sorry.  What is this you're --
24          MR. KIM:   I'm sorry, Your Honor?
25          THE COURT:   Say again what you're telling me now?
```

```
 1                                                    16
 2              MR. KIM:   My point, Your Honor, is that the U.S.
 3    Attorney's Office is in the process of seeking the
 4    extradition of a Chinese National who resides in Hong Kong.
 5    It's docket number 16cr360.  It's pursuant to the treaty I
 6    just handed up.
 7              So Your Honor, I say this because I want to
 8    clarify what I think is an inaccuracy in the record.  There
 9    is an extradition treaty with Hong Kong.  If Dr. Ho were to
10    cut his ankle bracelet and flee to Hong Kong, he would be
11    subject to expedition.  Now there's a plethora of reasons
12    why Dr. Ho would never even seek to cut his bracelet and
13    never have the ability to flee, and I'll get into that.  But
14    I wanted to start with that, Your Honor.
15              Now time and time again the government, and in
16    fact the members of this very team, have stood up in similar
17    cases involving like power charges against foreign
18    nationals.  And time and time again, the government has
19    argued that no set of conditions could reasonably assure
20    those defendants return to court.  And repeatedly judges in
21    this building have rejected the government's argument.
22    Defendants have been bailed and they have returned to court.
23              In fact, in this very same case, Your Honor, in
24    the case of Mr. Gadio, who is a co-defendant in this case,
25    the government made some of the same arguments they're
```

```
 1                                                      17
 2   making here today.  Those arguments were rejected by
 3   Magistrate Judge Fox.  They were rejected on appeal by Judge
 4   Pauli.  And for the reasons I'm going to talk about here,
 5   they should be rejected again today.
 6              Now, I want to start with the argument that Mr.
 7   Richenthal made about this vast Chinese energy conglomerate.
 8   And the way he says it, it sounds so sinister.  There is no
 9   basis for the government's argument that Dr. Ho has access
10   to the coffers of this country.  And I'll note, Judge, that
11   the government made actually the same argument with respect
12   to the bail hearing of Mr. Gadio.  And they claim that he
13   also could tap into the resources of this Chinese energy
14   conglomerate.
15              And here the argument seems to be that because Dr.
16   Ho is alleged to have facilitated transactions on behalf of
17   his Chinese Energy Company, that he could then necessarily
18   attack the resources to use them and to flee.  Just because
19   someone's associated with Goldman Sachs, or name whatever
20   company you want, Judge, doesn't mean they have the ability
21   to use those company's resources to flee.  No white-collar
22   defendant, or for that matter, any individual who's
23   affiliated with the company with any means would ever be
24   granted bail under those circumstances.
25              And let's talk about the Energy Company, Judge.
```

1                                                                    18

2   The government cited the monetary transactions from that

3   company to the foundation, and cited it has sinister piece

4   of evidence.  It's far from it, Judge.  It's the foundation

5   that's been quite transparent about the source of its

6   funding.  It's funded by the energy conglomerate.

7          And on the energy conglomerate specifically,

8   Judge, it's a major company with operations around the

9   world.  It's not some fly-by-night criminal operation.  It

10  hasn't been charged with a crime.  It has no incentive.

11  There's no basis in the record to argue that it has an

12  incentive to help Dr. Ho flee.

13         Now, I want to talk a little bit, Judge, about

14  what the government referred to as the illusion of Dr. Ho's

15  life.  There's nothing illusory about it, Judge.  He's a

16  medical doctor trained here in the United States.  Had a

17  very distinguished career of public service as a cabinet

18  level official in Hong Kong, and then became a leader of a

19  nongovernmental organization.

20         Now, he's obviously never previously been charged

21  with a crime, he's never been arrested.  And Your Honor has

22  read the letter that we submitted.  I'm not going to go

23  through it in detail here.  Suffice it to say that he spent

24  nearly two decades here being educated and trained as an eye

25  doctor, as an eye surgeon, and then moved on to Hong Kong

19

where he moved into private practice, and served in the

government as some secretary.  He's been recognized

internationally for his service.

