UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

    -*v.*-                                              :          17 Cr. 779 (LAP)

CHI PING PATRICK HO,                              :
  a/k/a "Patrick C.P. Ho,"
  a/k/a "He Zhiping,"                              :

                 Defendant.                 :

-------------------------------------------------------------------x


## THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                      GEOFFREY S. BERMAN
                                      United States Attorney
                                      Southern District of New York

                                      SANDRA MOSER
                                      Acting Chief, Fraud Section
                                      Criminal Division

Daniel C. Richenthal
Douglas S. Zolkind
Catherine E. Ghosh
Assistant United States Attorneys

Paul A. Hayden
Trial Attorney

- Of Counsel -

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 2

ARGUMENT ..................................................................................................................... 4

I. EVIDENCE THAT THE DEFENDANT WOULD ONLY CONTRIBUTE MONEY TO JOHN ASHE IF ASHE FIRST AGREED, IN RETURN, TO UNDERTAKE ACTIONS BENEFICIAL TO CEFC'S INTERESTS IS ADMISSIBLE ..................... 4

    A. The Proffered Evidence ........................................................................................ 4

    B. Applicable Law ..................................................................................................... 6

        1) Direct Evidence ............................................................................................ 6

        2) Evidence of Other Acts ................................................................................ 6

    C. Discussion ............................................................................................................. 8

II. EVIDENCE OF THE DEFENDANT'S BROKERING IRANIAN TRANSACTIONS AND ARMS TRANSACTIONS IS ADMISSIBLE .................................................. 11

    A. The Proffered Evidence ...................................................................................... 11

        1) Evidence of Transactions With Iran ........................................................... 11

        2) Evidence of Arms Transactions .................................................................. 12

    B. Discussion ........................................................................................................... 14

III. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S ALLEGATION THAT THE CHARGES AGAINST HIM ARE POLITICALLY MOTIVATED SHOULD BE PRECLUDED ........................................................... 17

IV. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S FAMILY BACKGROUND, HEALTH CONDITION, AGE, PRETRIAL DETENTION, OR ANY OTHER PERSONAL FACTOR UNCONNECTED TO GUILT SHOULD BE PRECLUDED, AS SHOULD DISCUSSION OF PUNISHMENT ............................. 19

V. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S OR CEFC'S PRIOR COMMISSION OF "GOOD ACTS" OR NON-COMMISSION OF OTHER BAD ACTS SHOULD BE PRECLUDED ................................................................ 20

VI. EVIDENCE OR ARGUMENT CONCERNING THE "MERITS" OF THE PROJECTS THE DEFENDANT SOUGHT TO ADVANCE THROUGH BRIBERY, OR THE ALLEGED GOOD CAUSES TOWARD WHICH THE OFFICIALS HE BRIBED COULD HAVE USED THE BRIBE PAYMENTS, SHOULD BE PRECLUDED .... 22

VII. THE DEFENDANT'S PROFFERED EXPERT TESTIMONY SHOULD BE PRECLUDED ...................................................................................................... 24

CONCLUSION ................................................................................................................ 30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

UNITED STATES OF AMERICA             :

    -*v.*-                            :      17 Cr. 779 (LAP)

CHI PING PATRICK HO,             :
  a/k/a "Patrick C.P. Ho,"
  a/k/a "He Zhiping,"             :

                      Defendant.      :

----------------------------------------------------------------x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully seeks rulings *in limine* on several issues prior to trial.

*First*, the Government moves for the following pretrial rulings:

- evidence that the defendant stated that he would provide a financial contribution to John Ashe—who served as the President of the United Nations General Assembly ("PGA") during the year prior to Sam Kutesa, whom the defendant is charged with bribing—only if it were first clear that Ashe would, in return, take actions beneficial to CEFC,[1] is admissible pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)"); and

- evidence of the defendant's efforts to broker transactions in or with Iran, and to broker arms transactions, is admissible as direct evidence, or in the alternative, pursuant to Rule 404(b).

*Second*, the Government seeks to preclude certain evidence or argument that is wholly

irrelevant to the issues at trial, and/or for which any conceivable probative value is substantially

---

[1]      Kutesa is described in the Complaint and the Indictment as the "Ugandan Foreign Minister." "CEFC" herein refers to CEFC China Energy Co. Ltd. (the "Energy Company" in the Complaint and the Indictment), China Energy Fund Committee (the "Energy NGO" in the Complaint), and affiliated entities, collectively. Where we intend to refer only to the "Energy Company," we will refer to "CEFC China," and where we intend to refer only to the "Energy NGO," we will refer to "CEFC NGO." In communications, the defendant and others often referred simply to "CEFC," without specifically identifying the company or the NGO.

outweighed by the risk of juror confusion, distraction from the evidence, unnecessary

lengthening of the trial, and/or unfair prejudice to the Government.

Specifically, the Government moves to preclude evidence or argument concerning:

- the defendant's view that the charges against him are politically motivated;

- the defendant's family background, health condition, age, conditions of detention, or any other personal factor unconnected to his guilt or innocence, and the potential punishment he faces if convicted;

- the defendant's or CEFC's alleged prior commission of good acts, such as philanthropic giving, and/or failure to commit other bad acts; and

- the "merits" of the projects that the defendant sought to advance through bribery, or the alleged good causes to which the officials he bribed could have used the bribe payments.

*Finally*, for similar reasons, the Government moves to preclude the defendant's proffered

expert testimony, or other evidence or argument concerning the same subjects.

## **BACKGROUND**

The factual allegations against the defendant are set forth in detail in Complaint 17 Mag.

8611, summarized in the Indictment, and described in prior submissions to the Court.

In sum, the defendant served as the Secretary-General of a non-governmental

organization based in Hong Kong and Virginia (referred to herein as "CEFC NGO"), which

holds "Special Consultative Status" with the United Nations ("UN") Economic and Social

Council, and which is funded by a Shanghai-based oil and gas conglomerate (referred to herein

as "CEFC China"). The charges against the defendant are based on two schemes in which the

defendant offered and/or provided payments to high-level officials of African countries for the

purpose of obtaining business advantages for CEFC China.

