# Exhibit A

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    UNITED STATES OF AMERICA           :   17-MJ-8611 (PAE)
                                        :
5                                       :
                     v.                 :   500 Pearl Street
6                                       :   New York, New York,
     CHEIKH GADIO,                      :
7                                       :   November 18, 2017
                      Defendant.        :
8    ------------------------------------X

9        TRANSCRIPT OF CRIMINAL CAUSE FOR INITIAL APPEARANCE
                          AND BOND HEARING
10         BEFORE THE HONORABLE KEVIN NATHANIEL FOX
                 UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

14   For the Government:        DANIEL RICHENTHAL, ESQ.
                                THOMAS McKAY, ESQ.
15                              U.S. Attorney's Office
                                One Saint Andrew's Place
                                New York, New York 10007
16

17
     For the Defendant:         ROBERT M. BAUM, ESQ.
18                              Federal Defenders of New York
                                52 Duane Street
19                              New York, New York 10007

20

21

22   Court Transcriber:         SHARI RIEMER, CET-805
                                TypeWrite Word Processing Service
23                              211 N. Milton Road
                                Saratoga Springs, New York 12866
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

```
 1              THE CLERK:  United States v. Cheikh Gadio, Case No.
 2   17-MJ-8611.
 3              Counsel, please state your appearances.
 4              MR. RICHENTHAL:  Good afternoon, Your Honor.  Daniel
 5   Richenthal and Thomas McKay for the Government.
 6              THE COURT:  Good afternoon.
 7              MR. RICHENTHAL:  Good afternoon.
 8              MR. BAUM:  Good evening, Your Honor, or good
 9   afternoon.  Robert M. Baum on behalf of my client, Mr. Gadio,
10   and also present at counsel table, Lewis Camarro, who's an
11   attorney admitted to practice in the State of Maryland and the
12   District of Columbia.  He is not admitted to practice in
13   federal court but I will be making all arguments today on
14   behalf of Mr. Gadio.
15              THE COURT:  Good afternoon.  Can I have the date and
16   time of arrest, please?
17              MR. RICHENTHAL:  Mr. Gadio was arrested a little
18   after three p.m. yesterday afternoon, Your Honor.
19              THE COURT:  Thank you.  Mr. Gadio, the purpose of
20   the proceeding is to advise you of certain rights that you
21   have, to inform you of the charge made against you, to
22   consider whether counsel should be appointed for you and to
23   determine under what conditions if any you might be released.
24   Do you understand, sir?
25              THE DEFENDANT:  Yes.
```

3

1          THE COURT:  Would you move the microphone closer to

2   you, please, sir?

3          THE DEFENDANT:  Yes.

4          THE COURT:  You have a right to remain silent.  Even

5   if you've made statements to authorities already you need not

6   make additional statements.  Anything that you do say can be

7   used against you.

8          You have a right to be released either conditionally

9   or unconditionally pending trial unless I find that there are

10  no conditions that would reasonably assure your presence in

11  court and the safety of the community.

12         You have a right to be represented by counsel during

13  all court proceedings and during all questioning by

14  authorities.  If you're not able to retain counsel the court

15  will appoint counsel to represent you.

16         Was a financial affidavit prepared by your client,

17  Mr. Baum?

18         MR. BAUM:  No, it hasn't been, Your Honor, and I

19  will be representing Mr. Gadio for presentment purposes only.

20  His plan is to retain counsel following the presentment.

21         THE COURT:  Very well.

22         MR. BAUM:  But I would ask the court's permission to

23  maintain my representation until counsel is retained.

24         THE COURT:  Very well.  Sir, if you're not able to

25  retain counsel you should advise the court of that so that the

4

1  court is aware that Mr. Baum will continue to represent you.

2  Should you retain counsel Mr. Baum will no longer represent

3  you.  He's appearing principally for today's proceeding only.

4        Mr. Baum, have you received a copy of the complaint?

5        MR. BAUM:  I have, Your Honor, and it's been

6  discussed with Mr. Gadio.  We waive its public reading.

7        THE COURT:  Very well.  Mr. Gadio, you have a right

8  to have a preliminary hearing held in connection with the

9  charge that is set forth in the complaint.  At the hearing the

10 Government would have the burden of establishing that there's

11 probable cause to believe that a crime has been committed as

12 described in the complaint and that you committed it.

13        If probable cause is not established you'll be

14 released from the charge.  If it is established the Government

15 will have the right to proceed to trial against you.  If you

16 are in custody the hearing will be held within 14 days.  If

17 you're not in custody the hearing will be held within 21 days.

18 No hearing will be held if before the date on which it is

19 scheduled you're either indicted by a grand jury or an

20 information is filed against you by the Government.

21        I'll shall address the date for a hearing after we

22 address the issue of bail.

23        Was Mr. Gadio made aware that a consulate

24 representative of his country could be notified of his

25 circumstance?

5

1          MR. RICHENTHAL:  We had advised his counsel of that

2     fact.  I don't know whether he's personally been advised of

3     that fact.  Among the things I was going to do today is say on

4     the record we're happy to notify his consulate if he would

5     like.  We were told by his counsel, I'm referring to Mr.

6     Camarro when I say that, that Mr. Gadio would actually like

7     that we not do that.  But it remains an open offer and we're

8     happy to do it should he change his mind.

9          MR. BAUM:  That's accurate, Judge.  We're not

10    requesting consular notification.

11         THE COURT:  All right.  Let's turn to the issue of

12    bail.  What is the Government's position?

