IBE5hoC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          17 Cr. 779 )LAP)

5   CHI PING PATRICK HO,

6              Defendant.

7   ------------------------------x

8                                          November 14, 2018
                                           10:00 a.m.
9

10  Before:

11                  HON. LORETTA A. PRESKA,

12                                         District Judge

13

14                     APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  DOUGLAS S. ZOLKIND
17       DANIEL C. RICHENTHAL
         CATHERINE E. GHOSH
18       Assistant United States Attorneys

19  PAUL HAYDEN, US DOJ Fraud Section

20  DECHERT, LLP
         Attorneys for Defendant
21  BY: BENJAMIN E. ROSENBERG
         KATHERINE M. WYMAN
22       -and-
    KRIEGER, KIM & LEWIN, LLP
23  BY: EDWARD Y.K. KIM
         JONATHAN L. BODANSKY
24       JONATHAN BOLZ

25

IBE5hoC                        conference

1          (Case called)

2          THE COURT:  Good morning, counsel.  Won't you be

3     seated?  United States v. Ho.  Is the government ready?

4          MR. ZOLKIND:  Yes.  Good morning your Honor.  For the

5     government, Douglas Zolkind, Daniel Richenthal, and Katherine

6     Ghosh with the U.S. Attorney's office, and Paul Hayden with the

7     Department of Justice Fraud section.

8          THE COURT:  Good morning.

9          And is the defense ready?

10         MR. ROSENBERG:  We are, your Honor.  Benjamin

11    Rosenberg and Katherine Wyman of Dechert on behalf of Dr. Ho.

12         MR. KIM:  Edward Kim, Jonathan Bolz, and Jonathan

13    Bodansky behalf of KKL for Dr. Ho.

14         THE COURT:  Good morning, counsel.

15         Does it make sense to work on our motions *in limine*

16    first?

17         MR. ZOLKIND:  Your Honor, I think that does make

18    sense.  Obviously there are a number of motions filed by both

19    sides.

20         THE COURT:  No kidding.  Including one that came in

21    last night, thank you very much.

22         MR. ZOLKIND:  I think perhaps more than one that came

23    in last night.  Your Honor, we are happy to structure our

24    arguments in whatever way the Court would find most helpful.

25         THE COURT:  I guess I really want to know whether you

1    want to add anything to your papers.

2            MR. ZOLKIND:  If we can have just a minute to think

3    about that, your Honor?

4            THE COURT:  Certainly.  And, one of the things you can

5    think about is that in some of these motions, for example, when

6    we were talking about the allegation that the charges are

7    politically motivated, the defendant said that he might seek to

8    offer evidence with respect to his view of the purpose of his

9    work and its relation to China and Chinese foreign policy.

10   With respect to the defendant's family background, health,

11   etc., etc., etc., defense said that it would not offer evidence

12   regarding personal factors unconnected to guilt but might

13   introduce evidence of the defendant's background or

14   professional activities, if needed.  I don't know what that

15   means.

16           On the defendant's prior good acts, the defense agreed

17   that specific act propensity evidence is not admissible but did

18   note that it might introduce evidence regarding the nature and

19   mission of the CEFC NGO in order to demonstrate defendant's

20   intent.  I don't know what that means.  I also don't know what

21   the relevance of the CEFC NGO's special consultive status with

22   the U.N. would be.

23           So, those are questions I have, and I guess mostly I

24   want to know if you people want to add anything to your papers.

25           MR. ZOLKIND:  And, your Honor, I think on those

1    specific issues it probably makes sense for the defense to add

2    first.

3              THE COURT:  You think?

4              MR. ZOLKIND:  And then we can respond.

5              One thing that as I was standing here that occurred to

6    me that we would want to add, unless the Court wants us to

7    respond in writing, one of the defense motions filed last

8    evening was essentially to preclude Gadio from testifying about

9    Déby's statements in terms of the $2 million, essentially

10   arguing that Gadio shouldn't be allowed to testify about the

11   $2 million that he would otherwise say was provided in cash in

12   those gift boxes.  And I think that motion, although it was a

13   newly filed motion last night, is related to a motion the

14   defense had previously filed which we did respond to and which

15   is fully briefed, and that's the motion to preclude Gadio from

16   testifying about his own understanding of those events in terms

17   of his understanding of the fact that it was a bribe.

18             THE COURT:  Right.

19             MR. ZOLKIND:  And that it was rejected.

20             So, we responded to the second part of that.  We

21   haven't responded to the motion they filed last night.  I am

22   certainly happy to address that orally today.

23             THE COURT:  Sure.  Why don't you do that.  And, I

24   think the government had not yet filed a reply to, on its

25   motion to preclude the defendant from offering various videos

1    and speeches, etc., etc., etc. and thought maybe you want do

2    that orally as well.

3            MR. ZOLKIND:  We can respond to that as well orally,

4    your Honor.  We will split up the arguments between members of

5    our team but if you like, we can start with that right now.

6            THE COURT:  Certainly.  So, we are going to do videos

7    and speeches first?  What do you want to do first?

8            MR. ZOLKIND:  I will start with Gadio's testimony,

9    your Honor.

10           THE COURT:  Fine.

11           MR. ZOLKIND:  So, your Honor, I think as I said, the

12   issues are interrelated.  The first issue is can Gadio testify

13   to the various statements and assertions that were made during

14   the December 2014 trip to Chad including statements that

15   President Déby made to him, to Dr. Gadio, and statements that

16   President Déby made to the defendant which were in Gadio's

17   presence.  That is a core part, as I think the Court

18   appreciates, of the testimony that was government intends to

19   elicit from Gadio.

20           And then, a secondary issue is whether Gadio, having

21   related his involvement in those discussions, the sort of back

22   and forth, the what, when, and where, what happened during

23   those meetings, for Gadio to convey to the jury his

24   understanding as a participant in those events of what he,

25   Gadio, subjectively understood was going on.  And we think that

IBE5hoC                          conference

1    also is entirely permissible, is really quintessential

2    cooperating witness testimony.

3          Your Honor, in terms of -- so, let me get to the first

4    part first which we haven't responded to in writing but I will

5    address now.  So, this is the issue of whether Gadio should be

6    permitted to testify about the $2 million just as a fact that

7    he learned about while he was in Chad.  To be clear, and just I

8    think a little bit of background may be helpful in setting the

9    stage for this.

10         THE COURT:  May I just interrupt you to be sure that

11   what we are actually talking about is statements made by

12   President Déby to Gadio, or to the defendant with respect to

13   those activities.

14         MR. ZOLKIND:  Yes, your Honor.  That is the motion

15   that the defense has filed.  As I will get into, I think

16   isolating the statements of President Déby from other

17   statements that were made by all the various participants

18   during the Chad meeting is not really an exercise that can be

19   done but, yes, the motion that the defense has filed is

20   directed at Gadio's testimony regarding Déby's statements.

21         Just to back up for a moment, I think the Court may

22   know this, but Gadio's role in this Chad scheme was to work as

23   an intermediary between defendant, who is his point of contact

24   at CEFC and President Déby, and Gadio was retained not formally

25   in the first instance but certainly retained by the defendant

IBE5hoC                         conference

1    to broker this introduction to the president of Chad explicitly

2    for the purpose of pursuing business for CEFC in Chad.  And so,

3    the nature inherent in the nature of the Gadio's role, and he

4    will testify to this and it is corroborated by extensive e-mail

5    and text message documentation, Gadio's role was to meet with

6    the defendant, speak with the defendant, communicate with the

7    defendant, convey that information to President Déby, and then

8    go to President Déby, meet with him privately, hear his

9    thoughts, and then convey that back to the defendant.

10          So, there is already, leading up to the meeting in

11   Chad in December 2014, there will already have been, I think, a

12   very solid record established of Gadio meeting with Déby,

13   hearing things, assertions, statements of Déby, and conveying

14   those to the defendant and there has been no argument, at least

15   yet, that any of that is hearsay and I think there couldn't be

16   any argument that it is hearsay.  That was Gadio's role, was to

17   convey that information to the defendant.

18          And so, in order to explain what was going on, in

19   order to explain, for example, that the defendant wanted a

20   second meeting in Chad, the December meeting in Chad, the

21   statements of Déby which Gadio conveyed have to come in and the

22   defense hasn't moved on that.  But I think that background is

23   important for the Court to understand.

24          So then you get to there is a November meeting in Chad

25   with CEFC, Gadio, and Déby, and then sort of immediately on the

1    heels of that meeting Gadio will testify and the emails will

2    corroborate, that the defendant wanted, urgently, a second

3    meeting in Chad.  And there was a back and forth, Gadio didn't

4    think that made any sense but, nonetheless, the defendant

5    persisted, he wanted that second meeting, and so a meeting in

6    Chad in December 2014 was scheduled.

7            The defendant and his colleagues -- we would say

8    co-conspirators -- from CEFC flew into Chad on a private jet;

9    Gadio met them there.  They met with President Déby.  The CEFC

10   side brought a number of gift boxes, our understanding it was

11   about seven or eight approximately gift boxes.  At the end of

12   the meeting the CEFC side presented those gift boxes to

13   President Déby.  The defendant was there.  We understand from

14   Gadio that the defendant was not in the least surprised or

15   showed any sort of unusual reaction to the fact that his side

16   was offering gift boxes to the president.  The president did

17   not open them at that point and the meeting ended.  Gadio

18   returned to his hotel and then, very shortly thereafter, he was

19   contacted by the president's office and was essentially whisked

20   back to the presidential compound.  And we understand from him

21   that his next meeting with the president took place very

22   shortly after the presentation of the gifts, within

23   approximately two hours, he believes.

24           At that meeting it was Gadio, President Déby, and

25   President Déby's chief of staff, just the three of them.  Déby

IBE5hoC                        conference

1    was upset.  Gadio says he was furious.  And he -- Déby -- says

2    to Gadio, that the boxes contained cash, $2 million in cash,

3    and essentially the purpose of this meeting is to suss out

4    whether Gadio is in on it or whether Gadio didn't know anything

5    about it.  And the meeting goes on but the bottom line is that

6    Gadio assures the president that he didn't know anything about

7    it and Gadio was, himself, very upset, very agitated.  He was

8    likewise furious that folks he thought he was in a business

9    partnership with, the folks he thought were relying on his

10   guidance and advice, went and did this without his knowledge, I

11   think that he thought was wrong for any number of reasons.

12        The initial plan is to get back in front with the CEFC

13   team including the defendant that night but it is already sort

14   of late and they can't be located.  And so, what happens is

15   that everyone reconvenes the next morning again in the

16   presidential compound.  And, by the way, there is text message

17   that will come into evidence when Gadio sends a text message

18   the next morning to the defendant saying the president called,

19   he wants to see you and me right away, and so that is shortly

20   after that they go back in front of the president.

21        Now, they're in front of the president, the CEFC team

22   is there, it is the defendant and two other executives from the

23   energy company, Gadio, the president, and the chief of staff.

24   The president is the first one to speak.  He says, for example,

25   he is furious.  He says one of the things that Gadio has been

IBE5hoC                    conference

 1    very consistent in recalling is that the president says, *Do you*

 2    *think all African leaders are corrupt?*  Or *Why do you think all*

 3    *African leaders are corrupt?*  I don't think that there is any

 4    argument that it is hearsay, it is a question, it is not an

 5    assertion, and I don't understand the defense to be moving on

 6    that statement.  But, that is one of the things he says.

 7              Déby also says that he had wanted to or had considered

 8    throwing the CEFC group out of the country but, in sum and

 9    substance, he was persuaded to hear what they had to say about

10    the money and the boxes before deciding on a course of action.

