IBR7HO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                         17 Cr. 779 (LAP

CHI PING PATRICK HO,

           Defendant.

------------------------------x

                          New York, N.Y.
                          November 27, 2018
                          10:00 a.m.

Before:

                    LORETTA A. PRESKA
                          District Judge

                     APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  DANIEL RICHENTHAL
     DOUGLAS ZOLKIND
     CATHERINE GHOSH
     PAUL HAYDEN
     Assistant United States Attorneys

BENJAMIN ROSENBERG
EDWARD KIM
KATHERINE WYMAN
JONATHAN BODANSKY
JONATHAN BOLZ
     Attorneys for Defendant

ALSO PRESENT:  Ryan Carey, F.B.I.
                 Aashna Rao, Paralegal
                 Peter Calabrese, Paralegal

IBR7HO1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, ladies and gentlemen.  Won't

3    you be seated.  Counsel, I think you have been informed that

4    Juror 2 has informed us this morning that he just found out

5    that his wife needs surgery a week from Friday.  What would you

6    like me to do, friends?

7              MR. RICHENTHAL:  So, the parties conferred once we got

8    that information.  I think our joint view is the timing

9    probably works, that is, I would anticipate we would be done in

10   time, and obviously we can dismiss the juror if need be.  The

11   only concern we have is -- without probing any personal

12   matter -- is whether the person might be distracted.  And we

13   thought it just could be appropriate to ask that question.  I

14   think the defense agrees that that's an appropriate question in

15   an abundance of caution.

16             MR. ROSENBERG:  Yes, we do.

17             THE COURT:  All right.  And do I correctly understand

18   that you think it ought to be done in the robing room on the

19   record with one lawyer from each side?

20             MR. ROSENBERG:  Yes, your Honor.

21             MR. RICHENTHAL:  Yes, your Honor.

22             THE COURT:  Should we go ahead and do that now?  We're

23   still missing a few jurors.

24             MR. RICHENTHAL:  That's fine with the government.

25             THE COURT:  All right.  Mr. Reporter, would you come

IBR7HO1

1   in, and, Ms. Phillips, would you get the juror.

2            MR. RICHENTHAL:  I also advised your Honor's deputy

3   that we have one small matter for the record.  I can put that

4   on the record now.

5            THE COURT:  Do that now, please.

6            MR. RICHENTHAL:  I think it's fast.  The parties have

7   conferred regarding the exhibits to be introduced through the

8   witnesses for today, in particular the witness this morning.

9            There is one exhibit, Government Exhibit 2739, where

10   the parties have a disagreement I think about the extent of

11   redaction, if any, under the rule of completeness, etc.

12            Our paralegal is telling me that she is going to get

13   your Honor a copy.

14            THE COURT:  Say again the number?

15            MR. RICHENTHAL:  2739.  I think our paralegal just

16   signaled it may not be in the set we gave you a few days ago,

17   and she is going to hand it up.

18            THE COURT:  Thank you.

19            MR. RICHENTHAL:  In any event, what I proposed to the

20   defense, to respect the jury's time, is that exhibit is going

21   to come pretty late in the witness's examination, and the part

22   that I intend to highlight is actually not a part we have a

23   dispute about.  So, what I propose is assume we reach the

24   morning break, we can deal with it then.  If we haven't reached

25   the morning break, we can either take a break, or I will offer

IBR7HO1

 1    the exhibit, not discuss the part that's disputed, and we can

 2    deal with it later.

 3              I think the defense is in agreement, I think there is

 4    a dispute, but I don't think it's one that's going to take a

 5    massive amount of time.

 6              THE COURT:  Mr. Rosenberg, is that all right with you?

 7              Mr. Kim?

 8              MR. KIM:  Your Honor, that proposal is acceptable to

 9    us, your Honor.

10              THE COURT:  All right.  Was it the defense's position

11    that additional material should be redacted?

12              MR. KIM:  No, your Honor.  I think -- is your Honor

13    looking at 2739R?  Yeah.  We're disputing that the portion --

14    the blacked out portion -- should be redacted at all.  We need

15    to talk about it, but I think primarily the redactions at the

16    end.

17              THE COURT:  All right.  Do we have an unredacted copy?

18    OK, thank you.

19              Should we go ahead with the juror now, assuming all

20    the other jurors are not present?

21              MR. RICHENTHAL:  I think so.  Let me also add on the

22    same subject, I think this morning will be the first time --

23    it's indeed our first witness -- where we offer a redacted

24    exhibit.  Does the Court typically give an instruction at that

25    time?  I may ask the witness his understanding of what

IBR7HO1

1    redaction is, but I don't know if the Court wants to say

2    anything.  We defer to your Honor's judgment.  I just wanted to

3    note we will both be offering some redacted exhibits this

4    morning.

5              MR. KIM:  I think as long as it is clear to the jury

6    that redactions have nothing to do with the subject matter.

7              THE COURT:  All right.  Why don't we hear what the

8    witness says, and if I think any comment is required, I will

9    make it.

10             All right, Ms. Phillips, if the jurors are not all

11   present, would you bring number 2 out, please.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

IBR7HO1

1          (In the robing room)

2          THE COURT:  Mr. Schmidt, I understood that your wife

3     has to have surgery next week.

4          JUROR:  Sorry.  This is number three; I wasn't

5     expecting it.

6          THE COURT:  Yes, sir, so sorry to hear that.  The

7     lawyers think we're going to be finished by then.

8          JUROR:  OK.

9          THE COURT:  And so the only question to you, sir, is:

10    Is there any reason that you wouldn't be able to give your full

11    attention to the evidence in the case during this time?

12         JUROR:  No.

13         THE COURT:  Any other questions you would like me to

14    ask Mr. Schmidt?

15         MR. ROSENBERG:  No, your Honor.

16         MR. ZOLKIND:  No.

17         THE COURT:  Thank you.

18         All right.  Are we ready?  Let's go.  Thank, friends.

19         (Continue on next page)

20

21

22

23

24

25

IBR7HO1

1           (In open court)

2           MR. RICHENTHAL:  While we're waiting, does the Court

3  have any objection when we offer a stipulation to our not

4  reading the whole thing?

5           THE COURT:  No, as long as obviously you're going to

6  read the guts of it, but I don't think you need to say by and

7  between this attorney or that one.

8           Do you disagree, Mr. Rosenberg?

9           MR. ROSENBERG:  No, your Honor.

10          THE COURT:  Thank you.

11          MR. ROSENBERG:  There is another issue.  It doesn't

12 relate I believe to this witness, but I don't know if your

13 Honor prefers to do it at side bar.  I guess it doesn't matter

14 if it doesn't relate to the witness.  It's about Exhibit 412,

15 which I understand the government is going to use with another

16 witness.  It's an e-mail that is --

17          THE COURT:  I think you probably ought to stand in

18 front of a microphone.

19          MR. ROSENBERG:  Forgive me, your Honor.  412, your

20 Honor, is an e-mail with several attachments.  I believe it is

21 a single file.  The government produced it to us, and then they

22 provided us with the marked copy of the exhibit, the file copy,

23 and they had taken over the last two pages.  I had not noticed

24 a difference, your Honor.  That happened the 24th.  I

25 apologize.

IBR7HO1

1          THE COURT:  For some reason, Mr. Rosenberg, I'm not

2     hearing you.  Go ahead, sir.

3          MR. ROSENBERG:  Exhibit 412 was provided.  It's an

4     e-mail with attachments and it's a single file, as I understand

5     it.  They have removed the final two pages of the document

6     which is a speech, the text of the speech by Dr. Ho that was I

7     believe written by the witness, and it is part of the same

8     document, relates to the same topic and indeed the same events,

9     and because it's part of the same document we submit it should

10    be part of the exhibit.

11         THE COURT:  Counsel?

12         MR. ZOLKIND:  Your Honor, just for context, we

13    anticipate offering this exhibit through the next witness.

14         THE COURT:  Not this witness.

15         MR. ZOLKIND:  Correct.  The next witness is a former

16    employee of the CEFC NGO who reported to the defendant, and one

17    of the things he did was he would work on press releases that

18    the defendant would direct him to draft about various things

19    that the NGO was doing.

20         And so this e-mail chain -- which includes the witness

21    amongst the group of people who were in the chain, and it also

22    includes the defendant and others -- this e-mail chain is about

23    a press release that relates to a $1 million donation from the

24    CEFC NGO to the United Nations.

25         So, we will go through the chain, the witness will

IBR7HO1

1   explain what press release they're talking about.

2           Then, Ms. Rao, if you could bring up the first page of

3   the attachment.

4           You can see here, your Honor, the first page of the

5   attachment is at least a draft version of that press release.

6           Ms. Rao, if you could just flip to the next page.  It

7   goes on.  We go to the next page, it goes on.  Keep going.

8   This is all press release.

9           THE COURT:  OK.

10          MR. ZOLKIND:  So this is where we propose to cut the

11  exhibit, at the end of the draft press release that's the

12  subject of the e-mail.

13          Ms. Rao, if you could go to the next page.

14          Sorry.  So the version, this is what we have marked as

15  an exhibit, this is where we propose the end the exhibit.

16          The original file name, the original file that this

17  was all included in, included as the next page or two pages

18  afterwards a speech that the defendant gave at, as we

19  understand it, a ceremony where this donation was provided.

20          In our view -- and consistent with the Court's ruling

21  excluding the defendant's speeches -- but really because it's

22  not the subject of what the exhibit is being offered for, we

23  don't see any relevance or need to include a speech that the

24  defendant gave just because by happenstance it was appended in

25  the same file.

IBR7HO1

1          MR. ROSENBERG:  Judge, it does relate to the -- it is

2     exactly the speech given at the event that the press release is

3     about, and I think by all appearances it was appended to the

4     press release presumably when the --

5          THE COURT:  What is the relevance of it other than

6     that it was appended to the press release?

7          MR. ROSENBERG:  That it relates -- exactly the same

8     relevance of the press release.  It relates to the same matter,

9     the same event, and it relates to a gift given by CEFC to the

10     UN -- excuse me -- a grant given for an award.  It's relevant

11     to the government, and it completes the picture of exactly what

12     was happening.

13          THE COURT:  Look, the government is the judge of what

14     is relevant for its purposes.  Is your position that it should

15     come in under the rule of completeness?  Is that what you're

16     arguing?

17          MR. ROSENBERG:  The rule -- yes, your Honor, it comes

18     in under the rule of completeness.

19          THE COURT:  Can someone give me the speech, please.

20          MR. ROSENBERG:  May I bring it up, your Honor?

21          MR. ZOLKIND:  Your Honor, it might be helpful if I

22     explain -- because I don't think we did -- why we view the

23     press release at all as relevant.

24          MR. ROSENBERG:  May I interrupt?  I have some

25     handwritten marks on that.

IBR7HO1

1          THE COURT:  I promise I won't read them.

2          MR. ZOLKIND:  Your Honor, the reason in our view that

3    the press release at all is relevant and that the testimony

4    about the press release is relevant, obviously our case does

5    not involve a $1 million donation to the United Nations.  In

6    our view it's relevant because it shows the practice when there

7    was a real and legitimate donation was to issue a press

8    release, and we expect to offer evidence in this case through

9    other witnesses and other evidence that there was no press

10   release with respect to any donation to Chad or any donation to

11   Uganda.

12          So, the substance of the press release is irrelevant.

13   The defendant's speech is even less relevant.  The only fact

14   that's relevant is that a press release was issued and it

15   related to a $1 million donation, and that's relevant because

16   we think it's going to show by contrast the significance of the

17   fact that there wasn't a press release issued with respect to

18   the quote unquote donations that are the subject of this case.

19          THE COURT:  OK.  Mr. Rosenberg?

20          MR. ROSENBERG:  I think if the only issue is that

21   there is a press release, then they can have the witness

22   testify that there was a press release; we don't have to put it

23   in -- which discusses matters -- and put in what appears to be

24   an incomplete document.

25          THE COURT:  How does it appear incomplete?

IBR7HO1

1          MR. ROSENBERG:  Because it was part of the same file

2    that was on the e-mail, and I think a fair inference from that

3    is that it was part of the same press package that was

4    prepared.

5          MR. ZOLKIND:  Your Honor, as I understand the rule of

6    completeness, the question is whether by not including the

7    additional text that the defense wants to include a

8    misrepresentation will be made or the evidence will not be in

9    proper context for the jury to understand.

10          I don't think that is at all the case here.  The jury

11    will fully understand that there was a press release, that it

12    related to this event, that there was a ceremony at the event.

13          They can cross the witness on whether the defendant

14    made a public statement, and I expect that the witness would

15    say yes because the witness was there.  I don't know that for a

16    hundred percent sure, but I expect he would say yes.  So I

17    don't think under the rule of completeness this at all needs to

18    be admitted.

19          THE COURT:  Anything else, Mr. Rosenberg?

20          MR. ROSENBERG:  Nothing, your Honor.

21          THE COURT:  All right.  The proffer under the rule of

22    completeness is overruled.  The speech is not necessary to

23    complete the story, it is not necessary to correct any

24    misunderstanding which might be conveyed by the other portion

25    of the document, and it does not fit any other requirement

IBR7HO1

1    under the rule of completeness.  Accordingly, the speech will

2    not be received.

3              Off the record.

4              MR. ZOLKIND:  Your Honor, as long as we have another

5    minute of down time, one item of business we just wanted to

6    raise with the Court.  The parties have discussed this, and I

7    believe we're on the same page.

8              As the Court knows, on Sunday the government filed a

9    letter motion regarding certain cross-examination of one of our

10   witnesses that we believe should be precluded.  The defense

11   responded last evening, if I'm not mistaken.

12             THE COURT:  Right.

13             MR. ZOLKIND:  What we would like to do, your Honor, is

14   put in a brief reply.  They raised at least one new issue with

15   respect to the agreement.

16             THE COURT:  Right.

17             MR. ZOLKIND:  So, we propose to reply to that this

18   evening and, if it's convenient for the Court, to convene

19   tomorrow morning to address those issues.

20             THE COURT:  OK, fine.

21             MR. ZOLKIND:  With respect to the one exhibit that the

22   defense requested redactions to, what we're going to do, if the

23   Court agrees, is offer the exhibit -- to the extent it comes

24   up -- but I will not publish it for the jury, and I won't read

25   from it until the Court rules on the redactions.

IBR7HO1

1              THE COURT:  All right, fine.  Thank you.

2              Mr. Rosenberg, can you stand up and speak into the

3     podium mic so we can test it off the record.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IBR7HO1                              Jeremic - Direct

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  I

3    hope you did not have to swim home last night.

4              Good morning, everyone.  Nice of you to bring the sun

5    with you this morning.  Come right in.

6              And we start with the evidence from the government.

7    Who does the government call?

8              MR. RICHENTHAL:  Good morning, your Honor.  The

9    government calls Vuk Jeremic.

10   VUK JEREMIC,

11        called as a witness by the government,

12        having been duly sworn, testified as follows:

13             THE COURT:  Mr. Richenthal.

14   DIRECT EXAMINATION

15   BY MR. RICHENTHAL:

16   Q.  Good morning, Mr. Jeremic.

17   A.  Good morning.

18   Q.  In what country do you live, sir?

19   A.  I live in Serbia.

20   Q.  For anyone who might not know, where is Serbia?

21   A.  Serbia is in southeast Europe.

22   Q.  Mr. Jeremic, there is a microphone in front of you.  Do you

23   mind just pulling it a little closer to you?

24   A.  Better now?

25   Q.  Now, I'm asking you questions in English.  Do you have any

IBR7HO1                         Jeremic - Direct

1  trouble understanding me?

2  A.  No.

3  Q.  You will let me know if you do?

4  A.  Yes.

5  Q.  Is your native language English?

6  A.  No.

7  Q.  What is your native language, Mr. Jeremic?

8  A.  Serbian language.

9  Q.  What do you presently do for a living?

10 A.  I do three things.  Number one, I am one of the leaders of

11 the opposition in my own country Serbia.  Number two, I am head

12 of international think tank called Center for International

13 Relations and Sustainable Development, headquartered in

14 Belgrade.  And, number three, international consultant.

15 Q.  Now, taking the first one for a moment.  I think you used

16 the phrase opposition.

17 A.  Yes.

18 Q.  What did you mean by that, Mr. Jeremic?

19 A.  I am leader of a party that is strongly opposed to the

20 current government that we have in Serbia.

21 Q.  When you say a party, do you mean a political party?

22 A.  Yes, sir.

23 Q.  What is your educational background?

24 A.  I graduated theoretical physics from Cambridge University,

25 United Kingdom, and I did my master's degree at Harvard

IBR7HO1                          Jeremic - Direct

1    University in Cambridge, Massachusetts.

2    Q.   Approximately when did you get your degree from Harvard?

3    A.   I graduated in 2003.  I was studying there from 2001 to

4    2003.

5    Q.   In what subject or subjects was your degree?

6    A.   That was a master's in public administration and

7    international development.

8    Q.   Have you held any positions with the Serbian government?

9    A.   Yes, I did.

10   Q.   What positions?

11   A.   I held many positions, the most prominent of which was the

12   position of the Minister of Foreign Affairs from 2007 to 2012.

13   Q.   Now, in short, what was your role as the Minister of

14   Foreign Affairs?

15   A.   Minister of Foreign Affairs is a company's chief diplomate,

16   he runs diplomatic service, he's boss to a country's

17   embassador, he speaks on behalf of the country abroad and so

18   on.

19   Q.   Mr. Jeremic, if I could ask you to just slow down just

20   slightly.

21   A.   No problem.

22   Q.   Now, in the United States, do we have an equivalent

23   position to the Minister of Foreign Affairs?

24   A.   You do, you call it Secretary of State in this country.

25            THE COURT:  You're exactly right, move into that

IBR7HO1                          Jeremic - Direct

1   microphone, sir.  See, all those people way in the back, they

2   all have to be able to hear you.

3          THE WITNESS:  Got it.  Thank you, your Honor.

4   Q.  Do you mind just giving your answer again.  Do we have an

5   equivalent position in this country, and what is it called?

6   A.  You do.  In this country this is called Secretary of State.

7   Q.  Now, changing subjects, are you familiar with an

8   organization called the United Nations or UN?

9   A.  I am, sir.

10  Q.  What is the UN?

11  A.  UN is the abbreviation for the united nations.  It is the

12  international multi-lateral organization that is comprised of

13  193 independent sovereign countries of the world.

14  Q.  Are those countries that you just referred to sometimes

15  referred to by a different phrase than the United Nations?

16  A.  Sometimes they're called member states because they're

17  members of the organization.

18  Q.  Member states?

19  A.  Yes.

20  Q.  And that's equivalent to a country?

21  A.  Yes, that's equivalent to a country in the context of the

22  UN.  There are some countries that are not members of the UN in

23  the world.

24  Q.  Sticking with the UN for a moment, where is the UN

25  headquartered?

1    A.   It is headquartered in New York.

2    Q.   And when you say New York, do you mean Manhattan?

3    A.   Yes.

4    Q.   Approximately where?

5    A.   It's on the East River, I believe between 42nd and 45th,

6    roundabout streets, but it's on the East Side of the Manhattan

7    island.

8    Q.   Now, Mr. Jeremic, there is a screen on your right.  I am

9    going to ask Ms. Rao to put a document on the screen.  Without

10   describing the detail, can you just let me know if you

11   recognize it.

12   A.   I do.

13   Q.   What do you recognize it as, sir?

14   A.   I recognize a number of buildings that are on the East Side

15   of Manhattan.

16   Q.   Does that include the UN or United Nations headquarters?

17   A.   Yes, sir.

18   Q.   Does it fairly and accurately depict what the headquarters

19   looked like between at least 2014 and 2017?

20   A.   Yes, sir.  That's the building on the left-hand side of the

21   photo.

22           MR. RICHENTHAL:  Your Honor, the government offers

23   Exhibit 1516.

24           MR. KIM:  No objection, your Honor.

25           THE COURT:  Received.

```
 1              (Government Exhibit 1516 received in evidence)
 2     Q.  Now, Mr. Jeremic, that exhibit is now on the jury's
 3     screens.
 4              Ms. Rao, could you put it on the big screen as well,
 5     please.
 6              While we're waiting for the big screen, let me
 7     continue.  Now that everyone can see it, can you just point out
 8     in the photograph which one is the UN headquarters, meaning
 9     which building?
10     A.  The one on the left-hand side, the left most building on
11     the screen, is the UN building.
12     Q.  What color?
13     A.  Light blue.
14              MR. RICHENTHAL:  Now, you can take that down for now,
15     Ms. Rao.
16     Q.  Did there come a time when you accepted a position at the
17     UN in Manhattan?
18     A.  Yes, sir.
19     Q.  Approximately when was that?
20     A.  I ran for president of the United Nations General Assembly
21     in 2012, and in June 2012 I was elected by the majority of
22     world nations that are member states of the United Nations for
23     this position, the position of the president of the UN General
24     Assembly.
25     Q.  You said that was June 2012?
```

1    A.  Yes, sir.

2    Q.  And when did you take office?

3    A.  I took office in September 2012.

4    Q.  Now, you described the position as the president of the

5    General Assembly?

6    A.  President of the General Assembly is nominally the top

7    position in the hierarchy of the United Nations.  You're

8    elected by the member states.  You are supposed to -- for one

9    year, because it's a one year term -- to chair the sessions of

10   the General Assembly, and the General Assembly is something of

11   a world parliament in which each country is represented by one

12   seat.  Equivalent in this country would be House of

13   Representatives chaired by the Speaker of the House.  So the

14   position of the president of the General Assembly is equivalent

15   to the Speaker of the House in the House of Representatives.

16   But the president of the General Assembly also speaks on behalf

17   of the UN throughout the world, attends conferences on behalf

18   of the UN across the world, engages with nongovernmental

19   organizations and private sector entities that are socially

20   responsible and want to engage with the UN in furthering the

21   agenda and goals of the United Nations.

22   Q.  I'm going to ask you some questions about a couple things

23   you just said, but, first, is the president of the General

24   Assembly sometimes also known as the PGA?

25   A.  Yes, that's the acronym of the president of the General

IBR7HO1                          Jeremic - Direct

1    Assembly.

2    Q.  And I believe you said this, but for how long does a PGA

3    serve in that position?

4    A.  It's always one year.  It's mandated by the General

5    Assembly rules and regulations.  It always starts in September,

6    lasts until the September of the following year.

7    Q.  In your experience, what's the typical background of a PGA?

8    A.  Most people who occupy this position used to be diplomats

9    or ministers in their governments, in particular ministers of

10   foreign affairs.  There are other examples, but the vast

11   majority have diplomatic background.

12   Q.  And within the hierarchy of the United Nations, where does

13   the PGA fit?

14   A.  Nominally this is the number one position in the United

15   Nations.  In practice, the secretary general of the United

16   Nations has a more pronounced especially operational role in

17   the running of this organization.

18              THE COURT:  Slow it down.

19              THE WITNESS:  I'm sorry.  Thank you, your Honor.

20   Q.  Now, if your term commenced in September of 2012, when did

21   it end?

22   A.  September 2013.

23   Q.  Was there a new PGA who took office at that time?

24   A.  Yes, sir.

25   Q.  What was his or her name?

IBR7HO1                        Jeremic - Direct

1    A.  His name was John Ashe.

2    Q.  Where was he from?

3    A.  He was from the country called Antigua and Barbuda.

4    Q.  And where is Antigua and Barbuda?

5    A.  It's a country that is located in the Carribean.

6    Q.  Did Mr. Ashe serve his term for a year?

7    A.  Yes, he did.

8    Q.  Did someone take office after him?

9    A.  Yes, somebody else took over after one year.

10   Q.  What was his or her name?

11   A.  His name was Samuel Kutesa.

12   Q.  Could you spell that, please.

13   A.  S-a-m-u-e-l and K-u-t-e-s-a.

14   Q.  Where was Mr. Kutesa from?

15   A.  From Uganda.

16   Q.  Where is Uganda?

17   A.  Uganda is located in the African continent.

18           MR. RICHENTHAL:  Ms. Rao, can you now show to Mr.

19   Jeremic what is marked for identification as Government's

20   Exhibits 1504 and 1504A.

21   Q.  Mr. Jeremic, is that on your screen?

22   A.  I see one person on the screen.

23   Q.  Let's take 1504 first then.  Do you recognize who is in

24   that photograph?

25   A.  I do.

1   Q.  Who is that, Mr. Jeremic?

2   A.  That is Samuel Kutesa, the aforementioned person.

3           MR. RICHENTHAL:  The government offers 1504.

4           MR. KIM:  No objection.

5           THE COURT:  Received.

6           (Government Exhibit 1504 received in evidence)

7   Q.  Mr. Jeremic, do you recognize what is marked for

8   identification as 1504?

9   A.  I do.

10  Q.  What is that?

11  A.  That is a photo.

12  Q.  A photo of whom, sir?

13  A.  That is a photo of Samuel Kutesa.

14  Q.  The same individual as in 1504?

15  A.  I think so.

16          MR. RICHENTHAL:  The government offers 1504A.

17          MR. KIM:  No objection.

18          THE COURT:  Received.

19          (Government Exhibit 1504A received in evidence)

20          MR. RICHENTHAL:  Now, at this time we would like to

21  offer a stipulation.  Actually, let me back up for one second.

22          I would like to offer 1504B, which is just a name.

23  It's the name that Mr. Jeremic provided that was associated

24  with the photographs.  It goes with the item there, so they can

25  put it on the board.

1          THE COURT:  I don't understand.

2          MR. RICHENTHAL:  It's a name.  There is Velcro on the

3     back of that, and 1504B is a name that goes with the photo.

4          THE COURT:  Sure.

5          MR. RICHENTHAL:  Your Honor, I would like to offer

6     stipulation S9 at this time.  It's with respect to certain

7     records of the United Nations.

8          THE COURT:  Fact or testimonial?

9          MR. RICHENTHAL:  It's testimonial, your Honor.

10         THE COURT:  Ladies and gentlemen, this is one of those

11    agreements between the parties to the case.  This one is

12    testimonial.  So that means that in it you will hear that if a

13    certain witness was called to the stand; the witness would give

14    certain testimony.  You are required to accept the fact that

15    the witness would give certain testimony as stated in the

16    exhibit.  The weight you give to that testimony is of course up

17    to you.

18         Mr. Richenthal.

19         MR. RICHENTHAL:  The stipulation is entitled

20    Stipulation as to Certain United Nations Documents.  Paragraph

21    3 reads as follows:

22         "Government Exhibit 2302 is an organizational chart of

23    the Office of the president of the UN General Assembly under

24    then press Sam Kutesa."

25         The government offers Exhibit 2302.

1          MR. KIM:  No objection.

2          THE COURT:  Received.

3          (Government Exhibit 2302 received in evidence)

4    Q.  No, Mr. Jeremic, is that exhibit on your screen?

5    A.  Yes, it is.

6          MR. RICHENTHAL:  And, Ms. Rao, can you put that on the

7    big screen as well.  Ms. Rao, can you blow up the top of the

8    first page, please.

9    Q.  Mr. Jeremic, do you recognize the individual at the top of

10   that document?

11   A.  I do, sir.

12   Q.  Who is that?

13   A.  That is Sam Kutesa.

14   Q.  The same individual you mentioned a minute ago?

15   A.  Yes, sir.

16         MR. RICHENTHAL:  Now, Ms. Rao, can you scroll down or

17   blow up the part below that, please.  Stop there.

18   Q.  Mr. Jeremic, are you able to read the words below the

19   photographs?

20   A.  Yes, sir.

21   Q.  Do you recognize any of those positions?

22   A.  I recognize the one that is currently being on top.

23   Q.  Are you referring to the position under Ambassador Arthur

24   Kafeero?

25   A.  Yes, sir.

IBR7HO1                          Jeremic - Direct

1  Q.  What is that position?

2  A.  It's a Chef de Cabinet, which is a diplomatic expression

3  that refers to chief of staff, so the chief of staff is

4  somebody who is operationally running the office of the

5  president, much like this country, for example, you would have

6  a White House Chief of Staff.  Chef de Cabinet literally means

7  Chief of Staff.

8  Q.  Changing subjects, you used a term a couple minutes ago

9  that I'm going to return to you.  You used the term NGO.  What

10 is an NGO?

11 A.  NGO is an acronym that stands for nongovernmental

12 organization.

13 Q.  What is an NGO or nongovernment mental organization?

14 A.  It's an organization comprised of people who come together

15 to advance a certain goal or a certain issue that is of their

16 particular interest.

17 Q.  Now, in your experience, what role, if any, do NGOs play at

18 the UN?

19 A.  NGOs are engaged in the United Nations activity in order to

20 advocate certain goals, the goals that are at the heart of why

21 they were put together in the first place, those particular

22 NGOs; and the way they interact with the member states and

23 other organs of the United Nations is through their official

24 affiliation with the United Nations that is called a

25 consultative status that an NGO may acquire inside the

1  organization of the United Nations.

2  Q.  You just used the phrase consultative status.

3  Approximately how many NGOs have such status?

4  A.  Probably thousands.

5  Q.  Did you interact with such NGOs at the time you were PGA?

6  A.  I did.  It's a very normal practice to talk and to engage

7  with NGOs that are there in order to further a certain goal or

8  advocate a certain goal.

9  Q.  Do you have an example of the kind of meeting or event at

10  which you may have interacted with an NGO during your service

11  as PGA?

12  A.  First of all, NGOs often ask for meetings with UN officials

13  in order to discuss things that are in their interest.  It

14  could be from human rights, to climate change, to any other

15  topic.

16          The UN also invites them either through the General

17  Assembly or through other organs of the United Nations to

18  participate in debates that are sponsored by the United

19  Nations, and some of those are held at UN turf, in the UN

20  building, and sometimes they are organized elsewhere, but there

21  is a very rich interaction between those kinds of NGOs and the

22  organs and the officials of the United Nations.

23  Q.  You just used the term organ.  What do you mean by that in

24  the context of the United Nations?

25  A.  Organs of the United Nations is, for example, General

IBR7HO1                         Jeremic - Direct

1    Assembly.  Organ of the United Nations is Security Council of

2    the United Nations.  Organ of the United Nations is, for

3    example, ECOSOC, Economic and Social Council of the United

4    Nations amongst others.

5              THE COURT:  Slowly.

6    Q.  I'm going to switch subjects again.  Did you there come a

7    time when you connected with an individual connected to an NGO

8    known as Chi Ping Patrick Ho, or for short Patrick Ho?

9    A.  Yes, sir.

10   Q.  Do you recognize that person in the courtroom?

11   A.  I do, sir.

12   Q.  Could you describe what he is wearing, please.

13   A.  I can't actually see from this seat.  He is wearing a

14   purple shirt.

15             MR. RICHENTHAL:  Your Honor, may the record reflect

16   that Mr. Jeremic has identified the defendant.

17             MR. KIM:  So stipulated, your Honor.

18             THE COURT:  Yes, sir, thank you.

19   Q.  Now, Mr. Jeremic, I'm going to ask Ms. Rao to put another

20   photograph on your screen, Government Exhibit 1501.  Do you

21   recognize that?

22   A.  I do, sir.

23   Q.  What is that, Mr. Jeremic?

24   A.  This is a photograph of the aforementioned Dr. Patrick Ho.

25             MR. RICHENTHAL:  The government offers 1501.

1            MR. KIM:  No objection.

2            THE COURT:  Received.

3            (Government Exhibit 1501 received in evidence)

4    Q.  Mr. Jeremic, I am bringing you 1501A, as in apple.  Do you

5    recognize that?

6    A.  I do, sir.

7    Q.  What is that?

8    A.  That is also a picture of Dr. Patrick Ho.

9            MR. RICHENTHAL:  The government offers 1501A as well.

10           MR. KIM:  No objection, and we don't object to the

11   Velcro B.

12           THE COURT:  Wonderful.  Thank you.  Moving right along

13   here.

14           MR. RICHENTHAL:  For the record that's 1501B.

15           THE COURT:  Wonderful.

16           (Government Exhibits 1501A and 1501B received in

17   evidence)

18   Q.  Mr. Jeremic, approximately when did you meet Mr. Ho the

19   defendant?

20   A.  I met Dr. Ho for the first time in November of 2012.

21   Q.  Was this during your term as PGA?

22   A.  Yes, it was, sir.

23   Q.  How did you come to meet him?

24   A.  I received an invitation to the Office of the President of

25   the General Assembly for me to attend an event in Lincoln

1    Center here in New York, Manhattan, whose topic was building

2    bridges between various cultures and helping various cultures

3    better understand each other.