And Judge, his frequent travel is something that's

been cited.  Of course it's been a part of his work and that

travel has included extensive travel to the United States.

Over the last five years he's come to this country 38 times.

Those are not insignificant visits.  Often he's here for

multiple days and sometimes multiple weeks.  In 2017 alone,

he took six trips here.  And there's no dispute that he

entered this country illegally each and every time he came.

And his itinerary for his most recent travel, I think it's

telling.

And again, the government's trying to paint it all

in this sinister light, Judge.  But the truth of the matter

is that Dr. Ho, multiple times in the times he's come to the

United States, has come here to play prominent roles in

public events featuring officials and prominent business

people from United States and across the world.

He has powerful incentives to face charges in this

case.  He's worked, he's built on his reputation, Judge.  He

has all the reason in the world to face charges.  He's so

visible, the fact that even if he wanted to -- and he

doesn't -- he would have nowhere to run.

1                                                                    20

2              We've now spend many hours with Dr. Ho and it is

3    apparent, Judge, that from both personality and cultural

4    reasons, to flee would be a disgrace.  It is not an option

5    for him, Judge.  It would destroy everything he's worked for

6    and it would destroy his international reputation.

7              Now, I want to talk a little bit about what the

8    government's made of his lack of status in the country.  And

9    I will note, Judge, that Pretrial Services, in their report,

10   they had six reasons for the basis for their recommendation

11   of detention.  And first of all, let me just say this,

12   Judge.  The first, all six of these, Judge, they could file

13   to virtually any foreign national who's arrested and

14   prosecuted and brought to this courthouse.  And there are

15   some inaccuracies here as well.

16             THE COURT:   I would just note that the fourth

17   factor listed by Pretrial Services is more than one factor.

18   It's a lack of family ties, a lack of residential ties, a

19   lack of community ties, a lack of employment here, a lack of

20   property here, a lack of financial ties here.

21             MR. KIM:   Sure, Judge, and I can address that one

22   specifically as well.  I think the point I'm making first of

23   all, Judge, just categorically, it's sort of -- respectfully

24   I say this -- it's taking the same categorical approach that

25   the government takes, a foreign national defendant, then

1
2  let's check the box of detention.  I mean these categories
3  can really apply to any foreign national but they don't
4  actually apply in this case.
5          First of all, number five is inaccurate.  Dr. Ho
6  does not possess his passport; it was seized.  The more
7  fundamental point, Judge, is that -- number four.  You
8  specifically highlighted that.  He actually does have
9  extensive ties in the United States.  First of all, his
10 foundation operates five and one, two, three here in the
11 United States.  And Dr. Ho's traveled to the --
12          THE COURT:  Could you address this issue of if
13 you were released where he would live?
14          MR. KIM:   Sure.
15          THE COURT:  And you indicated that there's a co-
16 defendant who was released.  Did that defendant has his own
17 place to live here or was that a parallel situation?
18          MR. KIM:   Judge -- and the government can correct
19 me if I misstate this -- but Mr. Gadio had a family-owned
20 property in Maryland, a home there.  And he was allowed to
21 use that as security as his bail and also to reside there
22 during the pendency of this case.
23          THE COURT:   Okay.  So tell me about this
24 defendant.
25          MR. KIM:   Dr. Ho does not own a property, Your

```
 1                                                             22
 2   Honor, but what we have done is, we have begun the
 3   application process for essentially a long-term rental here
 4   in Manhattan.  And pending approval of the Court, obviously
 5   we wouldn't propose that Dr. Ho be released, unless and
 6   until Pretrial Services approves that apartment.  Our
 7   understanding is that it has a landline phone so he can be
 8   subject to home incarceration there.
 9            But Your Honor, I think -- I'll say a couple
10   things first of all.  I think Your Honor was starting to ask
11   a little bit about the lack of ties to the United States.