In the first scheme, the defendant offered a $2 million cash bribe to the President of

Chad. This money was offered in an effort to obtain advantages for CEFC China in its pursuit of

valuable oil rights and other business opportunities in Chad.  Cheikh Gadio—the former Foreign Minister of Senegal and a lawful permanent resident of the United States, who at the time was acting as the head of his own consulting firm, and who is cooperating with the Government and is expected to testify at trial—introduced the defendant to the President of Chad and acted as the defendant's intermediary for discussions and negotiations with the President and other Chadian officials.  The defendant met with Gadio at and around the UN in New York, New York, in or about late September 2014, to engage him for this role.  In exchange for Gadio's work, the defendant paid his firm $400,000 through two wires that were transmitted from a bank account in Hong Kong to correspondent banks in New York, New York, and then to a bank account in Dubai in the name of Gadio's firm.

In the second scheme, the defendant caused a $500,000 bribe to be wired from a bank in Hong Kong to a correspondent bank in New York, New York, and then to a bank account in Uganda that had been designated by the Foreign Minister of Uganda, Sam Kutesa (with the assistance of his wife), in the name of a purported charitable foundation.  The defendant caused this bribe to be paid for the purpose of obtaining business advantages for CEFC China in its efforts to secure contracts in Uganda, including in Uganda's financial and energy sectors.  The corrupt relationship between the defendant and Kutesa developed during the preceding year in which Kutesa had been serving as the PGA, including through multiple meetings in New York, New York.  The defendant also provided Kutesa, as well as the President of Uganda, with promises of future benefits, including proposing to partner with both officials' families in potentially lucrative joint ventures.

<u>**ARGUMENT**</u>

I. **EVIDENCE THAT THE DEFENDANT WOULD ONLY CONTRIBUTE MONEY TO JOHN ASHE IF ASHE FIRST AGREED, IN RETURN, TO UNDERTAKE ACTIONS BENEFICIAL TO CEFC'S INTERESTS IS ADMISSIBLE**

A. **The Proffered Evidence**

As described in the Complaint, the Indictment, and above, among the individuals whom the defendant is charged with bribing is Sam Kutesa, the Ugandan Foreign Minister. The Government expects that the evidence will show that the corrupt relationship between the defendant and Kutesa developed between in or about September 2014 and September 2015, when Kutesa was serving as the PGA (specifically, the PGA for the 69th session of the UN General Assembly).

The evidence, in both the form of emails and a recorded phone call, also shows that, just as he did with respect to Kutesa when he was the PGA, the defendant sought to cultivate a business relationship with Kutesa's predecessor, John Ashe, who served as the PGA between in or about September 2013 and September 2014. As he did with Kutesa, the defendant began by introducing himself to Ashe as the Secretary-General of CEFC NGO. And just as he did with Kutesa when he served as the PGA, the defendant invited Ashe to visit CEFC NGO in Hong Kong and to speak at various events.

In mid-April 2014, Ashe traveled to Hong Kong and met with the defendant and others. After the trip, Ashe's aide sent a letter to the defendant thanking the Chairman of CEFC NGO (who was also the Chairman of CEFC China) for the contribution of $50,000 to support the PGA. The aide had solicited the contribution from the defendant prior to the Hong Kong trip, and the defendant had confirmed that CEFC NGO would make the contribution.

In or about early June 2014, the defendant requested that Ashe officiate over a forum that CEFC NGO was planning to hold at the UN, and also attend and officiate over a luncheon at the

4

UN the following day. (The defendant made virtually the same request of Kutesa once he became the PGA.) The day before the forum (July 6, 2014), the defendant emailed two business associates of Ashe, who assisted him in raising funds, to invite them to the forum and luncheon and to request their assistance in "urg[ing] the PGA to grace the occasion with his presence and to deliver a short remark."[2]

On or about the same day, the defendant and one of these associates ("Associate-1") spoke by phone. (*See* Ex. A (draft transcript).) During the call, which was recorded, the defendant confirmed that he wanted Ashe to attend his event. The following conversation then took place:

> Associate-1: So the last question, so sorry if I ask too direct. . . . [H]ave you, made some contribution to him . . . ?
>
> The defendant: Yeah, we already paid.
>
> Associate-1: Oh you did? Okay.
>
> The defendant: Well, not a whole lot but it's—it's okay. On a couple of occasions. But I think the major contribution will come in after we talk about what he can—what he can help us with.
>
> Associate-1: What you—what you mean major contribution? It's after he return uh—leave the job?
>
> The defendant: Yes, yes.
> . . .
> Associate-1: Wonderful . . . okay.
>
> The defendant: That's not a—that's not a problem. The problem is—uh, it's give and take.
>
> Associate-1: Give and take. That's—of course. This is the—this is business, right?
>
> The defendant: Yeah, right.

---

[2] These two business associates subsequently pleaded guilty to bribing Ashe, based on conduct unrelated to the defendant and CEFC. Ashe was charged with tax offenses arising from his allegedly failing to disclose bribe payments as income. He passed away before trial, and the charges against him were therefore dismissed.

**B.  Applicable Law**

*1)  Direct Evidence*

Direct evidence of a crime is not limited to "that which directly establishes an element of the crime."  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  Rather, direct evidence includes evidence that is "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial."  *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *see also United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012).