13         MR. RICHENTHAL:  The Government seeks detention.

14         THE COURT:  Under what theory or theories?

15         MR. RICHENTHAL:  Risk of flight.

16         THE COURT:  Mr. Baum, what is your client's position

17    on bail?

18         MR. BAUM:  Your Honor, we respectfully are going to

19    ask the court to adopt the recommendation of the Pretrial

20    Services agency with the following specifics.  One, we're

21    asking for a $100,000 personal recognizance bond to be co-

22    signed by three financially responsible persons and to be

23    secured by $10,000 cash.

24         There's one exception to the other conditions set

25    forth by Pretrial Services.  We're going to ask the court to

6

1    release Mr. Gadio if the court grants bail pending the

2    completion of the conditions and setting a date of one week

3    for the conditions to be made.

4          THE COURT:  All right.  Let me hear the Government

5    in connection with his application and I'll permit you an

6    opportunity to respond, Mr. Baum.

7          MR. BAUM:  Thank you.

8          MR. RICHENTHAL:  So, Your Honor, the recommendation

9    of Pretrial Services might make sense if it were based on an

10   accurate assessment of the facts but unfortunately it looks

11   like the defendant has made either material misstatements or

12   omissions in the pretrial report, two of which I was going to

13   comment on anyway that is not the misstatements or omissions

14   but the underlying facts.  I want to start there though

15   because that matters.

16         So it is not the case in any way, shape or form that

17   the defendant returned to the United States to face these

18   charges.  This is a sealed complaint sworn out less than 48

19   hours ago of which the defendant had no knowledge of any kind,

20   could not have had knowledge of any kind.  The defendant did

21   not return to the United States to face these charges.  If he

22   told the Pretrial Services officer that he lied.  That's point

23   one.

24         Point two is if you read this report you'd be left

25   with the impression and reasonably so in light of how it's

7

1   written, and I'm not blaming Pretrial for this, that the

2   defendant basically resides in the United States.  He just

3   travels for business.  That is utterly and demonstrably false.

4   We're having this conversation on November 18, 2017.  In this

5   year, 2017, Mr. Gadio has been in the United States a total of

6   13 days.  In 2016 Mr. Gadio was in the United States for a

7   total in the entire year of 22 days.  In 2015 Mr. Gadio was in

8   the United States for a total in the entire year of 13 days.

9          Mr. Gadio does not reside in the United States.  He

10  owns a piece of property in the United States.  It's not clear

11  anyone lives there that's related to Mr. Gadio but he

12  certainly does not.  His wife does not.  His children do not.

13  In fact, all of those people, his wife and children, they also

14  reside outside the United States.  Mr. Gadio resides in

15  Senegal and that makes sense because Mr. Gadio works for the

16  government of Senegal.  He has no connection of any kind to

17  this country other than to use its banking system and its

18  corporate system to engage in the very crimes with which he's

19  charged.

20         I was going to begin there anyway because I think it

21  sets up the risk of flight but it certainly has given us even

22  greater concern that he appears to have misrepresented and

23  omitted material facts to the Pretrial Services officer.

24         So let me now talk about the actual facts.  The

25  strength of this case I think is apparent in the length and

8

1   detail of the complaint.  The complaint is 54 pages.  It

2   excerpts email after email in which Mr. Gadio, his adult son

3   and others are quite explicit about what's happening.  They're

4   going to engage in a bribery scheme and they actually do.

5           Those emails are corroborated by bank records.

6   They're corroborated by other kinds of financial records.

7   They're corroborated by search warrant after search warrant in

8   co-conspirator's email accounts and it makes sense therefore

9   that when Mr. Gadio chose after Miranda on video to make a

10  post arrest statement he not only admitted some of the central

11  facts in this case, he provided details about them having not

12  seen the complaint because it's what happened.

13          Now, Mr. Gadio, as we understand it, is denying that

14  he committed a crime.  There's a process for that.  But the

15  core facts here are reasonably not subject to dispute at all.

16  So that's the strength of the case.

17          In terms of the seriousness of the charges, again I

18  think it's inherent on their face this is a complaint in which

19  Mr. Gadio is charged with multiple serious crimes.  We've done

20  a rough back of the envelope analysis of what the sentencing

21  guidelines, admittedly only advisory, would look like.  Our

22  analysis is they exceed ten years in total in light of the

23  nature of the offense, the amount of money involved and the

24  circumstances of the offense.  But even if they only involved

25  say half that, five years, that's very significant.  Very

9

1  significant.

2        So it's an extremely strong case.  It's a case with

3  extremely serious potential consequences and the risk of

4  flight is about as extreme perhaps as this court can see.  We

5  have a defendant who doesn't reside here and hasn't in years.

6        We have a defendant whose entire family does not

7  reside here.  We have a defendant who is a member of a foreign

8  government.  We have a defendant who not just is a member of

9  the foreign government but the government at issue, Senegal,

10  is a country with which we do not have an extradition treaty.

11  If Mr. Gadio were to return to Senegal where he claims to be a

12  member of its government, and indeed it appears that he is, he

13  will never come back.

14        Let me also note the other countries at issue in

15  this complaint, Chad and Uganda, principally Chad with respect

16  to Mr. Gadio, those countries are also countries with which we

17  do not have extradition.  So if Mr. Gadio were to make it to

18  where he would like to go, has his home, has connections, has

19  financial wherewithal, he'll never come back.