11              So, that is the sum and substance of the president's

12    statement.  Gadio has been very crystal clear on the very next

13    thing that happened.  The very next thing that happened was the

14    defendant spoke up.  He didn't -- and Gadio is clear on this

15    too.  The defendant did not speak to a member of his group and

16    then translate for him.  The defendant spoke up, and he spoke

17    on his own, and what the defendant's first words were, were

18    that the defendant said he was very impressed by the

19    president's rejection of these boxes or the rejection of the

20    cash in the boxes.  And the defendant goes on to say something

21    like your rejection of those boxes confirms that we were right

22    in making Chad our first stop in Africa.

23              After that -- I am wrapping up the statement of fact

24    in a moment.  After that, the CEFC side confers briefly in

25    Chinese, only the defendant and his two colleagues or

IBE5hoC                        conference

1    co-conspirators can understand what they're saying, and then

2    after that brief colloquy or discussion in Chinese the

3    defendant's colleague, a man by the name of Zang -- Z-A-N-G --

4    who is a top-level energy executive at the company.  He then

5    speaks up, he only speaks Chinese and so the defendant

6    translates for him, but Gadio has a very clear recollection of

7    what he says through the defendant and it is, in sum and

8    substance, I don't know what we were trying to do,

9    Mr. President.  We did it badly.  We did it poorly.  We

10   intended this as a donation to the people of Chad.

11           He might have said other things, that's the main

12   thrust of Zang's comment.  The president then challenges that,

13   basically makes an argument for what we would certainly argue

14   to the jury that the president's remarks, as relayed by Gadio,

15   reflected the president didn't believe that explanation.  He

16   says, for example, *If it was a donation, you would have told me*

17   *before making it.  If it was a donation, you would have gone*

18   *through appropriate channels.*  Etc.  And essentially the CEFC

19   side it would be humiliating if they brought the $2 million

20   back to China.

21           So, at the end of the day, end of that meeting, a sort

22   of compromise is reached.  The Chinese side prevails on the

23   president to keep the money in Chad and they agree that they're

24   going to write a letter making clear that the money should be

25   donated for specific charitable purposes.

IBE5hoC                        conference

1          The very next day or perhaps the day after but as soon

2     as the defendant has left Chad, the very first person to write

3     that letter that we have seen in e-mails is the defendant and

4     he is writing an e-mail about a contract, he wants to get oil

5     rights in Chad, and in the same e-mail he types up the first

6     draft of this letter, it is a three-sentence letter in which he

7     says, and I think his exact language is something like, *We*

8     *would like to make a donation in Chad.*  He doesn't say anything

9     along the lines of with respect to the $2 million we had

10    already given you, we want to donate that for charitable

11    purposes.  And then Gadio later says that the letter is poorly

12    written and he revises it to make it a little bit more clear

13    that they're not talking about a prospective donation although

14    the language is still not crystal clear on that.

15          So, that's the sort of sum and substance of the

16    testimony in general.  I think that's relevant in part because

17    it illustrates how impossibly nonsensical the testimony would

18    be if Gadio were prohibited from talking at all about Déby's

19    statements and specifically the statements about $2 million.

20          So, for example, and I won't go through the full

21    recitation of facts again but just to illustrate the

22    impossibility of excising that from Gadio's testimony, which is

23    important because statements are not hearsay if they're being

24    offered to provide context to explain what was going on and so

25    forth.  And so, for example, if Gadio were to testify that the

1   gifts were given, he went back to his hotel and then he was

2   told he had to come back urgently to the presidential compound

3   and Déby was upset and Déby told him he was upset but I can't

4   tell you why he was upset or what he was upset about, and then

5   next morning we reconvened with the CEFC delegation and the

6   president said do you think all African leaders are corrupt,

7   but Gadio can't explain why he is saying that or what relevance

8   that has to anything that's been going on, and then Déby says

9   some other stuff and he is upset and he is talking, he is

10  confronting the CEFC side but Gadio can't explain what he says,

11  and then the defendant responds by saying I'm very impressed

12  with your rejection of the boxes or your rejection of the cash

13  but, again, Gadio can't explain, what statement the president

14  had made that caused Gadio to have that response, and without

15  that context the defendant's response, without the context, is,

16  I think, completely incomprehensible.

17          And then Gadio would go on to testify about a

18  compromise about writing a letter for a donation which also

19  doesn't make any sense.  Why is there a compromise?  Why are

20  they writing a letter if there is no explanation of what had

21  gone on beforehand?  And then you get to the letter and the

22  letter is phrased in terms of a donation they would like to

23  make prospectively, and Gadio revises it so that it is not as

24  false in that regard but, again, you can't really explain why

25  he did all of that.

IBE5hoC                        conference

1          So, I just think, I hope that that illustrates why for

2     Gadio to tell the story in a way that makes any sense

3     whatsoever, he needs to be able to explain what he was told and

4     what the defendant was told in order to make all of this

5     understandable to the jury.

6          THE COURT:  What do you say to the defendant's

7     argument that sometimes hearsay is allowed to come in for the

8     purpose of putting things in context or explaining

9     noncontroversial matters; and secondly, the defendant's

10    argument that all of this is being offered for the truth.

11         MR. ZOLKIND:  So, let me take those in turn, your

12    Honor.

13         First, this testimony about the $2 million in cash, it

14    is not even in the complaint.  So, I think to say that -- they

15    sort of say that this testimony is the government's case, that

16    this, that we would be proving the case through hearsay.

17    That's just not remotely true.  There is no question that there

18    will be, in evidence, the fact that the defendant wrote a

19    letter, a three-sentence letter in the same communication in

20    which he was talking about getting oil rights in Chad where he

21    talked about pledging or donating $2 million for the president

22    of Chad to use as his personal disposal.  That's going to be in

23    evidence.  So, this testimony helps to explain and clarify and

24    provide context for the evidence that is indisputably going to

25    come in of the defendant's bribery attempt.

1          And then, with respect to it being offered for the

2     truth, your Honor, there is, I think, a very strong basis to

3     get it in for the truth.  Everything I have described so far is

4     why it is admissible even if it is not in for the truth.  And,

5     I think it is very clearly admissible, even if it is not for

6     the truth.  But, it is also very clearly admissible for the

7     truth and that's because I think the clearest reason it is

8     admissible for the truth is Rule of Evidence 801(d)(2)(B), and

9     that's a statement of a party, it is a statement offered

10    against the defendant and where it is, one that the defendant

11    manifested, that he adopted or believed it to be true.  And I

12    would say, your Honor, this is a perfect example of a situation

13    where this rule applies and the way that the rules are

14    structured, this is not an exception to the hearsay rule, it

15    simply defines it as not hearsay but it is essentially a

16    version of a statement of the defendant.

17         So, it is 801(d)(2)(B) and it's -- what we have here

18    is President Déby saying to the defendant, in sum and

19    substance, those gift boxes had cash concealed within them,

20    among other things.  And then, the defendant's response is *I'm

21    very impressed by your rejection of that cash*, or *your

22    rejection of those gift boxes*.  And I think the only way to

23    understand the defendant's response is that it manifested an

24    adoption of or belief in the truth of what Déby said, i.e. that

25    there was cash in those boxes.

1          And, I will just quote from the committee notes on

2     this rule of evidence.  The committee notes say:  Under

3     established principles, an admission made be made by adopting

4     or acquiescing in the statement of another.

5          THE COURT:  Slowly.

6          MR. ZOLKIND:  My apologies.

7          Adoption or acquiescence may be manifested in any

8     appropriate manner.  When silence is relied upon, the theory is

9     that the person would, under the circumstances, protest the

10    statement made in his presence, if untrue.  The decision in

11    each case calls for an evaluation in terms of probable human

12    behavior.  That is just in the committee notes.  We got the

13    motion last night so I haven't researched the case law, but I

14    would argue to your Honor that even if, in the face of

15    President Déby's statement, if the defendant had simply

16    remained silent, we would still have strong argument that he

17    thereby adopted the statement.  But, the Court doesn't need to

18    decide that, that would be a somewhat harder case.  Here he

19    does not remain silent, his immediate response is that he is

20    impressed by the president's rejection of the cash.  So, that

21    is an adopted statement, it is admissible for the truth for

22    that very reason.

23          There is other.  We cited to the defense the excited

24    utterance section and the present sense impression exception.

25    I think the initial meeting that happens between when Gadio is

IBE5hoC                          conference

whisked back to the presidential compound after the gift is

opened and he says it happened very quickly, he estimated

within about two hours or less, he is sitting in front of the

president, the president is upset, and he tells him what

happened.  I think the Court could have a strong basis to admit

that as an excited utterance.  There is definitely case law

saying that depending on the event the stress of the excitement

of it can last longer than a matter of seconds and I have seen

cases where it can last hours but I don't think the Court needs

to go there, frankly.  I think it is very -- the statement of

Déby to the defendant, to which the defendant responds is, I

think, squarely an adoption of or manifestation of the truth of

the statement so it is admissible for the truth, period.  And

the earlier statement of Déby to Gadio, we don't need that to

be in for the truth of that.  I think it is clearly admissible

to provide context for what happens next.  It explains why

Gadio went home and texted the defendant that the president

wants to see you and me right away.  It explains why they

reconvened in front of the president.  It explains the whole

series of events.

        So, I think there is certainly no harm in offering

what the defense calls the first statement, the statement of

Déby to Gadio.  That is necessary to provide context and, in

any event, the statement of Déby to the defendant is clearly

admissible for the truth.  And, even if it weren't, as I laid

 1    out, it is critical to make all the other statements and

 2    actions and events in this case make sense.

 3              So, for all of those reasons, your Honor, I think the

 4    hearsay objection should be denied.

 5              THE COURT:  Who would like to be heard on that?

 6              MR. ZOLKIND:  Your Honor, I will note the second issue

 7    is whether Gadio can sort of convey his understanding.

 8              THE COURT:  Why don't we do -- can I finish with this

 9    one first?

10              MR. ZOLKIND:  Absolutely.

11              THE COURT:  Thank you.

12              Mr. Rosenberg.

13              MR. ROSENBERG:  Thank you, your Honor.

14              Your Honor, as we said in our brief, there is two

15    separate statements, the first statement would take place on

16    one day, I think December 8, and the next statement takes place

17    the next day and the first statement is not made to Dr. Ho.  It

18    is not made to any -- well, and for that reason I would submit

19    there is absolutely no foundation for putting it in.  There is

20    no hearsay exception.

21              THE COURT:  Is that coming in for its truth, though?

22    I mean, who cares whether the president was upset or not.

23    Maybe he was pretending he was upset.

24              MR. ROSENBERG:  That is -- forgive me, your Honor, for

25    interrupting.

1          That is the only statement in which President Déby

2     says what the government contends is critical:  *I have been*

3     *given $2 million in cash.*  That is the only time he says that,

4     according to the documents that we have read so far, in that

5     meeting.  It is not stated in the meeting the next day.  So, I

6     think to suggest -- that is obviously a powerful statement, the

7     jury won't be able to forget it, and under the government's

8     theory, essentially your Honor would instruct the jury, okay,

9     he just said that he received $2 million in cash.  You are not

10    to consider that for the truth of the matter asserted.  I think

11    that there is no way anyone could reasonably be expected to

12    abide by that, hard as they would surely try.  And it is

13    absolutely unnecessary.  They say to put things in context.

14    That's the answer, it seems, to everything.  *Well, we need this*

15    *to put this in context.  We need this to put this in context*.