4    Q.  And did attend the event?

5    A.  I did.

6    Q.  Did you speak with the defendant at that time?

7    A.  I did.

8    Q.  In what language did you speak?

9    A.  We spoke in English.

10   Q.  Did you have any trouble understanding him?

11   A.  No, not to my recollection.

12   Q.  Did he appear to have any trouble understanding you?

13   A.  No.

14   Q.  What did you talk about in sum?

15   A.  We talked about what was the main topic at that particular

16   event, which is how to help various cultures and civilizations

17   get more closely together, to have a better understanding

18   between each other and, in particular, the western civilization

19   and that of China.

20   Q.  Do you recall whether he told you the name of the NGO?

21   A.  I do, sir.

22   Q.  What was its name?

23   A.  The acronym was CEFC NGO.

24   Q.  And how, if at all, did he describe what that organization

25   was.

1    A.  We talked about what they do in the context of the topic of

2    that particular conference and the event, and I was told by Dr.

3    Ho that their main goal is to further and to improve

4    understanding between various cultures in the world.

5    Q.  How, if the all, did he describe his role at the

6    organization?

7    A.  I don't remember exactly, but I assumed at that moment he

8    was the front person within the NGO, the guy who was leading

9    that particular NGO.

10   Q.  What did you base that assumption on?

11   A.  On the conversations that we had and the very prominent --

12   in other words, the leading role that he had at that particular

13   event, at that particular function at Lincoln Center.

14   Q.  Based on your conversation at that time at Lincoln Center,

15   what understanding, if any, did you have as to whether the NGO

16   was connected to a for-profit company?

17   A.  I don't understand -- I don't remember us talking about

18   that at that particular event.

19   Q.  Now, after this event, were there other times when you

20   interacted with defendant over the course of your year as the

21   PGA?

22   A.  Yes, sir.

23   Q.  What kinds of times in general?

24   A.  A couple of months later I was invited in the official

25   capacity of President of the UN General Assembly to visit

1  China, where I met with top Chinese officials in Beijing.

2  Those meetings were held in Beijing in the capital of China.

3  And Dr. Ho kindly extended an invitation to me to visit Hong

4  Kong on my way back to New York in order to give a speech at

5  the banquet at a special function which would be organized by

6  the CEFC, the NGO, and where you would have a lot of prominent

7  Hong Kong residents present, like diplomats, business people,

8  media people, academicians from both Hong Kong and mainland,

9  and I accepted his invitation that I make a stop-over in Hong

10 Kong as a part of my official visit to China.

11 Q.  I'm going to ask you a few questions about that visit in a

12 moment.  But, first, was that the only other time you

13 interacted with the defendant over the course of your year as

14 PGA?

15 A.  No, sir.

16 Q.  Based on your conversations with him, did you come to learn

17 whether his NGO had a space or office that he used in

18 Manhattan?

19 A.  Yes, I did, at some point during our interactions -- I

20 cannot exactly remember when it was -- but, yes, I did learn

21 about it.

22 Q.  And where was that space or location?

23 A.  That space was located in the World Trump Tower, the

24 building that was very, very near -- it is still very, very

25 near to the headquarters of the United Nations.

1           THE COURT:  Thank you.  I was glad to hear they didn't

2      move it.

3      Q.  Did you ever go to the space itself, or were you only told

4      about it?

5      A.  I went to the place myself.  I remember at least one

6      occasion when I was present in that space.

7      Q.  Could you describe it.

8      A.  It's a big apartment on a very, very high floor of the

9      World Trump Tower, with a very good view of the entire

10     Manhattan island.

11          MR. RICHENTHAL:  Ms. Rao, could you put on Mr.

12     Jeremic's screen what has been marked for identification as

13     Government Exhibit 1515.

14     Q.  Do you recognize that, Mr. Jeremic?

15     A.  I do, sir.

16     Q.  What is that?

17     A.  That looks like the entry to that particular building that

18     we were talking about a minute ago.

19     Q.  Does it fairly and accurately depict what that entry looked

20     like at the time you were there?

21     A.  To my best recollection, yes.

22          MR. RICHENTHAL:  The governments offers 1515.

23          THE COURT:  Received.

24          (Government Exhibit 1515 received in evidence)

25          MR. RICHENTHAL:  Now, Ms. Rao, could you put up 1516,

1   the other photograph of the buildings, please.

2   Q.  Mr. Jeremic, is that office building or apartment building

3   in this photograph as well?

4   A.  Yes, sir.

5   Q.  Could you point it out, please.

6   A.  It is a dark blue building that is on the right, towards

7   the right side of that photo.

8   Q.  And approximately how far, in your experience, is the walk

9   from that building to the United Nations headquarters?

10  A.  It's like a few minutes maybe, a few minutes walk.

11  Q.  Now I'm going to return to your trip to China in a moment,

12  but from your interactions with the defendant during your year

13  as PGA, did you come to learn whether he had an assistant?

14  A.  I did, sir.

15  Q.  Did he?

16  A.  I'm sorry?

17  Q.  Did he?

18  A.  Yes, I did come to learn that he had somebody who was

19  helping him out.

20  Q.  And do you recall that person's name?

21  A.  I don't, unfortunately.

22  Q.  Do you recall what he or she looks like?

23  A.  I think I could if I saw her.

24  Q.  Now, in preparing to testify today were you shown a

25  photograph of a person that's the person you're describing?

1   A.  OK.

2              MR. RICHENTHAL:  Ms. Rao, could you put up what has

3   been marked for identification as Government Exhibit 1506.

4   Q.  Do you recognize that photograph, Mr. Jeremic?

5   A.  I do, sir.

6   Q.  Who is that?

7   A.  It is the assistant that I was just referring to a minute

8   ago.

9              MR. RICHENTHAL:  The government offers 1506.

10             MR. KIM:  No objection.

11             THE COURT:  Received.

12             MR. RICHENTHAL:  And 1506A.

13             MR. KIM:  No objection to A or B.

14             THE COURT:  Thank you.

15             (Government Exhibits 1506, 1506A and 1506B received in

16   evidence)

17  Q.  Now, Mr. Jeremic, I said I was going to ask you about your

18  trip to China, so I'm going to do that now.  So I think you

19  said where you met in China, but just to repeat where did you

20  meet?

21  A.  That was happening in Hong Kong, inside a private club in

22  Hong Kong where this dinner or luncheon speech -- or meal

23  speech -- was given to diplomats, business people, media.

24  Q.  Approximately when was that during your term as PGA?

25  A.  That was towards the ends of the calendar year 2012.  This

1    is when my first official trip to China took place.

2    Q.  Did you have an opportunity during your meeting or luncheon

3    in Hong Kong to speak with the defendant?

4    A.  Yes, it was during that particular meal that we talked.

5    Q.  Now, during that conversation, did you learn how, if at

6    all, the defendant's NGO was funded?

7    A.  I did, sir.

8    Q.  What did you learn?

9    A.  I learned that the CEFC NGO was primarily, if not fully,

10   funded by the company, energy company, with the same acronym

11   CEFC.

12   Q.  And what if anything did you learn in that conversation

13   about what that company was?

14   A.  That company -- I was told that the company was privately

15   owned and fast growing energy conglomerate from China that had

16   an interest in anything to do with energy business in the

17   widest sense of that word.

18   Q.  Just to pause for a second, Mr. Jeremic.  You just used the

19   term conglomerate.  For anyone who might not know, what is a

20   conglomerate?

21   A.  A large and diversified company.

22   Q.  And I think you said it had certain interests.  What from

23   your conversation with the defendant did you understand those

24   interests to be?

25   A.  Energy.  Oil, gas, alternative energies and so on and so

IBR7HO1                          Jeremic - Direct

1     forth, anything to do with the energy business.

2     Q.  Now, was that the only trip you took to China during your

3     year as PGA?

4     A.  No, sir.

5     Q.  How many more trips were there?

6     A.  There were two more trips.

7     Q.  So let's take those one at a time.  Approximately when was

8     the second trip that you took to China during your year as PGA?

9     A.  The second trip to China was when I received an invitation

10    to speak at the opening of the largest, most pronounced annual

11    forum in China that takes place at the Island of Hainan.  It's

12    called the BOAO forum.  It's known as the Davos of China, in

13    the sense that the highest government officials and the highest

14    company leaders, business leaders and academic leaders of China

15    attend together with those from the rest of the world.

16              THE COURT:  It is known as the what of China?

17              THE WITNESS:  Davos.

18              THE COURT:  Oh, Davos, as in Switzerland.  Sorry to

19    have interrupted you.  And then you were saying business

20    leaders and academic leaders of China together with --

21              THE WITNESS:  -- business leaders and political

22    leaders from the rest of the world.

23              THE COURT:  Thank you.

24              THE WITNESS:  That particular year it was President Xi

25    Jinping that opened, and I was invited as President of the UN

IBR7HO1                          Jeremic – Direct

1    assembly to join him in speaking at the opening of that forum.

2                The way you fly to Hainan Island is usually through

3    Hong Kong, so I made a trip to Hainan via Hong Kong, and during

4    a brief stopover I played in Hong Kong I met again Dr. Ho.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. RICHENTHAL:

Q.  Now at whose request did you make that stopover and have that meeting?

A.  Dr. Ho and I spoke during the last trip about my personal friendship with an individual who at the time was leading a large energy company from Mexico, and that person, who was one of my good friends from Harvard, from my graduate studies in America, he was just recently appointed at that time the head of the Mexico energy state company.  And Dr. Ho expressed interest in getting to know him, getting to know my friend, and I said that I would do my best for them to get introduced.  It happened to be the case that that individual was also flying to speak at that particular forum in Hainan, and he was also flying through Hong Kong, and I helped them meet each other and talk to each other.

Q.  One specific question before I ask you about the meeting. You mentioned there was a Mexican energy company?

A.  Yes, sir.

Q.  What was the name of that company, Mr. Jeremic?

A.  The name of that company was and is PEMEX.

Q.  Could you spell that, sir.

A.  It's P-E-M-E-X.

Q.  Did the meeting in fact take place?

A.  Yes, sir, it did.

Q.  Who was present for it?

Ibr1ho2                    Jeremic - Direct

1    A.  Well, it was an introduction; I wouldn't call it a official

2    meeting.  It wasn't an official meeting.  And I remember that

3    gentleman, the chairman -- sorry, the president of the company,

4    Mexico, Mexican company, PEMEX, and I also remember Dr. Ho

5    being present, as well as president of CEFC energy company

6    being present as well.

7    Q.  You just used the phrase "CEFC energy company."  What are

8    you referring to when you say that?

9    A.  I'm referring to the company that we touched upon earlier

10   that was major or exclusive sponsor or supporter of the CEFC,

11   the NGO that Dr. Ho was heading.

12   Q.  Now approximately how long did this meeting or conversation

13   last?

14   A.  It was a relatively short conversation.

15   Q.  What was discussed?

16   A.  Well, it was discussed that the energy policy of the world

17   in general, where the world energy markets are going, what is

18   the future of energy in the context of UN sustainable

19   development agenda that was aimed at cutting the use of carbon

20   and fossil fuels in the forthcoming decades, as well as

21   interest of the CEFC, the energy company, of establishing the

22   business relationship with the Mexican state-owned company.

23   Q.  What do you mean by a business relationship?

24   A.  It means like doing business together, doing work together.

25   Q.  Now based on this meeting, what understanding, if any, did

1    you have about whether the energy company had an interest in

2    expanding only to Mexico or other countries as well?

3    A.   Now my understanding was that CEFC, the energy company, had

4    an interest to do business all over the world, but Mexico was

5    particularly interesting because Mexico is one of the largest

6    oil producers in the whole world, and I happened to have a

7    personal connection to the guy who was at the time leading the

8    company, not like the president of the UN General Assembly but

9    as a former Harvard classmate.

10   Q.   And similar question.  Based on your conversation, what

11   understanding, if any, did you have as to how quickly the

12   energy company wished to grow?

13   A.   The vision of the company, to my best understanding, was to

14   move as fast as possible and to engage with as many as possible

15   countries around the world, in order to do energy-related

16   businesses.

17   Q.   And finally, based on the same conversation or meeting,

18   what understanding, if any, did you have as to whether the

19   defendant was going to play a role in helping to expand that

20   business?

21   A.   My understanding was that Dr. Ho was somebody who, with a

22   very sophisticated knowledge of how the world works, a good

23   command of the English language, and the web of networks around

24   the world, was somebody who in a way was helping the company

25   grow and expand and get into different markets around the

Ibr1ho2                        Jeremic – Direct

1    world.

2    Q.  Now I think you said this was your second meeting in China.

3    Was there a third?

4    A.  There was a third meeting.

5    Q.  Approximately when was that?

6    A.  It was approximately in summer of 2013.

7    Q.  Was this then still during your term as PGA?

8    A.  Yes.  I was, again, invited into a farewell visit, because

9    my term was coming to an end, so China invited me to a farewell

10   visit.  I had meetings with their top leadership again,

11   including minister of development, and during that official

12   trip I again met Dr. Ho.

13   Q.  At whose request?

14   A.  It was at Dr. Ho's request.

15   Q.  And who, if anyone, was present for your meeting with him?

16   That is, other than yourself and him, was anyone else there?

17   A.  Yes.  This was the occasion where I had privilege of

18   meeting the chairman of the company, CEFC, the energy company,

19   and Dr. Ho's request, or proposal for me to visit at that time

20   was for me to get to know the chairman of the company.

21   Q.  And let me just pause for one moment.  I should have asked

22   this, but where in China did this meeting take place?

23   A.  It took place in Shanghai.

24   Q.  And where in Shanghai; an office, an apartment, something

25   else?

Ibr1ho2                        Jeremic - Direct

1   A.  Happened in a private club, in Shanghai.

2   Q.  Now I think you just used the phrase or word "chairman."

3   Did you learn that individual's name?

4   A.  I did, sir.

5   Q.  What was his or her name?

6   A.  His name was Ye, Y-E.  Spell it as Y-E, you pronounce it as

7   "Yee."

8   Q.  What was discussed during this meeting?

9   A.  We talked about what was going on in the world.  He was

10  very interested in my views on geopolitics and especially what

11  are going to be the implications of global political

12  developments to energy markets.

13  Q.  Was the business of the energy company discussed?

14  A.  We did touch upon it.  It was not the main topic of the

15  conversation.  He was interested in also what are the forces

16  within the EU that are pushing for the sustainable development

17  agenda adoption.  Those were the years when this big document

18  was being negotiated by the world countries.  That negotiation

19  culminated in 2015, but that particular year, 2013, was the

20  year when so many interesting developments in these

21  negotiations were going on regarding climate change and other

22  aspects of sustainable development, so I remember Chairman Ye

23  being very interested in how is this going -- how this was

24  going.

25  Q.  I don't want to cut you off.  Sorry.

Ibr1ho2                              Jeremic - Direct

1    A.  No problem.

2    Q.  I asked you a question a couple minutes ago about your

3    understanding of the energy company's interest in expanding its

4    business.  Do you recall that question?

5    A.  Well --

6              THE COURT:  Slowly.

7    A.  Yes.

8    Q.  Based on this conversation you had during your third

9    meeting, did your understanding change whether the company had

10   an interest in expanding its business?

11   A.  No, sir.

12   Q.  At this point in your relationship with the defendant, how

13   would you describe that relationship?

14   A.  It was relationship in which we could more or less openly

15   discuss the politics of the world and what was going on.  This

16   was like at least third time that we met at that moment, and we

17   talked about what was going on in China, what was going on in

18   the UN, what was going on in other parts of the world, and

19   especially what was going on in the parts of the world that are

20   critical to the sustainable development agenda of the United

21   Nations in terms of oil, gas, and otherwise.

22   Q.  Would you describe yourself as friends by that point?

23   A.  I would describe ourselves as close acquaintance at that

24   moment.

25             MR. RICHENTHAL:  Ms. Rao, I'd like you to put a couple

Ibr1ho2                        Jeremic - Direct

1   things on Mr. Jeremic's screen.  Let's start with 1507, please.

2   Q.  Mr. Jeremic, do you recognize that?

3   A.  I do, sir.

4   Q.  What is that?

5   A.  That is a photo.

6   Q.  A photograph of who?

7   A.  A photograph of aforementioned Chairman Ye of the CEFC

8   energy company.

9            MR. RICHENTHAL:  The government offers 1507 and 1507A.

10           MR. KIM:  No objection to 1507 and 1507A, your Honor.

11           THE COURT:  Received.

12           (Government's Exhibits 1507 and 1507A received in

13   evidence)

14           MR. RICHENTHAL:  Ms. Rao, can you put that up briefly.

15           You can take that down.

16           And now can you put up 1509 just on Mr. Jeremic's

17   screen, please.

18   BY MR. RICHENTHAL:

19   Q.  Mr. Jeremic, do you recognize that?

20   A.  I do recognize that gentleman.

21   Q.  Who is he?

22   A.  I cannot remember his name, sir.

23   Q.  What do you recognize him from?

24   A.  I recognize him in -- from one of the meetings that I had

25   with the CEFC, but I cannot remember if it was during those

1    meetings that we just discussed or perhaps it was during the

2    time later on when, following the end of my term as president,

3    I became consultant of the CEFC.  I recognize this gentleman as

4    being among the employees of the CEFC, the company, the energy

5    company, but I cannot remember his name.

6              MR. RICHENTHAL:  The government offers 1509 and 1509A.

7              MR. KIM:  No objection, your Honor.

8              THE COURT:  Received.

9              (Government's Exhibits 1509 and 1509A received in

10   evidence)

11             MR. RICHENTHAL:  You can take that down, Ms. Rao.

12   BY MR. RICHENTHAL:

13   Q.  Now you mentioned earlier your conversation involving your

14   friend at PEMEX.  What specifically did you understand the

15   company's interest to be with respect to PEMEX?

16   A.  PEMEX is one of the largest petrol companies, oil companies

17   in the whole world; one of the largest producers.  He is -- at

18   the time he was energy monopoly in Mexico, one of the big

19   players in the energy world, and my understanding was that the

20   CEFC, the energy company, a large and fast-rising Chinese

21   energy company, had an interest in getting a relationship with

22   PEMEX.

23   Q.  What kind of relationship?

24   A.  A business relationship.

25   Q.  Do you know whether individuals from the energy company and

Ibr1ho2                        Jeremic - Direct

1    individuals from PEMEX spoke after the meeting you described a

2    few minutes ago?

3    A.   Well, I was asked to introduce them, and I introduced them,

4    because I knew the president of the Mexican company, so I

5    facilitated their direct contact, and to my best memory, they

6    did try to meet to discuss how to proceed in their common

7    business, but I was not part of those conversations.

8    Q.   Even if you weren't part of the conversations themselves,

9    did you on occasion speak with the defendant about how the

10   conversations were going?

11   A.   Yes, I did, at certain points.

12   Q.   What did you understand his and the energy company's goal

13   or purpose to be in the conversations they were having with

14   PEMEX?

15   A.   I understand that -- we are now talking about much later

16   on.  It was after I finished with my term as president of the

17   UN General Assembly, and it was after I'd become an

18   international consultant to the CEFC.  I remember that at some

19   point Dr. Ho briefed me that there were some difficulties, that

20   they ran into difficulties when it comes to mutual

21   understanding, and he asked me if I could kindly help improve

22   that relationship which at the time had stalled.

23   Q.   And what did you understand the goal to be?  That is, the

24   conversations that were ongoing, what did you understand the

25   purpose, the end goal?

Ibr1ho2                         Jeremic - Direct

1    A.   Now again, if we're talking about the year 2013, I had no

2    idea as to what their relationship -- what kind of relationship

3    they wanted.   I just introduced them to each other.   But in

4    2014, later on, when I became a consultant and Dr. Ho shared

5    with me a little bit more information -- not much, but a little

6    bit more information, indicating that they would love to engage

7    in a JV -- that stands for joint venture, like partnership

8    between two companies, in which the two companies would have

9    shares, both sides would have shares in this common company.

10   Q.   And when you say shares, what do you mean, Mr. Jeremic?

11   A.   I mean equity, I mean ownership of a certain company that

12   would be created by the two sides for the purpose of doing

13   joint business.

14   Q.   Now stepping back for a second, was this business

15   opportunity with respect to PEMEX the only potential

16   opportunity that you and the defendant discussed towards the

17   end of your time as PGA?

18   A.   So there was a second instance that I can recall, and that

19   was towards the very end of my term as president of the UN

20   General Assembly.   I recall another personal friend of mine who

21   was at the time working for a government of a third country,

22   and who asked me if I have any connection to a country or to a

23   company from somewhere in the world that would be interested in

24   purchasing a large potash production, potash mine.

25   Q.   And you just used the word "potash."   Could you spell that.

Ibr1ho2                          Jeremic - Direct

1   A.   Potash is spelled like P-O-T-A-S-H.   It stands for anything

2   that contains mineral called potassium, which is a crucial

3   mineral for producing fertilizer and many other derivatives

4   that are key to industrial development and potash production.

5   Since it has a big role in fertilizer and industrial

6   development, facilitating potash is one of the goals --

7   facilitating industries that as their result can have the

8   killing of the world hunger, was one of the priorities of the

9   United Nations.   Therefore, a friend approached me if I knew

10  anybody who might be interested and big enough, in terms of

11  financial capacity, to engage in a project of that size, and I

12  recommended to him that they get in touch with the CEFC, the

13  company.

14  Q.   And did you have an opportunity to speak with the defendant

15  about that potential mine, I think you said it was?

16  A.   Yes, sir, I did.

17  Q.   How, if at all --

18  A.   I don't think it was -- just to clarify myself, I don't

19  think it was just a mine.   I think it was the entire facility.

20  It was the entire production line for potash.

21  Q.   Let me ask the question again then.

22           Did you have an opportunity to speak with the

23  defendant about that potential opportunity, that business

24  opportunity?

25  A.   I did, sir.

```
 1   Q.  How, if at all, did he react?

 2   A.  To my best recollection, he said that they would be

 3   interested -- "they" referring to the CEFC company.

 4            MR. RICHENTHAL:  Your Honor, at this time I'd like to

 5   offer stipulation S-10.

 6            THE COURT:  Fact or testimony?

 7            MR. RICHENTHAL:  It's testimony, your Honor.

 8            THE COURT:  All right.  Same thing, ladies and

 9   gentlemen.  This is evidence for your consideration, and you

10   must accept the fact that the testimony would be given.

11            Sir?

12            MR. RICHENTHAL:  The stipulation is entitled

13   Stipulation as to Materials Obtained from Google, Microsoft,

14   Yahoo, AOL, and GoDaddy.

15            And Ms. Rao, are you able to put page 3 on

16   Mr. Jeremic's screen and blow up the fourth email address,

17   please.

18   BY MR. RICHENTHAL:

19   Q.  Mr. Jeremic, do you recognize the email address there?

20   A.  I do, sir.

21   Q.  Whose is it?

22   A.  It is my email.

23   Q.  Did you use that email address to communicate with the

24   defendant?

25   A.  I did.
```

1          MR. RICHENTHAL:  You can take that down, Ms. Rao.

2          Now, Ms. Rao, can you now put on Mr. Jeremic's screen

3     what's been marked for identification as Government

4     Exhibit 2730R.

5     Q.  And Mr. Jeremic, there should be a set of the same

6     materials to your left that is in hard copy, but you're welcome

7     to use the screen.

8          Do you recognize this on your screen now?

9     A.  I do, sir.

10    Q.  What is that, Mr. Jeremic?

11    A.  That is an email.

12    Q.  An email between whom?

13    A.  This is an email between Dr. Ho and myself.

14         MR. RICHENTHAL:  The government offers 2730R.

15         MR. KIM:  No objection, your Honor.

16         THE COURT:  Received.

17         (Government's Exhibit 2730R received in evidence)

18         MR. RICHENTHAL:  Ms. Rao, can you now put that on the

19    public screen.

20    BY MR. RICHENTHAL:

21    Q.  So first, Mr. Jeremic, if you could look at the second line

22    that is the To line.

23    A.  Mm-hmm.

24    Q.  Do you see your name there?

25    A.  Yes, sir.

Ibr1ho2                      Jeremic - Direct

1   Q.  Now do you see after your name it's been redacted, that

2   it's a black box?

3   A.  Mm-hmm.

4   Q.  Prior to testifying today, did you see this email without

5   the black box?

6   A.  I did.

7   Q.  What's under it?

8   A.  It's the email; it's the body of the email.  You mean under

9   the black box?

10  Q.  Yes.  Yes, sir.  What's under the black box?

11  A.  The black box is my email address.

12  Q.  Now did you always use the same email address in

13  communicating with the defendant?

14  A.  I don't remember it, but like I -- I don't use any other

15  email address, so I guess -- I guess I did.

16  Q.  Was it a personal address, a business address, or both?

17  A.  I use this email for all my communications.

18  Q.  Now if you could look at the top line, do you see the other

19  address, cpho@chinaenergyfund.org?

20  A.  I do, sir.

21  Q.  Do you recognize whose email address that is?

22  A.  That was the email address that Dr. Ho used to communicate

23  with me.

24  Q.  What did you understand China Energy Fund to be?

25  A.  CEFC, but I'm personally not sure if it meant the CEFC NGO

Ibr1ho2                    Jeremic - Direct

1   or the CEFC energy company.

2   Q.  Now this email address, the CP Ho, was this the only email

3   address that the defendant used to communicate with you?

4   A.  I don't remember, sir.  There could have been others.

5   Q.  Do you recall what the others were, if they were?

6   A.  I don't recall by heart.

7   Q.  Please now look at the subject line.  Do you see it says

8   Potash Project?

9   A.  Yes, sir.

10  Q.  What does that refer to?

11  A.  The project that we just discussed recently, like a few

12  minutes ago.

13  Q.  Now if you could look at the email itself.  Do you see it

14  says, "We're in Beijing briefing the top leader on the progress

15  of the project"?

16  A.  Yes, sir.

17  Q.  What did you understand "Beijing" to mean?

18  A.  Superiors to Dr. Patrick Ho.

19  Q.  Please now look a few lines below.  Do you see where it

20  says, "Memorandum or an agreement of intentions and interests"?

21  A.  Yes, sir.

22  Q.  What did you understand that to refer to?

23  A.  That's -- that's a standard word for the initial documents

24  the two parties signed in order to proceed with mutual

25  discussions and how to do business together in the future.

1    Q.  And finally, at the end of the same paragraph, do you see

2    the name of a company?

3    A.  I do, sir.

4    Q.  What is the name of that company?

5    A.  China CEFC Energy Company.

6    Q.  What did you understand that company to be?

7    A.  The company that -- the energy company that we had

8    discussed until now.

9            MR. RICHENTHAL:  Ms. Rao, can you now put another

10   document on Mr. Jeremic's screen, 2713, please.

11   Q.  Mr. Jeremic, do you recognize this?

12   A.  I do, sir.

13   Q.  What is it?

14   A.  It's a chain of emails.

15   Q.  Between whom?

16   A.  Between myself and most likely Dr. Ho.

17   Q.  Well, based on reading the email, do you believe it's with

18   Mr. Ho?

19   A.  Based on the content of the email, I do believe that this

20   is with Dr. Ho.

21           MR. RICHENTHAL:  The government offers 2713R.

22           MR. KIM:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 2713R received in evidence)

25           MR. RICHENTHAL:  Ms. Rao, can you put that on the

Ibr1ho2                         Jeremic – Direct

1   public screen, please.

2   BY MR. RICHENTHAL:

3   Q.  Mr. Jeremic, approximately how long after the email you

4   just saw was this email exchange?

5           MR. RICHENTHAL:  Ms. Rao, you can put them both on the

6   screen, if that would help.

7   A.  I think it was like maybe a few weeks after the previous

8   one.

9   Q.  What's the date of this email, that is, 2713R?

10  A.  It's September 5.

11          MR. RICHENTHAL:  Ms. Rao, you can just keep 2713R on

12  the screen, please.

13  Q.  Now if I could direct your attention to the middle email.

14          MR. RICHENTHAL:  And Ms. Rao, maybe you could blow

15  that up.

16  Q.  Mr. Jeremic, do you see the first line, it says, "Very good

17  news indeed"?

18  A.  Mm-hmm.

19  Q.  And then the middle, it says, "Also very good progress on

20  the potash front"?

21  A.  Yes.

22  Q.  What does that refer to?

23  A.  I understood this that he wanted to tell me that their

24  discussions on potash went well.  My job -- my job -- my

25  goodwill was that I put them together with a friend who I knew

Ibr1ho2                          Jeremic - Direct

and they would proceed in discussing it.  Since I was not part

of these discussions, then I believe that he was -- just wanted

to tell me that these discussions were proceeding in a good

direction.

Q.   And I think you used the term "they" in describing who was

involved in the discussion.  What was your understanding of who

"they" was?

A.   "They" being the CEFC energy company side.

Q.   Now if you could look at the middle of the email.  You see

it says, "I shall report immediately to BJ"?

A.   Yes.

Q.   What did you understand "BJ" to refer to?

A.   "BJ" is a common abbreviation for Beijing.

Q.   And then finally, at the end of that paragraph, could you

read the sentence beginning, "The venue."

A.   Yes, sir.  "The venue shall be our premise at the Trump

Tower."

Q.   What did you understand "premise at the Trump Tower" to

refer to?

A.   I understand that to be the premise that we had discussed

earlier, a few minutes ago, and the Trump Tower building that

is near the United Nations headquarters.

Q.   And in that sentence, the word "our," who is "our," to your

understanding?

A.   I guess this was the CEFC, but whether this was energy

Ibr1ho2                          Jeremic - Direct

1    company or NGO, I can't tell.

2              MR. RICHENTHAL:  Now, Ms. Rao, can you back out of

3    that and go to the first email, please.

4    Q.  Mr. Jeremic, do you see the third sentence, please?

5    A.  I do, sir.

6    Q.  It says, "The team consists of myself, Chan, and some

7    experts in the trade of potash."

8    A.  Yes, sir.

9    Q.  What did you understand the defendant to mean by "the

10   team"?

11   A.  I understand this to be the delegation of the CEFC that

12   would talk to the other side in this -- in this project, potash

13   project, so "the team" refers to the CEFC team that is -- that

14   was my understanding -- that is my understanding of this.

15   Q.  When you say "the CEFC team," you mean the energy company?

16   A.  I do mean the energy company, yes.

17   Q.  Now based on your conversations to date with the defendant,

18   were you surprised or unsurprised that he was a member of the

19   team?

20   A.  I wasn't surprised.

21   Q.  Not surprised?

22   A.  I was not surprised.

23   Q.  Why not?

24   A.  Because he did come across as an integral part of teams

25   that talked to foreign entities or foreign companies when it

1    comes to potential deals for the firm.

2              MR. RICHENTHAL:  You can take that down, Ms. Rao.

3    Q.  I'm going to pause for a second.

4              Approximately when did you leave the UN?

5    A.  I left the UN in September 2013.

6    Q.  Was that around the time of the email that you just

7    testified about?

8    A.  That was days, days within that email.

9    Q.  Did you return to your government, that is, the Serbian

10   government, at that time?

11   A.  No, sir, I did not return to the Serbian government.

12   Q.  Why not?

13   A.  Because after my election as president of the UN General

14   Assembly, almost concurrently with that, there was a change of

15   government in Serbia, and parties other than mine entered

16   government, so I would have been no longer welcome to serve in

17   the government of my country as of middle of 2012.

18   Q.  Did there come a time when you then sought other

19   opportunities?

20   A.  Yes, sir.

21   Q.  Did you talk with the defendant about that?

22   A.  I did, sir.

23   Q.  Did you talk with him about potentially doing work for the

24   energy company?

25   A.  Yes, sir, I did.

1   Q.   How did that come about?

2   A.   Well, my term was coming to close and I was not planning on

3   going back to the government of Serbia, so I remember an

4   occasion, I cannot remember when it was, but it was towards the

5   end of my term, when I talked to the defendant, to Dr. Ho,

6   about whether there is a space for our cooperation after I

7   become a private citizen again.  I told Dr. Ho at that time

8   that before we go any further in terms of discussing it, I

9   would have to make an official application to receive a

10  permission to do this work, because according to Serbia's rules

11  and regulations -- and I come from Serbia, I'm Serbian

12  citizen -- if you served in the government of your country, for

13  a period of two years after you finish with the term in

14  government, for any kind of business, paid or unpaid, you need

15  to apply to receive a special permission from a specialized

16  agency that is called anticorruption agency.

17           So I first of all had to submit formal request that

18  was processed by the agency.  I did submit this request in

19  October of 2013, after I completed my term as president of the

20  UN.  The agency processed this for about a month, and end of

21  November of 2013, I received an official permission from the

22  government agency that I am free to engage in a consultancy

23  relationship, consultancy agreement with the CEFC.

24  Q.   What do you mean by consultancy relationship or consultancy

25  agreement?