12            THE COURT:   Mm-hmm.
13            MR. KIM:   You know, Your Honor, I think the
14   government sort of glossed over this and it's not a point
15   that should be glossed over.  There are five co-signers who
16   are willing to pledge their assets to secure the bond here.
17   We have four letters that we submitted to the Court.
18            Your Honor, cumulatively, these people have known
19   Dr. Ho for probably over 200 years.  That is no small
20   amount.  They can vouch for his character and I'll walk
21   through some of the highlights of the letters.  But Judge,
22   these are people who have deep and meaningful ties to Dr.
23   Ho.
24            Now, I'm going to also just note, Judge, on this
25   issue about bailing foreign nationals.  Foreign nationals
```

23

1

2  are routinely granted bail in this courthouse.  I'll give

3  you a handful of examples when this has happened.

4          THE COURT:  It would seem to me foreign

5  nationals, just like U.S. nationals, are sometimes granted

6  bail and sometimes not granted bail.

7          MR. KIM:  Yeah, my point, Your Honor --

8          THE COURT:  So you can give examples of those who

9  were and you can give examples of those who are not.

10         MR. KIM:  Absolutely.  The reason I brought it

11 up, Judge, is because I want to respond, I think in part to

12 what I think Pretrial Services recommendation was based on,

13 with sort of a knee-jerk response of the fact that he's a

14 foreign national.

15         But we can all agree on that premise, Judge, that

16 there are many defendants in this court actually been

17 granted bail, some who have not, who come from other

18 countries.  That list includes a number of defendants who

19 come from countries with no extradition treaty to the United

20 States as well.

21         Now, I'll talk a little bit about the co-signers,

22 Judge, because I think they are pretty exceptional in this

23 situation.  They speak to the genuine depth of Dr. Ho's ties

24 to people in this country.  They've known Dr. Ho for

25 decades, and based on the man that they know and trust who

24

1

2   are willing to pledge their assets.

3           Steven Chan is a retired electrical engineer who

4   has known Dr. Ho for over 50 years.  He cites Dr. Ho as a

5   man of great integrity.  Dr. Zolily Chan (phonetic) and John

6   Deap (phonetic) are retired doctors who have known Dr. Ho

7   for approximately 30 years, and they say that he loyal to

8   his friends.  We believe in his integrity as a person.  We

9   have no reservation in our support of him.  Dr. Peter Quak

10  (phonetic), a childhood best friend, who's known Dr. Ho for

11  over 50 years.  He says that I therefore have no hesitation

12  to pledge my strongest support because of his integrity and

13  trustworthiness.

14          Dr. Ho has known these people for decades, Judge.

15  The government keeps raising the specter of a shadowy

16  conglomerate waiting to spirit Dr. Ho out of the country.

17  But these co-signers are regular Americans.  They know Dr.

18  Ho and they're willing to pledge their assets to secure his

19  release.

20          Judge, Dr. Ho's record of service speaks for

21  itself.  He's not going to abandon these co-signers and his

22  friends to financial ruin.  He's not going to disgrace

23  himself and flee.  The bail package that we propose, it's

24  strict but it's sufficient, Judge, and it more than

25  reasonably assures his return to court.

```
 1                                                          25
 2           Now Judge, the one thing I also want to put in
 3   context is this idea that I think the premise of the
 4   government's argument about why Dr. Ho should be retained,
 5   regardless of which country he flees to, and I think they've
 6   implied that Dr. Ho may also flee to Chad or Senegal, which
 7   is ridiculous.
 8           THE COURT:   Are those Uganda --
 9           MR. KIM:   We know his ties to foreign officials
10   in other countries, Judge, and --
11           THE COURT:   I thought it was Chad and Uganda.
12           MR. KIM:   Oh, Uganda.  I'm sorry, Judge.  Now,
13   Dr. Ho's a 68-year-old man who has surrendered his passport,
14   or it's been seized, rather.  The government cannot offer a
15   plausible explanation for how Dr. Ho would get a fake
16   passport while there's an active warrant against him, and
17   would sneak out of the country using a fake ID.  Nothing in
18   Dr. Ho's history, nothing about his character or past,
19   suggests he's capable of doing something like that, much
20   less willing to do it.