*2)  Evidence of Other Acts*

Rule 404(b) allows for the admission of uncharged crimes, wrongs, or other acts for purposes other than proving criminal propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  The Second Circuit "has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity."  *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (internal quotation marks omitted).  Applying this approach, the Second Circuit has routinely approved of the admission of "other acts" evidence with respect to the issues of knowledge, intent, and/or motive.  *See, e.g.*, *United States v. Thomas*, 54 F.3d 73, 81-82 (2d Cir. 1993); *United States v. Meyerson*, 18 F.3d 153, 166-67 (2d Cir. 1994).  Where the defendant claims his conduct has an innocent explanation, the admission of such evidence of prior acts is particularly appropriate.  *See, e.g.*, *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

The defendant's knowledge and intent are in issue unless the defendant has unequivocally conceded that element of the offenses with which he is charged. *See, e.g.*, *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *see also United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (when the defendant "disavows awareness that a crime was being perpetrated" and the Government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

Evidence of uncharged acts also is admissible as background evidence where it is used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual criminal trust that existed between co-conspirators; and/or (iii) complete the story of the crime charged. *See United States v. Mercado*, 573 F.3d 138, 141-42 (2d Cir. 2009); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (affirming admission of prior act evidence involving co-conspirators "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed" (internal quotation marks omitted)); *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (other act evidence admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.").

The Court has broad latitude in determining whether to admit evidence pursuant to Rule 404(b). *United States v. Brady*, 26 F.3d 282, 286 (2d Cir. 1994). Where evidence is offered for a proper purpose under Rule 404(b), it may only be excluded if the probative value of the

evidence is "substantially outweighed" by the danger of unfair prejudice. *Zackson*, 12 F.3d at 1182; Fed. R. Evid. 403. The Second Circuit has repeatedly held that evidence properly admissible under Rule 404(b) is not unduly prejudicial so long as the court gives a limiting instruction to the jury explaining the purpose for the evidence. *See Pipola*, 83 F.3d at 566; *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993).

### C. Discussion

The above-proffered evidence concerning the defendant's relationship with Ashe is admissible under Rule 404(b) to prove the defendant's intent and absence of mistake or accident. In particular, the Government expects that, at trial, there will be little dispute that the defendant participated in (i) wiring $500,000 to an account designated by Kutesa, and (ii) offering $2 million to the President of Chad. Rather, the central disputed issue is expected to be *why* the defendant offered and provided these funds—*i.e.*, whether he was motivated by charitable concerns or business interests. The proffered evidence strongly rebuts any claim that the defendant's interests were solely or predominantly charitable. It also demonstrates that it was no mere "accident" or "mistake" that the defendant developed a relationship with Kutesa during the time he was the PGA that resulted in the payment of substantial funds following that period, when Kutesa was in a position to assist CEFC's business interests. On the contrary, this was part of a conscious and deliberate plan by the defendant. *See Zackson*, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged."); *cf. Meyerson*, 18 F.3d at 166-67 (evidence of defendant engaging in fraud and tax evasion on prior occasions was "clearly admissible" under Rule 404(b) where he "contended that he lacked the state of mind to cheat on his income taxes").

Specifically, as set forth above, when Ashe was in office—immediately before Kutesa—the defendant undertook a near-identical course of conduct. As he did with Kutesa, the defendant forged a relationship with Ashe by introducing himself as the head of a purportedly charitable, UN-recognized NGO; as he did with Kutesa, the defendant honored Ashe at various CEFC NGO events; as he did with Kutesa, the defendant invited Ashe to visit Hong Kong for a meeting with executives; and, crucially, as he did with Kutesa, the defendant promised Ashe a significant "contribution" after his term as PGA ended. But as the defendant admitted when he did not know he was being recorded, the "major contribution" to Ashe would not be made until the defendant could determine "what he can help us with." As the defendant put it, "it's give and take"; and as Associate-1 agreed, "this is the business," to which the defendant responded, "Yeah, right."

In short, the defendant would make a bigger payment, but only if he could be assured that he—and those on whose behalf he was acting ("us")—got something in return. That is precisely what the defendant did the following year with the next PGA, Kutesa. The repeat of the same plan, executed in the same way, powerfully demonstrates that, as the Government has alleged, the defendant entered into a *quid pro quo*. He did not "accident[ally]" or "mistake[nly]," Fed. R. Evid. 404(b)(2), send substantial money abroad at the direction of someone from whom he wanted business, and his intent was not principally a charitable one.

The proffered evidence is also admissible for another purpose. To the extent that the defendant were to suggest that he was not a decision-maker with respect to whether to pay a "donation" or "contribution" to a foreign official, the proffered evidence rebuts that claim. It shows that the defendant was no mere low-level bystander to events or ministerial actor who simply did what he was told. Rather, he played a central role in business decisions, including

weighing whether a particular "donation" or "contribution" to a foreign official would result in sufficiently valuable return benefits. *Cf. United States v. Ramirez-Amaya*, 812 F.2d 813, 817 (2d Cir. 1987) ("[Defendant's] defense to the present charges against him was that, although he was a business associate of [co-defendant], he had had no intention of involving himself in unlawful activities. Proof that [defendant] had previously sought to engage in precisely such activities was admissible on the issue of his intent.").

Nor is there any basis to preclude this evidence under Federal Rule of Evidence 403 ("Rule 403"). The evidence is straightforward, non-sensational, and highly probative of the defendant's intent and absence of mistake. There is no risk that this evidence will elicit a separate, heightened response from the jury that would prevent the jury's fair assessment of the evidence, even with a limiting instruction. *See, e.g.*, *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (perceiving "no undue prejudice under Rule 403 [where] the evidence did not involve conduct more serious than the charged crime"); *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence not unfairly prejudicial because it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged"). Indeed, the recorded call involves conduct that is less severe than the bribe arrangements at the center of this trial. In addition, the proffered evidence would not materially lengthen or complicate the trial. The Government proposes simply to introduce a small number of emails, play a short recorded call, and call a witness to identify the participants and context.

## II. EVIDENCE OF THE DEFENDANT'S BROKERING IRANIAN TRANSACTIONS AND ARMS TRANSACTIONS IS ADMISSIBLE

As outlined in detail in the Complaint, the investigation that led to charges against the defendant uncovered numerous emails from the defendant that make plain his willingness to advance the business of CEFC China through payments to officials in Chad and Uganda and more generally show his focus on growing CEFC China's business.