20        So the question is then what will keep him here.

21  The answer in our view is nothing.  There's nothing that could

22  possibly keep him here because his entire life is abroad.  His

23  professional life, his personal life, his finances.  It's all

24  abroad.

25        We also have real concern that the finances

1  described here are not accurate.  In the complaint itself it

2  describes in detail how Mr. Gadio had $400,000 wired to a bank

3  account in the United Arab Emirates.  Now, the Pretrial

4  Services report says that Mr. Gadio indicated that that bank

5  account is closed.  We don't know that that's true.  There's

6  no particular reason to believe it's true.  That's a lot of

7  money.  By the way, after Mr. Gadio did that he then routed

8  money elsewhere including for use of his children who again

9  all reside abroad in various countries, not even in one

10 country.  We don't have access to information of where all of

11 his money is, and it's reasonably apparent it can't possibly

12 be limited to what he says here.

13         I am not saying that because of the complaint.  I'm

14 saying that Mr. Gadio travels internationally for business as

15 a consultant all the time.  When he was arrested he had four

16 cell phones with him, 16 SIM cards, meaning what one would use

17 to operate a cell phone in different countries, and seven

18 flash drives.  Now, one can have those things lawfully.  I'm

19 not suggesting otherwise.  But a man who has four cell phones,

20 16 flash -- 16 SIM cards and seven flash drives who's an

21 international business consultant, he's not a man who earns

22 $26,000 a year.  It's literally not possible to fly around the

23 world on that salary, never mind as regularly as Mr. Gadio

24 does.

25         The reality is we know he has wherewithal.  We just

1   can't show Your Honor the records because they are in Dubai

2   and in other places.  We're trying but what's before this

3   court should give this court great pause on the assertions

4   that this is a man who's indigent and can't make his way back

5   to countries.

6          Even if he were indigent look at his connections.

7   He's a member of his government, a government that again does

8   not have an extradition treaty with this country.  I've

9   confirmed with the Office of International Affairs that we

10  cannot extradite Mr. Gadio if he returns to Senegal.  We

11  cannot extradite Mr. Gadio if he were to make it to Chad.

12         Even if somehow he would be on the outs with his own

13  country, and he isn't -- he's a current member of the

14  government, not just a [inaudible] member, he has very tight

15  connections with Chad, the president of Chad himself, and if

16  he makes it to Chad we also cannot get him back.  The people

17  in those two countries, particularly Chad, have every

18  incentive to help Mr. Gadio.  This is an ongoing complex

19  lengthy international investigation.

20         There are steps being undertaken as I speak that I

21  can't comment about in court.  I expect there will be other

22  steps undertaken in future days, weeks and months.  People do

23  not want to uncover what Mr. Gadio and his co-conspirators do.

24  They would like the 54 pages to not be 554 pages.

25         In sum, this is a man who has no connection to the

1  United States of any kind, has meaningful financial

2  wherewithal to fly around the world and does it regularly.

3  He's connected at a high level to a foreign government that we

4  don't have an extradition treaty with and another foreign

5  government we don't have an extradition treaty with.  His

6  entire family lives abroad.  He's facing incredibly serious

7  charges.  There is no reason he would stay here.  And even if

8  the court weren't moved by that the fact that he told the

9  Pretrial Services officer he returned to face those charges is

10  a demonstrable misstatement and he could not have possibly

11  meant it other than to mislead this court.  The only

12  appropriate outcome in our judgment is detention.

13            THE COURT:  Thank you.  Mr. Baum.

14            MR. BAUM:  Judge, there's ample basis to believe

15  that Mr. Gadio is not a risk of flight and that conditions can

16  be set which would address any concerns about that.

17            Let me start off with the allegations of

18  misrepresentation and misstatement.  I'm not sure that what

19  Mr. Gadio said was misinterpreted or interpreted in a way

20  that's reflected in the Pretrial Services report.  But here is

21  the fact.  In October of 2017 Mr. Gadio was in the United

22  States, was given a letter by Homeland Security asking him to

23  return to the United States for a hearing on November 17th.

24  Admittedly not saying face charges but asking him to return

25  for a hearing.  On November 17th as requested Mr. Gadio walked

13

1    into the Offices of Homeland Security at nine a.m. in the

2    morning.  He was told come back 2:00.  He came back at 2:00

3    and was arrested.

4           Did he return for the charges?  No.  But according

5    to Mr. Gadio he never said he returned to the charges.  He

6    said to Pretrial that he was given a letter advising him to

7    return to the United States on a specific day for something

8    which he was not aware of.  He could make guesses as to what

9    it was about.  But he returned voluntarily at his own expense

10   paying whatever it cost to return and then after being told by

11   Homeland Security at nine a.m. we want you to come back at two

12   somebody might have suspected somebody who wanted to flee

13   might have suspected something devious was going to happen to

14   them or something suspicious and would have fled.  Not Mr.

15   Gadio.  At 2:00 when he was told he walks back into Homeland

16   Security and then he gets arrested.  That's the facts about

17   him coming back to see Homeland Security.  He never

18   misrepresented that and that is an important fact for the

19   court to know.

20          What other facts are important?  The Government

21   keeps saying he has no ties to this country, he would flee in

22   a second.  Well, Mr. Gadio is a legal permanent resident and

23   has been a legal permanent resident for 17 years.  Mr. Gadio

24   is married, has no prior record and what's important about

25   that is I will add in a moment he has a distinguished history

14

1  of service not only to his own community but to governments

2  all across Africa, to the United States -- and I'll explain in

3  what manner -- and has never ever been accused of corruption

4  or any act of illegal nature during that entire period.  He is

5  a man who has Ph.D. degrees, who has taught across the world

6  and I'm going to get into those details.