16    Only admissible evidence can come in and it can't be the

17    answer, well, we have a lot of things we want to put into

18    context so we should allow some inflammatory hearsay material

19    in just because it will put the rest in context.

20          The only statement which, according to the

21    government's rendition here to which Dr. Ho responded was, *Do*

22    *you think all African leaders are corrupt?*  Now, under the

23    materials we have read it is not at all clear to me the timing

24    of whether there was a response, when there was a response, or

25    whether Dr. Ho stated, spoke with other people, was translated

for them, whether the statements were translated or not.  The
government has represented that there was no translation and
that it was right then and there immediately and now they say
that that's an adoption.  Even if that were so, I don't think,
your Honor, that is clear adoption of anything given the
circumstances.  *Do you think all leaders are corrupt?*  I don't
know how anyone would adopt a question, the whole theory of
questions if they're not assertions and the government referred
to that, that's why they're not hearsay.  But, even if that was
so, the statement that could be adopted would be -- that could
be admitted was *Do you think all African leaders are corrupt?*
That would be the only statement.  The government suggests, oh,
well, look.  You have to look at the whole picture with all of
these statements and everything.  All they are saying is we
want a lot of inadmissible evidence before the jury so we can
then put into context the relatively few pieces of admissible
evidence.  The government will have the letter, I presume, I
think that that will come in, Dr. Ho's letter.  They will be
able to argue the inferences from that.  They can argue if in
fact it is true, in response to a question from President Déby,
*Do you think all leaders in Africa are corrupt?* and Dr. Ho gave
an answer, and if Gadio can testify as to what that is, that
comes in, it is a statement of Dr. Ho.  Then the jury is left
to understand and infer and the government can present whatever
admissible evidence it wants --

IBE5hoC                        conference

          THE COURT:  Mr. Rosenberg, I wish you would quit

telling me that.  The question is whether the evidence that we

are talking about is admissible.

          MR. ROSENBERG:  And the answer is it is not.

          THE COURT:  Thank you for that.

          MR. ROSENBERG:  Forgive me, your Honor.

          None of the statements that have been identified, with

the exception of, *Do you think all African leaders are corrupt*?

which is allegedly adopted in some fashion, there is no theory

under which they come in for the truth of the matter asserted.

The excited utterance occurred approximately some hours after

the money was allegedly seen does not fall within the excited

utterance exception according to the materials that -- the 3500

materials to Dr. Gadio.  The president told him that he saw the

money, thought about it, talked to his aide, decided to call

Gadio, had Gadio come over, and then they discussed it.  I

don't think that, in any sense, that is an excited utterance.

He may have been angry -- according to Dr. Gadio he was or

insulted -- but that doesn't make it an excited utterance.

          The statements next day, which do not include a

statement that there was $2 million, are similarly not adopted

and there is no adequate theory under which they should be

admitted.  To then say, well, let's put them in in order to put

things in context, would be unfairly prejudicial.  In these

circumstances I think that putting things in context is

1    appropriate only if the material that is being used to do that

2    is not, in fact, the most inflammatory material of all.  The

3    remainder of the context can be presented through the

4    government's otherwise admissible evidence.

5              THE COURT:  All right.

6              MR. ROSENBERG:  Thank you.

7              THE COURT:  Would you please tell me, Mr. Zolkind,

8    your best thought on what the defendant said -- what Gadio is

9    going to say the defendant said after President Déby said *Do*

10   *you think all African leaders are corrupt?*  And, *I thought*

11   *about throwing the entire CEFC crowd out.*  And then at least my

12   notes say that the defendant, according to Gadio said, *I was*

13   *very impressed by your rejecting the cash.  It confirms that we*

14   *were right in the first to make Chad our first stop*.  Can you

15   tell me what your best information as to what Gadio is going to

16   say the defendant said there?

17             MR. ZOLKIND:  Absolutely, your Honor.  And, I think

18   Mr. Rosenberg didn't get it exactly right.

19             So, what we are arguing was an adopted assertion of

20   the defendant.  That did not follow immediately from the

21   president saying, *Do you think all African leaders are corrupt?*

22   So, here is what happened.  The CEFC delegation is brought in.

23   President comes out.  The president then makes a statement and

24   the statement that he makes, he goes on for a couple minutes.

25   My understanding is that one of the first things he says is, *Do*

IBE5hoC                    conference

*you think all African leaders are corrupt?* Or it might be, *Why
do you think all African leaders are corrupt*? He says
something to the effect of who do you think you are and who do
you think I am. He says -- at some point in the president's
statement he makes the assertion: Those gift boxes had cash in
them.

So, that is part of the president's assertion, that
the gift boxes that the CEFC had given him had cash in them.
That's part of the assertion. And then, after that
assertion -- I'm sorry, the president's statement also
includes, And when I found out about it, I want you guys thrown
out of the country but I was persuaded that I should sit you
down and hear your explanation before doing anything that
drastic, so what is your explanation, essentially. And at that
point the defendant jumped up -- and I should say Gadio has
been very consistent that in all of these meetings with the
president the first member of the CEFC delegation to speak was
virtually always the defendant who sort of set the stage from
the CEFC team's perspective.

So, Déby makes the statement. The defendant stands up
and says Mr. President, I am very impressed by your rejection
of the boxes. Either it is I am very impressed by your
rejection of the cash or the cash in these boxes or these
boxes. I don't view any of those as materially different
because the president had said the boxes had cash in them and

1    the defendant responds he is very impressed by the president's

2    rejection of the boxes the president has just said had cash in

3    them.  That is the adoption.

4         So, the argument we are making is that there is no way

5    to understand the defendant's statement that he is very

6    impressed by the rejection of the boxes with cash unless he is

7    adopting the president's assertion of fact that the boxes had

8    cash.

9         THE COURT:  All right.  What else did you want to say?

10        MR. ZOLKIND:  So, a second motion *in limine*, which is

11   actually the first motion *in limine* that defense filed is

12   similar but different, and in this motion the defense seeks to

13   preclude -- my notes are here.

14        Your Honor, just before I move on to the second issue

15   I should just make crystal clear if I haven't already, we argue

16   that the defendant's statement about being impressed was an

17   adoption and therefore it is admissible for the truth.  Even if

18   for some reason that weren't a correct application of that rule

19   of evidence, the statement is still admissible to explain why;

20   to give context.  In other words, the defendant's statement, "I

21   am very impressed by your rejection of the boxes," is going to

22   be utterly inexplicable to this jury unless they know what

23   statement he is responding to.  So, whether he adopted it or

24   not, you can't understand the defendant's statement which is

25   admissible -- and they're not disputing is admissible -- unless

IBE5hoC                        conference

you have the context.  And I think the same thing goes for

Déby's statement, *Why do you think all African leaders are*

*corrupt?*  That's not a statement of fact, the defense is not

arguing that that is hearsay.  They couldn't argue that it is

hearsay.  So, that statement is coming in.  But, again, the

jury is not going to understand what is going on.

THE COURT:  I got it.  I got it.

MR. ZOLKIND:  All right.  My apologies.

So, the second issue is assuming Gadio can testify to

the statements that were made, sort of events, facts that he

witnessed and he attended this conversation with the defendant,

can the government elicit from Gadio his understanding of what

happened.  And what we have in mind is essentially asking --

so, for example, as I just related to your Honor during this

confrontation with the president a member of the CEFC team

finally got up and said, your Honor, we did it poorly, I don't

know what we were trying to do but we meant this as a donation.

I think we are entitled to ask Gadio what was your reaction

when you heard that explanation?  And he didn't believe it.  He

found that not to make any sense at all.

THE COURT:  Wasn't there a difference between his

saying I didn't believe it and his saying I thought they were

trying to bribe President Déby?  Which sounds an awful lot like

his testifying to defendant's state of mind.

MR. ZOLKIND:  But, your Honor, it is testifying -- I

1    don't think there is a material difference between that sort of

2    testimony.  And I think --

3             THE COURT:  I didn't understand, difference between

4    what and what?

5             MR. ZOLKIND:  I don't think there is material

6    difference between Gadio testifying that in his own mind, in

7    Gadio's own subjective view what was going on here is that the

8    money -- that he didn't believe that it was a donation because

9    he understood that it had been cash offered directly to the

10   president, versus Gadio saying in a more shorthand way that his

11   understanding was that a bribe had been offered and Déby had

12   rejected it.  And I think there is no reason to prohibit Gadio

13   from explaining what he thought, that as he experienced these

14   events his understanding was that the money was offered for the

15   president's personal benefit and the president rejected it

16   because the president saw it as a bribe and that is, for

17   example, why the president said, *Do you think all African*

18   *leaders are corrupt?*

19            This, I would suggest to your Honor, quintessential

20   cooperating witness testimony.  He, Gadio had accepted

21   responsibility for his own involvement in this conduct.  He has

22   admitted to the facts, to the things he did that were wrong in

23   this particular case for reasons that --

24            THE COURT:  But I thought his testimony is or will be

25   he did not know that there was $2 million in the boxes and so

1    he wasn't complicit in that.

2            MR. ZOLKIND:  That's absolutely correct, your Honor,

3    and I think this is also critical, Gadio will, when explaining

4    what he did wrong which is important for the jury to understand

5    that he has an agreement with the government, a non-prosecution

6    agreement, it is important for the jury to understand what he

7    has accepted responsibility for in order to get the significant

8    benefit.  What he is taking responsibility for is after

9    learning what he viewed subjectively as a bribe offer, he

10   didn't walk away from this deal and, to the contrary, he helped

11   CEFC write this letter which essentially papered it over or

12   described what had been, in Gadio's view, cash offered to the

13   president personally as a "donation."  And then he didn't stop

14   there.  Gadio continued to help defendant and CEFC try to work

15   out a deal in Chad and he has accepted responsibility for that.

16           I think there is no difference between Gadio

17   explaining his understanding of what went on, why that

18   implicates his own culpability, no difference between that and

19   any case where a member of a conspiracy explains their own

20   understanding of the events that they were involved in and what

21   happened.

22           I mean, I will say in the defense's -- it was their

23   sur-sur-reply or their response to our sur-reply, they argue

24   that the government is trying to obscure the issues and avoid

25   the conclusion that this is lay opinion testimony under 701.

IBE5hoC                        conference

1    And that's not true.  One of the reasons the testimony is

2    admissible is because it is proper lay opinion testimony under

3    701 and we cited cases that are in accord with that, the case

4    like *Skelly*, for example.

5           What those cases stand for is that in a conspiracy,

6    much is left unsaid.  Right?  That is doubly true in corruption

7    cases and bribery cases.  It is exceedingly rare, in my own

8    experience and my review of the case law, that any members of

9    conspiracy talk in terms of here is the person we are going to

10   bribe, here is how we are going to do it.  They use language

11   that, even amongst themselves, tries to come up with, make it

12   sound legitimate.  And that is absolutely what went on in this

13   case.  Right?  This defendant, his formal position was as the

14   head of an NGO.  As the head of an NGO he is sort of in the

15   business of making charitable donations.  That is part of what

16   he does and it is critical for the jury to -- I think it is

17   entirely appropriate and common for the government to call a

18   cooperating witness who was there in those closed-door meetings

19   who can say what happened and how he understood it.  Even the

20   language like "donations" was being used, even though a

21   donation letter was being drafted, can give his own

22   understanding of what was going on.  And I think that really is

23   critical, your Honor, because otherwise the jury is only going

24   to see the part of the events that the defense wants them to

25   see.  That pledge letter is coming in and the pledge letter

IBE5hoC                      conference

 1    reads as a crystal clear charitable donation, and I think

 2    unless Gadio can explain here are the reasons that I didn't

 3    think it was a donation, that I viewed it as a personal benefit

 4    being offered to the president, it was in cash, that they never

 5    mentioned the donation before the president confronted them --

 6             THE COURT:  But he can say all of those things.

 7    Right?  There is no reason you can't say it was in cash, I

 8    never heard the word donation until then, blah, blah, blah, all

 9    of that comes in.