Ibr1ho2                        Jeremic - Direct

A.   That means that you become paid consultant for the company.
I'm talking about the energy company.  So we entered a
contractual agreement in which I would give the company
leadership my advice with regard to where the world was going,
about political developments in the world, also opening doors
to various countries and markets in the world, and any kind of
strategic advice that would come from my wealth of experience
and knowledge as having served as foreign minister for many
years and then as president of the United Nations.

Q.   Was that agreement in writing?

A.   Yes, that was a written agreement.

          MR. RICHENTHAL:  Ms. Rao, can you put on Mr. Jeremic's
screen what's been marked for identification as Government
Exhibit 2703.

Q.   Do you recognize that, Mr. Jeremic?

A.   I do, sir.

Q.   What is that?

A.   That is the official consultancy agreement that I signed
with the CEFC, the company.

          MR. RICHENTHAL:  Government offers 2703.

          MR. KIM:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 2703 received in evidence)

          MR. RICHENTHAL:  Ms. Rao, can you put that on the
public screen, please.

Ibr1ho2                           Jeremic - Direct

1              And could you blow up the top.

2       BY MR. RICHENTHAL:

3       Q.   Mr. Jeremic, what is the date of this agreement, according

4       to the first paragraph?

5       A.   November 15, 2013.

6       Q.   Approximately how long after you left the UN was that?

7       A.   It was two months after I left the UN.

8       Q.   Now with whom was this agreement; with whom or what?

9       A.   This agreement was with the CEFC, the energy company.

10      Q.   In sum, what were your duties under the agreement?

11      A.   To give the company leadership advice on geopolitical and

12      geostrategic affairs, to tell them my views on where the world

13      is going in which particular countries, if they had any

14      interest in a certain country, that from my wealth of

15      experience, I give them advice as to what are the politics,

16      what are the economics and so on, so forth of such countries.

17      Q.   How much were you to be paid under the agreement?

18      A.   I was to be paid $333,000 annually.

19      Q.   In what currency?

20      A.   US dollars.

21      Q.   For what period of time was the agreement; that is, what

22      period did it cover?

23      A.   It covered two years, so it was two times the annual salary

24      that I just mentioned.

25      Q.   So each year roughly $333,000?

Ibr1ho2                          Jeremic - Direct

1   A.  Exactly $333,000 for every year.

2            MR. RICHENTHAL:  Now, Ms. Rao, can you go to the

3   second to last page of the exhibit, marked on the lower

4   right-hand corner with the number 805.

5            And maybe blow that up for Mr. Jeremic.

6   Q.  Mr. Jeremic, do you recognize that page?

7   A.  Yes, sir.

8   Q.  What is that?

9   A.  That is the extension of the agreement that was signed on

10  December 2015 that had the actual effect of extending the

11  agreement that we just talked about for another year.

12  Q.  Do you see the name in the lower left-hand corner?

13  A.  I do, sir.

14  Q.  Who do you recognize that to be?

15  A.  I recognize that to be president of the CEFC energy

16  company, Mr. Chan.

17  Q.  Was that one of the individuals you mentioned a few minutes

18  ago --

19  A.  Yes, sir.

20  Q.  -- in connection with one of your meetings in China?

21  A.  Yes.

22            MR. RICHENTHAL:  Could you turn to the next page,

23  please.  That is the last page of the exhibit.

24            And maybe blow the top up.

25  Q.  Mr. Jeremic, do you recognize this page?

1    A.  I do, sir.

2    Q.  What is this?

3    A.  It was the termination of the previous consultancy

4    agreement that we agreed to sign in order to enter another

5    contractual agreement that followed.

6    Q.  And did you in fact enter another agreement?

7    A.  Yes, sir, I did.

8    Q.  Was it for substantially the same terms or different terms

9    from your first agreement?

10   A.  It was for identical terms, in terms of the amount of money

11   and in terms of the obligations.

12   Q.  And was that agreement also thereafter renewed or extended?

13   A.  The following one wasn't because it was only for one year

14   and it was I think prior to the time when these charges in this

15   particular trial were being made.

16   Q.  And the agreement after this one, was that also in writing?

17   A.  All the agreements that I ever had with CEFC were always in

18   writing, signed, and processed adequately.

19          MR. RICHENTHAL:  Ms. Rao, can you show Mr. Jeremic

20   what's been marked for identification as Government

21   Exhibit 2704 and 2705.

22   Q.  So first, is 2704 now on your screen?

23   A.  Yes, sir.

24   Q.  Do you recognize that?

25   A.  I do, sir.

1    Q.  What's that?

2    A.  It's a consulting agreement.

3    Q.  Is that one of the extensions you referred to?

4    A.  Yes, sir.

5           MR. RICHENTHAL:  And now, Ms. Rao, can you put on his

6    screen 2705.

7    Q.  Do you recognize that?

8    A.  I do, sir.

9    Q.  What is that?

10   A.  It's another extension of the agreement.

11          MR. RICHENTHAL:  The government offers 2704 and 2705.

12          MR. KIM:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibits 2704 and 2705 received in

15   evidence)

16   Q.  Now, Mr. Jeremic, a couple of minutes ago I asked you with

17   what entity your first agreement was.  Do you recall that

18   question?

19   A.  I do, sir.

20   Q.  When the agreement was extended, was it with the same

21   entity or entities?

22   A.  No, sir, it was with a different entity.

23   Q.  What was your understanding of why that was?

24   A.  I didn't ask too many questions.  I made the under -- my

25   understanding was that this was one of the companies

affiliated, or related to the CEFC, so from my perspective, it

was just the continuation of the very same agreement, for the

very same terms, for the very same compensation, and it was up

to them to decide which entity would be on their side.

Q.  Now I'm going to ask you some specific questions, but in

general, from the period of the signing of the agreement until

the ending of your relationship, what kinds of work did you do

for the company in China?

A.  I was giving advice, political and geopolitical advice to

the leadership of the company, primarily chairman and the

president of the company -- the aforementioned chairman and the

aforementioned president of the company.  I also opened some

business opportunities with various countries by means of

introducing company executives to the business or political

leadership of various countries.  This is what I was doing

during my years of consultancy work for the CEFC, the company.

Q.  Now in connection with that work, who was your principal

contact with respect to the work prior to at least late 2014?

A.  My primary contact was Dr. Ho.

Q.  How would you communicate, by what method or methods?

A.  We communicated mostly by email, but also we communicated

personally when we met in various occasions, so in the early

part of my contract, in the period that you were referring to

in the -- those contracts that are now government exhibits, I

was talking to Dr. Ho about various market opportunities, but

Ibr1ho2                          Jeremic - Direct

1    then later on, and I believe it was as of 2015, my

2    communication has become more or less exclusively with the

3    president and the chairman of the company, CEFC energy company.

4    Q.  So prior to 2015, when you were communicating with the

5    defendant, whether by email or in person or another method,

6    roughly how frequently did you speak?

7    A.  Regularly, I would say.

8    Q.  I'm going to ask you some questions now about more

9    specific --

10   A.  Sure.

11   Q.  -- things that you did together.

12          So first, without naming the country, did he ask you

13   to assist with respect to any business in East Asia?

14   A.  Yes, sir, he did.

15   Q.  And again, without naming the country, did he ask you to

16   assist with respect to any business in Europe?

17   A.  Yes, sir, he did.

18          THE COURT:  In?  I didn't hear you.

19          MR. RICHENTHAL:  Europe.

20          THE COURT:  Thank you.

21   Q.  Can you give an example, without naming the country, of the

22   kind of business opportunities you discussed in either East

23   Asia or Europe.

24   A.  For example, privatizing of -- or buying large stake in

25   a -- in companies in those countries, large stake in petrol

1    companies, in energy companies in those countries, or

2    acquiring -- acquiring production facility that would -- that

3    would do, again, with the energy.

4    Q.  I think you used the word "petrol."  What is petrol?

5    A.  I meant oil.

6    Q.  Now I asked you about Europe and I asked about East Asia.

7    Again, without naming the country, did he ask you to do any

8    work with respect to business in the Middle East?

9    A.  Yes, sir, he did.

10   Q.  Were you always able to assist with what he requested you

11   to do?

12   A.  Not always, but in many occasions, yes, 'cause I have

13   friendships and connections in all parts of the world.

14   Q.  Now you said all parts of the world.  I asked you several

15   minutes ago about whether you had an understanding of the

16   energy company's interest in expanding.  Do you recall that

17   question?

18   A.  Expanding, yes, sir.

19   Q.  From your conversations with the defendant, did you

20   understand that interest to be expanding only to the parts of

21   the world that I've mentioned or all over the world?

22   A.  I don't think that they had like no-go parts of the world.

23   They -- my understanding was that they wanted to be a truly

24   global company, and they were happy to do businesses in all

25   parts of the world.

Ibr1ho2                              Jeremic - Direct

1   Q.  Did that include the United States?

2   A.  It did.

3        MR. RICHENTHAL:  Ms. Rao, can you put on Mr. Jeremic's

4   screen what's been marked for identification as Government

5   Exhibit 2716R.  That's 2716R.

6   Q.  Do you recognize that, Mr. Jeremic?

7   A.  I do, sir.

8   Q.  What is it?

9   A.  It's an email.

10  Q.  Between whom?

11  A.  It's an email between Dr. Ho and myself.

12       MR. RICHENTHAL:  Government offers 2716R.

13       MR. KIM:  No objection.

14       THE COURT:  Received.

15       (Government's Exhibit 2716R received in evidence)

16       MR. RICHENTHAL:  Ms. Rao, can we start with the bottom

17  email.  Can you put it on the public screen, please.

18  BY MR. RICHENTHAL:

19  Q.  Mr. Jeremic, do you see the second paragraph here?

20  A.  I do, sir.

21  Q.  Do you see the name of an individual, Noel Thompson?

22  A.  I do, sir.

23  Q.  Who was Mr. Thompson?

24  A.  Mr. Thompson was a person who I met during my term in

25  office as President of the General Assembly.  That person was

involved in lobbying for sports activities in the context of

the United Nations.  In particular, I think it was wrestling

that -- it was a sport that he was lobbying for, together with

the Olympic Committee, International Olympic Committee, with

whom the UN General Assembly did work under my leadership.  We

passed a resolution in the United Nations about the -- naming

the International Day of Sports that is now celebrated

everywhere around the world.  And in the context of this

International Day of Sports, I got to meet Mr. Noel Thompson,

who is, if I remember well, one of the executives of the United

States Wrestling Federation.

Q.  If I can just direct your attention, though, to the

relationship between Mr. Thompson and the defendant.

A.  Sure.

Q.  What did you understand Mr. Thompson's interests to be with

respect to the defendant or the energy company?

A.  Mr. Thompson wasn't only a sports executive; he actually

did business -- he had business interests in oil and gas and

other energy businesses.  So I introduced Dr. Ho to Noel

Thompson because both parties were close to world of energy and

they expressed interest in having a relationship between each

other.

Q.  Please now look at the third paragraph.  Do you see where

it says, "It's a very small deal according to your standards,

less $70m"?

1  A.  Yeah.

2  Q.  What were you saying, Mr. Jeremic?

3  A.  I was saying that the deal that Noel Thompson was referring

4  to, I have no recollection right now of what that deal was, but

5  here, what I say in my email, less than $70 million, and

6  referring to the fact that for the standards of the CEFC, in

7  terms of how big deals they were making, a deal of 70 million

8  was not considered amongst the bigger projects that they would

9  look at.

10 Q.  70 million was small?

11 A.  Yes, sir.

12         MR. RICHENTHAL:  Now could you go to the top, Ms. Rao.

13 Q.  Do you see defendant's response, Mr. Jeremic?

14 A.  Yes, sir.

15 Q.  How did he respond to the proposal you passed on from

16 Mr. Thompson?

17 A.  He said that, "Anything related to energy, we are

18 interested."

19 Q.  And based on your conversations with him to date, what did

20 you understand "we" referred to?

21 A.  I meant -- I understood that to mean the CEFC energy

22 company.

23 Q.  Could you read the next two sentences, please.

24 A.  Yes, sir.

25 Q.  Would you read them aloud, please.

Ibr1ho2                        Jeremic - Direct

1   A.   "But from the attached information, this appears to be a

2   venture/development call for capital.  The potential outcome

3   (profits) has to be better defined."

4   Q.   What did you understand him to be saying?

5   A.   Well, I'm not particularly well versed when it comes to

6   business, but he was probably referring that venture call is

7   the call for raising money for certain projects, whereas the

8   CEFC was more interested in strategic investments and not just

9   project financing.

10  Q.   What's the date of this email?

11  A.   That's September 23, 2013.

12  Q.   Do you know whether the defendant and Mr. Thompson spoke

13  directly, that is, without you?

14  A.   I introduced them to each other, and I know that they

15  started to interact directly without myself.

16           MR. RICHENTHAL:   Ms. Rao, can you now put on

17  Mr. Jeremic's screen what's been marked for identification as

18  Government Exhibit 2732R.   2732R.

19  Q.   Mr. Jeremic, do you recognize that?

20  A.   I do, sir.

21  Q.   What is it?

22  A.   It's an email.

23  Q.   Between whom?

24  A.   Between Mr. Thompson and myself.

25  Q.   Does it contain a second email?

1    A.  It does.

2    Q.  Between whom?

3    A.  Between what appears to be Dr. Ho and Noel Thompson.

4             MR. RICHENTHAL:  And the government offers 2732R.

5             MR. KIM:  No objection.

6             THE COURT:  Received.

7             (Government's Exhibit 2732R received in evidence)

8             MR. RICHENTHAL:  Ms. Rao, can you put that on the

9    public screen now.  And could you blow up the bottom of it in

10   doing so, please.  That is the first email.

11   BY MR. RICHENTHAL:

12   Q.  So Mr. Jeremic, looking at the From line, do you see an

13   email address there?

14   A.  I do, sir.

15   Q.  Is that the same email address that you talked about a few

16   minutes ago, that Mr. Ho was using?

17   A.  No, it wasn't.

18   Q.  Does it have the same ending?

19   A.  It does have the same ending, the main ending.

20   Q.  Do you know why, if he did, he chose to use a different

21   email address to Mr. Thompson than the one he had used with

22   you?

23   A.  I have no idea.

24   Q.  Now could you look at the first line, please.

25   A.  Yes, sir.

Ibr1ho2                    Jeremic - Direct

1   Q.  It says, "Noel: thank you for all the leads you are passing

2   this way."

3   A.  Yes.

4   Q.  Had you talked with Mr. Thompson and the defendant about

5   leads?

6   A.  I don't remember talking with -- from this email, it

7   appears that they were actually in direct communication in

8   talking to each other, without myself being involved or

9   knowing.

10  Q.  And could you read the next sentence, please.

11  A.  "We are interested, especially with crude oil/refined

12  product swaps, trades with crude and also petrol and

13  petrochemicals, not to mention the pipeline proposal in

14  Oklahoma, which I have passed to our research team to study in

15  Shanghai."

16  Q.  What did you understand the reference to Shanghai to be?

17  A.  Probably the CEFC company headquarters, because I told you

18  earlier that that was in Shanghai.

19           MR. RICHENTHAL:  Now, Ms. Rao, I'm going to ask you to

20  show Mr. Jeremic a series of emails.

21  Q.  Mr. Jeremic, I'm going to ask you the same question for

22  each:  Do you recognize them?

23  A.  Sure.

24  Q.  They're also to your left in hard copy, all right?

25           So let's start with what's been marked for

1    identification as Government Exhibit 413R.

2              Do you recognize that, Mr. Jeremic?

3    A.  Yes, sir, I do.

4    Q.  What is it?

5    A.  It's an email.

6    Q.  Between whom?

7    A.  Between Dr. Ho and myself.

8    Q.  And next, 2735R.  Same question, Mr. Jeremic:  Do you

9    recognize that?

10   A.  I do, sir.

11   Q.  What is it?

12   A.  Email.

13   Q.  Between whom?

14   A.  Between myself and Dr. Ho, the top one, and -- yes, this

15   is -- well, the bottom one, I suppose it is from Dr. Ho, but I

16   cannot say, because it's in the Chinese letters.

17   Q.  Do you recognize the conversation as one that you had with

18   him?

19   A.  I do recognize the conversation.

20   Q.  Next in the list is 2736R.  Same question:  Do you

21   recognize it?  And if it's an email, who is it with?

22   A.  Same answer.  From Dr. Ho; communication between Dr. Ho and

23   myself.

24   Q.  And finally, 2738R.  Same question:  Do you recognize it?

25   And if it's an email, who is it with?

1   A.  Again, an exchange between Dr. Ho and myself.

2           MR. RICHENTHAL:  The government offers all those

3   exhibits:  413R, 2735R, 2736R, and 2738R.

4           MR. KIM:  No objection.

5           THE COURT:  Received.

6           (Government's Exhibits 413R, 2735R, 2736R, and 2738R

7   received in evidence)

8   BY MR. RICHENTHAL:

9   Q.  So I want to talk about them one at a time, Mr. Jeremic,

10  and again, they are to your left, but I'm going to ask Ms. Rao

11  to use your screen.

12          MR. RICHENTHAL:  Ms. Rao, can you put up the first of

13  those.  It's 413R.  And can you blow up the top part.

14  Q.  Mr. Jeremic, do you recognize the email address at the very

15  top, that is, CP Ho?

16  A.  Yes, sir.

17  Q.  Whose email address is that?

18  A.  I believe this is Dr. Ho's.

19  Q.  And when was this email sent, according to you?

20  A.  It was sent on January 2, 2014.

21  Q.  All right.  Now look at the next paragraph, please.  Do you

22  see where it says, "Thanks for mediating between us and

23  Emilio"?

24  A.  Yes, sir.

25  Q.  Who was Emilio?

1  A.  I believe that Dr. Ho was referring to the director, to the

2  CEO of the aforementioned Mexican oil company, PEMEX.

3  Q.  Could you read the next line, please.

4  A.  "There have been much cross-messages and wrong signals."

5  Q.  What do you understand that to me?

6  A.  I understand that to mean that since I introduced them, I

7  think like months ago at that time, that they went on to -- to

8  talk to each other directly to try and come to an agreement,

9  and they couldn't, that it slowed down at some point and it

10 didn't work out the way they expected.

11 Q.  Did you understand them to still have an interest in coming

12 to an agreement?

13 A.  Yes, sir.

14 Q.  What kind of agreement?

15 A.  An agreement about like how to work together in Mexico, as

16 a Chinese company in Mexico partnering up with the Mexican

17 state company.

18 Q.  Could you now look at the next sentence.  Do you see a

19 reference to Ye's call -- that is Y-E apostrophe S call?

20 A.  Yes, sir.

21 Q.  Who do you understand Ye to refer to?

22 A.  I understand that to be the chairman of the company that we

23 talked about.

24 Q.  And now looking at the next paragraph.  What did you

25 understand the defendant to be saying in this paragraph?

Ibr1ho2                          Jeremic - Direct

1  A.  "The impending visit and cooperation of the major Chinese

2  companies --"

3  Q.  I'm sorry, sir.  You can read it aloud if you like, but

4  just in sum, what did you understand the defendant to be

5  saying?

6  A.  The defendant was trying to say, according to my best

7  understanding, that they really want to do business in Mexico

8  and that while there is interest of other companies from China

9  to do business in Mexico, that the CEFC company was perhaps

10  better placed to do business there because of the fact that

11  they were a private company and that as a private company, they

12  have much more business flexibility than the state-owned

13  Chinese enterprises, which are big and slow and full of

14  bureaucratic burdens.

15  Q.  Now on the same paragraph, do you see an acronym and a

16  series of letters, ICBC?

17  A.  Yes, sir.

18  Q.  What did you understand that to refer to?

19  A.  I understand that to refer to a large Chinese bank.

20  Q.  I'm sorry.  A bank?

21  A.  Large bank, Chinese bank, financial institution.

22  Q.  And do you also see the phrase or acronym MOU?

23  A.  I do, sir.

24  Q.  What is that, Mr. Jeremic?

25  A.  I believe that stands for memorandum of understanding.

Ibr1ho2                        Jeremic - Direct

1    Q.   What's a memorandum of understanding, in this context?

2    A.   Memorandum of understanding is an initial document --

3              THE COURT:  Slowly, slowly.

4              THE WITNESS:  Sorry, your Honor.

5    A.   It's the initial document that the two parties sign and

6    this being like a first step on the way to building a business

7    relationship.

8    Q.   Continuing on in the paragraph, do you see where it says

9    "JV"?

10   A.   Yes, sir.

11   Q.   What did you understand "JV" to refer to?

12   A.   Joint venture.

13   Q.   In this context, what is a joint venture?

14   A.   It's a joint company that the two parties make, in a

15   certain proportion of equity stake that they agree on.

16   Q.   When there's a joint venture between two companies, who

17   gets the profits?

18   A.   Both parties do.

19   Q.   Now a few moments ago I think you referred to the energy

20   company as private.  What did you mean by that?

21   A.   That they are not owned by the state, that they are not a

22   state-owned enterprise.

23   Q.   What is "state owned" in this context, Mr. Jeremic?

24   A.   "State owned" is -- it means that the company -- hundred

25   percent owner of a company is government.

Ibr1ho2                          Jeremic - Direct

1    Q.  Now I'd like you now to look at the next email, 2735R.

2              MR. RICHENTHAL:  Ms. Rao, can you put that one up, and

3    if we could start with the bottom and maybe blow it up a

4    little.

5    Q.  Can you read that, Mr. Jeremic?

6    A.  I do, sir.

7    Q.  When was this email sent?

8    A.  That email was sent on June 12, 2014.

9    Q.  Now do you see the To line, there are two names there?

10   A.  Yes, sir.

11   Q.  Who is the person that isn't you?

12   A.  This seems to be an associate of mine, somebody who works

13   with me in the think tank that I am running.

14   Q.  Could you now read the email, please.

15   A.  Do you want me to read it aloud?

16   Q.  Yes.

17   A.  "Hi, Vuk.  Meeting in Shanghai on June 26.  Please liaise

18   with Chen's office for logistics and details."

19            No. 2.  "Do you have any leads to the UAE?"  That

20   stands for United Arab Emirates.  "For energy and politics.  We

21   are eager."

22            No. 3.  "The last exchange with the sheik was

23   lukewarm.  Can you heat it up."

24            No. 4.  "Losing steam on Mexico."

25            "Attention is now on 2 and 3.  Please see what you can

1    do."

2    Q.  So I'm going to ask you a few questions about that.

3            So first, line 2, where it says, "We are eager," who

4    did you understand "we" to be?

5    A.  I understand this to be CEFC energy company.

6    Q.  And then turning to No. 4, it says, "Losing steam on

7    Mexico."  What did you understand that to be saying?

8    A.  I understand this to be like, again, the relationship, the

9    attempt, the joint efforts to come to an agreement didn't go as

10   well as they expected, and since I was never part of those

11   negotiations or discussions, he's just reporting to me that

12   things are slowing down and implicitly asking for my help.

13   That was my understanding.

14   Q.  And finally, it says, "Attention is now on 2 and 3."  What

15   did you understand him to be asking you to do, if anything?

16   A.  Well, to -- he was just like saying -- my understanding is

17   that he was saying like what were the priorities from his

18   perspective at that moment.

19   Q.  Priorities for whom or what?

20   A.  Again, the CEFC energy company.  That was my understanding,

21   but it could have been for him.  I don't know.

22           MR. RICHENTHAL:  Could we look at the next email in

23   the chain.  That is the response, Ms. Rao.

24   Q.  So Mr. Jeremic, is this your response to that email?

25   A.  Yes, this seems to be my response.

1   Q.  So taking them in order, I'd like to direct your attention

2   to No. 2.

3   A.  Sure.

4   Q.  Do you see that there?

5   A.  I do, sir.

6   Q.  Do you see where it says, "He's an old friend.  I can ask

7   him for the opening for CEFC"?

8   A.  Yes.

9   Q.  What were you saying, Mr. Jeremic?

10  A.  I was saying to Dr. Ho that I have relationships at the

11  highest level of government in the United Arab Emirates and

12  that I would be happy to talk to them in order to put them in

13  touch with the CEFC energy company, presumably interested to do

14  business in that particular country.

15  Q.  And it appears you asked the question next.  Could you read

16  the question, please.

17  A.  "Could you please feed me with what exactly should I ask

18  him for."

19  Q.  What were you asking?

20  A.  Well, I had no clue what exactly would they want to do in

21  terms of business in the UAE, so I asked for clarification in

22  order to be able to approach my good contact in the UAE

23  government.

24  Q.  Do you recall getting clarification?

25  A.  Vaguely, but I don't remember the details.

Ibr1ho2                              Jeremic – Direct

1   Q.  Did the energy company in fact gain business in that

2   country, that is, in UAE, United Arab Emirates?

3   A.  Yes, they did.  At the end of the day, I made an

4   introduction to them and they made a very sizeable deal in the

5   United Arab Emirates.

6   Q.  A deal for what, Mr. Jeremic?

7   A.  It was the acquiring of a stake in the national oil company

8   of Abu Dhabi.

9   Q.  Now I'm going to direct your attention to the first line

10  there.

11  A.  Sure.

12  Q.  Do you see where it says, "Great news.  Thanks.  Damjan is

13  in touch with Kelly"?

14  A.  Yes, sir.

15  Q.  What is that referring to, Mr. Jeremic?

16  A.  First sentence is referring to some good news, which I

17  don't exactly recall what about, and the second sentence refers

18  to our respective assistance being in touch with organizing

19  logistics of the next meeting, I think.

20  Q.  You said "next meeting."  Is that the reference to

21  Shanghai?

22  A.  It looks like that from the email.

23  Q.  And again, what was in Shanghai?

24  A.  Shanghai was company headquarters, the CEFC company

25  headquarters.

Ibr1ho2                          Jeremic - Direct

1   Q.  Finally, if you could look at No. 4, please.

2   A.  Sure.

3   Q.  Again, there's a reference here to Emilio.  What were you

4   talking about here, Mr. Jeremic?

5   A.  Like before, I was referring, and I'm referring now, to the

6   CEO of the Mexican energy company, again, my friend from

7   Harvard.

8   Q.  Do you see in that sentence there's a reference to

9   Blackstone and ICBC?

10  A.  I do.

11  Q.  I asked you a few minutes ago what ICBC was.  What was

12  Blackstone?

13  A.  Blackstone is a huge American private equity firm, a

14  financial firm, like an investment firm that does big dealings,

15  big businesses around the world.

16  Q.  Would you look at the last sentence, please --

17  A.  Yes, sir.

18  Q.  -- in No. 4.  Do you see where it says -- there's numbers?

19  A.  Yes.

20  Q.  What is that talking about?  What are those numbers?

21  A.  He's talking about numbers between 500 million and

22  $800 million, US dollars, so I understand the sentence to mean

23  that the Mexican side is looking into an investment of that

24  particular size, 500 to $800 million, and something to do with

25  infrastructure, because it also says in that particular line.

1           MR. RICHENTHAL:  You can take that down, Ms. Rao.

2    Q.  Now in addition to the defendant asking for your help to do

3    business in certain countries, did you ever pass on potential

4    business opportunities to him?

5    A.  I did.

6    Q.  What kind of opportunities?

7    A.  Anything that sounded of interest to me from anywhere in

8    the world that they might be -- that I thought that they might

9    be interested in acquiring a stake in a company or -- or

10   otherwise.

11   Q.  And you just used the term "they" again.  Who or what are

12   you referring to, Mr. Jeremic?

13   A.  Referring to the CEFC company.

14          MR. RICHENTHAL:  Ms. Rao, can you now put up the next

15   exhibit that was introduced in the series, 2736R, please.

16   Q.  Mr. Jeremic, is that on your screen?

17   A.  Yes, it is.

18          MR. RICHENTHAL:  Ms. Rao, can you start with the

19   bottom email, please.

20   Q.  Mr. Jeremic, when did you send this email?

21   A.  It appears to be sent on the 26th of September 2014.

22   Q.  And what did you advise the defendant in this email?  What

23   did you tell him?

24   A.  I asked him to advise me how to proceed, and I was

25   referring to the solutions related to the supplying of the

Ibr1ho2                          Jeremic - Direct

subsidiary of the CEFC, that is an affiliated company of CEFC,

with the required Russian products that are oil products, oil

derivatives.

            (Continued on next page)

1    BY MR. RICHENTHAL:

2    Q.  Just to pause for one second.  For anyone who might not

3    know, what is a subsidiary in this context?

4    A.  Subsidiary means an affiliated company.

5    Q.  An affiliated company with what?

6    A.  I don't have a very good recollection of that particular

7    discussion, because it never materialized, but I believe it

8    related to a company -- an affiliated company to the CEFC who

9    wanted to purchase some oil.

10   Q.  You said some oil.  Is that the reference to Russian

11   products?

12   A.  Oil or oil derivatives.

13          MR. RICHENTHAL:  Ms. Rao, can you go to the next

14   e-mail in the conversation. and would you blow up the middle.

15   Q.  What did defendant says in response to your inquiry, Mr.

16   Jeremic?

17   A.  This response relates to the technical details of what kind

18   of products and what were the specifications for products in

19   terms of price, in terms of volume, in terms of specifications,

20   in terms of quality and origin of goods.

21   Q.  Do you see the reference to commissions in the final

22   sentence before "thanks"?

23   A.  I do, sir.

24   Q.  What did you understand that to refer to?

25   A.  I understand this to refer to the fact that since this

1   would have been like a trade between two parties, that

2   commissions, meaning profits, are to be made by the two

3   parties, the one that sells and the one that buys.

4           MR. RICHENTHAL:  Go up to the next e-mail in the

5   conversation, Ms. Rao.

6   Q.  How did you respond, Mr. Jeremic?

7   A.  I responded that he would need to give me guidance with

8   regard to commission, with regard to how profit is made,

9   because I had very little experience to how trades are done.

10  My speciality is to give advice as to where the politics are

11  going to a certain country or a certain part of the world, but

12  I'm not that well versed or experienced in how the actual

13  business transactions or trades are being executed, so I asked

14  him to help me better understand that.

15  Q.  Did he respond?

16  A.  I don't remember him responding, but just like I don't

17  remember -- I think we never did this business.

18  Q.  Let's look at the next e-mail.

19          Ms. Rao, could you go to the top of the conversation.

20          Is this the response?

21  A.  I guess it is.

22  Q.  Would you read the first sentence, please.

23  A.  "Since the deal does not involve directly CEFC company, we

24  are acting as free agents going between a supplier and a

25  buyer."

1   Q.  What did you understand him to be saying?

2   A.  He was explaining to me that this particular transaction --

3   this particular trade in certain products -- would not involve

4   CEFC company, so he was suggesting that the profits from the

5   particular transaction would not be made by the company, that

6   it would be made by the two parties that engaged in this kind

7   of trade.

8   Q.  And the two parties here being whom?

9   A.  Being the two of us.

10  Q.  Personally?

11  A.  Personally.

12  Q.  Now, do you see the line beginning "A commission will be"?

13  A.  Yes, sir.

14  Q.  Could you read that sentence and the next sentence, please.

15  A.  It says, "The commission will be 50/50 between J and H

16  gentlemen agreement.  J portion will take care of all interests

17  on J side, and H likewise."

18  Q.  So first who was J?

19  A.  I assume the J is referring to myself, because the first

20  letter of my surname is Jeremic -- my surname Jeremic is J, and

21  I assume that refer H refers to Dr. Ho.

22  Q.  What did you understand gentlemen agreement to mean?

23  A.  I really don't know in this particular context.  I think it

24  says like we split the profit 50/50, but then again I say I

25  never did any business of that sort, I have never done any

1    business of that sort until this day, so I wouldn't be able to

2    give you a good explanation.

3             This certainly has never gone through, or anything of

4    that sort.  I am referring to what I did with the defendant.

5    Q.  Do you see where it says, "J portion will take care of all

6    interests on J's side"?

7    A.  Yes.

8    Q.  What interest, if any, did you understand him to be

9    referring to?

10   A.  I had very little understanding of what he meant by that,

11   and that's probably one of the reasons why this never happened.

12   Q.  Now, was this the only potential opportunity in which you

13   and the defendant discussed getting a commission or a cut of

14   profits personally?

15   A.  According to my best understanding, there were a couple of

16   other occasions, a couple of other opportunities, trade

17   opportunities, when an entity A needed some kind of oil

18   products from an entity B, so that we helped facilitate this

19   trade deal.  But just like this particular one that we're

20   currently looking at, none such proposals have ever come to

21   fruition, because I was simply not very well versed in those

22   kinds of dealings.

23            MR. RICHENTHAL:  Ms. Rao, can you go to the next

24   e-mail in the series, that is 2738R, please, and again can we

25   go down to the bottom.

IBR7HO3                          Jeremic - Direct

1   Q.  Now, Mr. Jeremic, this is an e-mail from you to whom?

2   A.  It looks like it is an e-mail from me to Dr. Ho.

3          MR. RICHENTHAL:  And can you go to the next one in the

4   chain, Ms. Rao.