21           He has not desire to flee.  And even if he did, he
22   wouldn't have the ability.  And if he did flee, Judge, a Red
23   Notice would follow him wherever he went.  And keep in mind,
24   the same sort of fact the government is citing to, Dr. Ho's
25   frequent travel for his business.  It also tells you why he
```

1

2 has every incentive not to take that course of action

3 because his livelihood, his entire career's been built on

4 his international presence.  If he were to flee, and a Red

5 Notice were to be issued, he would be stuck in one country.

6           Judge, the history, everything about the history

7 of Dr. Ho, everything about his background and experiences,

8 tells you he is not a man who's willing to do that.  He'd

9 sooner hunker down in a cave in Afghanistan.

10           Dr. Ho certainly cannot flee to Hong Kong.

11 There's been significant press coverage there.  He's a

12 former cabinet-level official.  He's way too high-profile,

13 he's too visible.  He cannot hide in that country, and as

14 I've already mentioned, there's an extradition treaty there.

15           And to the extent that Mr. Richenthal is going to

16 get up and suggest that Dr. Ho can suddenly flee to China,

17 this was another inaccuracy, Judge.  Dr. Ho actually does

18 not possess a resident ID in China.  So that means he can't

19 work there, he can't open a bank account there.

20           He was born and raised in Hong Kong.  He's lived

21 there his entire life, aside from the approximately two

22 decades he lived here, in this country.  And the government

23 is painting a reductionist picture to say that Dr. Ho could

24 maybe uproot and move to China instead of Hong Kong.  And if

25 you accept that argument, Judge, then no individual who has

27

1

2      any desire to ever go to China, theoretical desire to go to

3      China, could ever be bailed.

4            I'll note that the government tried to argue with

5      respect to Mr. Gadio that he, too, could flee to China.  And

6      the standard here is not whether the government can imagine

7      a scenario in which a defendant could possibly flee.  The

8      standard is whether there are conditions that would

9      reasonably assure of the defendant's presence in court or

10     packing is sufficient for that.

11            MR. RICHENTHAL:   Your Honor, let me just start

12     with the treaty.  I'm happy to be corrected if there's a

13     treaty.  That was not our understanding.  We've certainly

14     spoken with the DOJ Office of International Affairs.  That

15     said, even if there's a treaty with Hong Kong, even skimming

16     it here I can see multiple potentially applicable

17     exceptions.

18            I'm just going to highlight one.  If Your Honor

19     were to Google this case, you will see there's a lot of

20     coverage in China and elsewhere.  Some of the coverage in

21     China and related parts of Asia accuses this prosecution of

22     being politically motivated.  That is frivolous, but there's

23     an exception in the treaty for when Hong Kong appears to

24     believe a prosecution is political.  This is not, but the

25     point is there are exceptions that could be invoked.

                                                                28

1

2              THE COURT:   I'm sorry.  Where is that?

3              MR. KIM:    In Article 3, Your Honor.

4              MR. RICHENTHAL:   That's correct and there are

5    other exceptions as well.  So for example, the crime has to

6    be a crime in Hong Kong.  I'm not aware standing here, are

7    the crimes charged in this complaint are also crimes in Hong

8    Kong.  This is some nuance stuff.

9              What I will say is, we spoke with the DOJ Office

10   of International Affairs before bringing the prosecution.

11   We spoke with them in connection with this case.  I could

12   not ask about this particular treaty because I was not aware

13   of it.  I'm happy to do that if it's dispositive, but there

14   are exceptions on the face and the fundamental point

15   remains.