In the course of its investigation, the Government has also uncovered evidence, including emails, in which the defendant expresses an interest in and willingness to advance CEFC China's business (and/or the business of affiliates) in other, particular ways, including (1) transactions in or with Iran, and (2) arms transactions. This evidence is admissible as direct evidence, or in the alternative pursuant to Rule 404(b).[3]

### A. The Proffered Evidence

#### 1) Evidence of Transactions with Iran

The evidence of the defendant's interest in and willingness to broker transactions in or with Iran principally consists of emails, spanning a multiple-year period. To choose a few examples:

In October 2014, the defendant sent his assistant an email stating, "I am going to BJ [*i.e.*, Beijing] this Friday to see [the Chairman of CEFC NGO and CEFC China] on Sat afternoon. The documents I want to send him before hand in separate items are: . . . 7. Iranian connection

---

[3]     As described herein, the defendant often discussed multiple potential business opportunities in the same communications, including transactions involving Iran or arms. The Government is moving *in limine* with respect these particular types of transactions because they may involve uncharged offenses, but this is not the only evidence of the defendant's interest in advancing the business of CEFC China that the Government intends to introduce.

(brief)."[4]  On the same date, the defendant sent his assistant another email, attaching a document, which stated, in pertinent part:

> 7) Iranian Connection . . . Iran has money in a Bank in china which is under sanction.  Iran wishes to purchase precious metal with this money.  The precious metal is available through a Bank in HK which cannot accept money from the Bank in China which holds the money but is under sanction.  The Iranian agent is looking for a Chinese company acting as a Iran middle man in such transactions and will pay commission. (details to be presented orally)  The Iranian connection has strong urge to establish trading relationship with us in oil and products . . . .

The following year, in June 2015, the defendant received an email that stated, in pertinent part: "The Iranian team will arrive in BJ . . . .  See the attached."  The attachment referenced in the email was a PowerPoint presentation entitled "Presentation to Potential Partners Iran Petroleum Investments."  The next day, the defendant forwarded the email to his assistant, stating, "For writing report to [the Chairman of CEFC NGO and CEFC China]."

The following year, in June 2016, the defendant emailed another individual, blind-copying his assistant, and stated, in pertinent part, "Will get [two executives of CEFC China] to meet with [oil executive at company with operations in Iran] in BJ, and [another individual] also on another occasion if he comes. You can start organizing these. . . . Other matters ftf [*i.e.*, face to face]."

### 2)  *Evidence of Arms Transactions*

The evidence of the defendant's interest in and willingness to broker transactions in arms consists of both testimony and emails.  Gadio is expected to testify, in sum, that the defendant told him that CEFC could provide arms and military equipment to Chad as part of an oil deal, and that over the course of Gadio's dealings with the defendant, they had multiple discussions

---

[4]  All emails of the defendant in this section are with CEFC NGO email accounts.

about the possibility of CEFC selling or providing such arms and equipment. This testimony is corroborated by an email exchange in which Gadio asked the defendant: "Do you think CEFC can intervene with the Chinese state to get an urgent, extremely confidential and significant military weapon assistance to our friend [the President of Chad] who has engaged in the battle of his life against the devils of Bokko Haram?," to which the defendant replied, "Your important message has been forwarded. It is being given the highest level of consideration. Will inform you once I hear back."

The defendant also sought to and did broker arms transactions unrelated to the Chad and Uganda schemes charged in this case. For example:

In March 2015, an individual sent the defendant an email, stating, "I have the list and end user agreement. Pls advise next step." On the same day, the defendant replied, in pertinent part, "Find a way to pass them onto me and we can execute that right away[]." The individual replied, "Attached. [W]e have the funding and processing mechanisms in place. If it works nice there will be much more. Also for S. Sudan." The attachment to this email was a document entitled "End User Certificate," certifying that the user of the goods in question would be the Ministry of Defense of the Republic of Libya. The goods listed on the document included numerous arms.

The following month, the defendant sent an email that stated in pertinent part: "It so turns out Qatar also needs urgently a list of toys from us. But for the same reason we had for Libya, we cannot sell directly to them. Is there a way you could act as an intermediary in both cases?" The person whom the defendant emailed replied: "Qatar good chance bc there is no embargo. Libya is another case bc going against an embargo is tricky." The defendant responded: "Qatar needs new toys quite urgently. Their chief is coming to China and we hope to give them a piece of good news. Please confirm soonest."

**B.      Discussion**

The above-proffered evidence is admissible for multiple reasons.

*First*, it is admissible as direct evidence because it is, at least in large part, "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial.  *Carboni*, 204 F.3d at 44 (internal quotation marks omitted).  Indeed, it substantially overlaps in time, method of communication, and persons involved with the evidence of the defendant's agreeing to pay and payment of bribes.

For example, as discussed above, in October 2014, the defendant emailed his assistant a list of a number of items, one of which was "Iranian connection."  Other items in the numbered list included "[a] few PR items in the US with photo of PGA Kutesa," "Chad President Report (brief)," "Croatia Oil company," "PAZ Oil company," and "Husky Oil team (Canada)."  In short, the defendant's interest and willingness to do business with Iran, as expressed in this email, is not separable from his general interest in advancing the business of CEFC China in multiple countries—including Uganda and Chad.

Similarly, the Government expects to introduce evidence that among the work of CEFC NGO was tracking energy developments (so as to assist CEFC China in profiting from them) in various parts of the world.  This evidence includes reports that described such developments in, among other places, the Middle East and Africa.