7          But to say that he would flee in a minute and has no

8  ties to this country is just not accurately representing the

9  facts.  So he's married.  He has three children.  He has four

10  grandchildren and he has a wife who owns a home in Maryland.

11  If he's released on bail he will live at the home in Maryland

12  and he will not leave the country.  He will not leave the

13  country because the court will direct him not to leave the

14  country and as you're about to learn this is a man of great

15  honor, responsibility and integrity.  He will not leave the

16  country.  He will report as required.  Two of his children I

17  might add are U.S. citizens.

18          Now to get to his background.  He was born in

19  Senegal.  That is true.  He is a citizen of Senegal.  That is

20  true.  But he was ultimately educated after receiving an

21  undergraduate degree in Paris at the Sorbonne.  He was

22  educated and got a Ph.D. degree from Ohio State University.

23  His wife also attended Ohio State University.  This was in

24  1988.  A long time ago.  He received -- he received his Ph.D.

25  in 1994 and he was a full bright scholarship recipient when he

1   got his Ph.D. from Ohio State University.

2          After that he taught for many years.  He taught --

3   prior to his Ph.D. he actually taught in Senegal and then came

4   to the United States for his Ph.D.  He -- after that he also

5   was in Vermont.  He founded the School for International

6   Training.  He was a director for Africa.  He -- it was funded

7   by the United States Government.  It's called SIT, acronym for

8   the School for International Training, and he was there for 11

9   years in Vermont working at a school.  Again, the Government

10  represents no ties.

11         So here we have him attending Ohio State University

12  for years getting a Ph.D.  We have him working in Vermont at a

13  school for 11 years.  Subsequent to that, Judge, he was in

14  2000 invited to Senegal to become the foreign minister --

15  excuse me.  Before he went to Senegal he worked for the World

16  Bank in Washington, D.C., another employment role in the

17  United States.  He was director of World Links for Africa at

18  the World Bank in Washington, D.C.

19         The Government for some reason either didn't

20  investigate his background when he said he has never really

21  spent time in the United States or they left it out for some

22  reason but these are years and years, decades of time in the

23  United States.

24         In 2000 he was invited to become the foreign

25  minister, which is the equivalent of secretary of state for

1   Senegal.  He accepted that position and he was in that
2   position from 2000 to 2009.  During that position as foreign
3   minister for Senegal he was involved in major negotiations,
4   peace negotiations between various countries of Africa.  For
5   example, he brokered the peace deal in Madagascar working with
6   Condoleezza Rice.  He later worked with Colin Powell in
7   reference to attempts, attempts to have a nuclear treaty with
8   Lybia.  He later worked in 2008 on a peace deal between Chad
9   and Sudan which unfortunately broke down after he left as
10  prime minister.
11          But this is a man with strong ties to this country,
12  with decades of service to government, to education and
13  spending time in this country.  This is a man whose wife has a
14  residence in this country, legal permanent resident in this
15  country.
16          Then the Government goes on to say they don't
17  believe his finances.  They don't tell you anything to say
18  it's not true.  They just say we don't believe it.  Why don't
19  they believe it?  Because they say he flies all over the
20  world.  He told Pretrial a fact that his various positions pay
21  him a salary but they pay for his travel.  That's not part of
22  his salary.  So he doesn't pay for his salary to travel -- he
23  doesn't pay out of his salary to travel but governments paid
24  for it over the years and he did travel.  But for the
25  Government to say that -- and this is what they said.  This is

1   a man who is not indigent.  When did anyone say he was

2   indigent?  I mean they have taken facts and twisted them in a

3   manner to fulfill their argument that he has no ties.

4          In sum, Judge, clearly the risk of flight is

5   mitigated by his background, his history, his work, his

6   commitment to world peace, to everything he's done in his

7   life.

8          Again, as I said before, think of all the things

9   that I've outlined to you that he has done including I might

10  add that while he was the foreign minister I left out this

11  fact that he was part of a peace deal in Mauritania to end the

12  war there and that was six months in negotiation.  But in all

13  those years, nine years as foreign minister there was never an

14  allegation of corruption, of taking bribes, of kickbacks or

15  anything else.

16         Now, I know the Government always likes to believe

17  that if they argue there's a strong case someone should not

18  get bail but the Bail Reform Act does not consider that only

19  innocent people get bail.  Even if -- taking the Government's

20  charges at face value the Bail Reform Act permits bail for

21  those in which the evidence might be overwhelming and the

22  Government was very happy to point out that this is a 55 page

23  complaint.  I spent a lot of time reading it and most of what

24  I read had nothing to do with Mr. Gadio.  It had to do with

25  the co-defendant's actions who induced Mr. Gadio according to

18

1   the complaint to join him in seeking a relationship with

2   Senegal but most of it was about the co-defendant's ties to

3   China, his role for energy, the things that he asked Mr. Gadio

4   to do, the emails that he sent to Mr. Gadio.  So yes, the

5   charges are serious.  We don't deny that.

6          But you have a man with a family who's a legal

7   permanent resident, a distinguished career and life as a

8   teacher and diplomat who will live in Maryland, who will put

9   up a substantial bond ultimately to secure his release of

10  $100,000 and $10,000 cash and three co-signers.