10             MR. ZOLKIND:  Agreed, your Honor.  I just think that

11    unless he is able to convey his own understanding of what it

12    was, it would lead to a very serious misperception on the side

13    of the jury and I think also would not allow the jury to

14    appreciate the extent to which he is taking responsibility.

15    Again, the fact that he views himself as having continued to

16    work with a defendant and an organization that had offered a

17    bribe, right, he believes a bribe is offered, he believes it

18    was wrong and then --

19             THE COURT:  How is he taking responsibility?

20             MR. ZOLKIND:  Well, he is admitting to it and those

21    admissions are in writing and he has the obligation to testify

22    truthfully and cooperate and fulfill the obligations of his

23    non-prosecution agreement.

24             So, this is not a case in which he has pled guilty but

25    I don't see why that distinction -- I mean, that is certainly

IBE5hoC                        conference

1    fodder for cross-examination.  No question.  He is going to get

2    crossed on that.  That's appropriate.  But the fact that after

3    taking responsibility he resolves his case through one type of

4    agreement versus a different type of agreement does not change

5    the probative value of being able to explain, as a member of

6    the conspiracy, his own understanding of the events that

7    transpired and what they amounted to.

8            And so, again, we are emphatically not going to ask

9    him what the defendant was thinking or what the defendant

10   intended, but I think we are entitled to ask him when that cash

11   was handed -- when you learned about the cash and the defendant

12   said he was very impressed by the president's rejection of it,

13   what was your understanding of what the defendant meant by

14   that.  And then when the defendant's colleague said we did it

15   poorly, I don't know what we were thinking but we meant it as a

16   donation, did you believe that?  Did you believe it?  What was

17   your understanding of what had gone on?  I think that it is

18   important evidence, your Honor.  All of the issues that the

19   defense has raised about it will be things they can very

20   adequately explore on cross-examination.

21           THE COURT:  All right.

22           Mr. Rosenberg?

23           MR. ROSENBERG:  Your Honor, I may respond briefly to

24   some of the earlier points that were made.

25           THE COURT:  Yes, sir.

IBE5hoC                    conference

1          MR. ROSENBERG:  And then Mr. Kim will respond to the

2     second part of the argument.

3          THE COURT:  Yes, sir.

4          MR. ROSENBERG:  I think what the government said is

5     exactly why President Déby's statement should not be admitted

6     in front of the jury.  What the government said is that he

7     spoke for a couple of minutes, he wasn't clear at all what he

8     said.  The only phrase consistent was the question, *Do you*

9     *think all African leaders are corrupt?*  But there are other

10    things, other statements made apparently.  And then, when the

11    government reported what Dr. Gadio says Dr. Ho said, again, it

12    was not clear what was said, it is not clear whether he said

13    I'm very pressed by your rejection of the boxes, of the money,

14    of the gift.

15         THE COURT:  I thought that Mr. Zolkind was clear that

16    President Déby said, in the course of his statement, that the

17    gift boxes had cash in them.

18         MR. ZOLKIND:  That is correct, your Honor.

19         THE COURT:  Mr. Zolkind said he was unclear as to what

20    the defendant's responsive remark was but let us assume that it

21    was that he was impressed by the president's rejection of the

22    boxes.  Why is that not an adoption of the president's

23    statement that the boxes had cash in them?

24         MR. ROSENBERG:  Because there may have been numerous

25    other things President Déby said.

IBE5hoC                    conference

1          THE COURT:  There were.  Answer my question.

2          MR. ROSENBERG:  And because in that circumstance where

3     someone may just want to pass through something, not dispute

4     something, not ask questions about there was what?  Or what are

5     you talking about?  There is a meeting with a diplomat or head

6     of state one might well say, might accept that, and simply say

7     we accept what you say and therefore I'm moving on.

8          THE COURT:  Same thing.

9          MR. ROSENBERG:  No.  With respect, I think not.  It is

10    not an agreement not to disagree or it is a decision not to

11    challenge or not to explore at that time.

12         THE COURT:  All right.

13         MR. ROSENBERG:  I think that is different from saying,

14    when someone says in the examples we gave when there is a plain

15    yes or something, or a plain adoption, under these

16    circumstances I think it is not and I think given the

17    circumstances --

18         THE COURT:  Well, then what's the meaning of

19    rejection?  What does that mean?  The statement is meaningless

20    if it is not an adoption.  *I am happy you rejected the boxes.*

21    What, it was purple?  It makes no sense.

22         MR. ROSENBERG:  They were something or the president

23    has a policy of not accepting gifts of any way, shape or form.

24    They could have been ceremonial and the doctor is saying, no,

25    if you don't accept the boxes, fine, and that's how we will

1  proceed from there.

2          THE COURT:  Go ahead.

3          MR. ROSENBERG:  Your Honor, I think the government

4  said that Dr. Gadio can say, well, it was cash.  Just to be

5  clear, again, that is only from President Déby.  Dr. Gadio

6  never saw the cash, he cannot say that, but for hearsay --

7          THE COURT:  That doesn't have anything to do with what

8  we are talking about.

9          MR. ROSENBERG:  Well, your Honor, I think it does

10  insofar as it limits because we are trying to distinguish the

11  different statements and that is my point in trying to bring

12  that point out.

13          Your Honor, that's what I have to say on the hearsay

14  and now I will let Mr. Kim address another matter.

15          THE COURT:  Sir.

16          MR. KIM:  Thank you, your Honor.

17          I agree with the government on one point, your Honor.

18  There is really no difference between saying did you think that

19  was a bribe?  And saying, What was your understanding of the

20  intent behind giving you that money?  It is the same thing.

21  And what the government, what they're trying do is have their

22  witness testify about what went on inside somebody else's head.

23          THE COURT:  I know, but what do you say about the

24  analogy to a co-conspirator's testifying, yep, we were out

25  there selling drugs, this was an agreement to sell drugs, even

IBE5hoC                        conference

1    though we were talking about shirts.

2            MR. KIM:  Your Honor, I think you are hitting on the

3    exact issue here.  If this were a co-conspirator I wouldn't be

4    standing up making this argument, but Dr. Gadio is not alleged,

5    and he will testify, that he was never part of a conspiracy

6    with Dr. Ho.  The reason why, in the quintessential

7    co-conspirator case, you allow a witness to get up and say,

8    yeah, this is what we agreed to because there was a presence of

9    a conspiratorial agreement, there was a meeting of minds.  In

10   this case, Judge, Dr. Gadio is going to testify that he never

11   had any agreement with Dr. Ho or anybody else to bribe anybody.

12           So, what the government is trying to do is trying to

13   ask an outsider -- an outsider -- to opine on the views of

14   people inside an alleged conspiracy and that's totally

15   different.  He is not qualified to give that opinion.

16           THE COURT:  What do you say to counsel's suggestion

17   that Gadio signed on with illegal activity in working with the

18   donation letter and the like?

19           MR. KIM:  And, Judge, I think he is -- the

20   testimony -- the permissible the testimony the government can

21   get in is not going to leave any juror with a misimpression

22   that Gadio thought everything was on the up and up.  They can

23   elicit, for instance, that in all the lead-up to the meetings

24   that Gadio never intended to ask anybody to bring cash to a

25   meeting.

IBE5hoC                          conference

1            THE COURT:  I have got all of that.

2            MR. KIM:  Okay.  Judge, let's start the clock when we

3    say Gadio was participating in an alleged cover-up of this

4    donation.  First of all, I don't think there the going to be

5    any testimony that Gadio agreed with anyone to cover anything

6    up.

7            THE COURT:  What about his work on the donation

8    letter?

9            MR. KIM:  He is going to be able to talk about that,

10   Judge.

11           THE COURT:  I'm sorry?

12           MR. KIM:  He is going to be able to talk about that

13   and he can say, he can be asked, Is this what you had in mind

14   when you asked for a nice financial package as an entry ticket

15   into the Chadian market?  He can say this is not what I had in

16   mind, this is not what I intended, but I did it anyway.  It is

17   all fair game.

18           What he can't do is get up and say, yeah, I believed

19   that that money was being passed to exert undo or secure some

20   sort of unfair business advantage.  He might as well get up and

21   point the finger at Dr. Ho and say I believe he is guilty.

22           THE COURT:  Thank you for that.  Come on.

23           MR. KIM:  I thought I would try, Judge.

24           THE COURT:  There is no jury here.

25           MR. KIM:  Well, I am warming up.

1        THE COURT:  I hesitate to think.

2        MR. KIM:  Judge, that's why this is important.  I

3   think, given the admissible evidence the government has to work

4   with, there is no danger that a jury is going to be confused

5   about what's going on here.

6        THE COURT:  That's not the test either.  So, the

7   question really is the co-conspirator test.

8        MR. KIM:  And, Judge, we can check the box on the

9   conspiracy leading up to I think what the government is now

10   calling the attempted bribe.  If there was conspiracy to do

11   that, Dr. Gadio wasn't a part of it.

12        THE COURT:  I got that.

13        MR. KIM:  Okay.

14        On the alleged cover-up, I don't --

15        THE COURT:  It wasn't just a cover-up, it was finding

16   another way to get the money in for a business advantage is

17   what the government will argue.

18        MR. KIM:  Unless I am mistaken I don't think that's

19   their argument.  I don't think their theory is that Dr. Gadio

20   facilitated what was effectively a bribe.  I think their theory

21   is -- they can correct me if I am wrong -- their theory is

22   there was an attempted bribe, Dr. Gadio realized and perhaps

23   President Déby said, well, I'm not taking bribe money and Déby

24   said it is going to have to be donation.  And Gadio then

25   instead of maybe picking up the phone and calling Department of

IBE5hoC                          conference

1  Justice said, okay, let's make lemonade out of lemons, it is a

2  donation now.

3              THE COURT:  Or whatever.

4              MR. KIM:  Or whatever.

5              But that's the core conduct, Judge.

6              THE COURT:  All right.

7              MR. KIM:  The government can stand up and correct me

8  if I am wrong about that.

9              THE COURT:  Do you want to add anything to that,

10  Mr. Zolkind, before Mr. Kim keeps going?

11             MR. ZOLKIND:  Well, your Honor, I do think what your

12  Honor referred to as the conspiracy test is not exactly the

13  right question because whether he, whether Gadio was a

14  co-conspirator is relevant if we were offering any statements

15  as co-conspirator statements.  That is not at all --

16             THE COURT:  Forgive me, but that was the analogy used.

17             MR. ZOLKIND:  No, I understand, your Honor and I think

18  it was one suggested by Mr. Kim and I am just arguing why I

19  don't think -- I don't think the analysis of this turns at all

20  on whether Gadio is a co-conspirator.  We are not offering --

21  we are not talking about offering co-conspirators statements.