5   Q.  Do you see the larger paragraph that is the second

6   paragraph, Mr. Jeremic?

7   A.  I do, sir.

8   Q.  So, let me just start with the beginning.  It says LNG?

9   A.  Yes, sir.

10  Q.  What did you understand LNG to mean?

11  A.  My understanding it stands for liquid natural gas.

12  Q.  What is liquid natural gas?

13  A.  It's natural gas that you make into liquid by a certain

14  physical and engineering intervention so that it can be more

15  easily transferred from one place to another place.

16  Q.  So let me just pause for a moment.  You will see there are

17  some black boxes, redactions, on this e-mail, Mr. Jeremic.

18  Prior to testifying today, did you review a version of this

19  e-mail without those boxes?

20  A.  I did.

21  Q.  Now, could you read the first sentence, please.

22  A.  "I'm asking my staff to send you all the pertinent

23  information about nomination for the award.  Thanks for seeing

24  that through."

25  Q.  Now, was that on the same subject as the second paragraph

1   or a different subject?

2   A.  I believe it's on a different subject.

3   Q.  Now, if you look at the second paragraph, please.

4   A.  Yes, sir.

5   Q.  It says, "On LNG from" -- redacted -- "a listed company in

6   Hong Kong which is a subsidiary of CEFC Energy Company, wishes

7   to buy bulks of LNG from" -- redacted -- "more the merrier, and

8   the limit is what" -- redacted -- "will let us buy from them."

9           what did you understand the defendant to be saying,

10  Mr. Jeremic?

11  A.  Like in the previous e-mail we were discussing, a trade

12  between two entities in certain oil products.

13  Q.  And what was your understanding of what "the more the

14  merrier" meant?

15  A.  The more quantity, the more that they're prepared to sell,

16  that there is basically no limit to how much they can buy or

17  they're willing to buy.

18  Q.  Do you see the next sentence where it says, "Please think

19  for a moment of how you and I can secure and protect our

20  interests first in such transactions."  What did you understand

21  the defendant to be saying?

22  A.  Like in the previous e-mail, in the direct trade, when you

23  help facilitate somebody selling something to someone, you have

24  a commission.  That's normal and customary in every trade that

25  you make not only in the oil and gas business but in other

1    businesses.  But then again I was never aware of how one makes

2    such a marginal profit, so that was partly the reason why it

3    didn't happen.

4    Q.  Now, you said you were not aware of how this works in

5    short.

6    A.  Yes.

7    Q.  Based on your conversations with the defendant, did he

8    appear aware?

9    A.  I'm sorry?

10   Q.  Did he appear aware?

11   A.  I don't remember, to be very honest, but the thing I do

12   remember very well is that none of those proposals -- and over

13   the course of our operation we discussed a few -- none of them

14   actually happened.

15   Q.  Do you see the last line, it says, "I can be the

16   preliminary point of contact and engagement."

17         What did you understand the defendant to be saying

18   there?

19   A.  I cannot tell with great precision, but this looks like he

20   wants to be the first person with whom the trade is discussed

21   on the seller side.

22   Q.  And did you pass on what the defendant had told you?

23   A.  I did.

24   Q.  Ms. Rao, can you go to the top, please.

25         Now, without naming names, what did you mean by "I'll

1    brief you as soon as I meet my friend in Istanbul?

2    A.   Probably about whether there is a willingness on the

3    seller's side to sell those kinds of gas products to the

4    company.

5    Q.   That is the LNG?

6    A.   That is the LNG.

7              MR. RICHENTHAL:   And finally, can you just go back to

8    the middle e-mail again, Ms. Rao.

9    Q.   I should have asked you this earlier.  But do you see the

10   reference to CEFC Energy Company?

11   A.   Yes.

12   Q.   What did you understand that be?

13   A.   I understand that to be the energy company that we have

14   been talking about this morning.

15   Q.   I think I asked you about four or five e-mails.  Were these

16   the only e-mails in which you and the defendant talk about a

17   business or potential business opportunities?

18   A.   No, sir.

19   Q.   Changing subjects for a moment.  Did he ever send you or

20   direct your attention to news articles or press releases about

21   the energy company?

22   A.   He did.

23   Q.   What kinds of things?

24   A.   About the company itself, about what they achieved, in

25   which parts of the world, who they managed to meet.  I remember

1    one when the CEFC made it to the Fortune list, and Fortune list

2    is the list of the world's largest companies.  So making it to

3    the Fortune list is an important thing for a company.

4              MR. RICHENTHAL:  Your Honor, this might be a good time

5    for a break both generally and in light of our conversation

6    this morning.

7              THE COURT:  Good.

8              Ladies and gentlemen, we will be taking a break now.

9    Would you follow the normal rules of not discussing the case

10   among yourselves.  Take your notebooks with you into the jury

11   room, please, and we will see you in hopefully five minutes,

12   maybe ten.

13             Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1             (Jury not present)

2             THE COURT:  Counsel, where do you want to discuss your

3    document?

4             MR. RICHENTHAL:  I think that Mr. Jeremic should

5    probably be excused, your Honor, for that discussion.

6             THE COURT:  Sir, you are excused out into the hall.

7             (Witness not present)

8             THE COURT:  Won't you be seated.

9             Counsel?

10            MR. RICHENTHAL:  So, your Honor, the next exhibit that

11   I intended to introduce through Mr. Jeremic -- which I did not

12   do on the list -- is 2739.

13            THE COURT:  Yes, sir.

14            MR. RICHENTHAL:  The version I propose to introduce,

15   2739R, is redacted.  My understanding is that the defendants

16   would like more information be included in two respects.

17            First, the top of the e-mail chain lists an individual

18   that Mr. Jeremic was willing to bring to a dinner with the

19   chairman Mr. Ye.  Our view is that the name of that name of

20   that individual is not relevant and could introduce a political

21   dimension to this case that we don't think is worth dealing

22   with.

23            I don't intend to ask him who the person is or even

24   what the person's role is.  That's not the purpose of this

25   e-mail chain.  That's the first dispute.

1              The second -- as your Honor can see in the redacted

2     version -- we are proposing to start the exchange where the

3     defendant's request to Mr. Jeremic that he try to find a person

4     for this dinner, saying that Mr. Jeremic will be in Washington

5     D.C. and can he find someone.  The purpose of this chain is

6     entirely captured in the unredacted portion.  There is a whole

7     bunch of stuff that happens before that is not on the same

8     subject that introduces, in our judgment, irrelevant or

9     confusing things, and so we simply redacted it.  Our

10    understanding is that defense objects.

11             We inquired this morning as to whether there were

12    specific portions that the defense thought admissible under the

13    rule of completeness, and they responded they just think the

14    entire thing should be in, and we respectfully disagree with

15    that position.

16             THE COURT:  All right.  Who wants to talk about it?

17    Yes, sir.

18             MR. KIM:  Your Honor, stand at the lectern?

19             THE COURT:  Whatever you want, but you have a

20    microphone in front of you.  As long as you use it, it's fine.

21             MR. KIM:  Sure.  So, your Honor, I will start with the

22    second redaction.

23             THE COURT:  Yes, sir.

24             MR. KIM:  So I believe the government's proposal

25    currently cuts off the e-mail that starts at the Bates stamp

1    page 1526, sent at 6:04 a.m.

2              THE COURT:  I'm sorry.  I have an unredacted portion

3    at the top of page 1527.

4              MR. KIM:  Yes, your Honor, I agree with that.  I am

5    sorry I wasn't clear.  So that e-mail I think would be the last

6    e-mail in the proposal.  That e-mail appears to be sent from

7    Dr. Ho, and it references an event on December 9.

8              THE COURT:  Yes, sir.

9              MR. KIM:  It references a lunch on December 8 in D.C.,

10   and then it references prominent and powerful friends.  We

11   think in order to actually understand the context for any of

12   those references you need to see the chain in which Mr. Jeremic

13   appears to be inviting him to an event with a lot of powerful

14   and prominent friends in Washington D.C.

15             Also, by admitting Mr. Jeremic's e-mail, it creates

16   the misimpression I think that Dr. Ho is the one who is

17   initiating the contact in Washington D.C., when I think the

18   opposite is actually true.

19             THE COURT:  With respect to the redacted information,

20   is there anything that, in your view, is required other than to

21   indicate that it was not the defendant who initiated this

22   e-mail chain?

23             MR. KIM:  Well, I think the phrase "prominent and

24   powerful friends," your Honor, I think that's the other flag

25   that went up for us, because I think in order to understand

where that came from you really do need to see that it was in

response to Mr. Jeremic inviting Dr. Ho to this event with a

lot of luminaries.

          MR. RICHENTHAL:  This is an extremely puzzling

argument, because that's literally not what the conversation is

about.  They're talking about an entirely different event.  The

defendant then says out of apparently nowhere I -- the

defendant -- am going to be in Washington D.C. with Ye.  And

then he asks Mr. Jeremic a question to which Mr. Jeremic

responds.  The prior discussion -- which involves a country the

parties have agreed to redact from the e-mails -- involved the

name of people who were not invited to that event, involves a

discussion of Chairman Ye going to a different country, and so

on and so forth, and it literally has nothing to do with the

request that the defendant asked Mr. Jeremic.

          MR. KIM:  But, your Honor, I think it's like an e-mail

chain like any other.  I think the e-mail that Mr. Richenthal

has just pointed to, I agree is not particularly illuminating

on the topic of what is being discussed by Dr. Ho in the e-mail

above.  It's really the e-mail sent by Mr. Jeremic.

          THE COURT:  So, the problem is that I don't understand

what you say is necessary from the redacted material to make

the unredacted material understandable, complete, not

misleading and the like.

          MR. KIM:  Sure, your Honor.  So, in a nutshell, A, I

1    think without the redacted material it appears that out of

2    nowhere Dr. Ho is saying, hey, I'm going to be in Washington

3    D.C., let's meet, let's have this lunch with prominent people.

4              I think the redacted material actually gives the

5    necessary context and understanding that this was triggered by

6    Mr. Jeremic.

7              THE COURT:  OK, that was my first question to you

8    about three paragraphs ago.  Other than the fact that the

9    defendant did not initiate this chain, is there something else

10   in the redacted material that you feel is necessary for

11   completeness to dispel a misimpression or the like?

12             MR. KIM:  And, your Honor, I did not do a good job of

13   explaining the second part, which is the prominent and powerful

14   people or powerful friends of yours.  I think in order to

15   understand the genesis of that reference you need to see that

16   Mr. Jeremic was inviting Dr. Ho to attend an event that was

17   going to be attended by other luminaries in Washington D.C.

18   That's the necessary context.

19             THE COURT:  And you see that in which part of the

20   redacted material?

21             MR. KIM:  I'm not sure your Honor actually has that

22   page maybe.

23             THE COURT:  I have 1525, 26, 27.

24             MR. KIM:  I'm 2528.

25             THE COURT:  Well, does somebody have 1528?

1          MR. RICHENTHAL:  I can give your Honor my copy.

2          THE COURT:  Yes, sir, I promise not to read your

3     notes.

4          MR. RICHENTHAL:  I don't have any, but my handwriting

5     is so horrible.

6          (Pause)

7          I'm prepared to respond to his argument when your

8     Honor is ready.

9          THE COURT:  So, am I correct that the chain begins

10    with the defendant's e-mail at the bottom of 1528 that's dated

11    November 27?

12         MR. KIM:  That's our understanding, your Honor.

13         MR. RICHENTHAL:  We concur, your Honor.

14         THE COURT:  OK.  So it is the defendant who initiated

15    this chain.

16         MR. KIM:  The chain, yes, your Honor, but not the

17    discussion about D.C. or the prominent figure.

18         THE COURT:  OK.  And what about the redacted material

19    is necessary again to dispel any misapprehensions, to complete

20    the thought?  What is necessary here?

21         MR. KIM:  Well, your Honor, I think that the first

22    sort of complete sentence on 528 from Mr. Jeremic begins with

23    "I don't know if you have any plans to visit D.C. next month."

24         THE COURT:  Um-hum.

25         MR. KIM:  So I think that addresses the first part of

1     our concern about initiating specifically with respect to

2     Washington D.C.

3              THE COURT:  Who cares?  I don't understand why we

4     care.

5              MR. KIM:  Your Honor, I think it's more an issue of

6     just properly understanding what the e-mail said.  It's to give

7     context to the e-mails.

8              MR. RICHENTHAL:  Again, this is deeply puzzling.

9     Mr. Ho asks Mr. Jeremic a question, can you bring people to a

10    lunch -- a lunch, by the way, which is an entirely different

11    event from the event discussed earlier in the chain.  And then

12    they talk about who he can bring.  We propose to introduce that

13    entire conversation other than with respect to the other

14    individual we haven't discussed yet.  So, there is literally no

15    context to be added.  I don't see the relevance of the fact

16    that Washington D.C. is mentioned for a different reason.  I

17    can certainly elicit from Mr. Jeremic they had discussed that

18    city previously.  It seems utterly irrelevant.

19             THE COURT:  Anything else?

20             MR. KIM:  No, your Honor.

21             THE COURT:  All right.  I don't see that the material

22    that's been redacted is necessary for completeness, for

23    context, to dispel any misapprehensions or anything of the

24    sort, so I will sustain the redactions.

25             MR. RICHENTHAL:  Is that also with respect to the name

IBR7HO3                        Jeremic - Direct

1    of the individual invited?

2            THE COURT:  We didn't discuss the name of the

3    individual.

4            MR. KIM:  Your Honor, frankly it's less important.  I

5    think we had agreed to certain redactions for reasons unrelated

6    to the trial.  This redaction I don't think falls in that

7    category.  The e-mail immediately above the redacted portion

8    talks about meeting a certain individual.

9            THE COURT:  Yes, sir.

10           MR. KIM:  Your Honor, I think the default is -- we

11   don't intend to really refer to that, frankly.  I just think

12   it's an unnecessary redaction.

13           THE COURT:  OK, but it doesn't sound like we care.

14           MR. KIM:  That's right.

15           THE COURT:  If you don't care, then I guess it can

16   stay redacted.  All right, run out and run back, friends, so

17   that we're ready when the jury is ready.

18           MR. RICHENTHAL:  Sorry, one more thing.

19           I notice that I misspoke.  The first stipulation I

20   mentioned in fact was a fact stipulation.  I think the parties

21   had originally thought it would be a testimonial one.  I called

22   it a fact one.  I think it matters not, but I did want to

23   advise the Court.

24           THE COURT:  All right.  If anyone wants me to say

25   anything about it, you will just let me know.

```
 1              (Recess)

 2              (Jury present)

 3              THE COURT:  Welcome back, ladies and gentlemen.  We

 4    continue with the direct examination of the witness.

 5              Mr. Richenthal.

 6              MR. RICHENTHAL:  Thank you, your Honor.

 7    VUK JEREMIC, resumed.

 8    DIRECT EXAMINATION (Continued)

 9    BY MR. RICHENTHAL:

10    Q.  Welcome back, Mr. Jeremic.

11    A.  Thank you, sir.

12              MR. RICHENTHAL:  Ms. Rao, can you now put on Mr.

13    Jeremic's screen what has been marked for identification as

14    Government Exhibit 2739R.

15    Q.  Mr. Jeremic, is that on your screen?

16    A.  Yes, it is.

17    Q.  I'd like to ask the same questions I've been asking all

18    along.  Do you recognize it?  If it's an e-mail, who is it

19    with?

20    A.  I do recognize these e-mails.  They seem to be between

21    myself and Dr. Ho.

22              MR. RICHENTHAL:  The government offers 2739R.

23              MR. KIM:  No objection.

24              THE COURT:  Received.

25              (Government Exhibit 2739R received in evidence)
```

1                    MR. RICHENTHAL:  Ms. Rao, could you now put on the

2         public screen and go to the beginning e-mail in the

3         conversations.

4                    Can you blow that one up.  Thank you.

5         Q.  All right.  Mr. Jeremic, do you see the first line here

6         where it says, "Hi, Vuk.  I will be in D.C. with Ye Dec 7."

7         A.  I do.

8         Q.  Who did you understand to be Ye to be, Y-e?

9         A.  I understand Ye to be chairman of the CEFC Energy Company.

10        Q.  What if anything did the defendant ask you in this e-mail?

11        A.  He asked me if he would be available for a lunch with him

12        on December 9, and he's asking me if I would be able to bring

13        with me to this luncheon some other people.

14        Q.  And specifically what kind of people?

15        A.  In the defendant's words prominent and powerful friends.

16        Q.  How did you respond, if you did?

17                   Ms. Rao, if you could go to the next e-mail.

18                   You don't need to read it aloud, sir, but in general,

19        what did you respond?  What did you say?

20        A.  I said I'd love to meet with the chairman, but that it was

21        difficult for me to make it logistically to that particular

22        date.

23                   MR. RICHENTHAL:  And can we go to the next part of the

24        conversation, Ms. Rao.

25        Q.  Again, just in short, how did the defendant respond?

1    A.   I think these are just the discussion of the logistics as

2    to where could this take place.

3            MR. RICHENTHAL:   Go to the next part of the

4    conversation, Ms. Rao.   Blow up the e-mail that's November 30,

5    2015 at 10:43 p.m., the bottom of the page ending 1525.

6    Q.   What is the defendant proposing here, Mr. Jeremic?

7    A.   A dinner it looks like.   By reading this e-mail, I suppose

8    it's a dinner.

9    Q.   On a specific date?

10   A.   It seems like the date in question is December 6.

11   Q.   Did he ask you a question?

12   A.   Yeah, he did.

13   Q.   What did he ask you?

14   A.   "How many in your party?"

15   Q.   And how did you respond?   It should be the bottom e-mail on

16   your screen?

17   A.   I said it's short notice for high-level people, because you

18   are talking November 30 -- this exchange happened on November

19   30, and we were talking about December 6, so we're talking only

20   a week, and my suggestion here was that it's kind of hard to

21   get people to change their schedules on such a short notice.

22   Q.   And did you ask the defendant anything?

23   A.   I asked the defendant who did he have on his side?

24   Q.   What were you asking?

25   A.   Like who will be joining him for that particular dinner.

1    Q.  And how did he respond?

2    A.  Could you --

3    Q.  Look at the next e-mail.

4    A.  Oh, yeah, he responded by saying that he was considering on

5    their side -- that's he my reading of it -- Ye -- that is

6    chairman of the energy company -- himself, and then mentioning

7    two people Zang and Liu.  I can't really say who they were.

8    Q.  How did he describe that group of people?

9    A.  He described the group of people by the BJ oil team.  BJ

10   referring to Beijing, referring to Beijing.

11   Q.  What did you understand oil team to mean?

12   A.  I have no explanation, but some people to do with oil,

13   people who deal with oil within the conglomerate.  But that's

14   my understanding.  I don't know if it means something else.

15   Q.  I am going to ask you a general question, and then I'm

16   going to switch topics.

17        First a general question.  With respect to the

18   business opportunities that you talked about with defendant,

19   were you always personally involved in resolving negotiations,

20   if they occurred?

21   A.  I was very rarely personally involved, if at any point.

22   Q.  Did he always tell you how they went?

23   A.  No.

24   Q.  Did he sometimes tell you how they went?

25   A.  If he told me, it would have been like a very, very

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

superficial information.  My job as the consultant to the

company was to give strategic advice and to open doors, and I

would not be part of business negotiations.

Q.  So let me now change topics.  Are you familiar with what is

known as the annual UN General Assembly meeting or UNGA?

A.  I am, sir.

Q.  What is that?

A.  That is the annual meeting inside the UN of all the member

states of the UN, but represented at a very high level, meaning

presidents, or prime ministers, or secretaries of state or

foreign ministers.  It happens every September.  It lasts for

about a week and a half, and it happens every year, and that's

commonly known as UNGA week, UNGA week.

Q.  Where does it take place?

A.  At the UN headquarters.

Q.  In Manhattan?

A.  Yes, sir.  That is the week when the traffic is very, very

difficult in that part of town.

        THE COURT:  That's the first thing that came to my

mind.

        MR. RICHENTHAL:  Ms. Rao, can you put up what is

marked for identification as Government Exhibit 2741R, please.

Q.  Mr. Jeremic, same questions as always.  Do you recognize

this, if it's an e-mail, who is it with?

A.  I do, and this seems to be e-mails between Dr. Ho and

1   myself.

2           MR. RICHENTHAL:  The government offers 2741R.

3           MR. KIM:  No objection.

4           THE COURT:  Received.

5           (Government Exhibit 2741R received in evidence)

6   Q.  Let's start with the bottom of the conversation, Ms. Rao,

7   if we could.

8           This is a little cut off on the page.  Mr. Jeremic, if

9   you need to go back up, just tell us.

10          Now, do you see what the defendant wrote to you here?

11  A.  I do.

12  Q.  Before asking you some questions about it --

13          Ms. Rao, could you go up just to show the date, please

14          What is the date of this e-mail, Mr. Jeremic?

15  A.  September 22, 2014.

16  Q.  Do you recall if that was approximately the same time as

17  UNGA, as the General Assembly annual meeting you testified

18  about a moment ago?

19  A.  Yes, sir, that's approximately the time, it's always like

20  the third week of September, or like the last week of

21  September, it depends on the calendar, but that was definitely

22  around that date of UNGA.

23  Q.  What was the subject line of this e-mail?

24  A.  "Hello work" it says.

25          MR. RICHENTHAL:  Ms. Rao, if you can now go to the

1    body of the e-mail please.

2    Q.  So, first it says, "I am tasked with the following

3    missions."  Do you see that?

4    A.  Yes.

5    Q.  What did you understand the defendant to be saying?

6    A.  That these were the things that he wants to pursue, that he

7    wants to do at the request of superiors.  But I can't really

8    say which superiors for this relation.

9    Q.  I would like to now ask you, sir, about the numbered items

10   one at a time.

11           Before I do, Ms. Rao, would you just go to the top

12   again.

13           How does defendant begin this e-mail?  Does he talk

14   about where he is going to be, if anywhere?

15   A.  Yes, he said that he was going to be -- that he was in New

16   York at that time and that he was going to be in New York until

17   October 1.

18   Q.  Now let's go to the numbered items.  So let's go through

19   them one at a time.  First, "Following up with our Mongolian

20   and UAE friends in NY and briefing them on updates."  What was

21   that a reference to, Mr. Jeremic?

22   A.  I believe it was a reference to the high-level officials of

23   those two countries who were at the time attending like

24   high-level officials of all countries of the world during that

25   UNGA week.

1    Q.   Now, this is September 2014; is that right?

2    A.   Yeah.

3    Q.   Prior to this, had you discussed potential business with

4    the energy company in those two countries, Mongolia and UAE?

5    A.   I did, sir.

6    Q.   What kind of business in sum?

7    A.   I don't know about Mongolia.  Mongolia was just opening the

8    door, because I used to be a good friend of the president again

9    from my Harvard days; he was another classmate of mine.  And

10   the UAE, they were interested, as I said earlier, in purchasing

11   a stake in the state oil company of Abu Dhabi.  And when I say

12   they, I refer to the CEFC Energy Company.

13   Q.   Look at number two.  There is a black box there as well, a

14   redaction.  Prior to testifying today, did you review this

15   e-mail in unredacted form?

16   A.   I did.

17   Q.   Without describe what is under the box, what "deal" was

18   this describing.  In sum, what is this line talking about?

19   A.   It's talking about a potential acquisition of a large stake

20   in an energy company in that particular country.

21   Q.   Next is listed number 3 and next is number 4.  I'm going to

22   come back to those in a moment.  If I could direct your

23   attention to number 5, please.  Do you see there it refers to

24   60,000 tons of LNG.  Again, Mr. Jeremic, what is LNG?

25   A.   Like I said before, it stands for liquid natural gas.

1   Q.   Do you see a reference to a word mazut?

2   A.   I do, sir.

3   Q.   What's do you understand that to be?

4   A.   That I believe is called fuel oil in this country, but this

5   is one of the derivatives of oil.

6   Q.   And do you see the name of an individual on the next line,

7   Noel?

8   A.   Yes, sir, I do.

9   Q.   Who does that refer to, Mr. Jeremic?

10  A.   I suppose it refers to the gentleman we discussed earlier

11  named Noel Thompson, but I can't be sure from this.

12  Q.   And what if anything does the defendant ask you to do with

13  respect to Mr. Thompson, or here Noel?

14  A.   I understand this to be one of those attempts at making a

15  direct trade of oil products, the types of which I told you

16  earlier never came to pass with my involvement.

17  Q.   Now go up one line to number 5.  Do you see where it says,

18  "Meet briefly with incoming PGA Kuntesa."  Do you see that?

19  A.   I do.

20  Q.   Who did you refer that?

21  A.   I understand this to be the President of the General

22  Assembly Sam Kutesa.  My reading of this is that it's just a

23  typo.

24  Q.   And if you keep reading the sentence, it says, "Inviting

25  him to Hong Kong to meet Ye."

```
 1   A.  I do.

 2   Q.  Who did you understand Ye to be?

 3   A.  I understand Ye to be chairman of the firm CEFC Energy

 4   Corp.

 5   Q.  Finally now, number 3.  Could you read that aloud, please.

 6   A.  "Find a channel to the President of Chad Republic (direct

 7   or indirect)."

 8   Q.  First, where is the Chad Republic?

 9   A.  It is a country in Africa.

10   Q.  Is it also sometimes just known as Chad?

11   A.  Yes.

12   Q.  Now, had the defendant previously mentioned an interest in

13   the president or leader of the Chad Republic to you?

14   A.  I don't remember if this was the first time or not.

15            MR. RICHENTHAL:  Ms. Rao, tell you what, put on Mr.

16   Jeremic's screen Government Exhibit 200 marked for

17   identification.

18   Q.  Mr. Jeremic, is that on your screen?

19   A.  Yes, it is.

20   Q.  Do you recognize that?

21   A.  I do.

22   Q.  Now, approximately -- is this an e-mail?

23   A.  This is an e-mail, yeah.

24   Q.  Between whom?

25   A.  This is an e-mail seemingly between myself and Dr. Ho.
```

1    Q.  And approximately how long is this e-mail before the e-mail

2    that I just showed you?

3           Ms. Rao, you can put them both on the screen.

4    A.  This one is on the 19th and the 20th of September.  And I

5    don't know the previous one.  If I can see it again.

6    Q.  Ms. Rao is going to make your life easier and put it on the

7    screen.

8    A.  These are about the same days -- no, no, the other one -- I

9    need the other one, the previous one.

10          MR. RICHENTHAL:  Ms. Rao, could you put up 2741R next

11   to 200R, please.

12   A.  So, the one on the left are the e-mails dated 19th and the

13   20th of September, and on the right is the one dated 24th of

14   September of the same year.

15   Q.  Five days apart?

16   A.  Five days apart, yes.

17          MR. RICHENTHAL:  The government offers 200R.

18          MR. KIM:  No objection.

19          THE COURT:  Received.

20          (Government Exhibit 200R received in evidence)

21          MR. RICHENTHAL:  Ms. Rao, can you put 200R on the

22   screen by itself and go to the bottom.

23   Q.  So, Mr. Jeremic, is this the first of the two e-mails in

24   that five day period that you just talked about?

25   A.  It seems to be that this was the first.

```
 1   Q.  What if anything did the defendant say to you in this

 2   e-mail with respect to the Republic of Chad?

 3   A.  Dr. Ho asked me if I knew personally the President of Chad.

 4   Q.  Can you read the next line, please.

 5   A.  "Shanghai has intense interest over there and needs

 6   inputs."

 7   Q.  Again, what did you understand Shanghai to refer to in your

 8   conversations with defendant?

 9   A.  I understand Shanghai to be the company, the CEFC Energy

10   Company, because of the fact because they were headquartered in

11   China.

12   Q.  How did the defendant title this e-mail?  What was the

13   subject line?

14   A.  Urgent request.

15           MR. RICHENTHAL:  Ms. Rao, can you go to the next

16   e-mail in the chain, please.

17   Q.  How did you respond, Mr. Jeremic?

18   A.  I responded to Dr. Ho that I didn't know the President of

19   Chad, that I never met the President of Chad.

20   Q.  And what if anything did you ask the defendant about his

21   interest?

22   A.  I asked the defendant if he could explain to me a little

23   bit more detail as to what it was they were interested in doing

24   in that particular country.

25   Q.  Before I ask you how the defendant responded --
```

```
 1              Can we go back to the first e-mail, Ms. Rao.

 2              Mr. Jeremic, do you see the from line says "head"?

 3  A.  Yes.

 4  Q.  What did you understand that to be?

 5  A.  No idea.

 6  Q.  Let's go back up now, Ms. Rao, to the next e-mail.

 7              Mr. Jeremic, did the defendant ever respond to your

 8  inquiry?

 9  A.  Yes, he did.

10  Q.  What did he say?

11  A.  He said that the company was undertaking some very major

12  take-overs in that country, and which might need the

13  endorsement of the Chief.  Please see if you can find a channel

14  to him."

15  Q.  I'm going to ask you some specific questions about this

16  e-mail.  First, what did you understand the company to be

17  referring to?

18  A.  My reading of this e-mail is that the company referred --

19  the company means CEFC Energy Company.

20  Q.  And do you see where it says "very major takeovers"?

21  A.  Major takeovers refer to big business opportunities, big

22  business deals that involve change of ownership.  Takeover

23  means a change of ownership, ownership going from one party to

24  another.

25  Q.  Finally, the end of this sentence, do you see where it says
```

1    "endorsement of the Chief," capital C?

2    A.   Yeah.

3    Q.   What did you understand the defendant to be referring to by

4    "the Chief"?

5    A.   If you read "the chief" and "please see if you can find a

6    channel to him" -- which is the rest of the e-mail -- I

7    understand this to be Dr. Ho reaching to me who at the time was

8    a consultant, paid consultant to the company, to see if I can

9    find a channel to the President of the Chad Republic, the Chief

10   with a capital C.  That was my reading of this e-mail.

11            MR. RICHENTHAL:  Ms. Rao, can you go down to the first

12   e-mail we started with in this chain.

13   Q.   Mr. Jeremic, when was this e-mail sent, what day?

14   A.   September 19.

15            MR. RICHENTHAL:  And go to the top of the chain now,

16   Ms. Rao.

17   Q.   And when did the defendant provide that response?

18   A.   On the same date, 19th of September.

19   Q.   What if anything did you do to try to find the channel to

20   the President of the Republic of Chad that the defendant had

21   asked you to find?

22   A.   I tried to ask some of the people that I knew from Africa,

23   my former colleagues, foreign ministers.  I tried to reach out

24   to the Foreign Minister of Chad, who I knew but not terribly

25   well, and my initial round of asking wasn't very successful.

```
 1   Then I asked another person who is not from that particular
 2   country, not from Chad but from Senegal.
 3   Q.  What was that person's name?
 4   A.  The person's name was Tidiane Gadio.
 5   Q.  Why did you ask Mr. Gadio?
 6   A.  I asked Mr. Gadio because he was the former Minister of
 7   Foreign Affairs of Senegal who I knew, and he served as the
 8   Foreign Minister of Senegal for many years, so I thought that
 9   he knew presidents of African countries, having served as an
10   African foreign minister for a number of years.
11          MR. RICHENTHAL:  Ms. Rao, would you put back on Mr.
12   Jeremic's screen the prior e-mail that is 2741R, please.
13   Q.  Now, Mr. Jeremic, just to orient you --
14          Ms. Rao, can you go to the bottom of the first page.
15   I'm sorry, the bottom of the next.  Thank you.
16          So, Mr. Jeremic, I asked you some questions about the
17   bottom e-mail.  Do you recall that?
18   A.  Yeah.
19   Q.  I'd like to now direct your attention to above.  How did
20   you respond to the defendant's numbered list with respect to
21   Chad?
22   A.  I said that I was probably going to manage to schedule a
23   meeting with Chad's Foreign Minister.  Then I asked Dr. Ho to
24   provide me with more details as to what would he want me to
25   convey to Chad's Foreign Minister.  According to my best
```

1    understanding, according to my best memory, this meeting never

2    took place.

3    Q.  Now let me just pause there for a second.  Do you see where

4    it says, "Mind you, we're not that close, a common friend is

5    putting us together."

6    A.  Yes.

7    Q.  Who was the common friend?

8    A.  Can't remember, but it was probably some of the Foreign

9    Ministers of Foreign Affairs of Africa.

10   Q.  This is not a reference to Mr. Gadio; is that right?

11   A.  I cannot recall.  I cannot remember.

12   Q.  Let's look at the next e-mail in the conversation.

13         Looking at the defendant's response for the moment.

14   Do you see where it says "the Chad connection"?

15   A.  Yeah.

16         MR. RICHENTHAL:  Ms. Rao, can you put just that

17   paragraph alone up on the screen, please.  I'm sorry, just the

18   paragraph that begins "the Chad connection".  Great.