16             Now with respect to Mainland China, it's my

17   understanding, Dr. Ho actually does have a residence card.

18   But even if he didn't the Chinese energy conglomerate is

19   based in Mainland China in Shanghai.  It would be mind-

20   blowing if they didn't facilitate his movement across the

21   border into Mainland China where he could live a very

22   comfortable life.

23             Let me also note, by the way, the idea that a Red

24   Notice would prevent him from doing so is, in this case --

25   not in every case -- in this case, fanciful.  The countries

29

that he goes to regularly for business are not countries

that recognize American launched Red Notices, like Iran and

Russia, and for that matter, China.  These are not countries

where that can give the Court any reasonable assurance.  He

has been to countries where that's not true.  He travels all

over the world.  I don't want to lead the Court to think he

doesn't go to countries where that's true.  He does.  But he

also regularly goes to the countries where it isn't true.

And the business, as I've said, is on behalf of a massive

oil company.

        I also want to note just very quickly that, you

know, the idea that detaining this defendant for multiple

reasons, one of which is his association with the Chinese

Oil Company, essentially is akin to saying anyone related

to, say Goldman Sachs to use Mr. Kim's example, should be

detained.  But that's of course not what we're saying.  Bail

is a fact-dependent determination.

        This is not an American company.  This is not a

company subject to our jurisdiction.  And most importantly,

this is not a man, to use Mr. Kim's words, nearly, quote,

"associated," end quote, with the Energy Company.  The

complaint talks about who he's working with, the chairman of

the Energy Company, the high-level officials of the energy

company.  He's not associated as of some random employee.

1

2   He's the person who flies around the world paying bribes to

3   advance the interest of the oil company.

4          And let me also note with respect to Mr. Gadio, it

5   is true we sought detention.  It is true he was bailed.  But

6   the following facts are also true:  His wife's a United

7   States citizen, he's a lawful permanent resident of the

8   United States, his wife owned property in Maryland and had

9   for over a decade, which is the property he's currently

10  living in.  None of those factors exist here.

11         When Judge Pauli modified the bail in part to make

12  it more stringent, but nevertheless agreed with Magistrate

13  Judge Fox, that those are the factors he focused on.  Those

14  are actual connections with the United States.  We think, we

15  thought, and we still think they're insufficient, but

16  they're actual.

17         Mr. Gadio's role in this offense was also

18  essentially a facilitator, not a leader, and he's not from

19  China.  There are marked distinctions between these two men.

20  Mr. Gadio's assets, while real, are not 7 to $8 million.  So

21  regardless of whether he should've been bailed, this is a

22  totally different defendant, totally different placed.  And

23  Pretrial, by the way, recommended release for Mr. Gadio.

24  They recommend detention for Mr. Ho.  I don't think either

25  of those things was knee-jerk; I think it was thoughtful.  I

31

respectfully disagree with the recommendation for Mr. Gadio.
I agree with the recommendation of Mr. Ho, but it was not
knee-jerk.  They don't easily recommend detention.  They're
doing it here on the facts of this case because the facts of
this case cry out for detention.

          MR. KIM:   Your Honor, just to correct an
inaccuracy, Dr. Ho does not have an ID card, he has an entry
card which allows him to enter China, but not live there.

          Now, Mr. Richenthal actually drew some contrasts
to Mr. Gadio in this case.  It's ironic that he would talk
about Mr. Gadio's LPR status because as the government
pointed out, I think they essentially argued it wasn't worth
the paper it's written on because he didn't have much
contact with this country at all.  In 2017 Mr. Gadio was in
this country for a total of 13 days, far fewer than Dr. Ho.
And as the government pointed out, all of Mr. Gadio's ties
are abroad.  Dr. Ho has actually had more extensive ties
with this country than Mr. Gadio.

          And with respect to Mr. Gadio's house, the
government also argued that none of Mr. Gadio's family or he
had lived in that house.  We have an apartment that, pending
Your Honor's approval, we can secure that is not far from
this courthouse, our package offers equivalent security.