*Second*, with respect to the evidence of arms transactions, it is admissible as background evidence to show the development and nature of the relationship between Gadio and the defendant.  *See, e.g.*, *United States v. Oliviere*, 740 F. Supp. 2d 414, 422 (S.D.N.Y. 2010) ("It is well established in the Second Circuit that uncharged evidence of other acts is admissible to show the background of a conspiracy or a relationship of trust.").  Indeed, Gadio is expected to

testify that one reason he was willing to work with the defendant is that he understood that the defendant could assist in providing arms to Chad.[5]

*Third*, and in any event, it is admissible pursuant to Rule 404(b). As discussed above, the Government expects that a central defense at trial will be the argument that the defendant did not offer payments to Chadian and Ugandan officials to seek to advance the business interests of CEFC China, but rather, consistent with his title as the Secretary-General of an NGO, for charitable reasons. Evidence that—day in and day out, in ways large and small—the defendant focused on advancing the business interests of CEFC China directly rebuts any claim that the defendant cared more about charity than the interests of CEFC China. *See Zackson*, 12 F.3d at 1182; *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("Where, for example, the defendant does not deny that he was present during a narcotics transaction but simply denies wrongdoing, evidence of other similar narcotics involvement may, in appropriate circumstances, be admitted to show knowledge or intent."); *Ramirez*, 894 F.2d at 568-69 (when the defendant "disavows awareness that a crime was being perpetrated" and the government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

Of course, the defendant could eliminate the issue of intent—and thereby moot the purpose of admitting evidence relevant to these issues, whether under Rule 404(b) or otherwise—either by proceeding with a defense that does not dispute this issue or by agreeing to a stipulation that removes this issues from consideration. The Second Circuit has explained, however, that

> to take such an issue out of a case, a defendant must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed. A defendant may not purposely use ambiguity

---

[5] The Government is also permitted to introduce this evidence in its case-in-chief to the extent that it may be a subject for cross-examination. *See Giglio v. United States*, 405 U.S. 150 (1972); Fed. R. Evid. 607.

> tactically, seeking to gain the one advantage of barring admission of
> prior acts evidence by proffering a particular defense theory, only to
> later seek the additional advantages stemming from arguing lack of
> intent to the jury.

*Colon*, 880 F.2d at 659.  In short, to forestall the admission of evidence on the issue of intent, a

defendant must affirmatively express a decision not to dispute that issue with sufficient clarity

that the Court will be justified (a) in sustaining objections to any subsequent cross-examination

or jury argument that seeks to raise the issue, and (b) in charging the jury that if they find all the

other elements established beyond a reasonable doubt, they can resolve the issue against the

defendant because it is not disputed.  *United States v. Figueroa*, 618 F.2d 934, 942 (2d Cir.

1980).  Here, the defendant has not made such a decision.  On the contrary, he has repeatedly

suggested that he intends to contest the purpose of the monies he offered and paid.[6]

Nor, again, is there a basis to preclude this evidence under Rule 403.  While the

defendant's agreeing to broker and brokering transactions with Iran or in arms might constitute

crimes, *see* 50 U.S.C. §§ 1701 *et seq.*; 22 U.S.C. §§ 2771 *et seq.*, the jury will not necessarily so

expect, given that the defendant is a foreign national discussing transactions in a foreign country,

and the Court may minimize the risk of any prejudice with an appropriate limiting instruction.

*See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to

preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979)

("The 'rule'– indeed, the premise upon which the system of jury trials functions under the

American judicial system – is that juries can be trusted to follow the trial court's instructions.").

---

[6]     The evidence concerning arms trafficking is also admissible because to the extent it
discusses an "embargo," it shows that the defendant was aware of and sought to evade
restrictions on what he and those with whom he worked could lawfully do.  It is thus probative of
the manner in which the defendant sought to advance the business of CEFC China, and rebuts
any suggestion that the defendant inadvertently or unknowingly transmitted money, rather than
did so with an intent to bribe, in violation of Chadian and/or Ugandan anti-bribery laws (which
violations are an element of the charged money laundering offenses).

Nor is there a danger of "unfair prejudice," Fed. R. Evid. 403, with respect to this evidence. "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original). There is nothing unfair in the admission of straightforward, non-sensational evidence, which will be offered in part through a witness who is already expected to testify, and in part through emails and other documents that demonstrate the defendant's interest, in his own words, in advancing the business of CEFC China in multiple ways. This is particularly true because the defendant is free to argue that, notwithstanding this evidence, the payments at issue in this case were not bribes, but mere charitable donations. The jury can decide for itself what to believe, in light of all of the evidence.

## III. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S ALLEGATION THAT THE CHARGES AGAINST HIM ARE POLITICALLY MOTIVATED SHOULD BE PRECLUDED

As the Court is aware from submissions of the Government regarding the defendant's prior motions for bail pending trial (*see, e.g.*, Docket Entry No. 73), the defendant has repeatedly asserted since his arrest that his case is, at least in large part, political. In multiple emails— including with officers or employees of CEFC China or its funded affiliate, CEFC NGO—the defendant has suggested that his case is not principally, or at all, about what he is alleged to have done, but about the reputation of CEFC China, or more generally, China.

In one email, for example, he stated: "Please tell SH [*i.e.*, Shanghai, the headquarters of CEFC China] that we need solidarity most at this time, and cannot be divided. . . . Please tell SH, if we are on the same line, with their support, I will fight to the very end. For it is not only HO who is on trial, it is [CEFC NGO], the Company, Country and Chinese values are on trial." In another email, he asserted:

> [T]his is a battle of honor and for clearing the [CEFC NGO's] name.
>
> . . .
>
> Prepare a press release in Chinese and in English: key words: public diplomacy, energy diplomacy, helping Chinese enterprises "going Out", in accordance to the Belt and Road Initiative and its spirit.[7]

He also asked an individual to "set up blogs: such as 'Belt and Road by HO' with all my speeches ppts, articles and publications on OBOR [*i.e.*, One Belt, One Road, another way of describing the Belt and Road Initiative]; [and] set one blog up on 'Sino-US dialog by HO' and upload all speeches . . . ."