11         You have a brother-in-law who lives in the United

12  States who is willing to sign his bond who's been an attorney

13  for 15 years.  That is -- that is a substantial basis to

14  believe that he is not going to be fleeing this country.

15         So for all those reasons -- may I have just one

16  moment?

17         THE COURT:  Yes.

18                    [Pause in proceedings.]

19         MR. BAUM:  I was just reminded that while he was

20  foreign minister in Senegal he worked on an agreement with

21  Hillary Clinton who on behalf of the United States sent

22  millions and millions of dollars to Senegal for infrastructure

23  and improvements.  $540 million is my understanding.  And none

24  of that money disappeared.  There is no allegation that there

25  was anything untoward with any of that money and he worked

1  with Mrs. Clinton on behalf of Senegal in order to obtain that

2  money and use the money for improvements in Senegal.

3        So for all these reasons, Judge, we believe that a

4  bond is warranted.  We believe that Pretrial's recommendation

5  as to the general circumstances of the bond should be adopted

6  with the one exception.  We believe that based on Mr. Gadio's

7  background and circumstances that he be given just a few days

8  until Friday perhaps to meet the conditions but he'd be

9  released tonight.

10        MR. RICHENTHAL:  Your Honor, I'd like to respond

11  briefly to a few points.  There's no dispute Mr. Gadio has a

12  long and distinguished career.  Unfortunately a lot of people

13  with long and distinguished careers decide to trade on their

14  contacts for money.  That's what happened here.  That's what

15  facilitated the crime.  It's not a reason for bail.  It's what

16  made the crime possible.

17        Mr. Baum is an extremely good lawyer and he's an

18  accurate one with his facts.  So when he said that Mr. Gadio's

19  wife has a residence in Maryland, that's true.  She owns

20  property in Maryland.  She doesn't live there.  She lives in

21  Equatorial Guinea.  It's also true Mr. Gadio has children who

22  have various statuses with the United States.  They don't live

23  here either.  Two of them live in Senegal.  One of them lives

24  in the United Kingdom.  They have no relationship with the

25  United States besides the fact they can lawfully come here but

20

1  that doesn't give him a reason to stay here.  They're not

2  here.

3         Now, in addition, I only got the Pretrial Services

4  report literally as Your Honor was walking in and so I

5  actually didn't notice something that gives us even greater

6  concern that's also omitted.  The complaint talks about the

7  Gadio Firm.  That's a defined term, Gadio Firm.  That's the

8  firm through which the defendant laundered his payment,

9  $400,000 for bribing the president of Chad.  In the employment

10 history section of the Pretrial Services report on Pages 2 to

11 3 it's not mentioned.  It's literally like he never had that

12 company at all.  That's intentional.  That firm is

13 incorporated in Washington, D.C.  It has bank accounts abroad.

14 The evidence of that is all over the complaint.  Reading this

15 one would think it never existed ever.

16        I submit the only reasonable interpretation of that

17 is Mr. Gadio doesn't want to admit his association with that

18 firm although it is not reasonably subject to dispute.  He's

19 the founder of it.  The bank accounts are in his name.  The

20 $400,000 he got as his fee that's to that firm.  It's to a

21 bank account of the United Arab Emirates through New York, New

22 York in the name of that firm which does not appear here nor

23 does that $400,000 payment.

24        Now, Mr. Baum also talked about how this complaint

25 is largely about other people.  I don't think that's true.

21

1  Your Honor signed it.  So I'm not going to go over it.  Your

2  Honor is familiar with it but I would direct you to among

3  other places Pages 24 to 25 which has a lengthy recitation of

4  emails that Mr. Gadio wrote explicitly talking -- and I'm

5  going to quote one of them right now, about how we should

6  "reward him with a nice financial package as an entry ticket

7  in the Chadian oil market and later gas market and other key

8  business opportunities."

9          Mr. Gadio wrote that.  That's referring to a $2

10 million bribe that Mr. Gadio later wrote about how he should

11 get a fee for and he negotiated it and he got $400,000 to the

12 firm that he omitted from the Pretrial Services report.

13 That's what happened here.

14         So I go back again.  This man has no ties to the

15 United States.  Mr. Baum is right, he did.  The fact that two

16 decades ago he worked in Vermont does not in our judgment

17 assure his appearance in court two decades later.  The fact

18 that his wife owns property here she doesn't live in does not

19 in our judgment reasonably assure his appearance in court.  In

20 truth, nothing does.  He has money abroad, contacts abroad.

21 He works for a government that will not extradite him.  He has

22 connections to the top of another government that will not

23 extradite him.  He has multiple cell phones and SIM cards

24 because he's an international business consultant also not on

25 here.  That consultancy is that firm that he omitted.  He has

22

1   no reason to stay.   Literally no reason to stay.

2        I suppose the only reason might be if they post his

3   wife's property he might lose that property but that's not

4   sufficient reason to stay in light of everything else I'm

5   talking about.  His whole family, his professional life, his

6   assets, they are all outside this country.  A reasonable

7   man -- and Mr. Gadio is a well educated man -- would assume

8   that property is worth giving up because if you can make it to

9   any of these countries you'll never have to face these

10  charges, you'll never have to answer for why you chose to

11  reward the president of Chad with $2 million.  Detention is

12  the only appropriate option.  His distinguished career is not

13  a reason to treat him worse or better.  It's just who he is.

14       His former ties to the United States are not a

15  reason to treat him worse or better.  It's who he is.  We're

16  here November 17th, excuse me -- November 18, 2017.  Today he

17  has no ties other than property that no one lives in that he's

18  associated with.  Today all of his ties are abroad.  Every

19  fiber of his being will seek to go abroad.