22  We are talking about whether, to use the language of the rule,

23  we are talking about Rule 701 which is the rule for lay opinion

24  testimony.  It has to be rationally based on Gadio's

25  perceptions and it has to be helpful to the jury.  So, the

IBE5hoC                        conference

question here is, yes, co-conspirators easily satisfy the first

part of that and my point to your Honor is that, okay, he

didn't know about the bribe until it was offered so that makes

him not a co-conspirator for the purposes of the lead-up to the

meeting, but the question is whether he satisfies the predicate

of having personal knowledge of the events that happened and

the answer there is absolutely yes.  He was in very frequent

communications with the defendant so, for example, he had a

whole flurry of communications leading up to the meeting

including discussions about -- so, for example, Gadio --

          THE COURT:  But that's not really necessary for lay

opinion testimony.  Your position is that the proffered

testimony would be based on his perceptions of the box

presenting and the subsequent activities.

          MR. ZOLKIND:  And his extensive course of conduct with

the defendant.  I mean, I think that is critical.  He has a

long course of conduct with the defendant so, for example, the

fact that the defendant never -- Gadio did send him an e-mail

which Mr. Kim references where Gadio provides Gadio's

suggestion as to how, if CEFC wants to provide a charitable

humanitarian benefit how that should be done, and then the

defendant doesn't follow that guidance at all and instead they

stuff $2 million into a box.  And so, it is important for Gadio

to be able to explain why what he was suggesting he views as

the right way to make a charitable donation and why what

IBE5hoC                    conference

1    happened was completely different.  But, unless he can go the

2    full step of explaining -- the reason it is different is that

3    what he was suggesting would not have been a personal benefit

4    to the president and what happened was a personal benefit.

5              THE COURT:  I got it.  All right.

6              Mr. Kim, I think we are back to you.

7              MR. KIM:  Okay.  Thank you, Judge.

8              I think Rule 701 really boils down to a couple points.

9    One, you shouldn't be asking witnesses to talk about things

10   they aren't qualified to talk about.

11             THE COURT:  What does that mean?

12             MR. KIM:  Well, this is rooted in the testimony

13   rationally being based on the witness' perception.

14             THE COURT:  All right.

15             MR. KIM:  Which is you have a co-conspirator point,

16   your Honor.  The reason co-conspirators are situated to make,

17   to opine --

18             THE COURT:  Okay, but that's not how that testimony

19   comes in.  It doesn't come in under 701.

20             MR. KIM:  The co-conspirator testimony?

21             THE COURT:  Yes, so talk to me about 701.

22             MR. KIM:  My point here, Judge, is that what Dr. Gadio

23   is being asked to opine on is Dr. Ho's intent, his general

24   intent.  When he says -- I think the government is now

25   saying --

1          THE COURT:  Counsel is suggesting that he may testify

2     to his opinion as to what was going on based on what he knew

3     and saw.  Why is 701 not applicable is the question to you.

4          MR. KIM:  Well I think, your Honor, it is because the

5     thing that he is being asked to opine on is going on in someone

6     else's head.  And I get it that he happened to be in a room

7     with Dr. Ho at this critical meeting but that does not make him

8     qualified to talk --

9          THE COURT:  I'm not sure I saw any cases that drew

10    that distinction.

11         MR. KIM:  Your Honor, I think we have cited a couple

12    that -- I will give you one example, it's Tsekhanovich, where

13    the Second Circuit talked about the fact, I think it ended up

14    approving certain lay opinion testimony but noted that the

15    witness had not been asked to speculate about general knowledge

16    or intent.  And the reason why the co-conspirator, she was an

17    important one, your Honor, is because it all goes to the

18    witness' ability and qualifications to render the opinion he is

19    being asked to render.

20         THE COURT:  On 701 there is no qualification other

21    than that the opinion is rationally based on the witness'

22    perception.

23         MR. KIM:  Yes.  And I think if the government can put

24    me up as a witness to talk about a meeting I had I could

25    perceive all kinds of things that I think I could describe to

the jury, but what the government is asking me to do to opine on, if I thought you had criminal intent when you said those words, I think that's a totally different animal.

The other part of this rule, Judge, is subsection B. It is helpful to clear the understanding of the witness' testimony of determining a fact in issue and I think the case law makes clear that that term "helpful" means something specific within the context of Rule 701 and it should be something more than just telling the jurors what resulted for each and I think that's the line we are crossing here.

You can have Dr. Gadio get up --

THE COURT:  I am not sure what you mean by what result was reached.  He is saying he is supposed to say, according to the government, *holy moly, I thought this was a bribe.*

MR. KIM:  Yes.  Judge he is basically spoon-feeding the verdict to the jury.

I think what he is allowed to do --

THE COURT:  We got that.  I saw this, I heard that, blah, blah, blah.

MR. KIM:  Yes.

THE COURT:  Anything else on 701?

MR. KIM:  Let me just check one moment, your Honor?

THE COURT:  Yes, sir.

MR. KIM:  Thank you, your Honor.

THE COURT:  What else, Mr. Zolkind?

IBE5hoC                         conference

1          MR. ZOLKIND:  Your Honor, on the second prong in terms
2    of being helpful to the jury, again, I think it is worth asking
3    if the Court were the finder of facts and the Court had to
4    decide what happened behind these closed doors in Chad, what
5    ultimately happened, would the Court be aided by hearing the
6    testimony of a person who was there and who saw what President
7    Déby said, who saw how the defendant responded.  I mean, I
8    think, clearly, that would aid the finder of fact and so it is
9    a low burden.  He, like any co-conspirator has unique insight
10   into the events on the ground and Mr. Kim raises a series of
11   arguments about why his perceptions might have been flawed or
12   what he understood was a bribe, maybe it wasn't for a different
13   reason, and that can be explored on cross-examination.  But, in
14   terms of meeting the low predicates for Rule 701, we think we
15   have clearly cleared them, your Honor.

16         The last point I want to make is that admitting this
17   testimony does not depend on Rule 701.  It does come in within
18   701, I think it is on all fours with cases like *Skelly* and
19   *Urlacher* but it is also admissible because, again, without this
20   testimony a presentation of evidence to the jury will be
21   materially misleading.

22         THE COURT:  But what do you say to the cases cited by
23   the defendant that say the context only applies to
24   non-controversial items.  This is hardly a noncontroversial
25   item.

IBE5hoC                     conference

1          MR. ZOLKIND:  Your Honor, I understood them to be

2     citing that case law with respect to the hearsay issue.  I'm

3     not -- I don't see how that would apply at all in this context.

4          THE COURT:  In the what, in the 701 context?

5          MR. ZOLKIND:  In the context of Gadio explaining his

6     understanding of the events.  Maybe I'm wrong, maybe they did

7     cite it with respect to this but I don't see why it would

8     matter.

9          For example, let me be more concrete and talk about

10    the cases of *Skelly* and *Urlacher* which are both Second Circuit

11    cases.  In both of those, witnesses were permitted to testify

12    about their interpretation, and I think literally the case law

13    uses the term "interpretation," of things the defendant said

14    and actions that took place.  And the reason is that *Skelly* was

15    a securities fraud case, *Urlacher* was another fraud case.

16    Statements are, as I said before, statements in these fraud

17    contexts, like corruption contexts, are intentionally

18    ambiguous.  And so, if the jury is only presented with what the

19    defendant said, what the document said, then the defendant's

20    intentional mischaracterization of these things get before the

21    jury without Gadio being able to say here is why I didn't

22    believe any of that.  And, yes, it is helpful that he can say I

23    didn't believe it, but unless he can say why and can explain

24    what he did think it was --

25          THE COURT:  Those are two very different things.  Did

IBE5hoC                        conference

1    you believe it was a donation?  No.  Why?  They never said that

2    to me before, they had already done this.  Blah, blah, blah,

3    blah.  That's very different from saying What did you think was

4    going on?  I thought it was an offer of a bribe.

5         MR. ZOLKIND:  I think, your Honor, once we get into

6    that area it is hard to -- I mean, because they're intertwined.

7    He will say a donation is announced in advance and it is not

8    done in cash and this was done in cash and was offered to the

9    president personally and so I saw it as a bribe offer.  I think

10   the testimony is intertwined and I'm not sure it can be -- I

11   mean, we could tell him just don't say the word "bribe" but it

12   would lead to testimony that I think will be somewhat stilted

13   and won't, for example, won't allow the jury to fully

14   understand what he is taking responsibility for.

15        I mean it is not -- it is one thing to say they called

16   it a donation, I didn't think it was a donation and then I

17   continued to help them.  I'm not sure the jury will get that he

18   is really taking any responsibility and won't understand why he

19   is testifying pursuant to a non-prosecution agreement rather

20   than sitting there as the defendant.  It is much different if

21   he can say I take responsibility, understood that a bribe offer

22   had been made by my business partner, and instead of walking

23   away I continued do what I was doing.  I think that comes in in

24   virtually every case where a cooperating witness testifies and

25   it is no different just because he has a non-prosecution

IBE5hoC                          conference

1    agreement.  That is a basis for cross-examination but it is not

2    a basis for conclusion.

3             THE COURT:  All right.  Anything else on this point?

4             MR. ROSENBERG:  No, your Honor.

5             MR. KIM:  No, your Honor.

6             THE COURT:  Certainly we have all agreed, I think,

7    that Gadio may testify about his observations of the events of

8    December of 2014 including, for example, that neither the

9    defendant nor any of his associates had ever mentioned a

10   donation until after being excoriated by President Déby.  With

11   respect to the statements of President Déby that defendant has

12   objected to, the defendant certainly adopted statements under

13   801(d)(2)(B).  As related by counsel, certainly when the

14   president excoriated them the next morning he said those gift

15   boxes had cash in them.  Even if Gadio's testimony is only that

16   the defendant said I was impressed by your rejection of the

17   boxes, that can only make sense in the context of adopting the

18   president's statement that the boxes had cash in them.  So, I

19   will permit the statements of the president under 801(d)(2)(B).

20   As we have already said, I think, and agreed, Gadio may say

21   that he did not believe that it was a donation.  I will reserve

22   on the last portion and that is whether he may, under 701 or

23   otherwise, state his opinion that what was going on there was a

24   bribe.

25             What do you want to do next, friends?

IBE5hoC                           conference

1              MR. ROSENBERG:  Your Honor, can I --

2              MR. ZOLKIND:  Your Honor, I apologize.  Can I ask in

3     terms of clarifying?

4              THE COURT:  Sir.

5              MR. ZOLKIND:  What the Court is allowing us and what

6     the Court is reserving on?  I understand Gadio can say that he

7     didn't believe the explanation that it was a bribe.  I take it

8     from that, but I want to make sure, that he can explain that as

9     he viewed it, it is something offered personally to the

10    president and the Court is reserving on whether he can use the

11    "B" word, that he understood it was a bribe.

12             THE COURT:  Right.  Correct.

13             MR. ROSENBERG:  Your Honor, may I?

14             THE COURT:  Yes, sir.

15             MR. ROSENBERG:  May I ask for another clarification?

16             THE COURT:  Yes, sir.

17             MR. ROSENBERG:  We divided in our brief the statements

18    that one day President Déby made to Dr. Gadio, the defendant

19    wasn't present, and the statements next day.  Your Honor has

20    ruled on the statements the next day on the theory of adopted

21    admission.

22             Are those the only statements that are admitted?

23             THE COURT:  I'm sorry, Mr. Rosenberg, I just didn't

24    hear the last sentence.

25             MR. ROSENBERG:  Are those the only statements of

IBE5hoC                         conference

1    President Déby's that are admitted?

2              THE COURT:  No.  I think the controversial ones were

3    the cash statements, and because the defendant adopted the

4    proposition that there was cash in the boxes, the president's

5    statements as to that may come in and the rest of it comes in

6    purely as context and to tell the story.

7              MR. ROSENBERG:  And, your Honor, my question is does

8    that include statements of the prior day?