19   Q.  Mr. Jeremic, can you read this paragraph.

20   A.  "The Chad connection is important."

21   Q.  Can you start with "The Chad connection is important" and

22   end with "please see what you can help".

23   A.  "China National Oil has a major project there about to be

24   sold to CEFC China Energy company.  But China oil has gotten

25   into a bind with local government requiring them to pay a big

1    fine.  We were given to understand that only the very powerful

2    president himself can mediate the deal.  Shanghai is quite

3    desperate about finding a direct channel to the Big Man

4    himself.  Please see what you can help."

5    Q.  So, Mr. Jeremic, we're about to break for lunch.  I want to

6    ask you some specific questions, and then we will take a break.

7          So, first, "CEFC China Energy Co," what was that a

8    reference to?

9    A.  I believe this was a reference to the energy company.

10   Q.  And, second, where it says, "Only the very powerful

11   president himself can mediate this deal."  Who did you

12   understand the defendant to be talking about?

13   A.  My understanding was that he was talking about the

14   President of the Chad Republic.

15   Q.  And finally, it says "Shanghai is quite desperate about

16   finding a direct channel to the Big Man himself."

17          Again, what did you understand Shanghai to be?

18   A.  I understand Shanghai to be the energy company."

19          MR. RICHENTHAL:  It's just about one o'clock, your

20   Honor.

21          THE COURT:  Ladies and gentlemen, we will take the

22   lunch break now.  Would you be kind enough to observe the

23   normal rules about not discussing the case among yourselves or

24   with anyone else.  Certainly don't do any research about the

25   case.  Leave your notes in the jury room.

```
1              Would you return, please, to be able to start at 2:15.

2   Thank you for your attention today.  At least it's not raining

3   out on you.  Thank you.

4              Ladies and gentlemen, would you remain in the

5   courtroom until you get word that the jurors are down in the

6   elevators, please.

7              Sir, you may step down.

8              (Jury not present)

9              THE COURT:  Counsel, is there anything else on the

10  record?  Thank you, folks.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Jury not present)

 2              MR. RICHENTHAL:  There was a redaction in the e-mail I

 3    just showed that I think was sort of inadvertently not done the

 4    way the parties agreed.  I have just spoken to Mr. Rosenberg,

 5    and I think we're just going to swap the exhibit in.

 6              THE COURT:  OK, whatever you like.  Thank you,

 7    counsel.  And thank you for staying in until you get the word.

 8    Ms. Belmont will tell you when the jurors are down.  Thank you,

 9    friends.

10              (Luncheon recess)

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ibr1ho4                          Jeremic – Direct

1                          AFTERNOON SESSION

2                               2:20 p.m.

3            (In open court; jury not present)

4            THE COURT:  Good afternoon, ladies and gentlemen.  I

5    think we're still waiting for a juror.  You can be seated.

6            We can have the witness come in, if you want.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   (Jury present)

2                   THE COURT:  We continue now with the direct

3       examination of the witness.

4                   Mr. Richenthal.

5       BY MR. RICHENTHAL:

6       Q.  Good afternoon, Mr. Jeremic.

7       A.  Good afternoon.

8                   MR. RICHENTHAL:  Ms. Rao, could we put back up

9       Government Exhibit 2741R, which I believe is where we left off.

10                  Could you go to the middle, please.  Actually, I'm

11      sorry.  Could you go up a little.

12                  Thanks.

13      Q.  So Mr. Jeremic, before we broke for lunch, I had asked you

14      some questions about the middle email on this page.  Do you

15      recall those?

16      A.  I do, sir.

17      Q.  And about halfway through it says, "Please see what you can

18      do to help."  Do you see that?

19      A.  I do.

20      Q.  Did you in fact do something to try to help?

21      A.  I did.

22      Q.  What did you do?

23      A.  I reached out to Mr. Gadio, who we mentioned before, former

24      Senegalese foreign minister with extensive web of connections

25      in Africa, and asked him if he knew president of Chad, who is

1   being referred to in this email.

2               MR. RICHENTHAL:  Ms. Rao, can you go to the top email

3   in the conversation, please.

4               Let's stop there.

5   Q.  Mr. Jeremic, do you see your response to the defendant's

6   email, beginning, "When can you meet"?

7   A.  Yes.

8   Q.  Could you read it, please.

9   A.  "When can you meet with my African connection for Chad?

10  He's a good friend of the president.  He's here until Saturday

11  morning."

12  Q.  To whom were you referring, Mr. Jeremic?

13  A.  I believe that I was referring to Mr. Gadio, and the reason

14  why I say I believe was that I was -- those days I was like

15  trying to find a connection, and I believe that I referred in

16  this one email -- I actually referred to Dr. Gadio, who ended

17  up being that connection.

18  Q.  Now do you know whether the defendant and Mr. Gadio in fact

19  met?

20  A.  I know that they got together, but I have no exact memory

21  or recollection when exactly did they meet.

22              MR. RICHENTHAL:  You can take that off the screen,

23  Ms. Rao.

24  Q.  Do you know, if they met, what they talked about?

25  A.  The idea was to get a channel through to the president of

1    the Chad Republic, as mentioned in those emails, so that would

2    have been the topic of the conversation.

3    Q.  I'm going to ask you some more questions about this period

4    of time in a moment, but did you learn one way or another prior

5    to this case being brought whether the defendant had ever

6    traveled to Chad?

7    A.  I didn't find out whether they made -- whether the

8    defendant, Dr. Ho, made this trip or not.

9    Q.  Did you ever attempt, either by contacting the defendant or

10   contacting Mr. Gadio, to learn how their relationship

11   progressed, if it did?

12   A.  I did try to find out.

13   Q.  What did you do?

14   A.  I was reaching out by email to both, on one or more

15   occasions, I don't exactly remember, just to ask them how did

16   things go, whether they made any progress and so on and so

17   forth.

18   Q.  Did either of them respond?

19   A.  I never received any information that would bring to my

20   knowledge the fact that they actually ended up traveling there.

21   Q.  Do you know why neither of them responded?

22   A.  I have no explanation for that, but neither -- neither of

23   them responded to me what happened.

24        MR. RICHENTHAL:  Ms. Rao, could you now put on

25   Mr. Jeremic's screen what's been marked for identification as

Ibr1ho4                          Jeremic - Direct

1    1502, please.

2    Q.  Is that on your screen, Mr. Jeremic?

3    A.  Not on this screen.

4           Now it is.

5    Q.  Okay.  Do you recognize what's on your screen?

6    A.  I do.

7    Q.  What is it?

8    A.  It's a picture, a photo.

9    Q.  A photograph of whom?

10   A.  A photograph of Tidiane, Dr. Tidiane Gadio.

11          MR. RICHENTHAL:  The government offers 1502 and also

12   1502A and B.

13          MR. KIM:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibits 1502, 1502A, 1502B received in

16   evidence)

17          MR. RICHENTHAL:  Could you put that up briefly,

18   Ms. Rao, on the public screen.

19          You can take that down now.  Thank you.

20   BY MR. RICHENTHAL:

21   Q.  Mr. Jeremic, I now want to move from Chad to another

22   subject.

23          MR. RICHENTHAL:  Ms. Rao, can we go back to Government

24   Exhibit 2741R and go down to the bottom email.

25   Q.  Mr. Jeremic, I asked you before the lunch break about Item

1    No. 4.  Do you recall that?

2    A.  Yes, I do recall this email.

3    Q.  And again, who did you understand PGA Kutesa to be?

4    A.  I understood PGA "Kentusa," as written here, to be PGA

5    Kutesa, with a typo, the 67th president of the UN General

6    Assembly.

7    Q.  Was this the first time that the defendant had expressed an

8    interest in meeting Mr. Kutesa?

9    A.  I don't remember if this was the first time or not.

10              MR. RICHENTHAL:  Ms. Rao, can you put on Mr. Jeremic's

11   screen what's been marked for identification as Government

12   Exhibit 2714R, please.

13   Q.  Is that on your screen, Mr. Jeremic?

14   A.  Yes, it is.

15   Q.  Same questions that I've typically asked you.  Do you

16   recognize what it is, and if it's an email, who is it with?

17   A.  It's an email from certain -- it's an email from certain

18   Anna Wong sent to me.

19   Q.  And whom did you understand Ms. Wong to be?

20   A.  I don't remember Anna Wong, but from the signature in this

21   email, I can read that this was supposedly secretary to Dr. Ho.

22              MR. RICHENTHAL:  The government offers 2714R.

23              MR. KIM:  No objection.

24              THE COURT:  Received.

25              (Government's Exhibit 2714R received in evidence)

Ibr1ho4                          Jeremic - Direct

1                MR. RICHENTHAL:  Put that on the public screen,

2    Ms. Rao.

3                And can we blow up the header and then the body of the

4    email, please.

5    BY MR. RICHENTHAL:

6    Q.  So first, Mr. Jeremic, I just asked about Ms. Wong.  If you

7    could look at the cc line.  Do you see where it says

8    head@chinaenergyfund?

9    A.  Yes.

10   Q.  And do you see the next one, Y Zhang?

11   A.  I do.

12   Q.  I believe I asked you before the lunch break about head.

13   Do you know who Y Zhang was?

14   A.  I don't know.

15   Q.  Now looking at the body of the email itself, first, what

16   was the date of this email?

17   A.  The date is 16th of September 2014.

18   Q.  Is that in the same time period as the emails you've been

19   talking about with respect to that annual UNGA meeting?

20   A.  Yes, it's a little before UNGA, maybe a week before UNGA

21   starts.

22   Q.  Now if you could read the first two sentences, please.

23   A.  "Dear Mr. Jeremic, Dr. Patrick Ho will be in New York from

24   September 21 to October 1.  He would appreciate your kind

25   coordination in order to meet with several parties listed

Ibr1ho4                         Jeremic – Direct

1    below."

2    Q.   Now the first numbered item, it says, "You and your friends

3    (especially the ones from Mongolia and the one from the UAE and

4    Kuwait)," do you see that?

5    A.   I do.

6    Q.   What do you understand that to be a reference to?

7    A.   That relates, in my opinion, to the high-level

8    representatives and officials from those three countries that

9    are mentioned in the line.

10   Q.   I'd asked before the break about whether the energy company

11   had expressed an interest in doing business in Mongolia and

12   UAE.   Same question with respect to Kuwait.   Had the energy

13   company, through the defendant, expressed an interest in doing

14   business in Kuwait?

15   A.   They did.

16   Q.   What kind of business?

17   A.   Energy business.

18   Q.   Now the second line, it says, "The new PGA Mr. Kutesa."   Do

19   you see that?

20   A.   I do.

21   Q.   And then finally, below that, it says, "It would be

22   grateful if you could help to contact and make appointments."

23   Do you see that, Mr. Jeremic?

24   A.   I do.

25   Q.   Did you in fact attempt to make such appointments?

Ibr1ho4                        Jeremic – Direct

1    A.  I did attempt to make such appointments.

2    Q.  What did you do?

3    A.  Reaching out to the people in question, since those were

4    the people who I knew relatively well from different -- and in

5    different ways -- some of them were my Harvard classmates, some

6    of them were my former colleagues, and some of them were the

7    people I met otherwise -- reaching out and asking if they would

8    be prepared to meet with Dr. Ho.

9    Q.  Now with respect to Mr. Kutesa in particular, did you

10   attempt to set up a meeting with him?

11   A.  Yes, I did.

12   Q.  Were you successful?

13   A.  To my best recollection, I was successful in helping them

14   get together, but I was not present in that particular getting

15   together, the actual meeting between the two of them.

16          MR. RICHENTHAL:  Please, Ms. Rao, could you put up

17   what's been marked for identification as Government

18   Exhibit 254.

19   Q.  Mr. Jeremic, is that now on your screen?

20   A.  Yes, it is.

21   Q.  Do you recognize this?

22   A.  I do.

23   Q.  What is it?

24   A.  This is an email.

25   Q.  With whom?

Ibr1ho4                      Jeremic - Direct

1   A.  It's the email with -- looks like it is an email with

2   Patrick Ho.

3              MR. RICHENTHAL:  The government offers 254.

4              MR. KIM:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 254 received in evidence)

7   Q.  Now before I ask you about the email itself --

8              MR. RICHENTHAL:  Ms. Rao, could you blow up the

9   header, the To and the From, please.

10  Q.  Mr. Jeremic, the To line, is this one that you previously

11  testified about today?

12  A.  In the line To?

13  Q.  The hocpatrick@gmail, do you recognize that, Mr. Jeremic?

14  A.  I can read it now, but my recollection from this morning

15  was that we were discussing other email addresses other than

16  this.

17  Q.  Do you know why the defendant chose to use this email

18  address, if he did, to communicate on this subject?

19  A.  Unfortunately not.

20  Q.  Let's now look at the email itself.

21             Now, Mr. Jeremic, who wrote this email?

22  A.  So this email from HOC Patrick to Vuk Jeremic?

23  Q.  Yes.

24  A.  Well, it -- this email seems to have been written by -- to

25  have been written by Mr. Ho to me and sent to me.

1   Q.   Now do you see the first line, "Just got the LOI"?

2   A.   Yes.

3   Q.   What do you understand LOI to be?

4   A.   I understand LOI to be the letter of intent.

5   Q.   What is a letter of intent?

6   A.   It is when somebody needs some kind of cargo, some kind of

7   product, and writes a letter indicating that one needs

8   something.

9   Q.   Now the same line has some more phrases in it:  LNG; mazut,

10  M-A-Z-U-T; and D2 -- that is capital D and the number 2.

11  A.   Yes.

12  Q.   Taking them one at a time, what did you understand each of

13  these to be?

14  A.   LNG stands for liquid natural gas; mazut stands for fuel

15  oil; and D2 stands for diesel, if I'm not mistaken -- diesel

16  fuel.

17  Q.   What did you understand the defendant to be asking you to

18  do in this email?

19  A.   That he's trying to help somebody purchase these particular

20  products.

21          MR. RICHENTHAL:  Go up from this conversation,

22  Ms. Rao.

23  Q.   Now is this your response, Mr. Jeremic?

24  A.   This seems to be my response, yes.

25  Q.   Now directing your attention to the first two sentences,

1    what were you saying to the defendant there?

2    A.   "Dear Patrick, I passed on your email, and now I'm awaiting

3    the response.  It should be coming quickly, my Russian friends

4    are usually very efficient."

5    Q.   What were you informing him?

6    A.   That I passed on the information, the request for these

7    particular oil products, and I don't have a good memory of that

8    particular offer or this particular request, but this email

9    suggests to me, refreshes my memory in a way that I think that

10   it was Russia as a producer of oil, Russia as a producer of oil

11   products that came to my mind as a potential source for this

12   transaction.

13   Q.   Now looking at the second paragraph, begins, "Sam Kutesa."

14   A.   Yeah.

15   Q.   Could you read that paragraph, please.

16   A.   "Sam Kutesa just called me in the view of your luncheon

17   today to get some additional information about CEFC."

18   Q.   Could you keep going, Mr. Jeremic.

19   A.   "Be aware that he has extensive personal contacts with

20   China, although he may not be open at this stage about who they

21   are.  Feel free to say that I'll be able to confirm how

22   fruitful the win-win cooperation with CEFC can be.  (I

23   insinuated this to him over the phone)."

24   Q.   Do you recall in fact talking to Mr. Kutesa on the phone?

25   A.   I don't remember -- I don't recall this conversation.

1   Q.   What did you mean by "win-win" in this email?

2   A.   "Win-win" is a typical Chinese expression for mutually

3   beneficial cooperation.  In the Chinese culture, "win-win" is

4   opposite from a zero sum -- "zero sum" meaning that somebody

5   has to win -- somebody has to lose in order for somebody else

6   to win, whereas "win-win," it means like there's a positive

7   outcome for everybody involved.

8   Q.   Now you said everybody involved, but the email refers to

9   CEFC.  What is that?

10  A.   CEFC in that particular email I referred to as -- it could

11  be both energy company and the NGO.  I don't exactly remember

12  this email, but it could mean both.

13  Q.   Now with respect to the energy company, what would a

14  win-win be?

15  A.   With respect to the energy company, win-win would be for a

16  company to go to certain country and make an investment in that

17  country from which both the company and the country would get

18  benefits.

19  Q.   Do you know whether the defendant in fact met with

20  Mr. Kutesa that day, as the email says?

21  A.   I know for a fact that Dr. Ho met Mr. Kutesa, but I don't

22  know when exactly that did take place.

23  Q.   How did you learn they met?

24  A.   If I remember well, Dr. Ho wrote an email to me saying how

25  this meal went between him and Mr. Kutesa.

Ibr1ho4                          Jeremic – Direct

1   Q.  Do you know what they talked about?

2   A.  I don't recall at this stage what they talked about.

3             MR. RICHENTHAL:  Now you can take that down, Ms. Rao.

4   Q.  This is October 2014, is that right, Mr. Jeremic?

5             MR. RICHENTHAL:  You can put it back up if it's

6   helpful.  Ms. Rao -- I'm sorry -- could you put the email back

7   up quickly.

8   A.  Yes.  It's October 10.  Sorry.

9             MR. RICHENTHAL:  You can take that down.  Thank you,

10  Ms. Rao.

11  Q.  Did there come a time after this when you met with

12  Mr. Kutesa yourself?

13  A.  If I remember well, I did meet with Mr. Kutesa to talk to

14  him about many issues, about many things, and one of those

15  issues might well have been the CEFC.

16  Q.  And by the CEFC, you mean the energy company?

17  A.  I mean both energy company and the NGO.

18            MR. RICHENTHAL:  Ms. Rao, can you put on Mr. Jeremic's

19  screen what's been marked for identification as Government

20  Exhibit 2710R.  2710R.

21  Q.  Do you recognize this, Mr. Jeremic?

22  A.  I do.

23  Q.  What is it?

24  A.  This is an email from me, and it seems like this is an

25  email to Dr. Ho.

1              MR. RICHENTHAL:  The government offers 2710R.

2              MR. KIM:  No objection.

3              THE COURT:  Received.

4              (Government's Exhibit 2710R received in evidence)

5              MR. RICHENTHAL:  Ms. Rao, can you put that on the

6      public screen.

7              And could you blow up the first two sentences, please.

8      BY MR. RICHENTHAL:

9      Q.  Mr. Jeremic, this says, "I had dinner with PGA Kutesa

10     tonight in New York.  We went over a long range of issues,

11     including those that are of interest to CEFC."  Do you see

12     that?

13     A.  I do, sir.

14     Q.  What, if anything, do you recall telling Mr. Kutesa about

15     the interest of the energy company?

16     A.  Well, first of all, this CEFC could have been both energy

17     company and the NGO, and according to my best recollection, it

18     was -- it was probably both, so things that are of interest to

19     the CEFC, the energy company, were to make investments and to

20     enter foreign markets, including markets in Africa, and when it

21     comes to the interest of the CEFC, the NGO, it was to engage

22     with the UN and to -- to make the best use out of the

23     consultative status that the NGO had at that time with the UN.

24     Q.  Now I'd like to direct your attention about halfway through

25     the paragraph.  Do you see where it says, "I also asked him

Ibr1ho4                         Jeremic - Direct

1     about Chad"?

2     A.  Yes.

3     Q.  Do you recall why you asked Mr. Kutesa about Chad?

4     A.  I don't have a total recollection, but I'm almost sure that

5     it was because of the rest of the sentence, where it says,

6     "Since we're stalling with Gadio, I assume that we were at that

7     time really stalling and they were stalling with Gadio, that

8     Gadio -- Mr. Gadio did not come back with a connection to Chad,

9     so I asked another foreign minister of Africa -- mind you,

10    Mr. Kutesa kept the position of the Minister of Foreign Affairs

11    of his own country, Uganda, at the time when he served as

12    President of the General Assembly, so if -- if things were

13    stalling, as I say in this email, with Dr. Gadio, I was just

14    like trying to open up another avenue for them how to get

15    through to Chad.

16    Q.  Let me just expand on something you just said.  You

17    referred to Mr. Kutesa having a second position during his time

18    as president?

19    A.  Yes, sir.

20    Q.  Explain what you mean by that.

21    A.  So if you remember, we talked about my term in office.  I

22    was the 67th president of the UN General Assembly, and prior to

23    that I was the Minister of Foreign Affairs of my country.  But

24    before becoming president, before assuming the position of the

25    President of the General Assembly, I was no longer -- I stepped

Ibr1ho4                         Jeremic - Direct

1    down from the position of the Minister of Foreign Affairs, but

2    that doesn't have to be that way.  You get to be elected

3    President of the General Assembly, but you can carry on with

4    your national position at the same time.

5               So Mr. Kutesa, at the time of his election of

6    President of the General Assembly, was foreign minister of

7    Uganda.  He kept the title of the foreign minister.  He kept

8    the position of the foreign minister of Uganda throughout his

9    one year in office of PGA.

10   Q.  Take that down, Ms. Rao.

11              Do you know whether the defendant ever traveled to

12   Uganda?

13   A.  I have no knowledge of that.

14   Q.  Do you know whether anyone from the energy company ever

15   traveled to Uganda?

16   A.  I have no knowledge of that.

17   Q.  Changing subjects.

18              Separate from your compensation as a consultant which

19   we talked about before lunch, did you ever ask the defendant to

20   pay or arrange for payment to any other organization or

21   organizations?

22   A.  I remember one occasion when I did.

23   Q.  Actually, let me back up.

24              You said, sir, that you run a think tank, is that

25   right?

1   A.  Oh, yeah.

2   Q.  Did you ever ask him to pay your think tank?

3   A.  So basically, I'm -- I started a think tank after the end

4   of my term as President of the UN General Assembly.  That ended

5   in September 2013, and I started an international think tank

6   based in Belgrade, headquartered in Belgrade, called Center for

7   International Relations and Sustainable Development, and it was

8   launched in November 2013.  It consisted of a number of

9   prominent individuals from all around the world, and at some

10  point during, if I'm not mistaken, the following year, 2014,

11  after we already started out doing very interesting things all

12  around the world, I did raise with the CEFC a possibility of

13  they -- them supporting the think tank.  When I say I raised

14  with them for them to support, I don't have exact recollection

15  as to who was my interlocutory in the CEFC, whether it was

16  Dr. Ho or perhaps some of his superiors from the CEFC energy

17  company, but it did end up in them supporting the work of the

18  think tank that I just mentioned.

19  Q.  With what amount of money?

20  A.  If I am not mistaken, that amount of money was $1 million,

21  and there was sometime in the middle of 2014 that this took

22  place, but I do not recall the exact date.

23  Q.  When you say $1 million, in what currency, Mr. Jeremic?

24  A.  Dollars; that is, US dollars.

25  Q.  Was this payment or payments pursuant to a written

1   agreement or an oral agreement?

2   A.  It was always written agreement.  Nothing that I have ever

3   done, not just with them but with anybody else, would have been

4   oral.  It would have always been with a contract and properly

5   processed in my country.

6        MR. RICHENTHAL:  Ms. Rao, would you put on

7   Mr. Jeremic's screen what's been marked for identification as

8   Government Exhibit 2706, please.

9   Q.  Do you recognize this, Mr. Jeremic?

10  A.  I do, sir.

11  Q.  What is it?

12  A.  This is donation agreement between the CEFC Limited and the

13  Center for International Relations and Sustainable Development.

14  Q.  Is this the agreement to which you just referred?

15  A.  It is, sir.

16       MR. RICHENTHAL:  The government offers 2706.

17       MR. KIM:  No objection.

18       THE COURT:  Received.

19       (Government's Exhibit 2706 received in evidence)

20       MR. RICHENTHAL:  Ms. Rao, could you put the top of the

21  first page up on the screen, please.

22       And just -- probably good enough.

23       Could you put it on the public screen as well.

24  BY MR. RICHENTHAL:

25  Q.  Mr. Jeremic, the center on that top line, what is that?

Ibr1ho4                              Jeremic – Direct

1    A.  Center relates to the name of the think tank.

2    Q.  That was your think tank?

3    A.  Yes, exactly.

4    Q.  And the next line has an address and then your name.  Do

5    you see that?

6    A.  I do.

7    Q.  Now with what entity is this agreement?

8    A.  CEFC Limited.

9    Q.  What did you understand that to be?

10   A.  An entity within the realm of CEFC.

11   Q.  CEFC meaning the energy company?

12   A.  Or the think tank.  I wasn't really making the distinction

13   between the two.

14   Q.  And who signed this agreement on behalf of your think tank,

15   Mr. Jeremic?

16          MR. RICHENTHAL:  Go to the last page, Ms. Rao.

17   A.  Going to the last page.

18          Certain Mr. C.O. Lo.

19   Q.  Do you know who that is, or was?

20   A.  I have a recollection that he was engaged with the think

21   tank, with the CEFC NGO, the think tank at the time.

22   Q.  Now this agreement I think you said is from 2014.  Were

23   there other donations, other payments to your think tank in

24   subsequent years -- that is, later years?

25   A.  There were other donations in subsequent years.

1    Q.  Was that also pursuant to a written agreement, or

2    agreement?

3    A.  All of them were pursuant to a written agreement.

4              MR. RICHENTHAL:  Ms. Rao, one at a time, can you put

5    on Mr. Jeremic's screen 2707 through 2709.

6    Q.  So first, 2707, do you recognize this, Mr. Jeremic?

7    A.  I do, sir.

8    Q.  What is it?

9    A.  It's another donation agreement.

10   Q.  Meaning one later than the one that you testified about a

11   few moments ago?

12   A.  Yes, sir.

13   Q.  And now 2708, do you recognize this, Mr. Jeremic?

14   A.  I do, sir.

15   Q.  What is this?

16   A.  It's yet another donation agreement at a subsequent year.

17   Q.  And finally, 2709.

18   A.  I do recognize this, and this is yet another donation

19   agreement.

20             MR. RICHENTHAL:  Government offers 2707 through 2709.

21             MR. KIM:  No objection.

22             THE COURT:  Received.

23             (Government's Exhibits 2707, 2708, 2709 received in

24   evidence)

25   Q.  Now, Mr. Jeremic, 2706 was on the screen before and I asked

1    you what entity it was with.  Was the entity for 2707, 2708,

2    and 2709 the same entity or different entity?

3    A.  Those were different entities from the first one you're

4    referring to.

5    Q.  What's your understanding as to why?

6             THE COURT:  Slowly.

7    Q.  What is your understanding as to why?

8    A.  I did not have understanding as to why would they change

9    the entity, but in each and every occasion, it was a result of

10   my agreement with the superiors of Dr. Ho -- that is, chairman

11   and president of CEFC.

12   Q.  When you say "chairman," are you referring to an individual

13   you mentioned before lunch?

14   A.  I do, named Ye.

15   Q.  In total, approximately how much money did CEFC give to

16   your think tank?

17   A.  It would be the adding of these numbers.

18   Q.  Roughly.

19   A.  It was millions of dollars.

20            MR. RICHENTHAL:  You can take that down, Ms. Rao.

21   Q.  Now I asked you earlier I think whether you had talked with

22   the defendant about a different kind of payment or donation.  I

23   want to come back to that now.

24            Did there come a time when you asked the defendant to

25   make a different kind of payment or donation?

1    A.   Yes.

2    Q.   How did that come about?

3    A.   It was a donation that I made -- that I recommended that he

4    makes to a relief disaster fund in my own country, as a matter

5    of fact.  Dr. Ho was visiting Serbia in his capacity as the

6    head of a think tank to speak at a conference that the CIRSD

7    had organized, and I asked him that he considers that the CEFC,

8    be it NGO or energy company, makes a donation to the relief

9    disaster fund of Serbia, because at that time we had the worst

10   floods in the history of our country.  So many companies, many

11   countries, many nongovernmental organizations and international

12   organizations were making donations to this disaster relief

13   fund.

14           MR. RICHENTHAL:  Ms. Rao, can you put on Mr. Jeremic's

15   screen what's been marked for identification as 2742R, please.

16   Q.   Do you recognize this, Mr. Jeremic?

17   A.   I do, sir.

18   Q.   What is this?

19   A.   This is an email.

20   Q.   Between whom?

21   A.   If you refer to the middle, "Dear Patrick," the one that

22   starts, "Dear Patrick," or --

23   Q.   Well, in general, which individuals are talking in this

24   email?

25   A.   It was the -- it was the -- we were -- I was -- I was

1   discussing it with one of my assistants, but I was like

2   forwarding the correspondence between Dr. Ho and myself.

3            MR. RICHENTHAL:  The government offers 2742R.

4            MR. KIM:  No objection.

5            THE COURT:  Received.

6            (Government's Exhibit 2742R received in evidence)

7            MR. RICHENTHAL:  May I have one moment, your Honor.

8            THE COURT:  Yes, sir.

9   BY MR. RICHENTHAL:

10  Q.  Mr. Jeremic, do you see the middle email here?

11  A.  Sorry?

12  Q.  On your screen, do you see an email here in the middle?

13  A.  Yeah.

14  Q.  Is this the request that you were talking about regarding

15  the donation for the disaster?

16  A.  Yes, sir.

17  Q.  Now could you read the middle sentence that is the one

18  beginning, "If the CEFC"?

19  A.  "If the CEFC is in the position to help, it would resonate

20  strongly in Serbia.  Prime minister is thanking all help in

21  excess of $100,000 personally in the media."

22  Q.  Why did you tell the defendant that donations would be

23  announced in the media?

24  A.  Because I wanted Dr. Ho to know that this was going to be

25  the case.

Ibr1ho4                          Jeremic - Cross

1   Q.   Now at this point approximately how long had you known the

2   defendant?

3   A.   This was like a year and a half.

4   Q.   What impression, if any, had you come to understand about

5   whether he cared about how the energy company looked in the

6   media?

7   A.   He -- he preferred the energy company looks better in the

8   media than not.

9   Q.   Did that impression influence you deciding to inform him

10  that donations would be thanked in the media?

11  A.   I mentioned it because it could have influenced him, but it

12  was not necessarily the thing that would make up his mind.

13  Q.   You thought it would help.

14  A.   Sorry?

15  Q.   You thought it would help?

16  A.   From the way that I phrased it, it seems like I thought it

17  would have helped.

18  Q.   How did the defendant respond to your email?

19  A.   "CEFC will donate hundred thousand dollars to Serbia for

20  disaster relief.  I shall announce that at an appropriate time

21  you deem fit when in Belgrade."

22  Q.   Do you know whether the donation in fact was made?

23  A.   I don't know.

24            MR. RICHENTHAL:  No further questions.

25            THE COURT:  Thank you.

1          Cross-examination, counsel.

2                  MR. KIM:  Thank you, your Honor.

3                  THE COURT:  Yes, sir.

4    CROSS-EXAMINATION

5    BY MR. KIM:

6    Q.  Good afternoon, Mr. Jeremic.  How are you?

7    A.  Good afternoon.

8    Q.  Now you were asked a lot of questions by the prosecutor

9    about activities you engaged in with Dr. Ho and the energy

10   company, right?  Including consulting, correct?

11   A.  Yes, sir.

12   Q.  Including making introductions, right?

13   A.  Yes, sir.

14   Q.  Including doing work for commissions, is that right?

15   A.  Not for commissions, sir.

16   Q.  I'm talking about activities that you were asked to engage

17   in with Dr. Ho.

18   A.  Yes.  But we were never talking about commissions.  We were

19   talking about consultancy agreements that were fixed, for a

20   fixed period of time and for a fixed amount of money.

21   Q.  Okay.  Well, is there anything about those activities that

22   concerned you?

23   A.  No.

24                  MR. RICHENTHAL:  Objection, vague.

25                  THE COURT:  I think the witness has answered.

1            And sir, if you hear counsel shout out "Objection,"

2       just hold your answer, please.

3            THE WITNESS:  Thank you, your Honor.

4            THE COURT:  Sir.

5            MR. KIM:  Thank you, your Honor.

6       BY MR. KIM:

7       Q.  Mr. Jeremic, is there anything about those activities that

8       you thought was wrong?

9            MR. RICHENTHAL:  Objection.

10           THE COURT:  Sustained.

11      Q.  Now, Mr. Jeremic, in the activities that we've been talking

12      about, did Dr. Ho ever ask you to do anything you thought was

13      inappropriate?

14      A.  No.

15      Q.  Now you testified that you first learned about CEFC in

16      about November of 2012, is that right?

17      A.  Yes, sir.

18      Q.  At the time you were the President of the General Assembly,

19      or the PGA?

20      A.  Yes, sir.

21      Q.  And you were invited to attend an event sponsored by CEFC

22      at Lincoln Square, right?

23      A.  Yes.

24      Q.  Or Lincoln Center.  I'm sorry.  What was the name of that

25      event again?

Ibr1ho4                          Jeremic - Cross

1   A.  I don't exactly remember the name, but it was something to

2   do with cultures and interaction of world cultures and how the

3   world cultures better talk to each other and better interact.

4   Q.  Fair to say at the time your understanding was that CEFC

5   was a prominent think tank?

6   A.  Yes, it is fair to say that.

7   Q.  And you attended that event and met Dr. Ho there, right?

8   A.  Yes, sir.

9   Q.  Now you eventually learned about CEFC the think tank, CEFC

10  the think tank's relationship with CEFC the energy company,

11  correct?

12  A.  Yes, sir.

13  Q.  Who told you about that relationship?

14  A.  To my best recollection and memory, Dr. Ho did.

15  Q.  And you also learned that CEFC the think tank was sponsored

16  and supported by CEFC the energy company, correct?

17  A.  Yes.

18  Q.  Who told you that?

19  A.  I believe to my best recollection that this was Dr. Ho.

20  Q.  Now while you were still the PGA, you learned that Dr. Ho

21  was working to help CEFC the energy company find business

22  opportunities, correct?

23  A.  Yes, sir.

24  Q.  And Dr. Ho was open with you about the fact that he did

25  work on behalf of the energy company as well?

Ibr1ho4                          Jeremic – Cross

1          MR. RICHENTHAL:  Objection.

2          THE COURT:  Sustained.

3   Q.  Was it your understanding that Dr. Ho was working on behalf

4   of both CEFC the think tank and the energy company?

5   A.  Yes, it was my understanding.

6   Q.  Now during the time you worked with Dr. Ho did you have any

7   concerns about CEFC the energy company's relationship with CEFC

8   the think tank?

9          MR. RICHENTHAL:  Objection.

10          THE COURT:  What are we doing?  Is this a vagueness or

11   what is this?

12          MR. RICHENTHAL:  Vague.

13          THE COURT:  All right.  Sustained.

14   Q.  Did you have any concerns about the relationship between

15   CEFC China the energy company's relationship with CEFC the

16   think tank that caused you to hesitate in any way about working

17   with them?

18          MR. RICHENTHAL:  Same objection, your Honor.

19          THE COURT:  Sustained.

20          MR. KIM:  Now let me ask that we put up Government

21   Exhibit 2713R, which I believe is in evidence.

22          And Mr. Calabrese, if you could, just focus on the

23   bottom of that document, please.

24   BY MR. KIM:

25   Q.  And do you see that first paragraph, Mr. Jeremic?

Ibr1ho4                    Jeremic - Cross

1    A.  I do, sir.

2    Q.  And am I correct this is an email that you sent to Dr. Ho?

3    A.  Yes, this looks like the email that I sent to Dr. Ho.

4    Q.  Now you've mentioned there, "You will have a chance to

5    speak in the first roundtable on September 24."  What was that

6    a reference to?

7    A.  It was happening after my demise from the position of the

8    President of the General Assembly, the 24th of September, the

9    25th of September were the dates in the next session of the

10   General Assembly after I would have already been off duties,

11   but -- but I was discussing the possibility -- I was discussing

12   the schedule with my successor and people who came in my place

13   afterwards.  So this particular -- this particular paragraph

14   refers to a roundtable of sustainable development discussions

15   that would take place in the UNGA high level week in which

16   there was a mix of speakers, some heads of states, some

17   representing nongovernmental entities -- in other words, civil

18   society.  So I was telling Dr. Ho that CEFC at that moment was

19   scheduled to speak, the CEFC the NGO was given an opportunity

20   to speak in that particular session together with the president

21   of Turkey and the President Zuma of South Africa, so I thought

22   it would have been good news, which I was happy to break to

23   Dr. Ho.

24   Q.  I see.  And Mr. Jeremic, I think you mentioned that you

25   were extending this opportunity for CEFC the think tank, is

Ibr1ho4                          Jeremic - Cross

1    that right?

2    A.  Yes, sir.

3    Q.  And I think in the next paragraph that begins, "On the

4    potash front --"

5    A.  Yes.

6    Q.  -- was that an opportunity that was addressed to CEFC the

7    energy company?

8    A.  Yes.  This was the energy company that I was referring to

9    in the second paragraph.

10   Q.  Now during the time you were PGA --

11              MR. KIM:  And you can put that down.

12   Q.  During the time you were PGA, you arranged for Dr. Ho to

13   speak at a number of events, is that right?

14   A.  I don't remember a number of events, but I remember one.

15   Q.  And which was that, the one you were talking about?

16   A.  I remember one event being the interfaith dialogue,

17   dialogue of faith and religion.

18   Q.  I see.  And you invited Dr. Ho to speak at that while you

19   were PGA?

20   A.  Actually, this was not my event.  This was not the event of

21   the president, but the president was participating in it.  But

22   I did work with the people who organized this event, and I made

23   recommendation for Dr. Ho to speak at that event.

24   Q.  And fair to say that Dr. Ho was active around the UN?

25              MR. RICHENTHAL:  Objection.

1          THE COURT:  Sustained.

2    Q.  To your knowledge, Mr. Jeremic, did Dr. Ho attend meetings

3    at the UN?

4    A.  Yes, he did.

5    Q.  Did he speak on panels organized by the UN?

6    A.  Yes, he did.

7    Q.  Now while you were PGA, fair to say that it was common for

8    NGOs or think tanks to reach out to you?

9    A.  Yes, it was.

10   Q.  There's nothing unusual about that?

11   A.  There's absolutely nothing unusual about that.

12   Q.  And in your experience as PGA, NGOs and think tanks wanted

13   to work with PGA, is that right?

14          MR. RICHENTHAL:  Objection.

15          THE COURT:  Sustained.

16          Mr. Kim, I'm going to ask you either to keep your

17   voice up or adjust that microphone a little bit.  You just kind

18   of --

19          MR. KIM:  Sorry, your Honor.  Is that better?

20          THE COURT:  That's better.  Thank you.  Yes, sir.

21   BY MR. KIM:

22   Q.  Now in your experience as PGA, it was common for you to

23   work with NGOs and think tanks, is that right?

24   A.  Yes, it was common.

25   Q.  And you have testified that Dr. Ho reached out to you on

Ibr1ho4                          Jeremic – Cross

1   behalf of the think tank he headed, right?

2   A.  Yes, I did.

3   Q.  Now while you were PGA, Dr. Ho invited you to visit Hong

4   Kong, is that right?

5   A.  Sorry?

6   Q.  While you were PGA, Dr. Ho invited you to visit Hong Kong,

7   correct?

8   A.  Yes, he did.

9   Q.  And you traveled to Hong Kong and visited him, is that

10  right?

11  A.  That was, as I said in my earlier testimony, a part of my

12  official visit to China.

13  Q.  Now I want to actually talk about the office space.

14           I think if you recall, you were shown a photograph.

15           MR. KIM:  If we could have Government Exhibit 1515 put

16  up on the screen, please.

17  Q.  You were asked questions about this building; do you recall