And I'll also note, Judge, just with respect to Mr. Gadio,

1

2  he gave an extensive post-arrest statement and also lied to

3  Pretrial Services, neither of which are factors here.

4          THE COURT:   Well I asked the question about Mr.

5  Gadio earlier out of curiosity.  But the fact of the matter

6  is, every case has to be looked at individually anyway,

7  including co-defendants in the same case.  Each has to be

8  looked at individually.

9          And I was not on the bench when Mr. Gadio was

10 brought in.  And when there was a bail hearing for him, I

11 didn't hear the full arguments, and I'm not going to assume

12 what factors were particularly important to any judge, or

13 why Pretrial made the recommendation it did, when I don't

14 have that in front of me.

15         I will say this in support of Pretrial's

16 thoughtfulness in the work that it does, I don't think there

17 is anything knee-jerk about what Pretrial Services does, and

18 I will stick up for Pretrial in that regard.  I have had

19 many, many individualized recommendations for foreign

20 nationals, some of whom are -- it is recommended that they

21 be released, and some of whom it's recommended that they not

22 be.  We certainly have many people here who are not U.S.

23 citizens and who are not lawfully in this country, and

24 sometimes this is a factor that warrants detention, and

25 sometimes there are other reasons why someone should not be

1

2 detained.  So I'm not going to stand for Pretrial Services

3 work being maligned as knee-jerk.  It's not in my

4 impression.

5        Now, all that said, I have what I have here.  I'm

6 going to note for starters, and it's my understanding --

7 correct me if I'm wrong -- that the burden of proof to

8 establish flight risk is preponderance as opposed to danger,

9 which I believe is clear and convincing.  So it's an easier

10 burden for the government to establish risk of flight.  The

11 question is, which way does that needle tip, based on the

12 information we have in front of us.

13        I do see some letters from people who are in the

14 United States saying they trust in this individual's

15 integrity.  I have the government telling me it has evidence

16 of a lack of integrity of this individual in connection with

17 the conduct that's charged in the complaint.  So I don't

18 know if he is or is not a person of integrity.  I guess the

19 question is whether these individuals are willing to put

20 significant resources on the line for him.  They seem to be.

21        I also take the government's point that if Mr. Ho

22 should flee, it does not seem true that these individuals

23 would necessarily be subject to financial ruin, as he seems

24 to have enough assets that he would be able to reimburse

25 them should they lose their resources supporting him on the

1
2   bond.

3         I don't know how easy it would be for him to

4   travel without a passport.  The government has seized the

5   passport.  I do note the passport is rather remarkable for

6   the number of stamps in it.  He seems to travel quite a lot,

7   for whatever that's worth.  He certainly doesn't seem to

8   stay put here all that long at a time, and I am --

9         MR. KIM:   Although, Your Honor, I'll just note I

10  don't think the exit stamps are reflected in that passport,

11  the entries are.

12        MR. RICHENTHAL:   Actually, the overwhelming

13  majority of time, the departures are also reflected.  But it

14  is true in a manority of countries the departures are not

15  reflected.

16        THE COURT:   Well for the United States do we know

17  for sure how often he was here and how long he stayed.

18        MR. KIM:   I don't think that can be determined

19  from looking at the passport, Your Honor.

20        THE COURT:   Can it be determined from other

21  information the parties have?

22        MR. RICHENTHAL:   It can be determined from

23  records of the Department of Homeland Security.  I would

24  concur with Mr. Kim, he comes here a handful of times a year

25  and stays anywhere from a couple days to a couple weeks.  I

35

think we have a disagreement as to the number of times he

came here in 2017.  I think Mr. Kim said seven times.  By

our count it's five times, but I think that's sort of

material and distinguishable.  I think he actually comes a

few times a year and stays for a few days to a few weeks.