The defendant has also made similar statements in phone calls since his arrest. In one call, for example, the defendant stated that "they," apparently referring to the Government, are using him to get to the "big tiger," and to discredit "The Belt and Road."[8]

The suggestion in these and other communications that this case is not really about whether the defendant engaged in bribery and money laundering, but about something else, is meritless. But even if it were not meritless, it is in any event not for the jury's consideration. The only legally-cognizable motion that the defendant might bring based on his allegation is one of selective prosecution—but the defendant notably has not brought such a motion, and even if he did, it would be for the Court alone. *See United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury"); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

---

[7] The "Belt and Road Initiative" is an initiative of the Chinese government. *See, e.g.*, http://english.gov.cn/beltAndRoad/.

[8] The defendant also recently gave notice of a potential expert for trial, the purpose of which appears to be to support this view. As described below, such testimony is improper and it should be precluded for multiple reasons.

In short, any evidence or argument concerning the reasons for or timing of the

defendant's prosecution is irrelevant to the issues for the jury at trial, and would serve no

purpose other than to seek to distract the jury from evidence of the defendant's guilt or to

encourage jury nullification.  It therefore should be precluded.  *See United States v. Stewart*, No.

03 Cr. 717, 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude

defendant from "presenting arguments or evidence that would invite the jury to question the

Government's motives in investigating and indicting [the defendant]"); *see generally United

States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation

of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to

jurors in the federal courts, to 'render a true verdict *according to the law and the evidence*.'  We

categorically reject the idea that, in a society committed to the rule of law, jury nullification is

desirable or that courts may permit it to occur when it is within their authority to prevent."

(internal citation omitted; emphasis in original)).

For the same reasons, the defendant should be precluded from offering evidence or

argument concerning the filing of a motion in this case pursuant to the Classified Information

Procedures Act or the provision of notice concerning the Foreign Intelligence Surveillance Act.

## IV.  EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S FAMILY BACKGROUND, HEALTH CONDITION, AGE, PRETRIAL DETENTION, OR ANY OTHER PERSONAL FACTOR UNCONNECTED TO GUILT SHOULD BE PRECLUDED, AS SHOULD DISCUSSION OF PUNISHMENT

The Government is unaware of any lawful basis for the defendant to offer evidence or

argument concerning his family background, health, age, pretrial detention, or any other similar

factors.  He should be precluded from doing so, and from mentioning such subjects in his

opening statement, absent a showing that such a factor bears on his guilt.  *See, e.g.*, *United States

v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that

defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. S9 05 Cr. 774, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendant should similarly be precluded from offering evidence or argument concerning the punishment or consequences he faces if convicted. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

## V. EVIDENCE OR ARGUMENT CONCERNING THE DEFENDANT'S OR CEFC'S PRIOR COMMISSION OF "GOOD ACTS" OR NON-COMMISSION OF OTHER BAD ACTS SHOULD BE PRECLUDED

To the extent that the defendant may seek to present evidence or argument concerning his or CEFC's prior commission of "good acts," including any philanthropic giving or other good deeds—which he has suggested, in the above emails, he thinks are relevant—or to offer evidence of his non-criminal activities to seek to disprove his guilt of the crimes charged, he should be precluded from doing so. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait of character," or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. S2 11 CR 873, 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012), ("a defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014); *United States v. Rivera*, No. 13 Cr. 149, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of charitable giving). The defendant should accordingly be precluded from offering evidence or argument, including in his opening statement, concerning any charity, philanthropy, or any other specific instance or instances of his prior good acts, or the lack of commission of other bad acts. For the same reasons, the defendant should be precluded from offering this type of evidence or argument insofar as it relates to CEFC NGO, CEFC China, or affiliates, as any prior good acts by those entities similarly have no bearing on the defendant's guilt or innocence.

Similarly, the defendant should be precluded from offering evidence or argument suggesting that because CEFC NGO had so-called Special Consultative Status with the UN, the defendant would not or did not pay bribes in his capacity as a CEFC NGO officer. More than

*5,000* entities have consultative status; it is "very rare" for an application for such status not to be approved; "most new accreditations are in the Special category" (contrary to any suggestion that this designation means that CEFC NGO was deemed special in some way); and this common status does not somehow indicate that the UN has confirmed that the organization or its officers would not in engage in bribery. (*See* https://csonet.org/?menu=100.)[9]

## VI. EVIDENCE OR ARGUMENT CONCERNING THE "MERITS" OF THE PROJECTS THE DEFENDANT SOUGHT TO ADVANCE THROUGH BRIBERY, OR THE ALLEGED GOOD CAUSES TOWARD WHICH THE OFFICIALS HE BRIBED COULD HAVE USED THE BRIBE PAYMENTS, SHOULD BE PRECLUDED

The issue at trial is whether the defendant participated in the charged bribery and money laundering schemes. The "merits" of the goals he sought to achieve through bribery; how those goals, if achieved, allegedly would have helped others; or how those he bribed might have decided to use or used bribe payments are all irrelevant to his guilt. *See, e.g.*, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991) (an official "is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid."); *United States v. Miller*, 340 F.2d 421, 424-25 (4th Cir. 1965) ("It is immaterial whether the official action which the briber seeks to influence is right or wrong . . . ."); *United States v. Labovitz,* 251 F.2d 393, 394 (3d Cir. 1958) ("to constitute the offense of attempted bribery it is immaterial whether the official action sought to be influenced be right or

---

[9]     Nor would be proper for the defendant to point to other NGOs with such status to suggest that CEFC NGO must be like them. *Cf., e.g.*, *United States v. Berg*, 710 F. Supp. 438, 445 (E.D.N.Y. 1989) (testimony concerning the "custom of other arms dealers in complying with arms export laws" precluded on the ground that such evidence was irrelevant to the state of mind of the defendants), *aff'd in part, rev'd in part on other grounds sub nom. United States* v. *Schwartz*, 924 F.2d 410 (2d Cir. 1991); *United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (affirming preclusion of evidence as to how persons other than the defendant used funds because "only [the defendant's] actions and state of mind were material to her guilt").

wrong" (internal quotation marks omitted)); *see generally United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939) (official action, "whether just or unjust, right or wrong, is not for sale").