20       He had three passports with him.  They're all in his

21  name but that just demonstrates how connected he is.  One was

22  a diplomatic passport, one was a non diplomatic passport.

23  Side note, the diplomatic passport does not protect him

24  against these charges both because he's a lawful permanent

25  resident of the United States and because the charges do not

23

1  rest on anything he did in his capacity as a member of the

2  government of Senegal.  The point I'm making is not fact.  The

3  point I'm making is he has the wherewithal, knowledge and

4  contacts to flee.  He has an incredible incentive to do so and

5  there is a possibility that can be measured, it's zero of ever

6  getting him back.

7        MR. BAUM:  Just finally, Judge, very briefly.  The

8  passports as the Government admits are all legal.  There's

9  nothing illegal about it.  They should draw -- the court

10 should draw no inference from them that they make it more

11 likely he's going to flee because he's going to surrender

12 every passport he has.

13       His wife, she's a citizen.  She works for the UN.

14 The UN sent her abroad.  In all likelihood if he's released

15 and living at his wife's home in Maryland in all likelihood,

16 and I can't guarantee it because I haven't spoken to his wife

17 but my understanding is in all likelihood she will return to

18 the United States and remain here during the pendency of this

19 case.  She might even be a co-signer but that's neither here

20 nor there.

21       He will have three co-signers and he will make the

22 bail and we're just asking that you release him on hi sown

23 signature tonight.

24       MR. RICHENTHAL:  I just want to respond to one

25 point.  I don't want to be ping ponging.  It's been a long

24

1   day.  My point about the passports to be granular about it is

2   the government of Senegal would reissue a passport to him in a

3   second.  We can't stop him from doing so.  That's the problem.

4   There are many problems here but that's the point I'm making.

5   He's a member of a foreign government with no extradition who

6   would gladly give him another passport.  We can't stop Senegal

7   from doing that.  We have no lawful ability to do that.

8          He's connected to highest levels of multiple

9   governments.  That's the point I'm making about the passports.

10  The fact that he has three passports lawfully is true to our

11  knowledge but it's what it signals about his connections, it's

12  what should give this court pause about his ability to flee.

13  That's why I made that point.

14         In light of the constellation of factors here

15  there's just no reasonable assurance he can possibly return to

16  court.

17         THE COURT:  Did I understand correctly that Mr.

18  Gadio may post arrest statements that were videotaped?

19         MR. RICHENTHAL:  Yes, Your Honor.  Mr. Gadio was

20  advised of his Miranda rights consistent with Department of

21  Justice policy on video.  He waived those rights.  Let me

22  pause and note I have not personally reviewed the video.  So

23  I'm making these representations based on my description of

24  what occurred.  Excuse me.  Description to me of what

25  occurred.

1          He spoke for a meaningful period of time, hours

2     about the facts in the complaint during which I understand in

3     sum he admitted the material facts, the gift or payment to the

4     president of Chad for example.

5          My understanding, and I want to be very clear, it's

6     he denied having committed a crime.  I'm not suggesting

7     otherwise but he admitted facts that the law recognizes as

8     criminal.  He added some details to those facts that to be

9     honest weren't even in the complaint that we weren't even

10    aware of.  That is a fact that he's going to have to wrestle

11    with throughout this proceeding.  I don't think in and of

12    itself is dispositive and that's why I don't want to suggest

13    that it is but it is certainly a fact that gives us greater

14    assurance we got it right in the complaint and it's something

15    he's going to have to wrestle with as this proceeding

16    continues.

17         Let me also note not in the complaint is another

18    fact which he admitted also which is that he didn't report the

19    $400,000 to the Internal Revenue Service.  We already knew

20    that.  It's not charged but he admitted that.  That's a

21    problem independent of these charges.  He did file tax returns

22    and he omitted that income.  We think he did it both to avoid

23    taxes and because he didn't want anyone to know what it was

24    for because it's a lot of money, $400,000 wire or two $200,000

25    wires especially when it's being sent through New York to

26

1    Dubai for a man that lives in Senegal.  It looks suspicious on

2    its face.  We think that's why he omitted it but regardless of

3    the reason why the truth is he omitted it.  It's not on his

4    tax returns and that's another problem.

5           It's also an additional indication he is running

6    away from what I'm referring to as the Gadio Firm which he

7    omitted in the description of his employment because that is a

8    serious problem.  That's the firm that the proceeds were

9    laundered through that he founded and ran and it's nowhere in

10   this Pretrial Services report.

11          MR. BAUM:  Judge, I just have to add something to

12   what he just said.  Judge, this issue about not admitting the

13   $400,000, I mean the Government is misstating the tax laws.

14   Assuming he received $400,000 and he receives it in a foreign

15   country you pay tax to the foreign country.  You don't pay tax

16   to the United States.  That's a fact.

17          MR. RICHENTHAL:  That's not the law, Your Honor.

18          MR. BAUM:  I believe it is.  You have to pay tax in

19   the foreign country and if you pay the tax in the foreign

20   country you don't have to pay it.  That's -- assuming that

21   fact that he received the $400,000 without agreeing that he

22   did or did not that's an issue but because we're debating the

23   tax laws here I don't think that the court should pay great

24   deference to that.