9              THE COURT:  Yes, sir.

10             MR. ROSENBERG:  That they were not made to Dr. Gadio?

11             THE COURT:  Yes, sir; because they're in the same

12   bucket because they were the statements of the president which

13   Gadio will testify to.  And, the statement that there was cash

14   in the box was eventually adopted by the defendant.

15             What else, friends?

16             MR. ROSENBERG:  I understand the Court's ruling.  Very

17   well.

18             THE COURT:  What do you want to do next, friend?

19             MR. ZOLKIND:  Your Honor, there are obviously a number

20   of other motions.  I think two of the significant ones -- well,

21   there is maybe three additional significant ones.

22             THE COURT:  What if I go through the ones I have and

23   then you can tell me what you want?

24             MR. ZOLKIND:  Absolutely.

25             THE COURT:  All right.

IBE5hoC                              conference

Starting with the government's motion with respect to the Ashe quid pro quo, the government proffers various e-mails and a recorded telephone conversation between the defendant and associates of John Ashe who was president of the U.N. General Assembly's 68th Session.  Those items purport to show that the defendant would make a major contribution to Ashe depending on what Ashe "could help us with" because "it is give and take." As the government points out, the expected evidence demonstrates that the defendant's method of approaching Ashe was virtually identical to his method of approaching Sam Kutesa, the alleged bribee in this case, and Ashe' successor as president of the 69th session of the U.N. General Assembly.

While the evidence is admissible to complete the story of the crime on trial, it is most certainly admissible under Rule 404(b) to prove the defendant's intent, knowledge, and absence of mistake with respect to both the Chad and the Uganda schemes.

First, the evidence rebuts the notion that the defendant was motivated solely by charitable concerns when he participated in, among other things, wiring $500,000 to Sam Kutesa's "foundation" and offering $2 million in cash to President Déby.

Second, the evidence rebuts the suggestion that a *quid pro quo* with Kutesa or an attempted *quid pro quo* with President Déby was a mistake or misunderstanding, or the result of some

1    other innocent misunderstanding.

2           And, third, the evidence rebuts any claim that the

3    defendant had no decision-making power with respect to the CEFC

4    entities or any involvement when it came to providing CEFC's

5    money to foreign officials.

6           Clearly, the government has established a similarity

7    between the defendant's actions with respect to Ashe and the

8    charged actions with respect to Kutesa that is relevant to the

9    defendant's state of mind with respect to Kutesa.

10          I will just note that the defendant views the proffer

11   too narrowly by pretending that the evidence would only be

12   relevant if the defendant offered to pay Ashe "during his term

13   as president of the General Assembly" and also offered to pay

14   Kutesa "during his term as president of the General Assembly."

15   The temporal limits of their terms as president of the General

16   Assembly have nothing to do with whether or not the defendant

17   harbored a corrupt intent with respect to the bribery charge

18   and, in any event, the defendant is not charged with paying

19   Kutesa during his term as president of the General Assembly.

20   Accordingly, the government's motion on this topic is granted.

21          Next, the government seeks a ruling on the

22   admissibility of evidence relating to Iranian transactions and

23   arms transactions.

24          As outlined in detail in the complaint, the

25   investigation that led to the present charges against the

IBE5hoC                          conference

1    defendant uncovered numerous e-mails from the defendant that

2    make plain his willingness to advance the business of CEFC

3    China through payments to officials in Chad and Uganda, and

4    more generally show his focus on growing CEFC China's business.

5    In the course of its investigation, the government has also

6    uncovered evidence in which the defendant expresses an interest

7    in and willingness to advance CEFC China's business in other

8    ways including transactions in or with Iran, and arms

9    transactions.  The evidence consists generally of e-mails

10   discussing the defendant's efforts on behalf of the CEFC NGO

11   and CEFC China to broker deals with Iran allowing the country

12   to avoid sanctions.  It also includes e-mails and testimony

13   showing that Gadio was told by defendant that CEFC could

14   provide arms and military equipment to Chad as part of an oil

15   deal, and that over the course of Gadio's dealings with the

16   defendant they had multiple discussions about the possibility

17   of CEFC's selling or providing such arms and equipment.  This

18   testimony is corroborated by e-mail exchange between the

19   defendant and Gadio.  The government also proffers e-mails

20   between the defendant and others discussing additional arms

21   transactions by the defendant's company with Libya, South Sudan

22   and Qatar.  This evidence is admissible to complete the story

23   of the crimes on trial.  It is also admissible to show the

24   nature and development of the relationship between defendant

25   and Gadio, his supposed middle man.  Indeed, Gadio is expected

IBE5hoC                        conference

to testify that one reason he was willing to work with the

defendant is that he understood that the defendant could assist

in providing arms to Chad.  To the extent that the defendant

argues that the Iranian evidence is discrete from the charged

crimes, that argument is without merit.

In October of 2014, the defendant emailed his

assistant a list of items that included "Iranian connection,"

"PGA Kutesa," and the "Chad president."  Clearly, all of these

items were within the defendant's portfolio and go toward his

efforts to gain business advantages for the CEFC companies.  In

any event, the evidence is also permissible pursuant to Rule

404(b).  A central defense at trial is expected to be the

argument that the defendant did not offer payments to the

Chadian and Ugandan officials to advance the interests of CEFC

China but rather consistent with his title of the secretary

general of an NGO for charitable reasons.  The proffered

evidence that, day in and day out, in ways large and small, the

defendant focused on advancing the business interests of CEFC

China directly rebuts any claim that the defendant cared more

about the charity than the business interests of CEFC China.

To the extent the defendant seeks to preclude the

Iranian evidence under Rule 403, the government states that it

will not mention U.S./Iran relations or terrorism, but will

only demonstrate the defendant's desire to promote CEFC's

business all over the world.

IBE5hoC                        conference

The evidence concerning the arms trafficking is also admissible because to the extent that it discusses an embargo, it shows that the defendant was aware of and sought to evade restrictions on what he, and those with whom he worked, could lawfully do.  It is thus probative of the manner in which defendant sought to advance the business of CEFC China and rebuts any suggestion that the defendant inadvertently or unknowingly transmitted money, rather than that he did so with an intent to bribe in violation of Chadian and/or Ugandan anti-bribery laws which violations are an element, I note, of the charged money laundering offenses.

Finally, there is no basis to preclude the arms evidence under Rule 403.  While the defendant's agreeing to broker and brokering transactions with Iran or in arms might constitute crimes, the jury will not necessarily expect that to be the case given that the defendant is a foreign national discussing transactions with a foreign country.

To the extent that the defendant remains concerned, he certainly may request an appropriate limiting instruction.

With respect to the defendant's argument that the charges are politically motivated, as set out in the defendant's prior motions for bail pending trial, he has repeatedly asserted since his arrest that this case is political.  In multiple e-mails, including with officers or employees of CEFC China, or the CEFC NGO, the defendant has

IBE5hoC                        conference

suggested that his case is not principally or at all about what

he is alleged to have done but about the reputation of CEFC

China or, more generally, about China itself.  In light of the

government's motion to preclude that evidence, the defendant

states that he has no intention of arguing that the government

brought this case against him as part of a broader campaign

against China, or that the timing of this prosecution, in some

way, suggests that it is part of the administration's broader

political agenda, nor does the defense have any intention of

offering evidence or argument concerning the filing of a motion

in this case pursuant to the Classified Information Procedures

Act, or the provision of notice concerning the Foreign

Intelligence Surveillance Act.  To the extent, however, that

the defendant seeks to offer evidence with respect to his view

of the purpose of his work and its relation to China and

Chinese foreign policy, counsel shall inform the Court, in

advance, of the offering of such evidence so we have an

opportunity to discuss it.

        Similarly, with respect to the Government's motion

regarding the defendant's family background, age, etc., the

defense responds that it will not offer any evidence regarding

these personal factors but that it might introduce evidence as

to the defendant's background or professional activities "if

needed."  Again, the defense should alert the Court prior to

proffering any such evidence so that it can be discussed.

IBE5hoC                        conference

1            Similarly, the government moved to preclude the

2    offering of evidence regarding the defendant's or the CEFC

3    entity's prior good acts including philanthropic giving and

4    other good deeds.  The defense agrees that specific act

5    propensity evidence is not admissible but does note that it may

6    introduce evidence regarding the nature and mission of the CEFC

7    NGO "in order to demonstrate defendant's intent."  Again, prior

8    to proffering that evidence, the defendant shall alert the

9    Court so that it can be discussed.

10            Finally, the defense states that it has no intention

11   of arguing that CEFC NGO's special consultive status with the

12   U.N. precludes it from having engaged in a bribery.  Again,

13   though, before proffering evidence of the NGO's special

14   consultive status, the defense shall inform the Court so that

15   that evidence can be discussed.

16            Regarding the government's motion about the merits of

17   the projects the defendant sought to advance and how the

18   alleged bribes were in fact used, while the defense states that

19   it does not intend to argue that an otherwise corrupt payment

20   is excused merely because the money is meant to be spent or

21   ultimately spent on a worthwhile cause, it notes that it might

22   introduce evidence concerning how the payments at issue were

23   meant to be used or how they were in fact used insofar as they

24   say the evidence bears upon the defendant's intent with respect

25   to those payments.  But the issue for trial is the defendant's

1   intent at the time he agreed to and did offer the payments.  At

2   that time the crimes were complete.  Accordingly, how the money

3   was ultimately spent is irrelevant entirely.  Accordingly,

4   evidence of the merits of the projects or how the money was

5   spent is precluded.

6           The government has also moved to preclude the

7   testimony of the defendant's expert Professor William C. Kirby.

8           In brief, Dr. Kirby will testify to an overview of

9   China's One Belt, One Road initiative and the role that Chinese

10  companies play in carrying it out.  He will describe that

11  initiative as one that seeks to export Chinese excess

12  infrastructure capacity to use Chinese state financing for

13  international infrastructure projects, and to enhance China's

14  economic and political influence in various regions of the

15  world.  He will also testify about the role of CEFC China in

16  implementing the One Belt, One Road initiative.  He is also

17  expected to testify that CEFC was closely tied to the Chinese

18  state during the period relevant to this case and that it

19  participated in promoting the Chinese state's agenda.

20          The defense notes that Professor Kirby's testimony

21  will be based on publicly available information regarding the

22  structure, history, and financing of CEFC.

23          I note initially that the defendant's expert witness

24  notice is insufficient.  The rule requires the defendant to

25  give the government a written summary of any testimony that the

1    defendant intends to use under the relevant rules and the

2    summary has to describe the witness' opinions, bases, and

3    reasons for those opinions and the witness' qualifications.

4    Here, the defendant's letter does not meet those requirements.

5    For example, the letter states that Professor Kirby, "will

6    discuss the history of One Belt, One Road and the motivation

7    behind it, as well as its scope and importance to China," and

8    "will also describe the ways in which the Chinese government

9    agencies, state-owned banks, state-owned enterprises, and

10   private companies, participate in the implementation of One

11   Belt, One Road."  However, the letter doesn't say what

12   Professor Kirby's views are on these subjects.  The letter also

13   states that Professor Kirby is expected to testify that CEFC

14   China "participated in promoting the Chinese state's agenda"

15   but does not say in what way it participated, much less tie

16   such participation to the facts in this case.  Also, the letter

17   states that Professor Kirby is expected to testify that there

18   was a "confluence of interests between CEFC China and the

19   Chinese government's clearly articulated international economic

20   policies."  What it doesn't say is what those interests or

21   policies are, or the basis for Professor Kirby's belief that

22   there was such a confluence.  General statements like this are

23   not sufficient.  Accordingly, Professor Kirby's testimony is

24   precluded because it did not provide the appropriate notice to

25   the government.