18  that --

19  A.  Yeah.

20  Q.  -- Mr. Jeremic?  Now is that the building in which the CEFC

21  offices were located?

22  A.  My best recollection is that this is how the entrance looks

23  like, leading up to the apartment that we referred to in -- in

24  my previous testimony, in the beginning of my testimony.

25  Q.  I see.  And Mr. Jeremic, you actually went to that

Ibr1ho4                      Jeremic - Cross

1  apartment, correct?

2  A.  I have memory of going there at least once.

3  Q.  And isn't it correct that in your final meeting of the

4  board of advisors when you were PGA, you had that meeting in

5  the apartment --

6  A.  Yes, indeed.  That is the one occurrence that I -- that I

7  remember for sure.

8         MR. KIM:  You can take that down, Mr. Calabrese.

9  Q.  Now you were asked a number of questions about your work in

10  connecting CEFC to the head of PEMEX, P-E-M-E-X, is that right?

11  A.  Yes.

12  Q.  And you were still PGA at that time, correct?

13  A.  Yes.

14  Q.  And you understood that Dr. Ho was speaking on behalf of

15  both CEFC the think tank and the energy company when he talked

16  to you about meeting with the head of PEMEX?

17         MR. RICHENTHAL:  Objection.  Misstates the testimony.

18         MR. KIM:  I'm sorry.  Your Honor, I'll rephrase that.

19         THE COURT:  Yes, sir.

20  BY MR. KIM:

21  Q.  Your understanding, Mr. Jeremic, was that when Dr. Ho

22  talked to you about meeting with the head of PEMEX, he was

23  doing so on behalf of CEFC the energy company, is that right?

24  A.  Yes, sir.

25  Q.  And you eventually arranged for that meeting to happen,

Ibr1ho4                         Jeremic - Cross

1    correct?

2    A.  Yes, sir.

3    Q.  And in your --

4    A.  I initiated this contact because as I said, the head of the

5    energy company of Mexico was a close friend, and I put him in

6    touch with Dr. Ho, so when this meeting took place, I don't

7    know, but I did put them in touch.  There was one time that I

8    was present in the meeting, as I said in my previous testimony,

9    in late March, but for all the subsequent meetings, I don't

10   know if and when they take -- took place.

11   Q.  Now, Mr. Jeremic, I think you were asked a number of

12   questions about the energy company's interest in doing business

13   around the world.  Do you remember that?

14   A.  I do.

15   Q.  And in your experience working with CEFC the energy

16   company, fair to say that you helped look for business

17   opportunities in many different countries?

18   A.  Yes.

19   Q.  And your understanding was that the executives of the

20   energy company were interested in finding business

21   opportunities, is that right?

22   A.  Yes.

23   Q.  And that included building relationships with

24   businesspeople in other countries, is that right?

25   A.  Yes, sir.

Ibr1ho4                              Jeremic - Cross

1    Q.  And some of that work you did resulted in actual deals

2    getting done, right?

3    A.  I remember some of them being successful.

4    Q.  And others didn't result in any deals getting done, is that

5    right?

6    A.  Majority of those resulted in no deals happening because in

7    this -- in that world, there are few attempts that are

8    successful, far fewer attempts that are successful.

9              THE COURT:  Mr. Kim, move the microphone closer to

10   you --

11             MR. KIM:  Sorry, Judge.

12             THE COURT:  -- a little bit.  You're just kind of

13   swallowing the words at the end of the sentence, and it's hard

14   for all of us to hear.

15             MR. KIM:  I'm sorry, Judge.  Is this better?

16             THE COURT:  Yes, so much better.  Thank you.

17   BY MR. KIM:

18   Q.  Now you've talked a little earlier about how you started

19   working with the energy company as a consultant after your term

20   as PGA ended.  Do you recall that?

21   A.  Yes, sir.

22   Q.  And you eventually entered into a contract to provide

23   consulting services, right?

24   A.  Yes, sir.

25   Q.  And you renewed that contract multiple times, correct?

1    A.  Yes, sir.

2    Q.  And in your work as a consultant, your job for the energy

3    company was opening doors, is that right?

4    A.  Amongst other things, yes, opening doors.

5    Q.  And practically speaking, that meant making connections for

6    the energy company, is that right?

7    A.  Yeah, the opening doors -- when I said opening doors, I

8    referred to making connections.

9    Q.  You weren't paid any special bonuses for making these

10   introductions, were you?

11   A.  No.

12   Q.  Now I believe that you were asked by the government about

13   who your primary point of contact was while you were doing this

14   work?

15   A.  Yes, sir.

16   Q.  And your testimony was that prior to late 2014, your

17   primary contact was Dr. Ho, is that right?

18   A.  Yes, sir.

19   Q.  Now did that change over time?

20   A.  It did change over time.

21   Q.  How so?

22   A.  It started by my having a much more frequent interaction

23   with the president and chairman of the energy company.

24   Q.  Now I believe you also testified that you were very rarely

25   involved after making introductions, is that right?

Ibr1ho4                          Jeremic – Cross

1   A.  Yes, that is right.

2   Q.  And that the majority of times you were not told what

3   happened as a result of the introductions you had made, is that

4   right?

5   A.  Yes, that is right.

6   Q.  Do you know, sitting here today, whether or not Dr. Ho knew

7   what the result of those introductions was?

8   A.  No idea.

9          MR. KIM:  If we could please put up Government

10  Exhibit 2738R.  This is in evidence.

11         Okay.  Now, Mr. Calabrese, can you please zoom in on

12  the middle email, please.

13  Q.  Mr. Jeremic, do you see that first line after, "Thanks,

14  Vuk"?

15  A.  Yes.

16  Q.  "I'm asking my staff."  I think you were asked about this

17  line before, but what is your understanding of what the "Award"

18  was?

19  A.  My understanding about this "Award" is –– was that Dr. Ho

20  was talking about the award, that the energy company donated ––

21  the funds for this award were donated by the energy company to

22  the United Nations, and that was the award for sustainable

23  development.  It was like an award for like the sustainable

24  development kind of project of the year that would have been

25  selected by the UN and given to someone and that the CEFC was

Ibr1ho4                         Jeremic – Cross

1    the major donor of that particular award.

2    Q.  Thank you.

3         MR. KIM:  Mr. Calabrese, you can take that down.

4    Q.  Now I want to talk a little bit about the introductions you

5    made with respect to Chad and Uganda that you testified about.

6    A.  Yes, sir.

7    Q.  Now at the time you were trying to -- or you worked to

8    connect PGA Sam Kutesa and the energy company, you understood

9    that the energy company was capable of making large

10   investments, is that right?

11   A.  Yes.

12   Q.  It's fair to say that in your view, that while most Chinese

13   companies worked slowly, CEFC the energy company worked quickly

14   and their interest in projects didn't fizzle out.

15   A.  Yes.

16        MR. RICHENTHAL:  Objection.

17        THE COURT:  Witness answered.

18   Q.  Now I think you've testified that making introductions to

19   officials as you did in Chad and Uganda was consistent with

20   your responsibilities as a consultant for the CEFC energy

21   company, is that right?

22   A.  I must correct you.  I never made an introduction to

23   anybody in Chad.

24   Q.  I'm sorry.  In your testimony you said you made an

25   introduction between Dr. Ho and Dr. Gadio, correct?

Ibr1ho4                          Jeremic – Cross

1    A.  Exactly, who then in turn allegedly made a connection to

2    Chad, but my understanding, my knowledge about whether or not

3    this thing in Chad happened or not is -- is not -- I don't have

4    any knowledge, but I did make an introduction to Dr. Gadio.

5    Q.  And making the introduction between Dr. Ho and Dr. Gadio is

6    something you viewed as consistent with your responsibilities

7    as a consultant for CEFC the energy company?

8    A.  Yes, sir.

9    Q.  Now you were I think asked about a number of questions

10   about Sam Kutesa, and do you recall encouraging Kutesa, when he

11   was PGA, to accept an invitation from CEFC to visit Hong Kong?

12   A.  I do recall that.

13   Q.  And why is it that you encouraged him to accept that

14   invitation?

15   A.  It was because I made a trip to Hong Kong when I was on an

16   official visit to China, and I did have an opportunity to

17   address truly respected crowd of individuals in Hong Kong and

18   talked about the UN agenda, and it was a very useful exchange

19   platform for talking to influential people in an important part

20   of China.

21   Q.  An important part of China, you said?

22   A.  Yes.  Hong Kong is a part of China, a special

23   administrative region within the People's Republic of China.

24   Q.  And Mr. Jeremic, when you went to Hong Kong when you were

25   PGA, fair to say that you saw that as consistent with your work

Ibr1ho4                          Jeremic - Cross

1   as the PGA?

2   A.  Yes, sir.

3   Q.  Now you said that you served as Minister of Foreign Affairs

4   for Serbia, is that right?

5   A.  Yes, sir.

6   Q.  In that capacity did you meet with foreign companies

7   interested in investing in Serbia?

8   A.  I did.  I was meeting with them.

9   Q.  You testified earlier that Mr. Kutesa had not stepped down

10  as Ugandan foreign minister when he assumed his role as PGA,

11  right?

12  A.  I -- yes, that's exactly what I said.

13  Q.  And fair to say that because of that you felt it was

14  appropriate to inform Mr. Kutesa that the energy company could

15  make investments in his country?

16  A.  Yes.  This was amongst other reasons why I thought it

17  was -- it would have been appropriate.

18          MR. KIM:  Your Honor, may I have one moment, please.

19          THE COURT:  Yes, sir.

20  Q.  And you were asked a number of questions about the think

21  tank that you ran and still run, right?

22  A.  Yeah.

23  Q.  And that's called the CIRSD, right?

24  A.  Yes.

25  Q.  Now what are the goals of that think tank?

Ibr1ho4                          Jeremic - Cross

1    A.   The goals --

2              MR. RICHENTHAL:  Objection.

3              MR. KIM:  I think you can answer that question.

4              THE WITNESS:  Was there an objection or --

5              MR. RICHENTHAL:  Yes, your Honor.

6              THE COURT:  I'm so sorry.  I didn't hear you.  You

7    need to shout it out.  Forgive me.

8              Relevancy objection?

9              MR. RICHENTHAL:  It is, your Honor.

10             THE COURT:  Sustained.

11             MR. KIM:  Your Honor, may I refer to a document that's

12   in evidence on this topic?

13             THE COURT:  Sure.  Why don't you confer with

14   Mr. Richenthal off the record.

15             (Counsel conferring)

16             MR. KIM:  Mr. Calabrese, can you please put up

17   Government Exhibit 2706 in evidence.

18             And can you please zoom in on paragraph 1.2, please.

19   BY MR. KIM:

20   Q.   Mr. Jeremic, could you please read that.

21   A.   "The Donor accepts to provide support for the CIRSD

22   activities aimed at fulfilling its goals of strengthening

23   peaceful cooperation, advocating a more open, inclusive,

24   prosperous, and safe international system and promoting

25   sustainable development as the foundation of the new global

1    strategy of the UN's post-2015 agenda.

2                MR. KIM:  Thank you, Mr. Calabrese.  You can put that

3    down.

4    Q.  And your testimony was that CEFC contributed money to this

5    think tank, correct?

6    A.  Yes, sir.

7    Q.  Now while running your think tank, you were also performing

8    consulting work for CEFC the energy company, correct?

9    A.  Yes, sir.

10   Q.  And that was outside of your function as head of CIRSD?

11   A.  Yes, that was -- those were two separate things.

12               MR. KIM:  No further questions, your Honor.

13               THE COURT:  Thank you.

14               Redirect, counsel.

15   REDIRECT EXAMINATION

16   BY MR. RICHENTHAL:

17   Q.  Mr. Jeremic, Mr. Kim asked you several things.  Starting

18   with one briefly, he asked you whether Mr. Ho ever asked you to

19   do anything inappropriate.  Do you recall that question?

20   A.  I do.

21   Q.  Did the defendant ever tell you what, if anything, he did

22   in Chad?

23   A.  No, sir, he never told me.

24   Q.  Did he ever tell you what, if anything, he did in Uganda?

25   A.  He never told me about anything he did in Uganda.

1   Q.   Now I think you testified also on cross-examination that

2   you learned from him that he was doing work for both the NGO

3   and the company, is that right?

4   A.   Yes, sir.

5   Q.   Now did you learn that at a public speech he gave or in

6   something he told you?

7   A.   I remember his public speech he gave.

8   Q.   In those public speeches, did he talk about doing work for

9   a for-profit energy company?

10  A.   I don't recall him talking about the company in those

11  speeches.

12  Q.   That's something he talked about to you but not in

13  speeches, is that right?

14  A.   I did not hear a speech in which he spoke about the

15  company.  I'm not saying that he could not have said it in

16  another speech, but not in the ones that I heard.

17  Q.   Now I think Mr. Kim also asked you at times whether the

18  defendant was working for the NGO or the energy company, and I

19  think you said something like you weren't sure.

20  A.   Yes, I said that.

21  Q.   Wasn't always clear, is that right?

22  A.   Yeah.

23  Q.   Now regardless of whether it was clear whether he was

24  working for the NGO or the energy company or both, did you have

25  any doubt that he was interested in expanding the business of

Ibr1ho4                          Riccardi-Zhu - Direct

1   the energy company?

2   A.  I never had any doubt that this was something that he would

3   love to see happen.

4   Q.  Do you have any doubt that he worked hard to expand the

5   business of the energy company?

6   A.  Depends on how you define the word "hard."

7   Q.  Poor question.

8          Do you have any doubt that he spent time working to

9   expand the business of the energy company?

10  A.  No doubt about that.

11  Q.  Do you have any doubt that when he asked you to connect him

12  with the president of Chad, it was to expand the business of

13  the energy company?

14  A.  I had no doubt about that.

15          MR. RICHENTHAL:  No further questions.

16          THE COURT:  Thank you.  Recross, gentlemen?

17          MR. KIM:  No, your Honor.

18          THE COURT:  Thank you.  You may step down, sir.

19          THE WITNESS:  Thank you, your Honor.

20          THE COURT:  How are you holding up, ladies and

21  gentlemen?  Everyone all right?  Thank you.

22          (Witness excused)

23          THE COURT:  Yes, ma'am.

24          MS. GHOSH:  The government calls David Riccardi Zhu,

25  R-I-C-C-A-R-D-I, Z-H-U.

Ibr1ho4                          Riccardi-Zhu - Direct

1              THE COURT:  Come right on up, sir.

2              (Witness sworn)

3              THE COURT:  Be seated, sir.

4              Ma'am.

5    DAVID WEN RICCARDI-ZHU,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. GHOSH:

10   Q.  Good afternoon, Mr. Riccardi-Zhu.

11   A.  Good afternoon.

12   Q.  How old are you?

13   A.  Thirty-one years old.

14   Q.  Where are you from?

15   A.  I was born in Italy, but I grew up in New York City.

16   Q.  How far did you go in school?

17   A.  I finished law school in the autumn of -- in the spring of

18   2014.

19   Q.  Where did you go to law school?

20   A.  St. John's University in Queens.

21   Q.  What employment did you have before law school?

22   A.  I worked as a house manager in college, and then I was in

23   the Marine Corps Reserves before and through law school.

24              (Continued on next page)

25

Riccardi-Zhu - Direct

BY MS. GHOSH:

Q.   What did you do after graduating law school in 2014?

A.   I was looking for work for a while, and then I came across

a position at CEFC.

Q.   What city were you based in while working for CEFC?

A.   New York City.

Q.   Was the CEFC that you worked for a for-profit or a

not-for-profit company?

A.   Not-for-profit.

Q.   And did you ever hear it referred to as an NGO?

A.   Yes.

Q.   What's an NGO?

A.   Non-governmental organization.

Q.   Are you familiar with any other CEFC entity?

A.   Yes, there is also a for-profit company.

Q.   What is that?

A.   It was I think primarily in investments in fossil fuels,

but they also did business in real estate.  I think they had a

soccer club in eastern Europe, so it was a pretty wide range of

business.

Q.   Where was that company based?

A.   In Shanghai.

Q.   To be clear, I will refer to the one you worked for as the

CEFC NGO and the for-profit CEFC company.

A.   Understood.

Riccardi-Zhu - Direct

1  Q.  Based on your work at the CEFC NGO, what is your

2  understanding of the relationship, if any, between the NGO and

3  the CEFC for-profit company?

4  A.  My understanding is that the company fully funded the NGO.

5  Q.  Approximately when did you begin working for the NGO?

6  A.  I started volunteering there in the fall of 2014, I

7  believe, and then I started working there as a paid employee in

8  the spring of 2015.

9  Q.  And how long did you work for CEFC?

10  A.  I started working -- I worked until the winter of

11  2016-2017.  I started working part-time at that point, so from

12  the spring of 2015 until then I was working full-time, and then

13  I was working part-time from the spring of 2017 to the summer

14  of 2017.

15  Q.  And so you ended your employment there in the summer of

16  2017?

17  A.  Yes, around July.

18  Q.  If I could ask you to bring the microphone a little closer

19  to you.  Thanks.

20          What did you do after leaving CEFC?

21  A.  I went to a software engineering boot camp and then started

22  working as a software engineer.

23  Q.  Are you employed today?

24  A.  Yes.

25  Q.  Where do you work?

Riccardi-Zhu - Direct

1   A.   I work at Good Uncle, a start-up.

2   Q.   Are you working as a software engineer?

3   A.   Yes.

4   Q.   How did you first hear about the CEFC NGO?

5   A.   Through my father, he told me the organization was looking

6   for someone and suggested that I apply.

7   Q.   Where did your father work at the time?

8   A.   At the United Nations.

9   Q.   In terms of getting hired, what happened after your father

10  told you about this opportunity?

11  A.   There was an e-mail exchange with Dr. Ho, and then after

12  that a meeting I believe at the residence in Manhattan.

13  Q.   Did you learn Dr. Ho's full name?

14  A.   Yes.

15  Q.   What is it?

16  A.   Patrick Chi Ping Ho.

17  Q.   Did you meet with Patrick Ho?

18  A.   I did.

19  Q.   Please take a look around the courtroom and let me know if

20  you see him.

21  A.   I do.

22  Q.   Please identify an article of his clothing.

23  A.   He is wearing an a purple jacket.

24          MS. GHOSH:  Your Honor, may the record reflect that

25  the witness has identified the defendant.

Riccardi-Zhu - Direct

1          MR. ROSENBERG:  So stipulated.

2          THE COURT:  Yes.  Thank you, gentlemen.

3  Q.  Mr. Riccardi-Zhu, approximately when did you first meet

4  with the defendant?

5  A.  It was in the autumn of 2014.

6  Q.  Where did that meeting happen?

7  A.  At the residence in I believe in Manhattan.

8  Q.  Was anyone else present at this meeting with the defendant?

9  A.  I believe Mr. Zhang Ya was there is.

10  Q.  Who is Ms. Zhang Ya?

11  A.  She was another employee of the NGO, I believe.  She was to

12  my mind at the beginning working as Dr. Ho's assistant.

13          MS. GHOSH:  Ms. Rao, can you please bring up Exhibit

14  1506 which is already in evidence.

15  Q.  Do you have that on your screen?

16  A.  I do.

17  Q.  Who is that?

18  A.  That's Ms. Zhang.

19          MS. GHOSH:  Your Honor, we now offer 1506B into

20  evidence.

21          THE COURT:  Received.

22          (Government Exhibit 1506B received in evidence)

23  Q.  Mr. Riccardi-Zhu, what was the purpose of this meeting,

24  from your perspective?

25  A.  To see whether I was interested in the work that they were

Riccardi-Zhu - Direct

1   offering and whether I was a good fit for the organization.

2   Q.  How long did the meeting last?

3   A.  I would say approximately about an hour.

4   Q.  Who did most of the talking?

5   A.  Dr. Ho.

6   Q.  During this initial meeting with him, did he speak at all

7   about the CEFC NGO's mission?

8   A.  Yes.

9   Q.  Generally speaking, how did he describe the NGO's mission?

10  A.  It was a very broad mission, it included China/U.S.

11  relations, energy, sustainable transport.

12  Q.  You mentioned China/U.S. relations.  Can you explain what

13  that is?

14  A.  It's international relations between the Chinese -- between

15  China and the United States.

16  Q.  Did the defendant talk at all about the CEFC for-profit

17  company during this first meeting?

18  A.  No.

19  Q.  Did he say anything about how the CEFC NGO was funded?

20  A.  I don't believe at that first meeting.

21  Q.  What did he say his position was at the NGO?

22  A.  Secretary general.

23  Q.  Did he mention anything about whether he had a role at the

24  CEFC company?

25  A.  I don't believe that he did.

Riccardi-Zhu – Direct

1    Q.  After this meeting, did you start doing work for the NGO?

2    A.  Yes.

3    Q.  Now, what did you say the defendant's role was at the NGO?

4    A.  Secretary general.

5    Q.  And was that his position for the entire time you worked

6    there?

7    A.  Yes.

8    Q.  As you understood it, was there anyone more senior than him

9    at the NGO?

10   A.  I believe that the chairman of the for-profit company

11   officially had a higher role than Dr. Ho, but he never executed

12   that role, to my understanding.

13   Q.  When you say the chairman, do you know who that is?

14   A.  Ye Jianming.

15   Q.  Who ran the day-to-day operations of the NGO, as you

16   understood it?

17   A.  Dr. Ho.

18   Q.  Where was the CEFC NGO based?

19   A.  In Hong Kong.

20   Q.  Did it have any offices in the United States?

21   A.  I believe that it did.

22          MS. GHOSH:  Your Honor, I would now like to offer a

23   stipulation between the parties which has been marked as

24   Exhibit S4.

25          THE COURT:  Fact or testimonial?

Riccardi-Zhu - Direct

1          MS. GHOSH:  Fact, your Honor.

2          THE COURT:  OK.

3          This is evidence for your consideration, ladies and

4     gentlemen, and you must accept the agreed-upon facts to be

5     true.

6          Yes, ma'am.

7          (Government Exhibit S4 received in evidence)

8          MS. GHOSH:  Ms. Rao, could you please pull up

9     Government Exhibit S4 for the jury.

10         I will now read a portion of this into the record.

11         The stipulation begins:

12         "It is hereby stipulated and agreed by and between the

13    United States of America, by Geoffrey S. Berman, United States

14    Attorney, Daniel C. Richenthal, Douglas Zolkind, and Catherine

15    Ghosh, Assistant United States Attorneys, of counsel, Sandra

16    Moser, Acting Chief, Fraud Section, Department of Justice, Paul

17    A. Hayden, trial attorney, of counsel, and Chi Ping Patrick Ho,

18    the defendant, by his counsel, that:

19         "1.  Government Exhibit 2201 is a true and correct

20    copy of the Certificate of Incorporation of China Energy Fund

21    Committee (USA) Inc. ("CEFC USA"), filed with the Virginia

22    State Corporation Commission on or about May 1, 2012; and the

23    2014 through 2017 Annual Reports of CEFC USA, which were also

24    filed with the Virginia State Corporation Commission.

25         "Government Exhibit 2202 is a true and correct copy of

Riccardi-Zhu - Direct

the Articles of Organization of China Energy Fund Committee

(NYC) LLC, filed with the New York State Department of State on

or around about December 14, 2011.

"3.  Government Exhibit 2203 is a true and correct

copy of the Articles of Organization of Huaxin Petroleum (USA)

LLC, filed with the New York State Department of State on or

about February 9, 2012.

"4.  Government Exhibit 2204 is a true and correct

copy of the Articles of Association, Certificate of

Incorporation, and certain other corporate records, of CEFC

Limited, incorporated in Hong Kong on or about August 12,

2010."

Pursuant to this stipulation, the government offers

Government Exhibits 2201, 2202, 2203 and 2204.

MR. ROSENBERG:  No objection.

THE COURT:  Received.

(Government Exhibits 2201 through 2204 received in

evidence)

MS. GHOSH:  Ms. Rao, can you please bring up

Government Exhibit 2204.

And again pursuant to the parties' stipulation, these

are corporate records of CEFC Limited, incorporated in Hong

Kong.

Ms. Rao, could you please go to page 3.

Q.  Mr. Riccardi-Zhu, do you recognize the address at the top

Riccardi-Zhu - Direct

1    of this page?

2    A.  I do.

3    Q.  What is that address?

4    A.  That's the address of the NGO's offices in Hong Kong.

5           MS. GHOSH:  Ms. Rao, could you please go to page 4.

6    Q.  Do you see the section on founder members?

7    A.  I do.

8    Q.  Do you recognize these names?

9    A.  I recognize two of the names.

10   Q.  Which ones do you recognize?

11   A.  The first one, Ho Chi Ping Patrick, is Dr. Ho.  The second

12   one, Ye Jianming, is the chairman of the for-profit company.  I

13   don't recognize the last name Chan Chau To.

14          MS. GHOSH:  Ms. Rao, could you please bring up page 6.

15   Q.  And at the top of this, under first directors, individual

16   director, whose name is there?

17   A.  That's Dr. Ho's name, Ho, Chi Ping Patrick.

18   Q.  And if you look at the bottom of the page, whose signature

19   is there?

20   A.  Also Dr. Ho.

21          MS. GHOSH:  Ms. Rao, could you please go to page 48.

22   This is the Memorandum and Articles of Association of CEFC

23   Limited.  If you could go to the next page, please, Ms. Rao.

24   This is the Memorandum of Association of CEFC Limited.  And

25   page 55, please.

Riccardi-Zhu - Direct

1   Q.   Who are the signatories listed here?

2   A.   It's again Dr. Ho first signatory.  The second one I don't

3   recognize, Chan Chau To.  And the last one, Ye Jianming, is the

4   chairman of the for-profit CEFC.

5          MS. GHOSH:  Can you take that down.  Please put up

6   Government Exhibit 2201.

7   Q.   Again, pursuant to the parties' stipulation, these are

8   stipulated to be corporate records of China Energy Fund

9   Committee (USA) Inc. filed in Virginia.  On page 1 the title is

10  Articles of Incorporation of China Energy Fund Committee (USA)

11  Inc.

12         Do you see the section that says "Third:  Purpose"?

13  A.   I do.

14  Q.   And it says here, "The purpose of the corporation is to

15  provide a nonprofit, nongovernmental, think tank devoted to

16  public diplomacy and research on strategic issues beneficial to

17  the public interest, with emphasis on energy and culture."

18         Ms. Rao, if you just show the next sentence please as

19  well.

20         "The corporation is organized and shall be operated

21  exclusively for charitable purposes within the meaning of

22  Section 501(c)(3) of the Internal Revenue Code of 1986 ..."

23         Mr. Riccardi-Zhu, are you familiar with this entity

24  described here, China Energy Fund Committee (USA) Inc.?

25  A.   Yes, it's the NGO that I worked for.

Riccardi-Zhu - Direct

1              MS. GHOSH:  Ms. Rao, please go to page 2.

2    Q.  Mr. Riccardi-Zhu, do you see the list of initial members?

3    A.  I do.

4    Q.  First one is Dr. Patrick Ho Chi-ping?

5    A.  Yes.

6    Q.  And is that the defendant?

7    A.  Yes.

8    Q.  And the next one is Mr. Martin Wu Zhang.  Do you know who

9    that is?

10   A.  I am not familiar with that person.

11   Q.  And the third one, Andrew Lo, do you know who he is?

12   A.  Yes.

13   Q.  Who is that?

14   A.  He was sort of second in command to Dr. Ho at the NGO.

15             MS. GHOSH:  Ms. Rao, can you please turn to page 5 of

16   this exhibit.

17   Q.  This is the 2014 annual report, and do you see at the top

18   the corporation name, that this is China Energy Fund Committee

19   (USA) Inc.?

20   A.  Yes, I see that.

21   Q.  In the middle of the page do you recognize the principal

22   office address?

23   A.  Yes.

24   Q.  That's 1100 Wilson Boulevard in Arlington, Virginia?

25   A.  Yes.

Riccardi-Zhu - Direct

1    Q.  What do you recognize that address as?

2    A.  It was an office in Virginia we used a few times.

3            MS. GHOSH:  Miss Rao, could you please bring up page

4    6.  This is the 2014 annual report continued, and if you can

5    zoom in on this box.  Thank you.

6    Q.  Do you see here that Patrick Chi-Ping Ho is listed as both

7    an officer and director?

8    A.  Yes.

9    Q.  Was that consistent with your understanding of his role in

10   2014?

11   A.  Yes.

12           MS. GHOSH:  Ms. Rao, please go to page 8.

13   Q.  And this is 2015 annual report.  Do you see it again has

14   him listed as officer and director?

15   A.  Yes.

16           MS. GHOSH:  Ms. Rao, page 10, please.

17   Q.  And in 2016, again officer and director?

18   A.  Yes.

19           MS. GHOSH:  And page 12, please, Ms. Rao.

20   Q.  Same thing, officer, director?

21   A.  Yes.

22   Q.  Was this consistent with your understanding of the

23   defendant's role at the NGO during those years?

24   A.  Yes.

25   Q.  Now, you said that you were based in New York while working

Riccardi-Zhu – Direct

1    at CEFC; is that right?

2    A.  Yes.

3    Q.  Did you ever visit the Virginia office of CEFC USA?

4    A.  I did.

5    Q.  And you said it was located at the address which is on

6    Arlington?

7    A.  Yes.

8    Q.  About how far is that from Washington D.C.?

9    A.  Not very far at all.  I would guess it to be around a mile.

10   Q.  Approximately how many times did you visit that office?

11   A.  About three times, three or four times.

12   Q.  Why did you go there?

13   A.  Sometimes after events we would have extra material, and we

14   would drop it off there, and one time I believe that I worked

15   on a press release there.

16   Q.  Was the defendant with you when you went to that office?

17   A.  One time he was.

18   Q.  When you were at that office, could you see who else, if

19   anyone, was working there?

20   A.  Yes, I believe the time that I went to work on the press

21   release there were about three or four other people in the

22   office.

23   Q.  Did you ever visit any other CEFC location in the US apart

24   from the Virginia office?

25   A.  Yes, there was kind of an office/apartment in New York

Riccardi-Zhu - Direct

1    City.

2    Q.   What do you mean by office/apartment?

3    A.   It was furnished as an apartment, but my understanding was

4    that people worked out of it regularly.

5    Q.   And where was that space located?

6    A.   In Trump World Tower in Manhattan.

7    Q.   How many times did you visit that location?

8    A.   I would say also about three or four times.

9    Q.   Do you recall what floor the office/apartment was on in

10   that building?

11   A.   Not precisely, but I would guess it to be around the 68th

12   floor.

13   Q.   When you visited that location, what was the reason?

14   A.   Again, it was a couple of times after events we were

15   dropping off material that we hadn't used at the events, and

16   then one time Dr. Ho hosted a foreign representative from the

17   United Kingdom there.

18   Q.   Could you see who, if anyone, was working there?

19   A.   I believe one time that I went I remember seeing people

20   leaving from the back rooms and sort of entering the main area

21   of the apartment.

22   Q.   About how many people did you see on that occasion?

23   A.   Two or three.

24   Q.   Do you know whether they were affiliated with the CEFC

25   company or the CEFC NGO?

Riccardi–Zhu – Direct

1    A.   They weren't employees that were regularly working for the

2    NGO, so I assumed them to be company employees.

3              MR. ROSENBERG:   Objection, your Honor.   Move to

4    strike.

5              THE COURT:   Counsel?

6              MS. GHOSH:   Your Honor, the first portion of his

7    answer is his understanding that they weren't employees of the

8    NGO based on his time working there.

9              THE COURT:   Sir?   Mr. Rosenberg?

10             MR. ROSENBERG:   Lack of foundation on that point, your

11   Honor.

12             THE COURT:   I don't think we have inquired what his

13   basis was.

14             MS. GHOSH:   I will get back into it.

15   Q.   I'm going to now ask you about your work.

16             THE COURT:   This is hanging out here.   Do you want to

17   inquire what the witness's basis was for saying that because

18   they weren't employees who were regularly working for the NGO

19   he assumed them to be company employees?

20             MS. GHOSH:   Your Honor, I can ask him some questions

21   to verify that.

22             THE COURT:   OK.

23   Q.   During your employment for the NGO, did you interact with

24   other employees of the NGO?

25   A.   I did.

Riccardi-Zhu - Direct

Q.  And approximately how many other employees of the NGO did
you interact with?

A.  I believe I interacted with almost everybody.  I spent
about two weeks in Hong Kong where I worked out of the offices,
and met what I believed to be was the entire staff of the NGO
at the time.

Q.  And did you interact with these people outside of the time
that you spent in Hong Kong.  Or only when you were in Hong
Kong?

A.  I also interacted with them during the events.  It wasn't
always the same group of people that came by, but sort of on a
rotational basis I met the employees when they came over to the
U.S.

Q.  And were you included on e-mails sent to members of the
NGO?

A.  I was.

Q.  And through these interactions in Hong Kong and through
your work in the United States, and e-mails you were copied on,
did you have an understanding of who was employed by the CEFC
NGO?

A.  Yes.

Q.  And when you referred to the people that you saw in the
apartment/office, were those people ones who you understood to
be employed by the NGO?

A.  They were not employed by the NGO, to my understanding.

Riccardi-Zhu – Direct

1   Q.   Now, to turn more to what your work for the NGO was.

2   Generally speaking, who assigned you work?

3   A.   Dr. Ho.

4   Q.   What sort of assignments did he give you?

5   A.   It was research and writing primarily.  That included

6   editorials, speeches, press releases.  I helped organize some

7   of the events.

8   Q.   How much of your work at the NGO related to events that the

9   NGO was hosting or participating in?

10  A.   I would say probably the majority of my work revolved

11  around events.

12  Q.   Who typically attended these events?

13  A.   Usually people from international circles, so diplomats or

14  government officials, scholars.

15  Q.   Now, where was the defendant based?

16  A.   I'd say probably from Hong Kong.  He traveled a lot.

17  Q.   How often were you in contact with him?

18  A.   On a weekly basis.

19  Q.   How did you typically communicate?

20  A.   By e-mail.

21  Q.   About how often did the defendant visit the United States,

22  as far as you were aware?

23  A.   I would put it maybe around six times a year.

24  Q.   How would you know when he was coming to the U.S.?

25  A.   He would e-mail me before he arrived.

Riccardi-Zhu - Direct

1   Q.  Did he tell you where he was staying?

2   A.  Yes.

3   Q.  Was there a typical place that he stayed while he was here?

4   A.  He usually stayed at the Residence Inn in Manhattan.

5   Q.  Was he typically accompanied by anyone when he traveled to

6   the U.S., as far as you were aware?

7   A.  Typically he was accompanied by Ms. Zhang.

8   Q.  How were you paid for your work at the CEFC NGO?

9   A.  Occasionally when Dr. Ho came on his visits, Ms. Zhang

10  would give me an envelope with cash.

11  Q.  Did you have an understanding of who, if anyone, she was

12  paying you on behalf of?

13  A.  The NGO.

14  Q.  When the defendant visited the U.S., did you know his

15  complete itinerary?

16  A.  No.

17  Q.  Did you typically see him on those visits?

18  A.  Usually, yes.

19  Q.  Where would you see him?

20  A.  At the Residence Inn.

21  Q.  Other than the typical times you saw the defendant, did you

22  know who else he was meeting with?

23  A.  No.

24  Q.  Do you know what else he was doing during those trips?

25  A.  I do not.

Riccardi-Zhu - Direct

1   Q.  Did you attend NGO events or meetings with the defendant?

2   A.  I did.

3   Q.  Did you ever attend any meetings with the defendant related

4   not to the CEFC NGO but to the CEFC company?

5   A.  I don't believe that I ever did.

6   Q.  As far as you knew, did the defendant have a role at the

7   CEFC company?

8   A.  I was told by other employees I think once or twice that

9   Dr. Ho was traveling for the company, but I had never been told

10  directly that Dr. Ho was working for a company.

11          MR. ROSENBERG:  Objection, your Honor.

12          THE COURT:  Sir?

13          MR. ROSENBERG:  Hearsay.

14          THE COURT:  Counsel?

15          MS. GHOSH:  I can ask him who told him.

16          Your Honor, it goes to the witness's state of mind,

17  however, I can ask him more directly if the defendant ever told

18  him.

19          THE COURT:  All right.  Why don't you try that.

20  Q.  Mr. Riccardi-Zhu, did the defendant ever tell you whether

21  he did any work on behalf of the CEFC company?

22  A.  He did not.

23  Q.  Through your work at the NGO, did you ever learn of any

24  connection between the work of the NGO and the work of the

25  company that funded it?

Riccardi-Zhu - Direct

1   A.   Outside of the funding and some events, there were company

2   employees that helped sometimes.  I did not know of any

3   official connection.

4   Q.   I believe you testified that one of your responsibilities

5   at CEFC was writing press releases; is that right?

6   A.   Yes.

7   Q.   Can you please explain what a press release is.

8   A.   A press release was a document that we prepared surrounding

9   our events.  Usually it was sent to the press to explain what

10  the event was about, and in some cases I believe we sent it to

11  the press, particularly the Hong Kong/Chinese press, so they

12  could use the press release word for word.

13  Q.   And when you say use the press release word for word, what

14  do you mean by that?

15  A.   They would publish it, often translated publication.

16  Q.   Let's talk about the process of drafting a press release.

17  Without going into the specifics of any subject matter, what

18  are some of the reasons you would write press releases?

19  A.   Usually it was because we had just completed an event and

20  we wanted to let the press know what the event was about and

21  what the NGO did.

22  Q.   Who would typically assign you to draft a press release?

23  A.   Dr. Ho.

24  Q.   When he assigned you to draft a press release, how would he

25  typically communicate that to you?

Riccardi-Zhu - Direct

1    A.  Usually by e-mail, sometimes in person.

2    Q.  Would you discuss the press release with him?

3    A.  Yes.

4    Q.  Based on his directions to you, did you get any sense of

5    how important or unimportant press releases were to him?

6    A.  I would say generally they were very important.

7    Q.  What gave you that impression?

8    A.  For one thing, the attention to the language; another was

9    usually the urgency of the press release.

10   Q.  Did he ever give you any directions on what to say

11   specifically in a press release?

12   A.  Yes.

13   Q.  So after you drafted a press release, what would you do

14   with it?

15   A.  I would usually send it to Dr. Ho for revision.

16   Q.  Did he ever have comments or revisions?

17   A.  Yes.

18   Q.  Whose job was it to input those comments and revisions?

19   A.  My job.

20   Q.  Who had final authority to approve a press release?

21   A.  Dr. Ho.

22   Q.  Once the press release was approved, what would you do with

23   it?

24   A.  I would usually send it to Steven Cheng, an employee in

25   Hong Kong, who would then translate it and then send it off to

Riccardi-Zhu – Direct

1   the press.

2   Q.  So you would draft it in English, and he would translate it

3   into Chinese?

4   A.  Yes.

5   Q.  And once it was final in English or Chinese, what's your

6   understanding of what CEFC would do with it next?

7   A.  It would get sent off to the press at that point.

8   Q.  What was the purpose of sending the press releases off to

9   the press?

10  A.  I would say to inform the press of the events and to

11  promote attention on the NGO and the NGO's work.

12  Q.  Would CEFC itself post the press releases anywhere?

13  A.  Yes, on its website.

14  Q.  I'd like to show you what has been marked for

15  identification as Government Exhibit 412.  Is that up on your

16  screen?

17  A.  Yes.

18  Q.  Do you recognize this?

19  A.  Yes.

20  Q.  Generally what is it?

21  A.  It's an e-mail chain that discusses the press release for

22  one of the events we did in 2015.

23  Q.  Is the defendant involved in this e-mail discussion?

24  A.  Yes.

25  Q.  Are you?

Riccardi-Zhu - Direct

1   A.  Yes.

2           MS. GHOSH:  Your Honor, we offer Government Exhibit

3   412.

4           MR. ROSENBERG:  No objection.

5           THE COURT:  Received.

6           (Government Exhibit 412 received in evidence)

7           MS. GHOSH:  Ms. Rao, could you please publish this to

8   the jury.

9   Q.  Let's start with the header on the top.  Who are the

10  participants in this e-mail chain?

11  A.  So the sender is Steven Cheng.  That's who I would send my

12  press releases to when they were ready.  The recipients are Mr.

13  Lo; Dr. Ho; Roger Fong; a number of employees in Hong Kong;

14  Vivian Wong, another employee in Hong Kong; myself; Ms. Zhang;

15  then Kosh Li and Dan Nasir, also employees in Hong Kong.