THE COURT:  All right.

MR. KIM:  And Your Honor, just one other thing.

I'm sorry.

THE COURT:  Go ahead.

MR. KIM:  Your Honor had mentioned this point

about Dr. Ho's assets being sufficient to reimburse co-

signers in the event that they had to forfeit their assets.

The one thing I would say, Judge, we proposed a package that

we believe to be sufficient.  But if it's a question of

making sure that Dr. Ho is not in a position to do that,

than sooner than the Court ordering detention, we would ask

the Court to consider setting a higher bail amount.

THE COURT:  All I'm saying is that Mr. Ho seems

to be a man of substantial resources.  And it seems to be a

reasonable point that the government's making, that if he

were to flee and be able to tap into substantial resources,

that those supporting him may not have that much reason to

fear that they would be in, as you put it, financial ruin.

MR. KIM:  And I would just say, Judge, that

```
 1                                                         36
 2   there's a lot of contingencies in that statement, none of
 3   which are (inaudible).
 4         THE COURT:  Well you made a very absolute general
 5   statement, that if he were to flee, all these people who
 6   stand up for him, I think you used the phrase financial
 7   ruin, or something like that.  And that was not --
 8         MR. KIM:  I used the phrase knee-jerk and that
 9   came back to haunt me, Judge.
10         THE COURT:  But that would not seem to me to be
11   self-evident.  But you said that they would necessarily be
12   ruined and he would not want to see that happen.  I don't
13   think it's necessarily true that they would necessarily be
14   ruined.  So I think there's something to be said on both
15   sides on this point about having people willing and able to
16   stand up for him in terms of financial support for bond, and
17   with the government saying that if he, if Mr. Ho, were to
18   flee, he may be able to help them out on that point, at
19   least to some extent.  So let me pass by that for a moment.
20         Usually in any case, regardless of the number of
21   zeroes attached to somebody's means, we look at the same
22   kinds of factors.  The first thing we look at is are there
23   ties here and are there ties elsewhere and how strong are
24   they in each place.  I think it is correct Mr. Ho does not
25   have the kind of community ties here, living in community,
```

37

having family here, having a spouse here, having children
here, having parents here, having other family members here,
having a home here, having a business here, you know, and
having a job that's rooted here.  I think it's correct that
he does not have those kinds of ties to the community that
we generally look for.

It also is true that he has ties elsewhere, at
least to Hong Kong and possibly elsewhere, where he could
go.  We look to see is there a place where the person could
go.  We look to see does the person have means to flee, is
the person is incapacitated such the he really couldn't go
anywhere.  Does he have financial resources available to him
that would make it easier for him to flee.  He seems to have
means and he seems to be a seasoned traveler and he seems to
have strong ties elsewhere.  So we have a lack of ties here
relative to the strength of ties elsewhere.

In terms of his immigration status here, we don't
seem to have either citizenship or permanent residence
status or lawful residence status or -- we seem to have, as
Pretrial puts it, temporary status here.  That is not a
strong factor that helps him in terms of his quest to stay
here.

The question is what do we have that helps tip the
balance toward his ability to stay here.  Both sides have

1
2  talked about the charges as being something that weighs in

3  their favor.  The government says the strength of the

4  evidence, the seriousness of the charges, weighs in favor of

5  incentive to flee.  Defense counsel has said it weighs in

6  favor of his need to clear his name because he can't go back

7  with this hanging over his head.  I'll call it a draw; I

8  think it could be argued either way.

9         I'm not seeing a lot of factors that unequivocally

10  tip in favor of his being likely to stick around.  So then I

11  get to the, well, what if we have him on electronic

12  monitoring with home incarceration in an apartment that is

13  found for him and approved by Pretrial Services.