Moreover, even if evidence of the purported public benefits of the projects the defendant sought to advance through bribery, or the purported public benefits to which those he bribed might have used or did use the money were relevant—and neither is—such evidence should be precluded under Rule 403 because it is substantially more prejudicial, confusing, and/or misleading than probative, and would materially and unduly lengthen and complicate the trial. Were the defendant to offer such evidence, the Government would expect to offer evidence in rebuttal. For instance, the Government might offer evidence that other projects, not advanced by the defendant, would have been better for Uganda or Chad, or that bribe payments to officials generally have been squandered or spent on personal items rather than on the citizenry—leading to a trial within a trial on subjects that have no connection to the defendant's guilt.

To the extent such evidence were offered to show that, even if the defendant did not know it at the time he acted, his goals might have been achieved without bribery, that too is irrelevant, and thus also cannot support the evidence's admission. *See, e.g.*, *United States v. Orenuga,* 430 F.3d 1158, 1165 (D.C. Cir. 2005) (proper to charge jury that "[i]t is not a defense to the crime of bribery that had there been no bribe, the public official might have lawfully and properly performed the same act" (internal quotation marks omitted)); *United States v. Quinn,* 359 F.3d 666, 675 (4th Cir. 2004) ("it does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations"); *United States v. Jannotti,* 673 F.2d 578, 601 (3d Cir. 1982) ("it is neither material nor a defense to bribery that had there been no bribe, the [official] might, on the available data, lawfully and properly have made the very recommendation that [the briber] wanted him to make" (internal quotation marks omitted)).

To be sure, evidence bearing on the defendant's contemporaneous intent for the payments that he offered and made, at the time he offered and made them, is proper (provided it is in admissible form). But such evidence must bear on the contemporaneous intent of the defendant with respect to the payments at issue in this case. Otherwise, the evidence is both irrelevant and barred by Rule 403.

## VII. THE DEFENDANT'S PROFFERED EXPERT TESTIMONY SHOULD BE PRECLUDED

On September 17, 2018, the defendant sent the Government a letter, enclosed herewith as Exhibit B (with enclosures thereto), notifying the Government that the defendant might call as an expert at trial Professor William C. Kirby. The defendant's letter stated:

> Professor Kirby's testimony will concern two separate, but related topics. First, Professor Kirby will provide an overview of China's One Belt, One Road ("OBOR") initiative and the role that Chinese companies play in carrying it out. We expect that he will describe OBOR as a foreign policy initiative that seeks to export Chinese excess infrastructure capacity, use Chinese state financing for international infrastructure projects, and enhance China's economic and political influence in various regions of the world. He will discuss the history of OBOR and the motivation behind it, as well as its scope and importance to China. Professor Kirby will also describe the ways in which Chinese government agencies, state-owned banks, state-owned enterprises, and private companies participate in the implementation of OBOR.
>
> Second, Professor Kirby will testify regarding the role of CEFC China Energy Company Limited ("CEFC") in the implementation of OBOR. We anticipate that Professor Kirby will testify that CEFC was closely tied to the Chinese state during the period relevant to this case and participated in promoting the Chinese state's agenda. Professor Kirby's testimony will be based on publicly available information regarding the structure, history, and financing of CEFC, documents disclosed to the defense by the government in connection with this case, and Professor Kirby's expertise regarding the relationship between the Chinese state and private businesses in China and the structure of the Chinese energy sector. We expect that Professor Kirby will testify that the close relationship between CEFC and the Chinese state is demonstrated by, *inter alia*, the

> history of Chinese state monopoly in the energy sector; the lack of transparency and open information about CEFC and its founder, Ye Jianming; the organizational culture and personnel employed by CEFC; and the confluence of interests between CEFC and the Chinese government's clearly articulated international economic policies.

(Ex. B, at 2.) The defendant's letter also stated, "We reserve the right to amend or supplement this disclosure as necessary." (*Id.* at 1.) This proffered testimony should be precluded.

As an initial matter, the defendant's notice, at least in large part, is insufficient. A defendant must "give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial." Fed. R. Crim. P. 16(b)(1)(C). "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.* The defendant's letter does not meet these requirements. The letter states that Professor Kirby "will discuss the history of OBOR and the motivation behind it, as well as its scope and importance to China," and "will also describe the ways in which Chinese government agencies, state-owned banks, state-owned enterprises, and private companies participate in the implementation of OBOR" (Ex. B, at 2), but does not say what Professor Kirby's views are on these subjects. The letter also states that Professor Kirby is expected to testify that CEFC China "participated in promoting the Chinese state's agenda" (*id.*), but does not say in what way it participated (much less tie such "participat[ion]" to the facts of this case). The letter similarly states that Professor Kirby is expected to testify that there was a "confluence of interests between [CEFC China] and the Chinese government's clearly articulated international economic policies" (*id.*), but does not say what those "interests" or "policies" are, or the basis for his belief that there was such a "confluence." General statements like these are not sufficient. *See, e.g.*, *United States v. Valle*, No. 12 Cr. 847, 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) ("Merely identifying the

general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."); *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics.").

The failure to provide adequate notice is sufficient cause for preclusion. *See, e.g.*, *Valle*, 2013 WL 440687, at \*5; *United States v. Mahaffy*, No. 05 Cr. 613 , 2007 WL 1213738, at \*2 (E.D.N.Y. Apr. 24, 2007); *United States v. Ferguson*, No. 06 Cr. 137, 2007 WL 4539646, at \*1 (D. Conn. Dec. 14, 2007). The expert disclosure provisions of the Federal Rules exist to allow opposing counsel the opportunity to challenge the admissibility of testimony, adequately prepare for cross-examination, and decide whether to retain and prepare rebuttal witnesses. *See, e.g.*, *United States v. Rajaratnam*, No. 09 Cr. 1184, 2011 WL 723530, at \*3 (S.D.N.Y. Feb. 25, 2011) ("[T]he purpose of reciprocal expert disclosures is 'to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" (quoting Fed. R. Crim. P. 16 Advisory Committee's Note)); *Valle*, 2013 WL 440687, at \*5 (same); *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (same). The Government is unable to engage fully and properly in these tasks based on the defendant's letter.