25          The other thing I know the Government misstated this

27

1    and I'm sure that they didn't mean to do this when they say

2    that we have -- he said in the confession statement that they

3    described that the $2 million was given to Senegal.  The

4    Government knows the $2 million was never given to Senegal.

5            MR. RICHENTHAL:  If I said Senegal I apologize.  I

6    meant the president of Chad which is the allegation in the

7    complaint.

8            With respect to taxes though, let's just be very

9    clear.  The law is income must be reported.  Whether it

10   becomes taxed, that is whether it leads to being taxed is an

11   entirely distinct question.  My point is he omitted it

12   entirely.  It literally doesn't show up in his returns.  Just

13   like he omitted his founding and operation of an international

14   consulting firm from his employment history.

15           MR. BAUM:  Let me be clear.  The $2 million was not

16   paid at all.  The money was never paid.  So when the

17   Government says that I think they're mistaken.  I think they

18   know that's not true.

19           MR. RICHENTHAL:  Your Honor, Mr. Gadio on video said

20   to the contrary but even if Your Honor wants to assume that

21   didn't happen we think there's more than a sufficient basis

22   here to detain Mr. Gadio.

23           THE COURT:  What information, if any, does the

24   Government have about the defendant's position that he was

25   summoned to the United States by the Department of Homeland

28

1    Security?

2          MR. RICHENTHAL:  I am familiar with what Mr. Gadio

3    is referring to.  It's not quite as Mr. Baum described it

4    although I think it's largely in accord.  The Department of

5    Homeland Security gave a form, a standard form to Mr. Gadio

6    upon his departure from the United States in October of this

7    year requesting that he return to the United States to be

8    interviewed in connection with his immigration status.  This

9    is not unusual as the court is no doubt aware for people

10   essentially to have to check in with the immigration

11   authorities from time to time, particularly a man who doesn't

12   reside in this country.  So he was asked to return to be

13   interviewed in connection with his green card to use the

14   colloquial term, and he did.

15         Nothing about that is unusual as a general matter.

16   Nothing about that is unusual as a particular matter, meaning

17   the form was a standard form.  The language was standard

18   language.  He was requested to come to the actual place he

19   would otherwise come to.  In other words, there's nothing

20   about that that would lead him to have the remotest hint that

21   he was under a criminal investigation.  There's literally

22   nothing atypical.  Had he shown it to an immigration lawyer

23   they would say that's the normal form.  I don't know whether

24   he did or did not.  I'm not privy to those discussions.  The

25   point I'm making is there's nothing about that that in our

29

1  judgment weighs one way or another.  It has nothing to do with

2  this case.  It's the reason he came here this time although we

3  understand he also may have had business here.  He may have

4  been going to Washington, D.C. but it is a reason he came here

5  this time.  But it doesn't say anything about his belief or

6  lack thereof that he was under criminal investigation.  This

7  was an extremely sensitive, for obvious reasons, long term

8  entirely covert investigation.

9          The only moment anyone would have had a hint of

10  anything was when Mr. Gadio was arrested.  He was the first

11  person outside the investigative team to have any sense that

12  he was under investigation and that sense came when he was

13  arrested.

14          MR. BAUM:  Judge, just -- I can't resist this.

15  Let's be realistic here.  He got the letter to compel him to

16  come back.  Compel is the wrong word.  To make him come back

17  so he could be arrested.  Homeland Security didn't give him

18  that letter telling him come back November 17th and then when

19  he came back all of a sudden FBI agents came to Homeland

20  Security and arrested him.

21          The plan was to give him the letter to tell him to

22  come back November 17th so he could be -- it was a rouse.  It

23  was a rouse used by the Government with Homeland Security to

24  make him come back.  Being that as it may, the fact is as I

25  said to you he was told come for a hearing November 17th.  He

1   walks in November 17th and then told to come back later that

2   day.

3           Now, if someone thought they had done anything wrong

4   they might be suspicious and they might not come back but he

5   did and that's a fact.

6           MR. RICHENTHAL:  Your Honor, I'm not going to

7   comment on whether it was a rouse or not but let me just make

8   a fundamental point.  The whole point of a rouse if this was

9   one is so the person doesn't know what's going on.  So that

10  doesn't militate in favor of bail.  Just to be clear, I don't

11  think it militates in favor of detention either.  It's just a

12  fact.  He came here for reason A and unbeknownst to him he had

13  been under criminal investigation and he was arrested.  I

14  don't think it militates in favor of either side.  I just

15  don't think it's a fact of relevance here.

16          And my colleague Mr. McKay just reminded me of

17  something so I'll just briefly note it.  In addition, there

18  were four cell phones, 16 SIM cards and seven flash drives.

19  Mr. Gadio had a checkbook when he was arrested in the name of

20  the international consulting firm that he founded and

21  operated, the very one that he omits from his Pretrial

22  Services report.

23                      [Pause in proceedings.]

24          THE COURT:  I wanted also some clarity about a

25  reference to the Maryland home that you say Mr. Gadio's spouse

owns.  Is it the Government's contention that if Mr. Gadio

were to be at liberty he could not live in that home because

someone else is living there?

MR. RICHENTHAL:  I don't know standing here this

evening who is living there, Your Honor.  I just know that

neither Mr. Gadio nor any member of his family is living

there.  So the point I was making is that fact just means he

owns an asset in the United States.  I don't even know the

value of that asset but it certainly in our judgment does not

outweigh everything else I've said but to put a fine point on

it I don't know if anyone else is living there.  That's not a

home we searched.  I just don't have access to that

information standing here this evening.

MR. BAUM:  I can tell you no one is living there,

Judge.  It belongs to the family.  There's no outstanding

mortgage on it.