IBE5hoC                        conference

1            In any event, the proffered testimony is inadmissible.

2    First, it is wholly irrelevant to the issues on trial.  Despite

3    the defendant's repeated suggestions to the contrary, this case

4    is not a policy or a political debate.  Testimony about Chinese

5    foreign policy or whether and how China seeks to and has its

6    economic and political influence if various regions in the

7    world has no place in this trial.  It doesn't matter whether

8    CEFC China was closely tied to the Chinese state or not.  The

9    question for the jury is whether the defendant agreed to and

10   did offer bribes, not whether those bribes were in furtherance

11   of some alleged state agenda.

12           Secondly, Professor Kirby's proffered opinions are

13   insufficiently connected to what the jury has to decide.

14   Expert testimony is admissible only where it will help the

15   trier of fact to understand the evidence or to determine a fact

16   issue.  In short, there must be a fit between the proffered

17   testimony and the facts of this case.  There is no such fit

18   here.

19           Third, to be admissible, expert testimony must not

20   only be on a relevant subject and sufficiently connected to the

21   particular facts of the case, it must also be appropriate as

22   expert testimony.  The Federal Rules of Evidence preclude a

23   party from admitting expert testimony were the evidence

24   impermissibly mirrors the testimony offered by fact witnesses

25   or the subject matter of the expert's testimony is not beyond

IBE5hoC                    conference

1    the ken of the average juror.

2              Here, the defendant is trying to offer evidence of

3    CEFC China's connection to the Chinese state, and assuming such

4    testimony is relevant, he could always call witnesses from CEFC

5    China.  First of all, they would have personal knowledge.

6    Second of all, because that firm is funding the defendant's

7    defense, he clearly has access to them.  And finally, nothing

8    about such testimony is beyond the ken of the average juror.

9    So, the defendant may not avoid calling lay witnesses with

10   first-hand knowledge by calling a purported expert who doesn't

11   have first-hand knowledge to testify.

12             Indeed, there is substantial reason to doubt that

13   Professor Kirby is competent to testify as to the items that

14   are proffered.  To the extent that his testimony will be based

15   on "publicly available information regarding the structure,

16   history, and financing of CEFC China" and "documents disclosed

17   to the defense by the government in connection with this case,"

18   it appears that Professor Kirby will merely be repeating, in

19   the guise of expert testimony, hearsay.  Of course, that is

20   improper and, accordingly, the Professor's testimony is

21   excluded.

22             Counsel, I think the government has not replied on the

23   motion regarding videos and speeches.  Does the government want

24   to add anything now or does it insist upon writing?

25             MR. RICHENTHAL:  We don't insist upon writing.  I am

IBE5hoC                        conference

1    happy to make brief remarks.

2                THE COURT:  Sure.  Go ahead.

3                MR. RICHENTHAL:  I will stand here.

4           The defense essentially wants to introduce 23 minutes

5    of the defendant speaking on various philosophical and

6    political subjects so that the jury believes he is less likely

7    to have committed bribery.  That is indistinguishable from a

8    politician charged with receiving bribes whether it be, for

9    example, Dean Skelos or Sheldon Silver offering political

10   speeches.  One would think that's admissible.  This isn't

11   different just because the defendant is not an elected

12   official.

13          The subject matter of those speeches is utterly

14   irrelevant.  It could conceivably go to the defendant's

15   motivation, maybe, but motive isn't an element; intent is.  It

16   has absolutely nothing to do with his intent.  It is broad

17   sentimentality, broad philosophies, broad political statements.

18          Now, the defense purports to introduce this for state

19   of mind but it has to be a then-existing state of mind on a

20   relevant subject and not be precludable under 403.  This fails

21   all three tests.

22          First of all, it is not then existing, this is a

23   series of statements over literally years, a number of which we

24   think post-date the events at issue so, by definition, could

25   not have been existing at the time of the events at issue.

1          Second, in our view, a philosophical belief in, say,

2     the importance of development is not a state of mind, it is an

3     assertion of one's philosophical belief, it is not a state of

4     mind at all, it is not comprehensive as such.

5          Third, it is not on any fact of relevance.  Again,

6     motive isn't an element, never mind the defendant's belief in

7     Chinese foreign policy which, as your Honor just noted, has no

8     place in this trial by either side.

9          But, even if the defense could get past all of those

10    hurdles, it is plainly something that should be precluded under

11    403.  This is an end-run around settled rules against character

12    evidence being proffered with specificity, it is an end-run

13    frankly around the defendant testifying.  He doesn't have to

14    but if he wants to talk about his intentions, that's one way to

15    do it.  He could also tell people who have first-hand knowledge

16    of those intentions.  This isn't that either.  He wants to play

17    more than 20 minutes of videos of him talking.  I'm not aware

18    of any case ever that has even suggested that is permissible,

19    never mind in this manner in this context.

20          For all of those reasons, the video should be

21    precluded.

22          THE COURT:  Did anyone at the back table want to add

23    anything?

24          MR. KIM:  Just briefly, your Honor.

25          I think we set forth in our papers what the core

1    relevance is.  It goes to Dr. Ho's intent, your Honor.  To the

2    extent that he is viewed to have been working on behalf of a

3    larger, broader agenda to generate goodwill as opposed to

4    working to secure business advantages, that is the heart of the

5    relevance, your Honor.  That's why this is appropriate as state

6    of mind evidence, it is directly relevant to Dr. Ho's intent.

7              THE COURT:  Thank you.

8              Front table, anything else?

9              MR. RICHENTHAL:  No, your Honor.

10             THE COURT:  Thank you.

11             As we have noted, the government moves to preclude the

12   defendant from offering various videos and speeches of his,

13   including his "dream" of  "inspiring humanity," and the belief

14   that China seeks to "build a community of shared interest and a

15   common destiny."

16             It is the general rule that a defendant may have not

17   offer his own out-of-court statements.  If he could, he could,

18   in effect, testify without swearing an oath, facing

19   cross-examination, or having his attitude and demeanor

20   scrutinized by the jury.

21             Now, we all know that in limited circumstances a

22   defendant may offer his own out-of-court statements under Rule

23   803(3) if they are relevant to a then-existing state of mind or

24   intent regarding a relevant fact, as Judge Marrero explained in

25   United States v. Lesniewski, 2013 WL 3776235, 91

IBE5hoC                    conference

1   Fed.R.Evid.Serv 1278 (S.D.N.Y. 2013).  This exception only

2   permits the admissions of statement of future intent, not those

3   of past intent.  Here, first of all, the proffered evidence is

4   wholly irrelevant.  Not one of the videos or speeches mentions

5   people, transactions, or countries relevant to the charged

6   crimes.  Also, general charitable intent is not relevant to

7   whether the defendant did or did not have corrupt intent with

8   respect to the transactions at issue here.  Also, the proffered

9   testimony is inadmissible hearsay.  The statements are clearly

10  offered for the truth.  For example, the defendant's statement

11  that CEFC's "overriding objective is to make friends and foster

12  goodwill."  That statement is relevant only if it is true.  In

13  addition, none of the proffered statements deal with future

14  intent as would be required under Rule 803(d).

15         Finally, to the extent there is any probative value to

16  the statements, it is far outweighed by their prejudicial

17  value.  This case is not a debate about foreign policy, or

18  whether China's One Belt, One Road initiative promotes

19  tolerance around the world, or whether CEFC entities performed

20  good acts.  It is about whether the defendant did or did not

21  have a corrupt intent with respect to the acts at issue.  The

22  prejudice flowing from the admission of these gauzy statements

23  about global tolerance far outweighs any marginal probative

24  value.  Accordingly, those items of evidence are precluded.

25         Moving on to the defendant's motions.  First of all,

IBE5hoC                        conference

1   the defendant has moved to preclude the government's expert

2   Walkup.  As described in greater detail in the government's

3   notice, Mr. Walkup is expected to testify about standard

4   practices and procedures regarding petroleum exploration,

5   development, and production rights and licenses globally with a

6   focus on Africa and, in particular, Chad and Uganda.  He is

7   expected to testify that there are generally two approaches

8   followed by governments and the petroleum industry, open or

9   competitive bidding and open door or direct negotiation, and

10  that Chad and Uganda use both approaches.

11          Second, as is also described in the notice, Mr. Walkup

12  is expected to testify that energy companies, like other large

13  companies, often engage in "corporate social responsibility"

14  (CSR), or "stakeholder engagement," especially when operating

15  in less developed nations including many nations in Africa, and

16  he is expected to describe the standard practices and

17  procedures involved in such CSR.

18          The defense argues that Mr. Walkup's testimony about

19  practices in the petroleum industry globally is not relevant

20  because this case involves practices and procedures in Chad.

21  The defendant also argues that because the actions he allegedly

22  undertook concerning Uganda did not involve petroleum, that the

23  testimony is irrelevant.

24          Taking the first point first, the government has

25  proffered e-mails sent by defendant to his assistant entitled

IBE5hoC                          conference

"main points of Uganda possibility."  The first item listed is

"Energy:  Still some [oil] blocks to be licensed out," and

states that "refinery" was contracted to a Russian firm but

that "they need partners."  The government has also proffered

photographs of defendant and his associates from CEFC China

meeting with Uganda's Department of Energy.  Thus, the

proffered expert testimony with respect to Uganda is also

relevant.

          As to the defendant's argument that Mr. Walkup should

be precluded from testimony about global practices, that

argument is without merit.  Testimony about how regional,

national, or international markets work would be of assistance

to the jury in understanding the nature of the transactions at

issue here and in weighing the probative value of facts

presented concerning the defendant's knowledge and intent.

CEFC was and is a member of the Fortune 500 and a multi-billion

dollar conglomerate with tens of thousands of employees,

investments, and operations all over the world and second

headquarters in Europe.  Indeed, CEFC China touts these very

facts on its website which it maintains in both Chinese and

English.  The company also noted, in a document sent to the

defendant giving a "company overview" that it sought to achieve

its "mission" of "investing" in the "oil and gas business"

while "strictly adhering to the commercial standard and

international practice."  Accordingly, Mr. Walkup's testimony

1   about such commercial standards and international practices is

2   highly relevant.  I note the defendant himself traveled widely

3   giving speeches and negotiating business deals on behalf of

4   CEFC China including a speech entitled "Geo-politics and oil

5   prices."  A jury could easily find that just like the senior

6   CEFC China executives with whom the defendant traveled, he also

7   understood that the petroleum industry is global and operates

8   under established practices.  That understanding would tend to

9   show that when the defendant secreted and presented $2 million

10  in cash to the president of Chad, he was not acting out of a

11  misguided or naive view of how legitimate petroleum

12  transactions or charitable donations work, but instead was

13  intentionally offering a bribe to gain business advantage in

14  the petroleum market.

15          To the extent that the defendant argues that

16  Mr. Walkup is not qualified to render an expert opinion

17  regarding the practices in Chad or in Uganda because he did not

18  specifically work in either of those countries, that argument

19  also does not call for preclusion.  Defendant does not dispute

20  that Mr. Walkup has worked in the energy business for decades

21  and has experience in more than 30 countries including in the

22  region where Chad and Uganda are located and has vast

23  experience in market analyses for energy investment

24  opportunities around the world including in Africa and has

25  other relevant experience.