16  Q.  And the subject is:  Press Releases (Chi and Eng) on the

17  Energy Grant.

18          Do you see that?

19  A.  Yes.

20  Q.  And the attachment is entitled:  Press release, We Care

21  Solar awarded U.S. $1 million UN-CEFC Energy Grant.

22  A.  Yes.

23  Q.  Briefly, what's the $1 million UN-CEFC energy grant?

24  A.  It was a grant that the NGO funded and organized in

25  collaboration with the United Nations, where the recipient of

Riccardi-Zhu – Direct

1   the award after a vetting process would receive the $1 million

2   to further projects in sustainable energy.

3   Q.   And just to be clear, who donated the $1 million?

4   A.   The NGO.

5   Q.   And going back to the list of recipients of that e-mail,

6   you mentioned that one of them was the defendant.  Can you

7   identify which e-mail is his?

8   A.   Yes, it's head@chinaenergyfund.org.

9   Q.   Let's go to the bottom of that e-mail.  Do you see the

10  first e-mail here from Steven Cheng on September 15, 2015 at

11  2:43?

12  A.   Yes.

13  Q.   Could you please read that e-mail.

14  A.   "Dear Dr. Ho.  Attached please find the press releases

15  (Chinese and English) on the Energy Grant.  The English press

16  release was done by David and is waiting for your approval

17  before being sent off.  The Chinese press release was done by

18  me and has been edited and checked by" a Chinese name.  "Best,

19  Steven."

20  Q.   Who does David refer to?

21  A.   That's me.

22  Q.   If you could look at the next e-mail in the chain, which is

23  the same day at 3:16.  This is from head@chinaenergyfund.org.

24  Who is that again?

25  A.   Dr. Ho.

Riccardi-Zhu - Direct

1  Q.  Can you please read the e-mail.

2  A.  "Doctor Mr. Lo, can you please take a look at the English

3  press release and make revision and amendment when necessary as

4  soon as possible, as time is critical for its release.

5  Thanks."

6  Q.  As you understood it, why was time critical for its

7  release?

8  A.  I believe that we had this understanding that the faster

9  the press release went out, the more impact it would have.

10  Q.  Did you have discussions with the defendant about efforts

11  to publicize this million dollar donation to the UN?

12  A.  I did.

13  Q.  What was the defendant's attitude towards that?

14  A.  I think he valued the award and the press releases for the

15  award because they reflected well on the NGO.

16  Q.  And who was Mr. Lo again?

17  A.  He was sort of second in command at the NGO.  I forget his

18  official title.

19  Q.  Above the defendant's e-mail, Mr. Lo responds the same day,

20  he says, "The English copy is in order."  Then he responds

21  again, again the same day and says, "Further my last, the photo

22  captions focus only on Ben and the winner, no mentioning of

23  others in the very important cheque presenting photo."

24          Do you see that?

25  A.  Yes.

Riccardi-Zhu - Direct

1          MS. GHOSH:  Ms. Rao, could you please bring us to page

2     3 of the attachment.

3     Q.  What is this?

4     A.  This is the press release I prepared for that event.

5     Q.  OK.  And please go to page 5.

6          Mr. Riccardi-Zhu, do you recognize this photo?

7     A.  Yes, it's a photo taken at the event.

8     Q.  Were you at that event?

9     A.  I was.

10    Q.  And so this was an event to publicize the million dollar

11    donation?

12    A.  Yes, it was the official ceremony where the check was given

13    to the winner of the award.

14    Q.  In this photo, could you please identify from left to right

15    anyone that you recognize.

16    A.  Yes.  I don't recognize the first gentleman on the left,

17    but to his right is the former Secretary General of the United

18    Nations, Ban Ki-moon.  To his right is the former President of

19    the General Assembly, Sam Kutesam.  To his right is the person

20    who ran We Care Solar, the recipient of the award.  To her

21    right is Dr. Ho.  And to Dr. Ho's right is Mr. Wu Hongbo, the

22    former Under Secretary General of the United Nations.

23         MS. GHOSH:  Ms. Rao, can we pull it up a little so we

24    can see the caption.

25    Q.  The caption in the last sentence mentions the first person

Riccardi-Zhu - Direct

on the left as a Mr. Zang, Executive Vice President of CEFC.
Are you familiar with him?

A.   I'm not.

Q.   Based on your own personal experience, when the defendant
was involved in an activity such as a donation or an event like
this, how frequently did he direct that a press release be
drafted?

A.   Very frequently.

Q.   Were you the only CEFC NGO employee involved in writing
press releases, or did others do so as well?

A.   I was primarily the main person tasked with them from the
beginning of my years there, and then towards the end another
employee began writing them more often.

          MS. GHOSH:  Your Honor, at this point I would like to
enter another stipulation between the parties which is marked
as S11.

          THE COURT:  Yes, ma'am.  Fact or testimony?

          MS. GHOSH:  Fact, your Honor.

          THE COURT:  As you know, ladies and gentlemen, this is
evidence for your consideration, and you must accept the facts
stated as true.

          (Government Exhibit S11 received in evidence)

          THE COURT:  Yes, ma'am.

          MS. GHOSH:  I will now read a portion of this into
evidence.  It begins with the same introductory paragraph as

Riccardi-Zhu - Direct

1    before, and then says the attorneys agree, and I'm going to go

2    to paragraph 3 on page 2.

3            "The following Government Exhibits contain accurate

4    copies of pages from the China Energy Fund Committee websites

5    (http://cefc.co or http://cefc.org.hk) as those pages existed

6    as of the approximate dates set forth below."

7            And on the next page listed Exhibit 807, which was as

8    of July 9, 2016.

9            Pursuant to that stipulation the government offers

10   Government Exhibit 807.

11           THE COURT:  No objection, right?

12           MR. ROSENBERG:  Forgive me, your Honor.  I was just

13   looking at something.  No objection.

14           THE COURT:  Yes, sir.  Received.

15           (Government Exhibit 807 received in evidence)

16           MS. GHOSH:  Your Honor, at this time I would like to

17   offer another stipulation between the parties, which is marked

18   as Government Exhibit S8.  The government offers Exhibit S8.

19           MR. ROSENBERG:  No objection.

20           THE COURT:  Received.

21           (Government Exhibit S8 received in evidence)

22           MS. GHOSH:  This one begins with the same introductory

23   language.

24           "In the chart set forth in Annex A, below, the

25   exhibits in the "Translation" column contain fair and accurate

Riccardi-Zhu - Direct

1  English translations of the corresponding exhibits in the

2  "Original Document" column."

3          THE COURT:  And of course that's evidence for your

4  consideration which you must accept as true.

5          MS. GHOSH:  Pursuant to this stipulation, the

6  government offers Exhibit 807-TX which is the English

7  translation of Government Exhibit 807.

8          MR. ROSENBERG:  No objection.

9          THE COURT:  Received.

10          (Government Exhibit 907-TX received in evidence)

11          MS. GHOSH:  Ms. Rao, can you please bring up Exhibit

12  807 first and publish it to the jury.

13  Q.  Mr. Riccardi-Zhu, could you take a look at the web address

14  on the lower right:

15  A.  I see a web address, yes.

16  Q.  Do you recognize what cefc-ngo.co is?

17  A.  Yes.

18  Q.  What is that?

19  A.  That's one of the websites that the NGO had.

20  Q.  And if we could now go to Exhibit 807-TX, please.  At the

21  top do you see this refers to CEFC Hong Kong Non-Government

22  Fund Committee?

23  A.  Yes.

24  Q.  What's that?

25  A.  That's the NGO.

Riccardi-Zhu - Direct

Q.  And do you see that this is a print-up from the News Center
web page?

A.  Yes.

Q.  Is that one of the places where press releases were posted
by CEFC?

A.  Yes.

          MS. GHOSH:  And, Ms. Rao, if you can zoom out.

Q.  Mr. Riccardi-Zhu, does this appear to be a CEFC press
release?

A.  It does.

Q.  Do you recall seeing this at the time it was posted?

A.  I have just a very vague recollection of it.

Q.  Let me ask you some questions about it.  The headline
states, "A Delegation From CEFC Hong Kong Non-Governmental Fund
Committee Visited Uganda."  Then there is a photo.  Do you
recognize anyone in this photo?

A.  Yes.  That is Dr. Ho in the center shaking hands with a man
that I don't recognize.  To the right of that man it looks like
the former President of the General Assembly Sam Kutesa.

Q.  The caption of the photo says, "President Museveni (second
from right) and CEFC Hong Kong Non-Governmental Fund Committee
delegation."

          Could you turn to page 2 where the text begins.

          The first sentence says, "On May 11 through 13, 2016,
the delegation of CEFC Hong Kong Non-Governmental Fund

Riccardi-Zhu - Direct

1   Committee conducted a two and a half day visit to the city of

2   Kampala, Uganda."

3          Were you familiar with the defendant going on a trip

4   to Uganda in May of 2016?

5   A.  I don't -- I'm not -- I vaguely remember being told that

6   Dr. Ho had gone to Africa, but I'm not sure if that aligns to

7   that day.

8   Q.  In your experience, were trips of this nature the sort of

9   thing that the defendant would issue press releases on?

10  A.  Yes.

11  Q.  Take a minute to read over the rest of the press release,

12  and let us know when you are done with the first page, and we

13  will bring up the second.

14  A.  I'm done with the first page.  I'm finished reading.

15  Q.  Mr. Riccardi-Zhu, do you see any references in this press

16  release to a donation to a charitable foundation in Uganda?

17  A.  I do not.

18  Q.  Do you see a reference to any sort of donation or

19  contribution in connection with this trip?

20  A.  No.

21  Q.  Based on your experience preparing press releases for the

22  defendant, if he had been involved in making such a donation,

23  what is your expectation as to whether or not that donation

24  would be mentioned in a press release?

25          MR. ROSENBERG:  Objection, your Honor.  Foundation.

Riccardi-Zhu – Direct

1          THE COURT:  Foundation, ma'am?

2    Q.  Mr. Riccardi-Zhu, how many years did you work for CEFC?

3    A.  About three years.

4    Q.  And you testified that one of your responsibilities was to

5    draft press releases?

6    A.  Yes.

7    Q.  Who typically assigned you to draft press releases?

8    A.  Dr. Ho.

9    Q.  And did you have discussions with him about press releases?

10   A.  Yes.

11   Q.  Did you exchange e-mails with him about press releases?

12   A.  Yes.

13   Q.  Did he send you comments on press releases that you

14   drafted?

15   A.  Yes.

16   Q.  Did he ever give you specific information to include in the

17   press releases?

18   A.  Yes.

19   Q.  Did he ever e-mail around press releases once they were

20   finalized?

21   A.  Yes.

22   Q.  Based on all of your discussions and interactions with the

23   defendant between 2014 and 2017, did you form an impression as

24   to his typical practices with respect to press releases?

25   A.  Yes.

Riccardi-Zhu - Direct

1    Q.  So now let me ask you, if he had been involved in making

2    charitable donations in Uganda, what is your impression as to

3    whether or not he would have mentioned it in a press release?

4            MR. ROSENBERG:  Same objection.

5            THE COURT:  Overruled.

6            You may answer, sir.

7    A.  My impression is that it would have been mentioned in a

8    press release if it reflected well on the NGO.

9    Q.  While you were working at CEFC, did you ever learn of any

10   donation that the defendant was involved in to a Ugandan

11   charity or foundation?

12   A.  I did not.

13   Q.  Did you ever learn of any donation the defendant was

14   involved in making to people of the Republic of Chad?

15   A.  I did not.

16   Q.  If the defendant had been involved in making a donation to

17   Chad, what is your impression as to whether or not he would

18   have mentioned that in a press release?

19           MR. ROSENBERG:  Your Honor, same objection.

20           THE COURT:  Overruled.

21           You may answer, sir.

22   A.  Again, I believe that charitable donations would have

23   reflected well on the NGO.

24           THE COURT:  Does that mean you would have released a

25   press release?

1    THE WITNESS:  Yes, your Honor.

2    MS. GHOSH:  May I have a moment, your Honor?

3    THE COURT:  Yes, ma'am.

4    MS. GHOSH:  No further questions, your Honor.

5    THE COURT:  Thank you.  Cross-examination, counsel.

6    MR. ROSENBERG:  Thank you, your Honor.

7  CROSS EXAMINATION

8  BY MR. ROSENBERG:

9  Q.  Good afternoon, Mr. Riccardi-Zhu.

10  A.  Good afternoon, sir.

11  Q.  You testified that you began working on a paid basis in the

12  spring of 2015; is that right?

13  A.  That's my recollection, sir.

14  Q.  OK.  And you had started as an intern before that?

15  A.  I would say maybe more as a volunteer.

16  Q.  As a volunteer.  Was that sometime in the fall of 2014?

17  A.  That's what I remember, sir.

18  Q.  OK.  And you got that position because you were put in

19  touch with Dr. Ho by your father, correct?

20  A.  Yes.

21  Q.  And that's because your father knew Dr. Ho because your

22  father worked at the UN?

23  A.  Yes.

24    THE COURT:  Mr. Rosenberg, you need to slow it down.

25  It's ten after four, and the court reporter has been working

IBR7HO5                          Riccardi–Zhu –Cross

1   all day.

2              MR. ROSENBERG:  I will do so, your Honor.

3              THE COURT:  Yes, sir.  Thank you.

4              MR. ROSENBERG:  But I can be heard.

5              THE COURT:  Well, that was a little shaky also.

6              MR. ROSENBERG:  I was hoping for one out of two.  I

7   will do better.

8              THE COURT:  But first things first.

9   Q.  Now, you were an independent contractor; is that correct?

10  A.  There were a couple of titles.  That was one of the titles

11  I had.  I think I was also listed as a research officer at some

12  time.

13  Q.  Were you an employee, or were you paid as a consultant?

14             MS. GHOSH:  Objection, your Honor.

15             THE COURT:  Basis?

16             MS. GHOSH:  Relevance, and it calls for speculation.

17             THE COURT:  What's the relevance of this?

18             MR. ROSENBERG:  I just want to understand his position

19  at CEFC NGO, if he knows.

20             THE COURT:  Sustained.

21             Go ahead.

22  Q.  You worked principally from home, did you not?

23  A.  I did.

24  Q.  And so you went you said to the D.C. office only on about

25  three occasions; is that right?

1    A.  Something around that, yes.

2    Q.  That's in the approximate two and a half years you were

3    associated with CEFC, the think tank?

4    A.  Yes.

5    Q.  Now, in your examination -- withdrawn.

6            You believed that CEFC -- the think tank for whom you

7    worked -- was understaffed in the United States; isn't that

8    right?

9    A.  I'm not sure if I was ever -- I'm not sure I had that

10   conclusion ever, sir.

11   Q.  OK.  Were you the only full-time employee at CEFC's New

12   York offices?

13   A.  For the NGO, sir?

14           MS. GHOSH:  Objection, your Honor.

15   Q.  Yes, for the NGO.

16           THE COURT:  Ma'am?

17           MS. GHOSH:  It calls for speculation.

18           THE COURT:  I think the witness has answered it.

19           Sir, if there is an objection, would you hold your

20   answer, please.

21           If counsel says objection, don't answer.

22           THE WITNESS:  Yes, understood.

23           THE COURT:  And later on I will tell you if you have

24   to or not.  Thank you.

25           Mr. Rosenberg.

1                MR. ROSENBERG:  Your Honor, I'm not sure I heard the

2      answer.  I believe the witness did not answer, unless I'm

3      misreading.

4                THE COURT:  All right.

5                Sir, are you able to answer the question of whether

6      you were the only full-time employee at CEFC's New York office?

7      Do you know the answer to that?

8                THE WITNESS:  I don't, your Honor.

9                THE COURT:  All right.

10     Q.  During the time that you were with CEFC, were you the only

11     employee based full-time in New York?

12               THE COURT:  Isn't that the same question?

13               MS. GHOSH:  Objection.

14               MR. ROSENBERG:  I just wanted to be precise about it,

15     your Honor.  Then let me move on.

16     Q.  Mr. Riccardi-Zhu, do you recall being interviewed by F.B.I.

17     agents in connection with this case?

18     A.  I was.

19     Q.  And do you recall the first time you were interviewed was

20     approximately December 14, 2017?

21     A.  That sounds right.  I don't remember the exact date.

22     Q.  And do you recall being asked-- do you recall being asked

23     about the employment situation of CEFC and advising that during

24     your time at CEFC you were the only employee based full-time in

25     New York?

A.  My understanding is that I was -- as far as I was aware, I
was the only employee for the NGO in New York City.

Q.  And is it a --

        Now, you mentioned, Mr. Riccardi-Zhu, that there
were -- that you issued press releases or wrote press releases
following events; is that right?

A.  Yes.

Q.  Can you please describe the events after which you wrote
press releases?

        MS. GHOSH:  Objection, your Honor.  Relevance.

        THE COURT:  Sir?

        MR. ROSENBERG:  It goes to the testimony that was
given on direct examination.  He testified to events, and I'm
trying to understand what they were, and I believe the jury
should be able to hear that.

        THE COURT:  Were you just asking the witness to recite
random events, or are there some you want to focus on?

        MR. ROSENBERG:  On the topics of events and the nature
of them, where they were held and what the topics were.

        THE COURT:  Is there relevance to this case?

        MR. ROSENBERG:  Yes, your Honor.  I can state here or
at the side bar if your Honor prefers.

        THE COURT:  Well, if you're not going to take too
long, let's go, but otherwise come up.

Q.  Let me see if I can make this short.  Among the events,

1    were they about efforts to have smart cities and sustainable

2    transportation?

3              MS. GHOSH:  Objection.  Relevance.

4              THE COURT:  Sir, this sounds like it's getting into

5    the areas we had discussions about in the motions in limine.

6              MR. ROSENBERG:  Your Honor, I am attempting not to do

7    that, and I think there is relevance to show --

8              THE COURT:  All right, come on up, come up to the side

9    bar, please.

10             Mr. Reporter may I impose on you, please.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. ROSENBERG:  Your Honor, through the questioning of

3      Mr. Jeremic, the earlier witness -- and I think through it's

4      opening statement -- the government is pursuing the argument

5      that Dr. Ho was somehow working principally or solely or

6      deviously for the for-profit energy company.  I think it's

7      important to show that he did have -- that his role for the

8      not-for-profit was a robust one, that he did work for the

9      not-for-profit, the topics of the many events he hosted, took

10     part in, etc., related solely to the not-for-profit and to the

11     goals of the not-for-profit.

12             MS. GHOSH:  Your Honor, we never argued that he did

13     not work in some way for the not-for-profit.  In their own

14     questioning Mr. Jeremic brought out nonprofit-related things

15     that the defendant was involved in.  And the robustness of his

16     involvement in the nonprofit has nothing to do with his

17     simultaneous involvement with the energy company and the

18     bribery at issue here.

19             MR. RICHENTHAL:  And even if it did, the subject

20     matter of offense is distinguishable from whether he in fact

21     worked for the NGO.  We would not object to that question.  Of

22     course this witness already said he did work for the NGO.  The

23     subject matter of the events is entirely different.

24             MR. ROSENBERG:  The subject matter of the events is

25     not going to explain what the NGO did and what Mr. Ho did in

1    connection with the NGO.

2            THE COURT:  We are not spending time on this for 403

3    reasons.  There is no dispute that the defendant worked for the

4    NGO.  There has already been fairly robust testimony about the

5    topics on which he worked for the NGO about -- there is

6    absolutely no reason at this point to stand here and make this

7    witness list all sorts of events and what kinds of interests

8    there were.  It is of no relevance, because there is not a

9    disputed issue of fact about whether he worked for the NGO or

10   not.

11           MR. ROSENBERG:  Your Honor, I think the extent of his

12   work for the NGO is important, because, as I said, I think the

13   government has painted a picture that the NGO is simply a cover

14   for something, and that's why I would like to at least ask

15   about where the events were held, how often they were held, the

16   nature --

17           THE COURT:  We don't care.  Why is that relevant to

18   anything?

19           You're able to ask him about his observations of

20   division of time between NGO events and energy company events

21   or things like that, but it is a complete waste of time -- and

22   particularly under 403 reasons -- to have him list eight

23   zillion events.

24           We have also discussed in the motion in limine that

25   all of these prior good works are not coming in.

1          MR. ROSENBERG:  Judge, I understood that.  I thought I

2    was abiding by -- I was intending to abide by that ruling.  I

3    wasn't intending to go beyond the main of it.  But I

4    understand.

5          THE COURT:  But your issue is that he actually did

6    work for the NGO.

7          MR. ROSENBERG:  Yes.

8          THE COURT:  So ask him about that.  It doesn't matter

9    what he did, and it certainly doesn't have to have a list of

10   events.  So, let's get going.

11         MR. ROSENBERG:  Very well.

12         THE COURT:  Off the record.

13         (Discussion held off the record)

14         (Continued on next page)

1              (In open court)

2    BY MR. ROSENBERG:

3    Q.  Mr. Riccardi-Zhu, did Dr. Ho spend his time at the NGO

4    organizing the events that you described to that you referred

5    to earlier?

6    A.  I'm sorry, could you repeat the question, sir.

7    Q.  Did he spend his time with the NGO organizing the events

8    you referred to earlier?

9              MS. GHOSH:  Objection, your Honor.  Vague.  Personal

10   knowledge?

11             THE COURT:  Are you able to answer that question, sir?

12   Do you need it repeated?

13             THE WITNESS:  I'm just not -- I'm not sure if I can

14   really answer it.  I don't have an understanding of Dr. Ho's

15   entire schedule, your Honor.

16   Q.  Did he take part in the events that you organized?

17   A.  Yes, I did.

18   Q.  And did he as well?

19   A.  Yes, he did.

20   Q.  Was he a speaker at the events?

21   A.  Yes.

22   Q.  And was he a panelist in other events?

23   A.  Yes.

24   Q.  Did he also write articles?

25   A.  Yes.

1    Q.  And did you help him with those articles?

2    A.  Yes.

3    Q.  Did he also give speeches?

4    A.  Yes.

5    Q.  And did you help him with those speeches?

6    A.  Yes.

7    Q.  And these were all part of the work that he did on behalf

8    of the NGO, correct?

9    A.  Yes.

10   Q.  Now, isn't it correct, sir, that -- well, withdrawn.

11           I want to talk briefly about Exhibit 412 -- Government

12   Exhibit 412, which you saw earlier -- and that's the press

13   release that you wrote about We Care Solar; is that right?

14   A.  Yes.

15   Q.  That was a program -- excuse me.  This is pursuant to -- it

16   was about a grant that CEFC gave to the United Nations,

17   correct?

18   A.  Yes.

19   Q.  And it worked with the United Nations, and the United

20   Nations held a large competition for ideas in energy

21   sustainability, correct?

22   A.  Yes.

23           THE COURT:  Slowly.

24           MR. ROSENBERG:  Forgive me, your Honor.

25   Q.  Did you work on the administration and planning of that

1    grant and the program at the United Nations?

2    A.  Could you clarify what you mean, sir, by programming and

3    administration.

4    Q.  Did you work on the -- there was an award called The

5    Powering of Future We Want Energy Grant.  Was that the name of

6    it?

7    A.  Yes, sir.

8    Q.  And did the NGO work to organize that?

9    A.  Yes.

10   Q.  Did you take part in that, sir, the NGO's efforts to do

11   that.

12   A.  I believe that when the award was first being organized, I

13   had a brief role in talking about what sort procedure there

14   would be to get the award issued.  After that, my participation

15   in the organization was very limited, sir.

16   Q.  But you participated enough that you did eventually attend

17   the awards ceremony, correct?

18   A.  Yes, for preparing the press release.

19   Q.  And directing your attention, if you could, please, to the

20   second page of the press release, the first full paragraph on

21   the page, Exhibit 412, it stated that "CEFC's deputy chairman

22   and General Secretary Dr. Patrick Ho said that the UN-CEFC

23   energy grant is intended to encourage and commend excellent in

24   the field of global energy.  Individuals and organizations

25   working to promote sustainable development should be

1    recognized, he said, because they contribute to a better life

2    for all man kind."

3           Was that a statement that you wrote, sir?

4    A.  Yes.

5    Q.  And it was based upon your having attended the ceremony,

6    correct?

7    A.  Yes, sir.

8           Your Honor, just one moment.

9           MR. ROSENBERG:  Your Honor, just one moment.

10          May I have one moment, your Honor?

11          THE COURT:  Yes, sir.

12          MR. ROSENBERG:  I have nothing further.  Thank you.

13          THE COURT:  Thank you.

14          Redirect, counsel.

15   REDIRECT EXAMINATION

16   BY MS. GHOSH:

17   Q.  Mr. Riccardi-Zhu, you just referred to a statement from the

18   defendant in the press release about the energy awards

19   ceremony.  Do you recall that?

20   A.  Yes.

21   Q.  At the energy awards ceremony did the defendant mention any

22   work that he was doing for the CEFC company?

23   A.  No.

24          MS. GHOSH:  No further questions, your Honor.

25          THE COURT:  Thank you.

IBR7HO5                              Riccardi-Zhu - Redirect

1              Any further cross?

2              MR. ROSENBERG:  No, your Honor.

3              THE COURT:  You may step down, sir.  Thank you.

4              (Witness excused)

5              THE COURT:  Ladies and gentlemen, we're going to go to

6     about five.  Are you all OK?

7              JUROR:  Could we take a quick bio break?

8              THE COURT:  Only if you go fast.  We're going to take

9     a quick break, ladies and gentlemen.  Please follow the usual

10    rules, friends.  Thank you.

11             (Jury not present)

12             THE COURT:  Anything on the record friends?

13             Off the record.

14             (Off the record discussion held)

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Mr. Zolkind.

3              MR. ZOLKIND:  Your Honor, may we call our next

4    witness.

5              THE COURT:  Yes, sir.

6              MR. ZOLKIND:  The government calls Cheikh Tidiane

7    Gadio.

8              (Witness sworn)

9              THE COURT:  Thank you.  Won't you be seated, sir.

10             Counsel.

11             MR. ZOLKIND:  Thank you, your Honor.

12   CHEIKH TIDIANE GADIO,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. ZOLKIND:

17   Q.  Good afternoon, Dr. Gadio.  And Dr. Gadio, if you could

18   just make sure to have that microphone pulled right up to you.

19   A.  Okay.  Good afternoon.

20   Q.  Thank you.

21             Let me start with some background questions first.

22   How old are you, sir?

23   A.  I'm 62.

24   Q.  Where are you from?

25   A.  I'm from Senegal, West Africa.

Ibr1ho6                              Gadio - Direct

1    Q.   And is your permanent home in Senegal?

2    A.   Yes.

3    Q.   Are you a citizen of Senegal?

4    A.   Yes.

5    Q.   Are you a citizen or a lawful permanent resident of any

6    country besides Senegal?

7    A.   Yeah, lawful resident of the United States.

8    Q.   And is that also known as being a green card holder?

9    A.   Yes, sir.

10   Q.   How long have you been a lawful permanent resident or a

11   green card holder of the United States?

12   A.   Since 1999.

13   Q.   How far did you go in school?

14   A.   Up to a PhD.

15   Q.   And where did you earn your PhD?

16   A.   At Ohio State University, at --

17   Q.   I'm sorry.  The Ohio State University?

18   A.   Yes.

19   Q.   And that's here in US?

20   A.   Columbus, Ohio.

21   Q.   Okay.  Are you currently employed?

22   A.   Yes, sir.

23   Q.   Where are you employed?

24   A.   I'm a congressman in Senegal, member of the Parliament.

25   Q.   And is that an elected position?

1   A.  Yes.

2   Q.  When were you elected?

3   A.  July 2017.

4   Q.  Have you ever held any other positions with the government

5   of Senegal?

6   A.  Yes.  I was Foreign Minister of Senegal for almost ten

7   years.

8   Q.  And what is the equivalent position in the United States to

9   Foreign Minister of Senegal?

10  A.  Secretary of state, like Condoleezza Rice or Colin Powell,

11  or Mrs. Clinton.

12  Q.  And can you just briefly describe the role and

13  responsibilities of the Foreign Minister of Senegal.

14  A.  Our Constitution says that the president of the country

15  defines external policy, and then he asked me to organize his

16  diplomacy and to represent the country, to speak on behalf of

17  Senegal, and to work also for cooperation between Senegal and

18  the rest of the world.

19  Q.  You said cooperation, is that right?

20  A.  Cooperation; economic cooperation, cultural cooperation.

21  Q.  How long did you serve as Foreign Minister of Senegal?

22  A.  Nine years and a half exactly.

23  Q.  When did you step down from that role?

24  A.  October 1, 2009.

25  Q.  And Dr. Gadio, what did you do for work after serving as

1    Foreign Minister?

2    A.   I went to the private sector and set up a consulting firm.

3    Q.   What was the name of that firm?

4    A.   Sarata.

5    Q.   Could you just spell that for the record.

6    A.   S as in Sam, A-R as in Rogers, A-T as in tongue, A.

7    Q.   What was your title at Sarata?

8    A.   I was the CEO of Sarata.

9    Q.   What sort of business did Sarata do?

10   A.   We were trying to connect Africa to the rest of the world

11   in terms of access to the market of the rest of the world and

12   getting our fair share of international trade and business.

13   Q.   All right.  And at the time that you were working as the

14   CEO of Sarata, were you still in the public sector with the

15   government or were you in the private sector?

16   A.   Completely in the private sector.

17   Q.   Dr. Gadio, where are you residing today?

18   A.   I'm in Maryland, in the state of Maryland, in the US.

19   Q.   Okay.  And why are you residing in Maryland?

20   A.   I was arrested on November 2017 and since then I'm -- I'm

21   living in Maryland.

22   Q.   What law enforcement agency arrested you in November of

23   2017?

24   A.   The FBI.

25   Q.   Now after you were arrested did you agree to participate in

1    an interview with the FBI?

2    A.   Yes, I did.

3    Q.   And was that interview recorded, to your knowledge?

4    A.   Yes.

5    Q.   Have you ever seen that recording?

6    A.   No.

7    Q.   And have you ever reviewed a transcript of that recording?

8    A.   No.

9    Q.   What crimes were you charged with at that time?

10   A.   Foreign bribery and -- under the FCPA, and also money

11   laundering and conspiracy.

12   Q.   And with respect to the foreign bribery charges, what

13   country was the bribery alleged to have occurred in?

14   A.   Central African state called Chad.

15   Q.   Who else, if anyone, was charged along with you?

16   A.   Dr. Patrick Ho.

17   Q.   And do you know Patrick Ho?

18   A.   Yes, I do.

19   Q.   Could you please take a look around the courtroom and let

20   me know if you see Patrick Ho.

21   A.   I see him.  He's wearing a purple -- yes, a purple dress.

22            MR. ZOLKIND:  Okay.  And your Honor, we'd ask that the

23   record reflect that the witness has identified the defendant.

24            THE COURT:  Yes.

25            MR. KIM:  So stipulated.

1    THE COURT:  Thank you, gentlemen.

2    MR. ZOLKIND:  Thank you.

3    BY MR. ZOLKIND:

4    Q.  Briefly, Dr. Gadio, how do you know the defendant?

5    A.  We were introduced by a common friend in September 2014 at

6    the United Nations, here in New York.

7    Q.  And did you meet with the defendant here in New York at

8    that time?

9    A.  Yes, we did.

10   Q.  And can you describe the nature of the discussion you had

11   with him at that time.

12   A.  Yeah.  We had a discussion and he introduced me -- he

13   presented me his company, CEFC, Chinese oil company, and then

14   he told me they were interested particularly in the country

15   called Chad in Africa and that he wanted to meet the president

16   of Chad.

17   Q.  Okay.  So let me just break that down.

18       Again, the entity that he told you he was acting on

19   behalf of, what was it called again?

20   A.  C -- CEFC, Chinese Energy Fund Company.

21   Q.  And did he tell you what type of company CEFC was?

22   A.  Oil; oil, mainly -- mainly oil company, but they were doing

23   other -- other things.

24   Q.  And did he tell you where the CEFC oil company was based?

25   A.  Shanghai; Shanghai in China.

1  Q.  All right.  And you said that he asked for a connection to

2  the president of Chad, is that right?

3  A.  Yes, he wanted to be introduced to the president of Chad,

4  yeah.

5  Q.  And did he explain -- if you could just tell us in general

6  terms what he told you the CEFC oil company's interest in Chad

7  was.

8  A.  Yes.  He told me that they were mainly, of course,

9  interested in Chad's oil, number one, but their company were

10  also doing infrastructure, banking services, and military

11  equipment.

12  Q.  I'll ask you more about that in a little bit.

13        But let me just ask you:  Did you in fact assist the

14  defendant and CEFC in getting access to the president of Chad?

15  A.  Yes, I did.

16  Q.  Dr. Gadio, what's the status of the criminal charges that

17  were brought against you?

18  A.  They were dropped.

19  Q.  Who were they dropped by?

20  A.  The government.

21  Q.  Were the charges against you dismissed pursuant to any sort

22  of agreement?

23  A.  Yes.

24  Q.  And who is that agreement between?

25  A.  It's called NPA, nonprosecution agreement between the

1    government and myself.

2    Q.  And are you testifying today pursuant to that

3    nonprosecution agreement?

4    A.  Yes.

5    Q.  I'd like to show you now what's been marked for

6    identification as Government Exhibit 2701.

7            MR. ZOLKIND:  Ms. Rao, if we could bring that up on

8    the witness' screen.

9    Q.  Do you recognize the document that's in front of you there?

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  That's the NPA.

13           MR. ZOLKIND:  Okay.  And Ms. Rao, if we could go to

14   the last page.

15   Q.  Did you sign this document?

16   A.  Yes, I did.

17           MR. ZOLKIND:  Your Honor, the government offers

18   Government Exhibit 2701.

19           MR. KIM:  No objection.

20           THE COURT:  Received.

21           (Government's Exhibit 2701 received in evidence)

22           MR. ZOLKIND:  We can take that down.

23   BY MR. ZOLKIND:

24   Q.  Dr. Gadio, what's your understanding of your main

25   obligation under that agreement?

1   A.  To tell the truth.

2   Q.  And what's your understanding of what happens if you do not

3   tell the truth?

4   A.  I can be prosecuted again for perjury and for the initial

5   charges.

6   Q.  And when you say the initial charges, do you mean that you

7   could be prosecuted for the charges that were initially brought

8   against you?

9   A.  Exactly.

10  Q.  All right.  Could you also be prosecuted for lying under

11  oath?

12  A.  Exactly.

13  Q.  Dr. Gadio, if you do tell the truth and fulfill the other

14  obligations in your agreement, what's your understanding of the

15  government's obligation?

16  A.  The government can no longer go back to the initial charges

17  and prosecute me.

18  Q.  As you understand it, Dr. Gadio, what specific actions has

19  the government agreed not to prosecute you for as long as you

20  fulfill your obligations?

21  A.  In December 2014, I was in Chad with the delegation of CEFC

22  and the president of Chad, and gift -- gift box were given to

23  the president of Chad, were delivered to him.  I learned

24  afterwards that they contained $2 million in cash.  And -- and

25  I did not walk away.

Q.  And when you say you didn't walk away, what do you mean by that?

A.  I knew it was wrong and I continued to help CEFC to pursue its interests in Chad.

Q.  And Dr. Gadio, where were you when those gift boxes were presented to the president of Chad?

A.  We were -- all of us were in the mansion of the president of Chad, in his meeting room.

Q.  And what was the topic of the meeting that you were all there for?

A.  To discuss oil interests of CEFC and other interests in Chad.

Q.  Who presented those gift boxes to the president?

A.  The CEFC delegation.

Q.  And who were the members of that CEFC delegation?

A.  Dr. Patrick Ho, Mr. Zhang, Dr. Lo, the translator, and perhaps other -- some other people, but that was the main members of the delegation.

Q.  All right.  And I'll ask you more about who those people are in a little bit.

        Let me first ask you:  With respect to the defendant, what was your understanding of the role that he was playing in that CEFC delegation in Chad?

A.  He and me, we were the main facilitators of the relationship between Chad and CEFC.

1    Q.   And who were the gift boxes presented to?

2    A.   To the president of Chad.

3    Q.   Did you know that there was cash in those boxes before they

4    were presented to the president?

5    A.   Not at all.

6    Q.   When you learned about $2 million in those gift boxes, what

7    was your reaction?

8    A.   I was surprised and I was shocked, too.

9    Q.   Why were you shocked?

10   A.   Because in any way I can think of, $2 million in cash and

11   in gift box, I can only think of bribery attempts.

12   Q.   Dr. Gadio, why, after learning about what you just

13   described, as you understood it, a bribery attempt, why did you

14   continue to assist the defendant and CEFC after that point?

15   A.   We worked so hard, my company, to reach that point, where

16   we established the relationship between CEFC and the president

17   of Chad, that I really wanted to be compensated for all the

18   hard work that we have put in that process; and secondly, Chad

19   is a very symbolic country for us because it -- that country

20   fought really hard fight to defeat Al Qaeda, to defeat ISIS in

21   the Sahara region, and to kind of protect all our countries,

22   and to also defeat Boko Haram.  And so the president of Chad

23   got himself in trouble.  His economy was down, no resources.

24   And I felt it was important to continue the process with CEFC

25   and to conclude the contract that we were seeking.

1    Q.  All right.  So just make sure that that's clear.  So with

2    respect to the reasons why you continued working on this deal,

3    one of them was because you thought that Chad was an important

4    country for the development of Africa, is that right?

5    A.  Exactly.

6    Q.  What was the other reason?

7    A.  To get compensated for the work we put to get to that level

8    of relationship between CEFC and Chad.

9    Q.  And at some point did the defendant pay you for the work

10   that you did?

11   A.  Later, yes.  $400,000, yes.

12   Q.  When you say you were paid $400,000, what currency was

13   that?

14   A.  In US dollars.

15   Q.  All right.  Let me move into some additional background

16   questions.

17           Dr. Gadio, where were you born?

18   A.  I was born in Senegal, Saint-Louis.

19   Q.  And how long did you live in Senegal?

20   A.  Until age 20, and then I went to France and finished my

21   school, went back to Senegal, and taught in Dakar University

22   and then got a PhD in that program and came back to the US.

23   Q.  That's when you attended Ohio State?

24   A.  From 1988 through, yeah, 1994.

25   Q.  Did you attend school in France as well?

1   A.  Yes, at Sorbonne in France.

2   Q.  What's your native language?

3   A.  Fulani.

4   Q.  And are you fluent in any other languages?

5   A.  Of course.  Fulani, my native language; and the dominant

6   language of Senegal is called Wolof, so I'm fluent in Wolof;

7   and then I studied France -- French for 55 years or more, so

8   very fluent I believe in French; and I'm trying English.

9           THE COURT:  So far, so good.

10          THE WITNESS:  Thank you.

11  Q.  Again, what year was it that you became Foreign Minister of

12  Senegal?

13  A.  In 2000.

14  Q.  And you said you were in that position for about nine and a

15  half years, is that right?

16  A.  Exactly, from April 2000 to October 2009.

17  Q.  And you mentioned starting Sarata, the firm, after that?

18  A.  Exactly, yeah.

19  Q.  Okay.  Now Sarata, was that a for-profit or not-for-profit

20  organization?

21  A.  It was a consulting firm for profit, yes.

22  Q.  And who else, if anyone, worked with you at Sarata?

23  A.  My son.  Before my son came in, actually, a friend of mine

24  who was ambassador also, diplomat, joined me, and we formed

25  Sarata together.

Ibr1ho6                        Gadio - Direct