14         I'm not all that persuaded.  I'm really not all

15  that persuaded that that will --

16         MR. KIM:   Your Honor, I'd like -- I'd love to

17  take a crack at --

18         THE COURT:   Go ahead.

19         MR. KIM:   Judge, I think the root of this

20  argument is looking just under the bail format, at the

21  history and characteristics of Dr. Ho.  What is it in his

22  history that would suggest that he's a man capable of

23  cutting off a bracelet, finding a fake travel document,

24  secreting himself across a border to flee to Iran or China

25  or somewhere else?  And the answer is nothing, Judge,

1

2  nothing in his history suggests he's capable of it and

3  nothing to suggest that he's someone who actually wants to

4  do that, Judge.

5         But I think that's -- if we think very

6  specifically about the kinds of actions he would need to

7  take in order to effectuate his flight from justice.  He's a

8  68-year-old man, not in tip-top shape.  He would have to

9  literally cut off the bracelet, Judge, and find a way to get

10  out of the United States.  I mean there is nothing about

11  this man to suggest he's capable of it, nothing to suggest

12  he has the desire to do that.

13         Home incarceration with electronic monitoring,

14  Judge, I don't have all the stats here, Judge, but it's a

15  pretty darn effective way to keep defendants showing up in

16  court in this courthouse.

17         MR. RICHENTHAL:  Just very briefly, the answer on

18  history and characteristics is two-fold.  One, this crime is

19  one of deception.  As I said, he cloaked himself in a way

20  that just is utterly false.  That is part of his history and

21  characteristics.  But two is, I don't know Mr. Ho.  He may

22  be a kind and wonderful person but he's facing years in

23  prison.  And all he has to do is leave this country.  A

24  rational person would leave.  He has the ability to leave.

25         THE COURT:  All right.  The charges alone and

1                                                                    40

2   length of time someone's facing is alone not enough to, in

3   my view and I think in the Circuit's view, not enough to

4   warrant detention.  But electronic monitoring can certainly

5   be helpful and I have certainly ordered it in the past.  But

6   balancing everything that I have here, and in light of the

7   government's burden in this case, on this particular -- in

8   this case, on the flight-risk point, and whether the

9   government has met it in this particular case, looking at

10  the individual case that is in front of me, I am going to

11  accept Pretrial's recommendation.

12          I will say, as usual, capable defense counsel

13  makes it a closer call than it might seem at first blush.  I

14  don't consider it an easy decision but I'm persuaded the

15  government's met its burden by the standard they need to

16  meet it by.

17          I'm going to order detention for substantially the

18  reasons stated by Pretrial, particularly with respect to the

19  weighing of the strength of connections to different

20  locations, and factoring in, in some extent the lack of

21  immigration status not standing alone.  I have granted bail

22  in the past who did not have lawful status.  But in this

23  case, I think that it doesn't help.  And I'm not seeing the

24  factors that would really persuade me that release is

25  appropriate.  Anything further, counsel?

```
 1                                                          41
 2              MR. RICHENTHAL:   Not from the government.
 3              MR. KIM:   Judge, I don't think I need to do this
 4   for the record but we intend to take an appeal on the
 5   decision.
 6              THE COURT:   That's fine and I can't say I'm
 7   surprised.  I'm going to fill out a disposition sheet with
 8   short notations of my reasoning.  You might want to obtain a
 9   transcript of this to provide to the district judge.
10              MR. KIM:   We will, Your Honor.
11              THE COURT:   Depending upon how fast you go to a
12   district judge that may or may not be feasible.
13              MR. KIM:   We'll do that.  Thank you, Your Honor.
14              THE COURT:   Okay.  All right.  Thank you all.
15                   (Whereupon the matter is adjourned.)
16
17
18
19
20
21
22
23
24
25
```

42

## C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the United States District
Court, Southern District of New York, United States of
American v. Chi Ping Patrick Ho, docket number 17mj08611,
was prepared using digital electronic transcription
equipment and is a true and accurate record of the
proceedings.

Signature_____*Carole Ludwig*_____

Date:  December 8, 2017