In any event, to the extent that his proffered testimony is discernible at this time, it appears that Professor Kirby's testimony is inadmissible, in its entirety, for multiple reasons, even if the defendant were deemed to have given sufficient notice.

*First*, the proffered testimony is wholly irrelevant—as would be any other evidence or argument on the same subjects. Despite the defendant's repeated suggestions to the contrary, this in a criminal case. It is not a policy or political debate. Testimony about Chinese "foreign policy" or whether and how China seeks to "enhance [its] economic and political influence in

various regions of the world" (Ex. B, at 2) has no place in this trial. It is no more appropriate for the defendant to offer such testimony here than it would be for a defendant charged with bribing a state legislator to enact legislation concerning the real estate industry to offer testimony about the alleged good that industry does for the state economy. Nor does it matter whether CEFC China "was closely tied to the Chinese state during the period relevant to this case and participated in promoting the Chinese state's agenda" (*id.*). The question for the jury is whether the defendant agreed to and did offer bribes, not whether those bribes were in furtherance of an alleged "state agenda." The defendant, who bears the burden of demonstrating the admissibility of his proffered expert's testimony, *see, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016); *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), does not even attempt to explain the relevance at trial of such subjects.[10]

*Second*, the proffered opinions, even if deemed to be on potentially relevant subjects for trial (and they are not), are insufficiently connected to what the jury has to decide. Expert testimony is admissible only where it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In short, there must be a "fit" between the proffered testimony and "the facts of the case." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). There is no such fit here. The defendant does not purport to limit his proffered expert's testimony to that which might help the jury to weigh *the defendant's* contemporaneous knowledge, intent, and/or motive concerning *his* actions *in this case*. The defendant does not even purport to limit his proffered expert's testimony to relevant subjects.

---

[10]     The Government does not disagree with all assertions of fact in the defendant's letter, including the apparent connection between CEFC China and the Chinese state. Such facts might be relevant to sentencing, as would be any other evidence of the defendant's contemporaneous motivation for his crimes. But they are not relevant at trial, and even if relevant, they should be precluded.

*Third*, to be admissible, expert testimony must not only be on a relevant subject and sufficiently connected to the particular facts of the case; it must also be appropriate as expert testimony. The Federal Rules of Evidence preclude a party from "admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994); *see also, e.g.*, *United States v. Nouri*, 711 F.3d 129, 145 (2d Cir. 2013) (district court was "well within its discretion" to preclude testimony on customary commissions by brokerage firms where cumulative of other evidence at trial); *United States v. Collins*, 581 F. App'x 59, 60 (2d Cir. 2014) (affirming preclusion of testimony by lawyers on the materiality of an agreement and "the work of transactional lawyers" generally, where "fact witnesses" covered the same ground).

Here, if the defendant wishes to offer evidence of CEFC China's connection to the Chinese state—assuming *arguendo* that such testimony is relevant—he may call witnesses from CEFC China (which is funding the defendant's defense, and to which the defendant plainly has access). Nothing about such testimony is "beyond the ken of the average juror." *Amuso*, 21 F.3d at 1263. A defendant may not avoid calling lay witnesses with first-hand knowledge by calling a purported expert, without such knowledge, to say the same thing. *See id.*

Indeed, there is substantial reason to doubt that Professor Kirby is competent to testify as an expert as proffered. To the extent that his testimony "will be based on publicly available information regarding the structure, history, and financing of [CEFF China]," and "documents disclosed to the defense by the government in connection with this case" (Ex. B, at 2), it appears that he merely will be repeating, in the guise of purported expert testimony, hearsay. That is improper. Evidence that is otherwise inadmissible does not become admissible merely because it

emerges from the mouth of an expert. "Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [defendant] to circumvent the rules prohibiting hearsay." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (internal quotation marks omitted). The defendant offers no authority, and the Government is aware of none, permitting a witness to pass off "publicly available information"—which appears, in this case, to be a series of news articles selected by the defendant (*see* Ex. B, Source List)—as purported expert testimony.[11]

*Finally*, even if it were otherwise admissible (and it is not), the defendant's proffered expert testimony should be precluded under Rule 403. Testimony from someone qualified by a court as an expert is likely to be given special weight by the jury, and thus such testimony must be given particular scrutiny before it is admitted. "Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 595). "Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). The defendant fails to meet his burden of showing that his proffered expert testimony would be of such assistance. But even assuming *arguendo* that the defendant had met his burden, the testimony's limited probative value is substantially outweighed by the inevitable jury confusion and distraction, material lengthening of the trial, and unfair prejudice to the Government, that would result.

---

[11]    For these and other reasons, if the Court is inclined to admit Professor Kirby's testimony, the Government requests that the Court order a pretrial hearing to explore the contours and bases of his testimony.

This is so not merely because the defendant's proffered expert testimony is so utterly divorced from what the jury will have to decide, and appears to touch on sensitive or potentially contentious political issues, but also because if the defendant's proffered expert were to testify along the lines suggested by the defendant, the Government would have every right to respond. Prior to filing this memorandum, the Government gave notice, enclosed as Exhibit C, of an expert whom it would call in rebuttal. The Government is prepared to call such an expert. But that the Government is prepared to respond, if necessary, does not mean that the defendant is entitled to call an expert to testify on extraneous matters having nothing to do with his guilt.

## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
October 2, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:     s/ Daniel C. Richenthal
        Daniel C.  Richenthal
        Douglas S. Zolkind
        Catherine E. Ghosh
        Assistant United States Attorneys
        (212) 637-2109/2418/1114

        SANDRA MOSER
        Acting Chief, Fraud Section
        Criminal Division

By:     s/ Paul A. Hayden
        Paul A. Hayden
        Trial Attorney
        (202) 353-9370