THE COURT:  When an application is made that a

person be detained without bail pending the disposition of a

criminal offense, 18 U.S.C. Section 3142 requires that the

court consider several factors.  The nature of the charged

offense is to be considered, the strength of the evidence

against the accused be considered, the background of the

accused, his or her ties to the community, family ties,

employment history if any, prior criminal history if any,

whether at the time of the charged offense the accused is

32

1  under the supervision of a probation or parole entity is to be

2  considered.

3          In the instant case the accused is a permanent

4  resident of the United States.  He's a citizen of Senegal.

5  The information proffered during this proceeding and

6  information in the Pretrial Services report indicates that he

7  travels and lives in Senegal.

8          His wife owns property in the State of Maryland

9  where it's proffered that Mr. Gadio can reside when he's in

10  the United States.  He has no prior criminal history.  His

11  family ties to his spouse is indicated in the Pretrial

12  Services report.  He also has children.  His children live

13  abroad according to the Pretrial Services report and his wife

14  is working abroad according to the Pretrial Services report.

15          There is evidence proffered that during his arrest

16  Mr. Gadio made inculpatory statements to law enforcement

17  representatives and the statements were recorded in video

18  format.

19          The Pretrial Services report and the information

20  proffered to me indicates that Mr. Gadio is an official of his

21  native country, Senegal, holds a government position with that

22  country.

23          The Government argues that Mr. Gadio omitted to

24  provide certain information about his business background to

25  the Pretrial Services Office and so that omitted information

1  is indicative of an attempt by him to mask certain information

2  about himself that is pertinent the Government argues to the

3  charge made against him through the complaint.

4         It is proffered that Mr. Gadio was directed by the

5  Department of Homeland Security to come to the United States

6  for an appointment on the 17th day of November 2017 and he

7  complied with that directive and returned to the United

8  States.  It is proffered that that was a standard course of

9  action by the Department of Homeland Security and that he was

10  given a standard letter to -- with reference to his status as

11  a lawful permanent resident of the United States.  That is

12  being a permanent lawful resident of the United States, a

13  powerful tie to the United States.

14         The Pretrial Services Office has recommended that

15  there are conditions that could be fashioned to permit Mr.

16  Gadio to be at liberty while the criminal action is pending.

17  His counsel has endorsed that recommendation and also

18  recommended certain conditions in particular that could be

19  fashioned to permit Mr. Gadio to be at liberty.

20         Based on all the information that has been provided

21  to me during this proceeding and the arguments urged for and

22  against the Government's application that Mr. Gadio be

23  detained without bail I am not persuaded that there are no

24  conditions that could be fashioned to permit him to be at

25  liberty but I do not agree that the proposal by his counsel is

1  adequate to insure that he could be at liberty and returned to

2  court when directed to do so.

3                    [Pause in proceedings.]

4          THE COURT:  Following are bail conditions for Mr.

5  Gadio.  $1 million personal recognizance bond.  The bond is to

6  be co-signed by four financially responsible persons.  The

7  bond is to be secured by $250,000 cash or property.  His

8  travel is restricted to the Southern and Eastern Districts of

9  New York and the District of Maryland.  He must surrender all

10 travel documents he may possess and not seek or obtain any new

11 or replacement travel documents while the criminal action is

12 pending.  He's subject to Pretrial supervision at the level

13 determined appropriate by the Pretrial Services Office, be

14 subject to home incarceration with electronic monitoring.  He

15 will be detained until all of the conditions are satisfied.

16          Sir, if you satisfy the bail conditions and are at

17 liberty you must appear in court whenever you are directed to

18 do so.  If you fail to do so you and any co-signers on your

19 bond will be liable to the Government for the full amount of

20 the bond.  Any cash or property submitted to support the bond

21 will be forfeited to the Government.  A warrant may issue for

22 your arrest and you may expose yourself to a new charge in

23 connection with your failure to appear in court which would

24 have a penalty independent of any penalty that might be

25 imposed upon you should you be found guilty of the offense

35

1   that is outlined in the complaint.

2            Do you understand, sir?

3            THE DEFENDANT:  Yes.

4            THE COURT:  What date would you like the preliminary

5   hearing date, Mr. Baum?

6            MR. BAUM:  The thirtieth day, Judge.

7            THE COURT:  December 18, 2017 will be the

8   preliminary hearing date.

9            Is there anything else that we need to address?

10           MR. RICHENTHAL:  No, Your Honor.

11           THE COURT:  Anything else on behalf of --

12           MR. BAUM:  I'm sorry, Judge.  No, nothing else.

13  Thank you.

14           THE COURT:  Thank you.

15                     [Off the record.]

16           THE COURT:  We're back on the record.

17                     [Pause in proceedings.]

18           THE COURT:  All right, Mr. Baum.

19           MR. BAUM:  Judge, I apologize.  There's a medical

20  issue that we ask that you endorse medical treatment.  He's

21  being treated for diabetes and high blood pressure and he

22  received two -- he receives two medications for that.  One is

23  Metformin for diabetes and Hyzaar, H-Y-Z-A-A-R for high blood

24  pressure.

25           THE COURT:  I'll prepare a medical order.

36

1          MR. BAUM:  Thank you, Judge.

2          THE COURT:  You're welcome.

3                    *  *  *  *  *

37

1      I certify that the foregoing is a court transcript from

2 an electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5      _____

6      Shari Riemer, CET-805

7 Dated:  November 20, 2017