1            Based on the totality of his experience, Mr. Walkup is

2    more than sufficiently qualified to testify both about general

3    practices in the petroleum industry -- and I note that the

4    defendant doesn't seem to disagree about that, and about

5    industry practices in Chad and Uganda.  Mr. Walkup has worked

6    in, studied, written about, and been asked for his opinion

7    regarding numerous investments and transactions in the energy

8    and petroleum industry for decades all over the world including

9    in Africa.  He has formed an opinion grounded in extensive

10   experience and study about how that industry operates around

11   the world.  Any quibbling about whether Mr. Walkup worked in

12   Chad or Uganda can easily be brought out on cross-examination.

13           Defendant also seeks to preclude Mr. Walkup's

14   testimony with regard to CSR on the grounds that his proposed

15   testimony on that topic is not an appropriate subject of expert

16   testimony.  In making this argument, defendant ignores that

17   Mr. Walkup is not merely expected to state the general fact

18   that "corporations engage in various forms of charity," but to

19   testify specifically as to how energy companies engage in such

20   charitable giving, and how they do so in less developed

21   countries in particular.

22           As described in the government's notice, Mr. Walkup is

23   expected to testify that a discrete set of practices and

24   procedures are known to and utilized globally by countries

25   wishing to engage in CSR and the defendant does not contend

1    that these practices and procedures are a matter of general

2    common knowledge.  They certainly are not.

3          Secondly, the defendant asserts that Mr. Walkup is not

4    qualified to describe those practices or procedures because he

5    has not engaged in "a systematic or complete study"of such

6    procedures around the world.  And, thus, there is a possibility

7    that they may be utilized only by what the defendant terms

8    "western-centric countries."  This assertion ignores what it

9    means to be qualified to give an opinion and ignores that CEFC

10   China has repeatedly touted that it has engaged in CSR.  In

11   fact, it appears not to be so much a challenge as to

12   Mr. Walkup's qualification but as to the accuracy of his

13   opinion that there are standard practices and procedures known

14   and followed around the globe for companies wishing to engage

15   in CSR.  Any disagreement with Mr. Walkup's opinions on this

16   topic are for cross-examination or other action.  It is not a

17   basis for preclusion.  Accordingly, the defendant's motion to

18   preclude Mr. Walkup's testimony is denied.

19         Counsel, I might have exhausted myself.  Is there

20   anything else that we have on our list?  I think we have a

21   couple of outstanding newly made motions.

22         MR. RICHENTHAL:  That's what I was going to note.

23   There is one that we filed by letter last night.  We think it

24   is straightforward but I'm only one side of this equation.

25         THE COURT:  Which one is that, so counsel knows?

IBE5hoC                        conference

1          MR. RICHENTHAL:  It is our letter requesting a ruling

2    *in limine* that the defense may not argue that the government

3    has a view of Mr. Gadio's guilt, or a belief in his guilt or

4    lack thereof.  In short, as we put in our letter, we have no

5    objection, as Mr. Zolkind said earlier, to Mr. Gadio being

6    cross-examined about the fact that he was charged with a crime,

7    that it was then dismissed, etc.  That is standard

8    cross-examination.  Our objection is to an argument that those

9    facts lead to an inference that the lawyers at this table or

10   the government as an entity has a view of his guilt.  Our views

11   are irrelevant.

12          THE COURT:  Counsel, when do you want to respond to

13   that, please?

14          MR. ROSENBERG:  Your Honor, by Friday, if we may, by

15   letter?

16          THE COURT:  Does that give us enough time, friends?

17          MR. RICHENTHAL:  I think that depends whether the

18   defense intends to gesture in this direction in its opening

19   statement.  Otherwise, I think it is enough time.

20          THE COURT:  Is that going to be in your opening

21   statement?  No, right?

22          MR. ROSENBERG:  I don't believe so.  No, your Honor.

23          THE COURT:  Okay.  Friday is fine.  When do you folks

24   want to put in a reply?

25          MR. RICHENTHAL:  I think we can do it Monday.  This is

IBE5hoC                        conference

1    a pretty discrete issue.

2                THE COURT:  Okay.  Next.

3                MR. RICHENTHAL:  I think that the defense had moved to

4    preclude our rebuttal expert, Professor Mastro.

5                THE COURT:  Right.

6                MR. RICHENTHAL:  I view that motion as moot for the

7    record, in light of your Honor's ruling.

8                THE COURT:  Moot.  Next.

9                MR. ZOLKIND:  Your Honor, I just had a couple of

10   things I wanted to put on the record briefly, if I could,

11   mostly related to pretrial disclosures, discussions between the

12   parties.

13               THE COURT:  May I just note, we had talked a couple of

14   times about reciprocal discovery and I think I neglected to ask

15   you about returns from subpoenas.

16               MR. ZOLKIND:  Yes, your Honor, that was one of the

17   things I was going to mention.

18               We received reciprocal discovery shortly after the

19   Court directed the defense to produce it I think a week later.

20   We haven't received any further reciprocal discovery.  That

21   production did include subpoena returns they had received so

22   certainly the government's understanding is that there is no

23   remaining and reciprocal discovery to be turned over.

24               THE COURT:  Okay.

25               MR. ZOLKIND:  We have been producing 3500 material, I

IBE5hoC                          conference

1   think we have made three productions of it, if not four.  I

2   think it is largely complete.  We will continue to produce 3500

3   material promptly as it is generated up until trial.

4          We provided the defense with our list of witnesses we

5   currently anticipate calling in our case-in-chief, yesterday.

6          We will be providing the defense with a list of the

7   exhibits that we may offer in our case-in-chief; we are aiming

8   to do that this evening, it might get pushed until tomorrow but

9   we will get that very soon.  They have agreed to provide us

10  with a list of any exhibits that they may offer in the

11  government's case-in-chief and to do that this weekend.

12         The Defense has also agreed to provide us with their

13  witness list for their case-in-chief, any rule 26.2 material --

14  that is reverse 3500 material -- as well as an exhibit list for

15  their case-in-chief, and they've agreed to do that

16  approximately one week before the anticipated start of their

17  case-in-chief and so we will do our very best to keep the Court

18  and defense counsel apprised of when we think we are at that

19  one-week mark.

20         The government, your Honor, has also proposed to the

21  defense -- I have done this, I think my colleagues have too in

22  a number of trials, it certainly doesn't happen in every trial

23  but we proposed it because of the trials that we have done it,

24  we found it is very efficient and what we propose is that the

25  each evening, during trial, the government would basically tell

IBE5hoC                          conference

1    the defense here is the exhibits, you have got our exhibit list

2    but here is the specific exhibits we expect to offer tomorrow,

3    and the defense would like likewise tell us any exhibits they

4    intend to offer affirmatively.

5          We are not referring to documents used for impeachment

6    but to the extent they plan to offering anything affirmatively

7    to do that, exchange the night before, the reason being then we

8    could raise any disputes with the Court.

9          THE COURT:  Right.  I get the reason.

10         MR. ZOLKIND:  At any rate, the defense has not agreed

11   to that procedure.  I'm not --

12         THE COURT:  We are not going to do that, friends?  It

13   will certainly shorten the proceedings.

14         MR. ROSENBERG:  We are still conferring among

15   ourselves and we told the government we would get back to them

16   on it.

17         THE COURT:  Let me know, but I think it will shorten

18   the proceedings and certainly cut down on the number of side

19   bars and waiting by the jury.

20         MR. ROSENBERG:  Understood, your Honor.

21         MR. ZOLKIND:  To be clear, that is not the response

22   that we got from the defense but we are happy that they're

23   still considering it.

24         THE COURT:  I saw the look on your face.  Keep going.

25         MR. ZOLKIND:  We notified the defense that the

IBE5hoC                          conference

1    government intends to offer a number summary exhibits.  We are

2    working very hard to get those prepared.  We describe them in

3    general terms to the defense, we are going to produce them as

4    soon as they are ready, we hope that will be a week,

5    approximately a week before trial.  So I just want the Court to

6    be aware, I don't know if there will be any motion practice on

7    that, but we are working hard to get those to the defense.

8            THE COURT:  Where are we on foreign law, friends?  Are

9    we finished with that?

10           MR. ZOLKIND:  We are.  I invite my colleagues to

11   correct me if I am wrong, my understanding is we are all in

12   accord on foreign law.

13           THE COURT:  Are we all in accord, friends?

14           MR. ROSENBERG:  We are.

15           THE COURT:  Oh, thank you, God.

16           MR. ZOLKIND:  Your Honor, I wanted to put on the

17   record just briefly where the parties stand with respect to any

18   informal plea discussions.

19           THE COURT:  Yes, sir.

20           MR. ZOLKIND:  The answer there is that several months

21   ago the government inquired of defense counsel whether the

22   defense was interested in having any plea discussions.  The

23   government outlined the terms of the potential plea offer.

24   Defense counsel informed us they had conferred with their

25   client and that he was not interested in pursuing any

IBE5hoC                       conference

discussions or any further -- was not interested in taking any

informal plea discussions into formal plea discussions.  At no

point did the government make a formal plea offer.  And that is

the end of that.

Then, the last thing I wanted to just confirm with

your Honor is the schedule for trial and whether we will be

sitting on Fridays.

THE COURT:  Yes.

MR. ZOLKIND:  Sitting on Fridays?

THE COURT:  Sitting on Fridays.  Generally, depending,

assuming we have jurors from Westchester and the northern

counties, we probably will start at 10:00 and conclude between

4:00 and 5:00 depending on where we are with a witness and what

else we have following trial for the day.

MR. ZOLKIND:  Thank you, your Honor.

THE COURT:  What else, friends?

One thing.  We are always upstairs in the morning

before trial starts.  If you people have something you want to

talk about, you need to notify your adversaries, just pick up

the phone and call 0240 and have all of us come down.  We don't

want to waste jury time on matters that we can discuss outside

the jury time.

MR. ZOLKIND:  Your Honor, one other aspect of the

parties' agreement is that if either side intends to use slides

or visuals during openings, we will exchange those as least a

IBE5hoC                              conference

1    day before.

2              THE COURT:  You mean as opposed to some of the lawyers

3    who are on trial in this court house a few weeks ago?

4              MR. ZOLKIND:  No comment there, your Honor.

5              THE COURT:  Counsel, may I just confirm something with

6    you?

7              In hearing the status of plea negotiations which is

8    not, I think I don't need to allocute the defendant on this

9    because there has not been an offer.

10             MR. ZOLKIND:  I think that's right, your Honor.

11             THE COURT:  Do the defense lawyers agree on that?

12             MR. KIM:  Yes, your Honor.

13             THE COURT:  Government agrees?

14             MR. ZOLKIND:  Your Honor, the only thing I guess we

15   would ask is that the Court ask defense counsel to confirm that

16   the government's summary was correct, including that they spoke

17   with their client and that there was no interest in pursuing

18   any discussions.

19             THE COURT:  Mr. Kim, is that correct?

20             MR. KIM:  Yes, it is, your Honor.

21             THE COURT:  Thank you.

22             What else did you folks want to say?

23             MR. KIM:  We had just one minor logistical question,

24   your Honor.

25             THE COURT:  Yes, sir.

IBE5hoC                          conference

1              MR. KIM:  The Court, if it is possible, to make a room

2        available for the defense to store exhibits or other materials.

3              THE COURT:  Sure.  Speak to Ms. Phillips.  You can

4        probably leave them in here, but speak to Ms. Phillips.

5              MR. KIM:  Thank you.

6              THE COURT:  What else, friends?

7              MR. ZOLKIND:  Nothing further from the government.

8              MR. ROSENBERG:  Nothing from the defense.

9              THE COURT:  All right, counsel.  Thank you.  Good

10        morning.  Thank you, Ms. Reporter.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25