```
1    Q.  And what's your son's name?

2    A.  My son is Boubker.  His name is Boubker.

3            MR. ZOLKIND:  If we could bring up for identification

4    what's been marked as Government Exhibit 821.

5    Q.  Do you recognize Government Exhibit 821?

6    A.  Yes.

7    Q.  And what do you recognize it as?

8    A.  That's the website of Sarata International.  Sarata

9    Holding.

10   Q.  Is that a fair and accurate reflection of what the website

11   looked like back in the fall of 2014?

12   A.  Yes, exactly.

13           MR. ZOLKIND:  Your Honor, the government offers

14   Government Exhibit 821.

15           MR. KIM:  No objection.

16           THE COURT:  Received.

17           (Government's Exhibit 821 received in evidence)

18           MR. ZOLKIND:  And Ms. Rao, if we could publish that to

19   the jury.

20   BY MR. ZOLKIND:

21   Q.  So it says here, "Sarata Holding - Connecting the world to

22   Africa."  Could you just explain again what exactly was the

23   business mission of your consulting company.

24   A.  Because of my diplomatic experience for almost ten years, I

25   felt that Africa did not get its fair share of international
```

Ibr1ho6

business and trade and it was high time for me to use my

knowledge to help African businesspeople connect with the rest

of the world and to help also the rest of the world partners,

business partners to come into Africa and to invest in the

country.

         MR. ZOLKIND:  All right.  We can take that down.

Q.  After stepping down as Foreign Minister of Senegal, did you

get involved in any not-for-profit organizations?

A.  In -- I'm sorry?  In?

Q.  After stepping down as Foreign Minister --

A.  Yes.

Q.  -- in addition to forming Sarata, the consulting company,

did you get involved in any not-for-profit organizations?

A.  Yes.  I created a political party.

Q.  What's the name of that party?

A.  *Mouvement politique citoyen*; that's Citizens Movement for

like Pan-Africanism, to unite African countries.

Q.  Any other organizations?

A.  Africa -- I created also, in 2012 -- actually, two years

later, I created IPS, which is an Institute for Peace and

Security in Africa, and it was in 2012.  It's a nonprofit

organization.  We call it institute.

         MR. ZOLKIND:  Your Honor, I'm about to turn to another

topic.  I'm happy to do that.  I just wanted to check with the

Court on the time.

Ibr1ho6

1       THE COURT:  Whatever you want.  If you want to go till
2   5, that's fine.  How long is your next topic?
3       MR. ZOLKIND:  It's going to be a lengthy topic.  This
4   is a logical breaking point, if that makes sense.
5       THE COURT:  All right.  Why don't we break for the
6   evening.
7       Ladies and gentlemen, would you comply with the normal
8   rules.  Please remember not to discuss the case among
9   yourselves or with anyone else.  Don't do any research on the
10   case.
11       Please leave your notebooks in the jury room.
12       Let's all try to be here on time ready to start at
13   10:00 tomorrow.  The more time we get in during the day, the
14   shorter the trial will be.  So you know how long it takes you
15   to get in through security, so come right in, sit down.  Your
16   coffee's been ordered for 9:15.
17       Have a pleasant evening, ladies and gentlemen.  Thank
18   you for your attention today.
19       (Continued on next page)
20
21
22
23
24
25

Ibr1ho6

```
 1              (Jury not present)
 2              THE COURT:  Ladies and gentlemen, if you'd remain in
 3     the courtroom until the jurors are down in the elevator, I'd
 4     appreciate it.  Thank you.
 5              You may step down, sir.  I'll just ask you to stay in
 6     the courtroom for a few minutes.
 7              Counsel, do you have anything to put on the record?
 8              MR. ROSENBERG:  Nothing from the defense.
 9              MR. ZOLKIND:  Your Honor, I think everything that we
10     want to raise, we can raise tomorrow.  So yes, I don't think
11     there's anything.
12              THE COURT:  I only know of one item.
13              MR. ZOLKIND:  Yeah, I was going to raise -- I was
14     going to let your Honor know what issues we do want to raise
15     tomorrow.  So there's the --
16              THE COURT:  Ladies and gentlemen, won't you be seated
17     for a minute.
18              Sir.
19              MR. ZOLKIND:  Your Honor, I think in addition to --
20              THE COURT:  The witness is still here.  Do you want
21     the witness taken out?
22              Can you put the witness in the witness room for a
23     minute.
24              Gentlemen.
25              MR. ZOLKIND:  Yes, your Honor.  In addition to the
```

Ibr1ho6

1   issues that were raised in the letter, which we'll respond to,

2   there's one other issue that we think makes sense to take up

3   tomorrow.

4           The government has prepared a summary chart reflecting

5   essentially the dates that the defendant traveled to and from

6   the United States and reflecting emails and text messages that

7   he sent relevant to this case while he was in the United

8   States.  We've had a lot of productive discussions with the

9   defense about that summary chart.  We understand they are

10  prepared to stipulate to the accuracy of it.  They have certain

11  objections to the relevance of different aspects of the chart.

12  And so we were hoping that the Court will rule as to the

13  relevance of those disputed portions, and then I think the rest

14  of the chart will come in through a stipulation.

15          THE COURT:  Okay.  Can you give me a heads up as to

16  what the issue is on the relevance of certain entries.

17          Why don't you let the defense address it.

18          MR. ZOLKIND:  Oh, certainly.

19          MR. ROSENBERG:  Your Honor, the chart shows the visits

20  to the United States by Dr. Ho.  It shows visits where he

21  stayed.  It also shows visits to the UN.  They're at the same

22  time.  And it shows emails.  But there are certain rows and

23  times Dr. Ho came to the United States where there are no

24  emails and no visits to the United Nations.  Our position is

25  that those are not relevant to anything in the case.  The dates

Ibr1ho6

1    don't correspond to anything, according to the chart itself,

2    that happened in the United States related to the case.

3            THE COURT:  Thank you.  So it was in fact a visit.

4            MR. ROSENBERG:  Correct, your Honor.  We don't dispute

5    it was a visit.  We just think it doesn't need to be -- it

6    ought not to be presented to the jury.  The rest of the chart

7    is fine.

8            MR. ZOLKIND:  To be clear, your Honor, the chart does

9    not say -- it's not titled, you know, "Relevant Visits" or

10   anything.  It just is a reflection of the defendant's trips to

11   the United States.  We think it is absolutely relevant that the

12   jury have a picture of, during the period of the charged

13   conspiracy, how frequently he was in the United States.

14           For example, Mr. Riccardi-Zhu was asked about how

15   frequently he came to the United States.  He gave an answer.

16   The chart will corroborate that answer.  We don't necessarily

17   know all the evidence that's going to come in either through

18   witnesses the defense may call or cross-examination, and so --

19           THE COURT:  Off the record.

20           (Discussion off the record)

21           MR. ZOLKIND:  -- a visit that, just because there's no

22   email or text message reflected on the chart, does not mean

23   it's not relevant.  There could be other testimony that makes

24   it relevant.  At a minimum, as I said, it corroborates what

25   witnesses like Mr. Riccardi-Zhu testified to.  There's

Ibr1ho6

1    certainly no prejudice in the jury seeing how frequently he

2    came to and from the United States.  In fact, the defense had

3    stipulated to the admission of his passport, which reflects the

4    same exact thing.  It's just that it would require more work to

5    go through the passport.  So we think it's totally

6    unobjectionable evidence, plainly relevant.

7            THE COURT:  All right.  Let me see the chart in the

8    morning, and then if there's anything else you want to add to

9    it, I'll be happy to listen.

10           MR. ZOLKIND:  Thank you, your Honor.

11           THE COURT:  Anything else, gents?

12           MR. RICHENTHAL:  Small administrative matter.

13           The parties agree that with respect to certain

14   stipulations -- and in particular, the website one that

15   Ms. Ghosh put into evidence -- to the extent that it refers to

16   exhibits that themselves are not ultimately admitted, the

17   parties are going to remove them or redact it so the copy of

18   the stipulation the jury ultimately gets won't lead them to

19   speculate about certain things.

20           I just want your Honor to know the parties have come

21   to that agreement.

22           THE COURT:  All right.  As long as you people are on

23   top of it, it's fine.

24           MR. RICHENTHAL:  That's it from the government, your

25   Honor.

Ibr1ho6

1          THE COURT:  Okay.  Off the record.

2          (Discussion off the record)

3          THE COURT:  Thank you, counsel.  Good evening.

4          (Adjourned to November 28, 2018, at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3    VUK JEREMIC

 4   Direct By Mr. Richenthal . . . . . . . . . . .44

 5   Cross By Mr. Kim . . . . . . . . . . . . . 177

 6   Redirect By Mr. Richenthal . . . . . . . . 194

 7   DAVID WEN RICCARDI-ZHU

 8   Direct By Ms. Ghosh . . . . . . . . . . . 197

 9   Cross By Mr. Rosenberg . . . . . . . . . . 231

10   Redirect By Ms. Ghosh . . . . . . . . . . 243

11   CHEIKH TIDIANE GADIO

12   Direct By Mr. Zolkind . . . . . . . . . . . 245

13

14

15                  GOVERNMENT EXHIBITS

16   Exhibit No.                         Received

17    1516    . . . . . . . . . . . . . . . . . .49

18    1504    . . . . . . . . . . . . . . . . . .53

19    1504A   . . . . . . . . . . . . . . . . . .53

20    2302    . . . . . . . . . . . . . . . . . .55

21    1501    . . . . . . . . . . . . . . . . . .59

22    1501A and 1501B  . . . . . . . . . . . . .59

23    1515    . . . . . . . . . . . . . . . . . .63

24    1506, 1506A and 1506B  . . . . . . . . . .65

25    1507 and 1507A . . . . . . . . . . . . . .75
</pre>

1    1509 and 1509A  . . . . . . . . . . . . . . .76

2    2730R   . . . . . . . . . . . . . . . . . . .81

3    2713R   . . . . . . . . . . . . . . . . . . .84

4    2703    . . . . . . . . . . . . . . . . . . .90

5    2704 and 2705  . . . . . . . . . . . . . . .94

6    2716R   . . . . . . . . . . . . . . . . . . .98

7    2732R   . . . . . . . . . . . . . . . . . . 102

8    413R, 2735R, 2736R, and 2738R  . . . . . . 105

9    2739R   . . . . . . . . . . . . . . . . . . 133

10   2741R   . . . . . . . . . . . . . . . . . . 138

11   200R    . . . . . . . . . . . . . . . . . . 143

12   1502, 1502A, 1502B  . . . . . . . . . . . . 156

13   2714R   . . . . . . . . . . . . . . . . . . 157

14   254     . . . . . . . . . . . . . . . . . . 161

15   2710R   . . . . . . . . . . . . . . . . . . 166

16   2706    . . . . . . . . . . . . . . . . . . 170

17   2707, 2708, 2709  . . . . . . . . . . . . . 172

18   2742R   . . . . . . . . . . . . . . . . . . 175

19   1506B   . . . . . . . . . . . . . . . . . . 201

20   S4      . . . . . . . . . . . . . . . . . . 204

21   2201 through 2204  . . . . . . . . . . . . 205

22   412     . . . . . . . . . . . . . . . . . . 220

23   S11     . . . . . . . . . . . . . . . . . . 224

24   807     . . . . . . . . . . . . . . . . . . 225

25   S8      . . . . . . . . . . . . . . . . . . 225

1    907-TX   . . . . . . . . . . . . . . . . . 226

2    2701     . . . . . . . . . . . . . . . . . 252

3    821   . . . . . . . . . . . . . . . . . . 258

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25