UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
            v.                                      :
                                                    :
CHI PING PATRICK HO,                                :        No. 17 Cr. 779 (LAP)
     a/k/a "Patrick C.P. Ho,"                       :
     a/k/a "He Zhiping,"                            :
                                                    :
                          Defendant.                :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**DEFENDANT'S SENTENCING MEMORANDUM**


                        KRIEGER KIM & LEWIN LLP
                        500 Fifth Avenue, 34th Floor
                        New York, New York 10110
                        Tel.: (212) 390-9550

                        DECHERT LLP
                        Three Bryant Park
                        1095 Avenue of the Americas
                        New York, New York 10036
                        Tel.: (212) 698-3500
                        Fax: (212) 698-3599

                        *Attorneys for Chi Ping Patrick Ho*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   PATRICK'S LIFE AND BACKGROUND............................................................... 1

    A.    Early Years.................................................................................................. 1

    B.    College, Medical School, and Post-Medical School Training..................... 3

    C.    Medical Practice in Hong Kong ................................................................. 5

    D.    Private Medical Practice and Transition into Politics................................ 10

    E.    Post-Government Activities....................................................................... 12

    F.    Patrick's Family ...................................................................................... 16

    G.    Time at the MCC ..................................................................................... 18

III.   A SENTENCE OF TIME SERVED IS APPROPRIATE ...................................... 21

    A.    The Guidelines Do Not Accurately Reflect the Appropriate Sentence ..................... 21

    B.    The Total Offense Level Should Be 37, Not 39 ......................................... 22

    C.    When the Offense Is Considered in the Context of Patrick's History and Characteristics, Justice Does Not Require Additional Time ..................... 25

    D.    The Immigration Consequences of Patrick's Conviction Merit Leniency ................ 28

    E.    Additional Time Is Not Necessary to Achieve Specific or General Deterrence......... 28

IV.   CONCLUSION..................................................................................................... 31

## **TABLE OF AUTHORITIES**

**Cases**

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...................................................................... 29, 30

*United States v. Blackmon*,
    557 F.3d 113 (3d Cir. 2009)...............................................................................24

*United States v. Chong*,
    No. 13 Cr. 570 (JBW), 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014)..................................28

*United States v. Collins*,
    No. 17 Cr. 1170 (LAP) (S.D.N.Y. July 15, 2013) ..................................................22

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)...............................................................................21

*United States v. Dhafir*,
    577 F.3d 411 (2d Cir. 2009)..............................................................................23

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004).....................................................................22

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).....22, 27, 29, 30, 31

*United States v. Johnson*,
    No. 16 Cr. 457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ..................................22

*United States v. Mata*,
    409 F. App'x 740 (5th Cir. 2011) ......................................................................24

*United States v. Ng*,
    15 Cr. 706 (VSB) (S.D.N.Y. Mar. 30, 2018)...............................................................27

*United States v. Ng*,
    15 Cr. 706 (VSB) (S.D.N.Y. May 11, 2018) ..............................................................27

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...................................................................22

*United States v. Tanner*,
    No. 17 Cr. 61 (LAP) (S.D.N.Y. Oct. 30, 2018)...........................................................22

*United States v. Thavaraja,*
    740 F.3d 253 (2d Cir. 2014)........................................................................28

*United States v. Weeks,*
    No. 16 Cr. 167 (LAP) (S.D.N.Y. Sept. 14, 2018) ...................................20

**Statutes**

18 U.S.C. § 1956...........................................................................................24

18 U.S.C. § 1957...........................................................................................24

18 U.S.C. § 3553 ....................................................................21, 25, 27, 28, 29

U.S.S.G. § 2B1.1...........................................................................................24

U.S.S.G. § 2C1.1.....................................................................................23, 24

U.S.S.G. § 2S1.1.....................................................................................23, 24

U.S.S.G. § 3D1.2.....................................................................................22, 23

U.S.S.G. § 3D1.3...........................................................................................23

**Other Authorities**

Human Rights Watch et al., *Code Red: The Fatal Consequences of Dangerously
Substandard Medical Care in Immigration Detention* (2018), https://bit.ly/2JbPu8y ................28

Ian Urbina, *Using Jailed Migrants as a Pool of Cheap Labor*, N.Y. Times,
May 24, 2014, https://nyti.ms/2VNhS2h .......................................................28

Ian Urbina & Catherine Rentz, *Immigrants Held in Solitary Cells, Often for Weeks*,
N.Y. Times, Mar. 24, 2013, https://nyti.ms/2NZEGcN ................................28

U.S. Sentencing Commission, *Recidivism Among Federal Offenders:
A Comprehensive Overview* 23 (2016), https://bit.ly/2VPgE6Y ...................29

## I.     PRELIMINARY STATEMENT

Patrick Ho is a remarkable man.  He has led a life filled with extraordinary accomplishments and enduring work to better the lives of those around him.  The many chapters of his life are united by a common theme: Patrick has consistently sought to build bridges among people.  He has approached his work and life with a spirit of service, whether it be through treating patients in rural China, teaching scores of young doctors, serving the people of Hong Kong as a public administrator, hosting conferences on energy security, overseeing a grant program through the United Nations to support worthy development projects, or building appreciation for beautiful music.  The crimes of which he has been convicted are a small and uncharacteristic part of his long and successful life.

In light of Patrick's exceptional history of service and charity, his age and family circumstances, and his contributions to the Metropolitan Correctional Center (the "MCC") community during his incarceration, we respectfully ask the Court to impose a sentence of time served.  By the time he is sentenced, Patrick will have spent more than 16 months in custody, half a world away from home.  During these months, the lives of Patrick and his family have been upended.  An additional term of incarceration is unnecessary for deterrence purposes, and a sentence of time served appropriately balances the offense conduct against Patrick's exemplary character and personal history.

## II.     PATRICK'S LIFE AND BACKGROUND

### A.     Early Years

Patrick grew up during a different era.  He was born in Hong Kong in 1949, just as the Chinese Civil War was coming to a close.  He was raised in a middle-class family that, while not wealthy, was loving.  His father, Thomas, was a civil engineer who worked in construction for

many years before moving into a middle-management position at an electronics company, where he stayed until his retirement. Patrick's mother, Chan Ha, was a schoolteacher who taught English at a Catholic girls' school. Patrick has one brother, Joseph, who is two years his junior. Patrick's father passed away in 2017, but Patrick is a devoted son to his mother, now 92 years old, and he remains close with his brother.

From a young age, Patrick distinguished himself as a bright and hardworking student. After completing elementary school, Patrick took a standardized test used to place students in secondary school. His score was sufficiently high to secure his admission to the prestigious Diocesan Boys' School in Hong Kong, which was administered by the Anglican Diocese of Hong Kong. He was an excellent student, and "throughout [his] years in school," he stood out as being "gentle in character and helpful to others." Ex. 22, Bowen Leung Letter.

Music was an important part of Patrick's life, as was his Christian faith. He was a talented classical violinist, and he played in folk bands with his classmates. *See* Ex. 83, Shelley Lee Letter; Ex. 21, Peter C. Kwok Letter. Shelley Lee, one of Patrick's childhood bandmates, recalls him as a "dignified musician. . . [and] a team player," whom she appreciated for his "deep Christian faith [and] generosity of spirit." Ex. 83, Shelley Lee Letter.

While Patrick was at Diocesan, the headmaster bought him a violin that "match[ed] up with this talent," because his family could not afford one. Ex. 16, Fung Yee Wang Letter. Patrick responded to this generosity in what would prove to be characteristic fashion: he worked hard to cultivate his talents and paid the generosity forward. During high school, Patrick won several prizes as a violinist and worked as a violin teacher, using his earnings to pay for cello lessons for his brother, Joseph. *See id.*; Ex. 4, Joseph Ho Letter.

2

Attending the Diocesan Boys' School was formative for Patrick, and he credits his time there as having instilled in him a love of learning and a deep concern for ethics and community. In his later years, Patrick expressed his gratitude by financially supporting his *alma mater* and providing assistance to needy students.  Ex. 94, Lister T.S. Chang Letter; Ex. 28, Sung Tai Wai Letter.  Today, the school has a driveway named in his honor.  Ex. 94, Lister T.S. Chang Letter.

### B.      College, Medical School, and Post-Medical School Training

Upon his graduation from high school, Patrick had planned to attend a university in Hong Kong.  However, those plans changed one day when the dean of the music school at Stetson University, who happened to be visiting Hong Kong, heard Patrick playing violin during a concert.  The dean was so impressed that he approached Patrick and offered him a scholarship to attend the university.  This serendipitous encounter opened a world of opportunities that otherwise would not have been available to Patrick, in light of his family's modest finances. Patrick embraced the opportunity, and in 1968, he left the world he knew and boarded a ship bound for the United States in order to attend Stetson in Florida.

Patrick loved Stetson and recalls his years there as some of the best of his life.  As he has done in every chapter of his life, Patrick defied easy characterization.  He majored in chemistry, but his wide-ranging interests led him to other pursuits as well.  Patrick took classes in history, philosophy, and the sciences, and he played in the Stetson orchestra for ten hours a week, eventually becoming concertmaster.

Lacking the funds to travel home, he worked during his summer breaks to earn money to pay for his room and board.  He spent his first summer cleaning rooms at a country club outside of Chicago.  Patrick's faith remained an important part of his life, and for a time, Patrick considered becoming a theologian.  But Patrick also had a mind for science, and after reflection

and consultation with his family, he decided to pursue medicine.  In 1972, Patrick graduated

from Stetson *magna cum laude* with a B.S. degree.

Patrick attended medical school at Vanderbilt University in Nashville, Tennessee.  As he

had at Stetson, Patrick received a generous scholarship, but it did not cover all of his expenses.

To make up the difference, Patrick worked as a session musician on the Nashville music scene.

Dr. Walter King, Patrick's medical school roommate and former colleague, remembers Patrick

during his medical school years and fellowship as "a kind hearted, hard working, extremely

skillful, [and] intelligent . . . aspiring young ophthalmologist who [was] always law abiding and

who [held] American values and cultures in high regard."  Ex. 40, Dr. Walter W.K. King Letter.

When it came time to settle on a medical specialty, Patrick chose eye surgery.  Because

his years of playing the violin had made him skillful with his hands, he reasoned that he was

well-suited for the delicate movements that eye surgery required.  That instinct proved to be

right, to the eventual benefit of patients and physicians around the world.

Patrick's promise as a physician was recognized early, and he was trained at some of the

best hospitals in America.  After receiving his medical degree from Vanderbilt in 1976, Patrick

completed a one-year internship at UCLA-Harbor General Hospital in Los Angeles.  He then

returned to Vanderbilt in 1977 for a three-year ophthalmological residency, eventually becoming

chief resident in 1979.  According to Dr. Lily Chen, a friend and colleague of Patrick's, Patrick

had "a great reputation in his department, [and was] always willing to help his fellow residents."

Ex. 11, Dr. Lily Chen Letter.  Patrick also made a point of sharing his musical gifts during his

residency.  He would play the violin for his friends at social gatherings, and he helped Dr.

Chen's son learn the "the finer techniques" of the instrument.  *Id.*

After completing his residency in 1980, Patrick began a clinical fellowship at the Eye Research Institute and Massachusetts Eye and Ear Infirmary (the "ERI/MEEI"), an affiliate of Harvard Medical School.  At the ERI/MEEI, he was mentored by Charles L. Schepens, a pioneer in the field of retinal surgery.  Patrick stayed at the ERI/MEEI for three years, treating patients, performing retinal surgeries, and conducting research on diabetic eye disease.  By 1983, when he completed his fellowship, Patrick was a Fellow of the American Academy of Ophthalmology; he was certified by the American Board of Ophthalmology; and he was licensed to practice medicine in Tennessee, Massachusetts, and California.

### C.      Medical Practice in Hong Kong

Patrick was well on his way to a prestigious—and lucrative—medical career in the United States.  Around this time, many young professionals were leaving Hong Kong to pursue careers in the United States, where economic prospects were better.  But Patrick had the opposite desire.  He wanted to use what he had learned in the United States to improve the medical field back home, which at the time was decades behind the United States.  Thus, after his fellowship, Patrick made the momentous decision to return to Hong Kong to practice medicine and train a new generation of ophthalmologists.  As the letters submitted by Patrick's patients, students, and colleagues attest, that decision yielded a staggering legacy.

In 1983, Patrick accepted an offer to join the faculty of the Chinese University of Hong Kong ("CUHK"), a public university that was opening what would become only the second medical school in Hong Kong.  While CUHK was building its teaching hospital, Patrick spent a year as a clinical assistant professor at the University of California, San Francisco and as a consultant in the Kaiser Permanente Medical System, and then returned to Hong Kong in 1984.

5

Once Patrick arrived at CUHK, he set to work developing the school's Eye Teaching Unit and designing its teaching program.  Patrick was the first full-time academic ophthalmologist in Hong Kong, and by 1988, he had become a full professor.  In the words of Dr. Clement Tham, Patrick's successor at CUHK: "[Patrick] single-handedly established academic ophthalmology in Hong Kong, and also placed [CUHK] and [its] work firmly on the world map."  Ex. 54, Dr. Clement Chee-Yung Tham Letter.  For ten years, Patrick treated patients, performed surgeries, ran clinics, gave lectures, and trained students.  Between 1985 and 1987, he served as Honorary Secretary General for the Hong Kong Medical Association, and between 1988 and 1991, he served three terms as President of the Hong Kong Ophthalmological Society.

It is no exaggeration to say that Patrick's teaching revolutionized the practice of ophthalmology in Hong Kong and mainland China.  When Patrick joined CUHK, "[t]he standard of ophthalmic care in Hong Kong and China . . . was at least 50 years behind that in the [United] States."  Ex. 43, Prof. Jimmy Lai Letter.  Patrick made it his mission to correct that.

At CUHK, Patrick established the region's first subspecialty training in vitreoretinal disease and surgery, and he taught the most advanced medical techniques to young doctors.  In addition to teaching doctors from Hong Kong, Patrick launched and personally funded a post-graduate clinical fellowship program at CUHK for doctors from mainland China and other countries in Asia.  As Dr. Clement Chan, one of Patrick's former colleagues, writes: "[Patrick] had no reservation in passing his skills and knowledge to [foreign doctors] who very soon became experts in the area and able to serve patients in their countries."  Ex. 32, Dr. Clement W.N. Chan Letter.  Patrick's fellows returned home to share their new knowledge with local doctors and medical students, leading to a broad regional modernization of the practice.

6

Shortly after joining CUHK, Patrick dedicated himself to bringing vitrectomy,[1] which was at the time an innovative and potentially life-changing eye surgical technique, to other doctors in China.  As one ophthalmologist who met Patrick during this period explains, vitreoretinal surgery in mainland China "was still in its infancy" around this time, and "[i]t was amazing to see those blind people whom we used to believe hopeless have their vision miraculously restored under [Patrick's] treatment."  Ex. 57, Dr. Wang Zhijun Letter.  As another colleague from China writes: "no ophthalmologist [in mainland China] had ever personally seen a vitrectomy operation" before Patrick's demonstrations; they had only read about it in journals.  Ex. 50, Dr. Zhizhong Ma Letter.  Patrick taught the technique to ophthalmologists around the country, establishing himself as "the pioneer of vitrectomy . . . in mainland China."  *Id.*  Around this time, Patrick became an honorary or visiting professor or consultant at more than a dozen universities, eye institutes, and hospitals in mainland China.

Patrick has been recognized on numerous occasions for what his peers describe as his "enormous" "contribution . . . in the development of ophthalmology in Hong Kong, China, Asia and beyond."  Ex. 44, Dr. Timothy Lai Letter.  For example, in 2014, Patrick received the first-ever Lifetime Achievement Award from the Chinese Ophthalmological Society.  In 2018, he received the Outstanding Contribution Award from the Chinese Ocular Fundus Diseases Society.

But Patrick was not simply a pioneer in his field.  He was also a devoted and inspiring teacher to the young physicians he mentored.  He cared deeply about mentorship and cultivating the next generation of doctors.  As he once explained to one of his colleagues:

> I love taking care of my patients[,] but I only have 24 hours a day[.]  [N]o matter
> how hard I work, I can only treat a finite number of patients.  Identifying, grooming

---

[1]     Vitrectomy is a surgical technique whereby the vitreous—the clear, gel-like substance that fills the eye—is removed and replaced with another liquid.  The purpose of vitrectomy is to treat problems with the vitreous or facilitate surgical repairs to the retina or macula.

and helping young talents to become somebody, who would shoulder major
responsibility in [the] future is very meaningful and my priority.

Ex. 46, Dr. Dennis S.C. Lam Letter.  His efforts yielded enormous fruit, and he successfully

inspired many young medical students to pursue careers in ophthalmology.  *See, e.g.*, Ex. 47, Dr.

Vincent Y.W. Lee Letter.  In a remarkable testament to Patrick's efforts, many of his former

students have written letters to the Court attesting to the profound impact he had on their careers.

*See, e.g.*, *id.*; Ex. 38, Dr. Ho Sze Yuen Letter; Ex. 41, Dr. Kwok Sek Keung Letter; Ex. 48, Dr.

Peng Iok Lo Letter; Ex. 56, Dr. Tsui Chung-Wan Letter.

Patrick built a legacy of excellence in his profession, but perhaps just as importantly, he

imparted to his students the importance of giving back to the community.  His former students

and colleagues remember him as being "very concerned about ordinary citizens' eye health" and

as "a dedicated Christian" with a "heart for the needy."  Ex. 48, Dr. Peng Iok Lo Letter; Ex. 46,

Dr. Dennis S.C. Lam Letter.  Throughout his career, Patrick regularly participated in free public

eye screenings, and he encouraged his students to do the same.  As one former student, Dr.

Kwok Sek Keung, recalls:

> During weekends or long holidays, we [Patrick and his students] would deliver care
> to indigenous people living in the most remote areas.  We set foot in temples and
> prisons[,] school[s] for the blinded and hospitals for terminally ill patients.  When
> [Patrick] was not in Hong Kong, it was never about vacation.  He [would] be
> teaching somewhere in Asia or providing eye care in rural China.

Ex. 41, Dr. Kwok Sek Keung Letter.  Patrick's career was built around service, and his charitable

work inspired his students and colleagues to "volunteer regularly and aspire to [Patrick's] spirit

of community contribution."  Ex. 38, Dr. Ho Sze Yuen Letter.  From the development of eye

banks to raising money for his hospital's cancer center, Ex. 46, Dr. Dennis S.C. Lam Letter; Ex.

83, Shelley Lee Letter, Patrick took every opportunity to improve the health of his community.

Patrick eventually expanded his efforts to improve eye care in the region by working with the Hong Kong Lions Club to organize "sight saving" missions to underserved areas of China. In the late 1980s, Lions Clubs International had launched a program called "SightFirst" that funded efforts all over the world to fight blindness and provide services to the blind and visually impaired. In the 1990s, the Hong Kong Lions Club brought SightFirst to mainland China, where there was a tremendous need for such services. Patrick helped the Club launch SightFirst China Action ("SFCA") and served as the project's technical adviser. According to Dr. Wing-Kun Tam, the former President of Lions Clubs International and the Project Chairman of SFCA:

> [Patrick] joined [the SFCA] medical team on numerous occasions to provide trainings for local eye doctors and conduct cataract operations. His enthusiasm and commitment were most vividly shown during the field missions. It often took extensive hours to reach the remote regions of China . . . [y]et it did not stop him from leading and supporting the missions. He was even willing to extend the surgery sessions until late evenings so more patients could be treated.

Ex. 78, Dr. Wing-Kun Tam Letter. Over the life of the project, SFCA "provided over 5.2 million cataract surgeries, trained 60,000 ophthalmologists and set up more than 210 county-level eye clinics." *Id.* In support of SFCA, Patrick personally traveled to 33 provinces in China. *See* Ex. 76, Ho Yu Tin Letter; Ex. 77, Eddie Lam Sui Loong Letter.

In 1994—after a decade in academia—Patrick left CUHK and opened a private medical practice. The same year, he founded the Hong Kong Eye Foundation, a charitable organization that held public education events, organized public eye screenings (for children and the handicapped, among others), and assisted patients who could not afford to pay for treatment.

Even while operating his successful medical practice, Patrick continued to treat patients who could not afford his services. According to Patrick's mother:

> Once there was a blind monk who went to [Patrick's] clinic in Hong Kong and told him how much he admired [Patrick's] advanced medical skills and sought his medical advice in particular, but he said he was poor and could not afford the

medical bills.  Patrick simply treated and cured his eye disease for free, enabling the monk to see again.

Ex. 3, Ho Cheung Chan Ha Letter.  Patrick's wife recalls a similar story:

> [Patrick] received an elderly woman about 70 years old in his clinic . . . and she asked [Patrick] to perform an eye surgery on her eyes.  She already had the money ready, which was about HKD 50,000.  [Patrick] saw her humble dress which was a bit worn, noted the home address that this elderly woman provided, and figured out that she was living on Comprehensive Social Security Assistance (a measure provided by the Hong Kong government for those living in poverty). [Patrick] instantly decided not to charge her, but still performed the surgery for her. This elderly woman could not believe that there was such a kind doctor in the world.

Ex. 1, Sabrina Hui Chung Hu Letter.

### D.    Private Medical Practice and Transition into Politics

Patrick's broader commitment to service gradually led him to activities outside of the medical field.  In 1993, he was invited to join the Chinese People's Political Consultative Conference (the "CPPCC"), an advisory legislative body in China in which he served until 2012. In 1995, Patrick became Vice Chairman of the Hong Kong Policy Research Institute (the "PRI"), a think tank that developed domestic policy for Hong Kong in anticipation of its handover from the United Kingdom to China, which took place in 1997.  In partnership with the U.S.-based Heritage Foundation, the PRI developed an index to measure economic freedom in Hong Kong.

Between 1996 and 2002, Patrick was appointed to a series of governmental positions in Hong Kong.  In 1996, he joined the Preparatory Committee for the Hong Kong Special Administrative Region (the "HKSAR"), the official body established to oversee Hong Kong's transition to Chinese sovereignty.  After the handover in 1997, C.H. Tung, the HKSAR's first Chief Executive, appointed Patrick to Hong Kong's Urban Council, which was responsible for municipal services in Hong Kong until it was disbanded in 1999.  In 1999, Patrick was appointed a Justice of the Peace, a position that he held until 2017.  As a Justice of the Peace, Patrick was responsible for conducting inspections of prisons, detention and correctional centers, psychiatric

10

hospitals, nursing homes, and hostels to ensure that the human rights of inmates and inhabitants were protected and that their complaints were adequately addressed.

In 2000, Patrick became the Chairman of the Hong Kong Arts Development Council (the "ADC")—Hong Kong's analogue to the U.S. National Endowment for the Arts. In this position, Patrick helped craft Hong Kong's art and cultural policies and oversaw grant allocations to visual, literary, and performing artists. In carrying out his work with the ADC, Patrick stood out as "a good man that has a true heart." Ex. 93, Elias Kwan Kee Yip Letter.

Until 2002, Patrick's public service and government work, while significant, was part-time. He was still first and foremost a practicing ophthalmologist, engaged in both patient care and medical charity work. This changed in 2002, when Chief Executive Tung was reelected, and he asked Patrick to join his cabinet as Hong Kong's Secretary for Home Affairs. After consultation with his family, Patrick accepted, much to the surprise of many of his medical colleagues. At the time, Patrick was at the peak of his profession, and his move required him to take an 80 percent pay cut. But as Patrick later explained to one of his colleagues, "a single pair of hands especially in private practice could not impact the world the way he had always aspired to." Ex. 34, Dr. Gordon Kwok-On Chau Letter. Thus, Patrick gave up his successful medical practice, and accepted the call to serve in a different arena. For five years, he oversaw the local affairs of Hong Kong, managing a department of more than 10,000 civil servants. His mandate included public education, district management, housing management, district elections, sports, parks, culture, the arts, youth, religious affairs, racial affairs, and human rights.

During his tenure as Secretary for Home Affairs, Patrick organized events held in Hong Kong as part of the 2008 Beijing Summer Olympics, and helped manage Hong Kong's response to the Severe Acute Respiratory Syndrome ("SARS") epidemic in 2003. He mediated the

11

aftermath of a tragic building collapse, Ex. 96, Chung Pui-Lam Letter, and he led efforts to convert an old factory into a creative arts center that today accommodates over a hundred artists and regularly holds public events, Ex. 88, Tsang Tak Sing Letter.  Patrick worked hard to promote religious activities and religious diversity in Hong Kong, *see* Ex. 102, Rev. Kim-Kwong Chan Letter; Ex. 109, The Most Rev. Dr. Paul Kwong Letter; Ex. 111, Lee Yiu Fai et al. Letter, and introduced legislation to protect racial and ethnic minorities from discrimination, *see* Ex. 81, Hon. Ip Kwok Him Letter.  The hallmark of Patrick's tenure was "his sincere concern for the betterment of the community" and his devotion to the "well-being of the Hong Kong people." Ex. 88, Tsang Tak Sing Letter; Ex. 109, The Most Rev. Dr. Paul Kwong Letter.  That politicians, archbishops, and ordinary citizens have written on Patrick's behalf is a testament to the success of his work and his popularity as a government official.  *See, e.g.*, Ex. 88, Tsang Tak Sing Letter; Ex. 109, The Most Rev. Dr. Paul Kwong Letter; Ex. 147, Lawrence Wong Letter.

In the midst of his many professional endeavors, Patrick also found time during his years in Hong Kong to share his passion for music.  He played violin with multiple orchestras, including the Hong Kong Medical Association Orchestra and the Orchestra of Hong Kong Professionals, both of which he founded.  For two years, Patrick hosted a classical music appreciation radio program in Hong Kong called "Nocturne."  In addition, from 1998 to 2000, Patrick served as Chairman of the Hong Kong Philharmonic Society, the organization responsible for the oversight and management of the Hong Kong Philharmonic Orchestra.

E.     **Post-Government Activities**

Patrick's term as Secretary for Home Affairs ended in 2007.  The same year, the HKSAR awarded him the Gold Bauhinia Star—its second highest honor—in recognition of his service. While Patrick's formal role in government ended that year, his service continued in other forms.

12

In 2008, one of the deadliest earthquakes in history struck Sichuan province in China, killing nearly 90,000 people.  Patrick raised money and organized summer camps for orphaned children and helped rebuild schools in the affected areas.  Patrick's friend, Lisa Lau, writes:

> I can remember when [Patrick] came to me for help [with] the Szechuan Earthquake (Wenchuan) in 2008[.]  [H]e was not requesting . . . money but looking for resources to help children in the ruin; Patrick under[stood] during that time of grief, the best assistance [was] to bring children back to their normal living . . . From this I understand Patrick think[s] beyond just money-help[;] [the] school environment [was] a practical remedy for these children during [a] time of hardship.

Ex. 98, Lisa Man Man Lau Letter.  According to Ms. Lau, Patrick's work after the earthquake was a reflection of his unfailing "read[iness] to give and mobilize others to join hands and create better living for the deprived."  *Id.*

Patrick did not only perform public acts of service.  He also engaged in private acts of kindness that were never publicized.  For example, Patrick's driver, Tam Jin Hung, recalls an "unforgettable incident" from October 2017, shortly before Patrick's arrest:

> [A]fter reading a story about an elderly couple in the . . . Hong Kong Oriental Daily News, [Patrick] instructed me to pass on HKD 10,000 [about $1300] to the elderly couple in the story to help them buy useful daily necessities.  [Patrick] also said that it would not be necessary to tell the elderly couple who was helping them.

Ex. 123, Tam Jin Hung Letter.  The couple had been struggling to get by, and wrote a touching note of thanks to Mr. Tam.  *See id.*  They never knew of Patrick's involvement.

In 2008 or 2009, Patrick met Ye Jianming, the Chairman of CEFC China Energy Company Limited (the "CEFC Company"), who sought Patrick's help in creating a think tank devoted to international public diplomacy and energy security.  Patrick was initially uncertain about his role in such a venture, given his background in medicine and domestic policy, but Mr. Ye had a broad and compelling vision for the think tank that encompassed the impact of energy development on society and communities around the world, and he eventually convinced Patrick to join the project.  Patrick saw this as an opportunity to make a positive contribution on an

international scale and in a different arena, leveraging the skills and connections he had developed during his time in the Hong Kong government.  Thus, in 2009, Patrick began working with the CEFC Company to set up the think tank, which was launched in 2010 under the name China Energy Fund Committee (the "CEFC Think Tank").

To be sure, Patrick's involvement in the CEFC Think Tank gave rise to the conduct underlying this case.  But that conduct should not overshadow the genuine and well-intentioned good that resulted from Patrick's work with the organization.  Under Patrick's leadership, the CEFC Think Tank published periodicals, hosted conferences and symposia, and engaged in various philanthropic activities.  The periodicals included the *CEFC China Energy Journal*, a monthly English-language publication for an international audience concerning the Chinese energy sector, and *China Eye*, a biannual publication focused on Chinese geopolitics.  In addition, the CEFC Think Tank published annual reports on energy in China and monographs on China's Belt and Road Initiative.  Twice a year, the CEFC Think Tank held symposia on Sino-U.S. relations with participants from China and the United States at a venue that alternated between Hong Kong and the United States.  Beginning in 2013, the CEFC Think Tank also held annual symposia at the United Nations ("UN") devoted to issues raised at the most recent annual political convention in China.

In addition, the CEFC Think Tank, in consultation with the UN Department of Economic and Social Affairs ("UN-DESA"), established and funded the "Powering the Future We Want" grant—an annual $1 million award for a promising sustainable energy project (the "Energy Grant").  The CEFC Think Tank donated approximately $2 million to the UN every year to fund the prize and its administration.  Finalists for the grant were chosen by a panel of energy leaders from around the world, and the winner was confirmed by a committee that included Patrick and

various high-ranking UN officials.  All of the finalists participated in capacity-building workshops, seminars, and practitioner-to-practitioner training opportunities to disseminate and share knowledge.  In 2015, the Energy Grant was awarded to We Care Solar, a non-profit organization based in Berkeley, California, that supplies portable "Solar Suitcases" to provide light for medical procedures during childbirth in areas of Africa without electricity.  In 2016, it was awarded to SINTEF, a Norwegian non-profit research institute initiating a pilot project to demonstrate the feasibility and benefits of solar-fueled electric ferries to reduce road transport and fossil fuel emissions.  And in 2017, it was awarded to Grameen Shakti and ME SOLshare, two companies working in partnership to provide a platform for villagers to construct their own solar power grids, bringing electricity to rural, off-grid areas of Bangladesh.

Patrick considered his work with the CEFC Think Tank to be another phase of his lifelong effort to improve the lives of others.  John Hofmeister, the former President of Shell Oil Company, who worked closely with Patrick during Patrick's time at the CEFC Think Tank, was struck by Patrick's "dedication and commitment . . . to the impact on the world, developed and developing, of the future of energy and sustainable development."  Ex. 120, John D. Hofmeister Letter.  According to Mr. Hofmeister:

> Everything I knew and witnessed of [Patrick's] role modeled my expectations of a Foundation leader who was leveraging every means available to reach, engage and influence stakeholders wherever possible . . . I saw his organization as similar to what I experienced among the major integrated international oil companies such as the Shell Foundation, Shell Oil's own foundation, the ExxonMobil Foundation, the BP Foundation, and others that provide a philanthropic activist outreach for the larger organizations that fund them.

*Id.*  Similarly, Dr. Gal Luft, the co-director of a U.S. think tank, recalls Patrick's "dedicat[ion] . . . to the eradication of energy poverty through awareness raising and the promotion of the Belt and Road Initiative."  Ex. 122, Dr. Gal Luft Letter.  Even as Patrick sought to serve in a more visible and prominent way, his character was unchanging.  He remained the same beloved figure

to associates and colleagues that he had been to his students and fellow doctors years before: "soft spoken, thoughtful, respectful, kind, compassionate, generous and jolly." *Id.*

### F.     Patrick's Family

Patrick is a devoted husband, father, son, and brother with a close-knit family in Hong Kong.  He and his wife, Sabrina,[2] have been married for more than twenty years.  In her letter to the Court, she describes Patrick as "kind and generous"—her "soulmate."  Ex. 1, Sabrina Hui Chung Hu Letter.  Chan Yee Wah, one of Patrick and Sabrina's old friends, recalls a touching story from early in their relationship:

> The tradition of the Chinese New Year is to come home for family reunion dinner . . . .  After a year of hard work, the family opens a new chapter at this moment.  At that time, Hong Kong was a connecting hub for air transports across Asia.  You can imagine how full the flights were during the Chinese New Year holiday.  [Patrick] and [Sabrina] were then in a dating relationship.  Because of the nature of her job, [Sabrina] did not know whether she would be spending the holiday in Taiwan, Shanghai, Beijing, or Hong Kong.  It was not until the day before the holiday that it was confirmed that she would have to stay in Shanghai over the holiday.  Unbeknownst to anyone, [Patrick] unexpectedly showed up in Shanghai the next day.  Completely surprised, we asked him how he was able to get a flight ticket to Shanghai in such a short time!  He told us, "An opportunity is for those who are prepared in advance.  I had booked tickets long before from Hong Kong to Taipei, Beijing, and Shanghai.  Family reunion is a must during the Chinese New Year holiday."  [Sabrina] was touched by his sincerity, earnestness, and thoughtfulness, which also left a deep impression on me then.

Ex. 8, Chan Yee Wah Letter.  In the years that Sabrina and Patrick have been together, Patrick has demonstrated time and again "his natural passion for helping others."  Ex. 1, Sabrina Hui Chung Hu Letter.  Patrick's absence during the last 16 months has driven Sabrina to despair, and she has considered ending her life.  *Id.*  Sadly, Sabrina's mother passed away during Patrick's incarceration.  To his everlasting regret, Patrick could not support his wife in person during this difficult time.

---

[2]     Sabrina also goes by the name Sibelle.

Sabrina and Patrick's daughter, Audrey, is 18 years old.  She describes Patrick as her "best friend," "a great role model," and "a dedicated family member."  Ex. 2, Audrey Ho Ka Chun Letter.  As Audrey explains in her letter, Patrick's love for her is unconditional:

> Whenever I am in a difficulty my father helps me out with love and affection . . . I remembered one time when I was still in my junior years of secondary school, I was revising through my science textbook as there was a mid term test the next day[.]  [A]s science was my weakest subject after all, I was stressed out and starting crying uncontrollably[.]  [T]hen my dad hugged me and told me that he loved me no matter who I am and no matter how my marks are.  I was so touched by his words and determined to succeed.  His words ha[ve] greatly influenced me to be who [I am] and now I'm proud of who I am and I'm very grateful for that.

*Id.*  Before his arrest, Patrick was "always . . . one call away" whenever Audrey needed him, and he would "always tell [Audrey] that [her] best qualities are [her] kindness and [her] generosity," qualities that Audrey believes she got from Patrick himself.  *Id.*  Audrey has felt Patrick's absence during the last 16 months keenly:

> Whenever I was down, he would always run his fingers through my hair and would tell me that it's gonna be okay and now, I would want to say the same thing to him[:] "Dad, it's gonna be okay, we love you very much."

*Id.*  As Audrey writes in her letter, Patrick "is a great father and a great person.  I need him so much and he is really important to me."  *Id.*

Patrick's younger brother, Joseph, considers Patrick a mentor.  Ex. 4, Joseph Ho Letter.  In their early years, Patrick helped instill a lifelong love of music in his brother and guided him through difficult educational and career decisions.  *See id.*  Later in life, Patrick and Joseph have both devoted themselves to caring for their aging parents, ████████████████████ ████████████████████████████████████.  *Id.*  In Joseph's words, "as a brother [and] sibling, Patrick is always there when I need[ ] him."  *Id.*

Patrick's absence has also been a great hardship to his 92-year-old mother, Chan Ha.  She and Patrick have a deep bond, and their separation has caused her great anxiety, given her

17

advanced age.  Ex. 3, Ho Cheung Chan Ha Letter.  She prays that she can enjoy Patrick's

company in her final years.  *Id.*

### G.      Time at the MCC

The 16 months that Patrick has spent at the MCC have been the most difficult of his life.

After his arrest and detention, it would have been all too easy—and entirely understandable—for

Patrick to retreat into a shell.  But Patrick chose a different path.  His service to the MCC

community during this period has been—in a single word—extraordinary.  Patrick has tutored

inmates in preparation for their General Educational Development ("GED") examinations; he

has taught classes on a variety of topics, ranging from geography to personal finance; he has

played the violin during a GED graduation ceremony and at the MCC's holiday concerts; and he

has volunteered through the MCC's Inmate Companion program to spend countless hours

watching over inmates who are deemed to be suicidal.  *See* Ex. 137, Inmate Companion

Materials; Ex. 138, Music Materials; Ex. 139, Tutoring / Education Department Materials.  In

short, he has taken every opportunity to share his time and talents with the MCC community.[3]

Patrick's efforts to help others at the MCC have extended beyond these more visible

contributions.  The letters submitted by his fellow inmates are a powerful testament to Patrick's

character, and they detail the many ways that Patrick has helped those around him—often far

from the spotlight.  One inmate, Irfan Amanat, tells a revealing story:

> And if I had any doubt about his humility or patience, a small, but telling, and
> personally embarrassing incident dispelled it.  Another day I was in [Patrick's] cell
> getting advice on how to manage and cope with the conditions in prison.  He urged
> me to remain calm and in balance, despite anything that could happen.  And of
> course, as it happened, at that moment I accidentally dropped my only pair of
> glasses into the toilet.  I was horrified and disgusted, and panicked as I could not
> live without my glasses, as [Patrick] realized.  So even before I could react, without

---

[3]      We urge the Court to contact Thomas Volpini, the Education Supervisor at the MCC, to
hear Mr. Volpini's assessment of Patrick's contributions to various educational programs.

> any hesitation, [Patrick] calmly scooped my glasses out of the toilet, washed them thoroughly and returned them to me. He did not for a moment break the conversation to even allow any embarrassment of mine to show, and he did not allow himself to be distracted or disturbed by events we couldn't control. It was, in that small moment, one of the best lessons and examples of balance and humility he could have done for me. And he has never mentioned it again.

Ex. 129, Irfan Amanat Letter. Patrick—a renowned doctor, a former cabinet-level official in Hong Kong, and an internationally recognized figure—has demonstrated profound humility and courage during his time at the MCC.

Patrick has drawn on experiences from every chapter of his life to help those around him. He has individually counseled inmates on life skills. *See* Ex. 132, Christian Perez Letter. He has drawn from his medical training to help with medical issues, in one case materially improving the quality of another inmate's life. *See* Ex. 130, Carlos Bermudez Letter. And he has drawn from his educational background to teach others.

Patrick has poured himself into his GED tutoring, and he has helped to equip his students for post-release employment. Thanks to Patrick's tutoring, Francisco Ramos, a fellow inmate, recently received his GED, which he believes he "could not have done" without Patrick. *See* Ex. 134, Francisco Ramos Letter. Stalin Contreras, who had previously "struggled" with his GED studies, also recently passed numerous GED examinations with Patrick's assistance. Ex. 131, Stalin Contreras Letter. According to Mr. Contreras, "[Patrick] went above and beyond any other teacher" he had previously had, and he gave Mr. Contreras the "focused and dedicated classes" that Mr. Contreras needed to succeed. *Id.*

Patrick has worked with several other students as well, including Christian Perez and Carlos Bermudez. *See* Ex. 132, Christian Perez Letter; Ex. 130, Carlos Bermudez Letter. As Mr. Perez has explained, Patrick's tutoring "prepar[ed] [him] for what the world is going to bring [him] when [he] get[s] out of prison." Ex. 132, Christian Perez Letter. Mr. Bermudez similarly

19

found Patrick to be "a very good teacher" who "always has devoted his time and effort [to] helping [him]."  Ex. 130, Carlos Bermudez Letter.

Jonathan Weeks, whom Your Honor sentenced in September, was Patrick's first student. Over a period of several months, Patrick tutored Mr. Weeks four times a week for approximately two hours each day.  *See* Def. Sentencing Mem. at 18, *United States v. Weeks*, No. 16 Cr. 167 (LAP) (S.D.N.Y. Sept. 14, 2018), ECF No. 268.  Remarkably, Mr. Weeks earned his GED, despite having only completed the second grade and possessing only limited literacy skills when he began his study.  *Id.* at 19.  His success was thanks in large part to Patrick's tutoring.  But the lessons Patrick imparted were not merely academic ones.  As Mr. Perez writes in his letter: "I [k]new [Mr. Weeks] before and after his run in with [Patrick] and man I could tell the difference."  Ex. 132, Christian Perez Letter.  Mr. Weeks, who welcomed the opportunity to submit a letter from FCI Fairton, describes Patrick's influence in poignant terms:

> [Patrick] stated to me, "Mr. Weeks, you are very different from a lot in this environment . . . [you are] very bright, and have a wonderful heart."  I literally cried when he expressed that to me, because here's a man who[se] IQ is off the radar, telling me I'm bright, when most of my life I struggled.  *I wished I had a father like him*, or someone I met sooner before my life went down-hill!  Besides our circumstances, I'm grateful I've met [Patrick].

Ex. 135, Jonathan Weeks Letter (emphasis added).

Other inmates have also benefited from Patrick's guidance.  One inmate, Adam Raishani, writes—after praising Patrick for his teaching, participation in the Inmate Companion program, and musical performances—that "[d]espite all this I admire [Patrick] more for his gentle and positive aura that he gives off . . . He has changed hearts and mind[s] for the better.  He is inspirational to me and has at times provided reassurance on life to me when I needed it."  Ex. 133, Adam Raishani Letter.  These themes are echoed by numerous inmates, who describe

Patrick as "humble, peaceful, and kind" and "a humble, easy-going, optimistic gentleman with a caring nature and gentle soul."  Ex. 131, Stalin Contreras Letter; Ex. 136, Pai Yang Letter.

It is remarkable that Patrick has been able to bridge vast differences to impact his fellow inmates, many of whom come from drastically different cultural, socioeconomic, and educational backgrounds.  The impact reflected in the eight letters submitted by Patrick's fellow inmates is unprecedented.  And the sentiments expressed in these letters make it clear that Patrick's efforts could not have been the product of anything other than a genuine desire to help those around him.

## III.    A SENTENCE OF TIME SERVED IS APPROPRIATE

Additional jail time is not required to achieve just punishment in this case.  At the time of his sentencing, Patrick will have been in custody for more than 16 months, since his arrest on November 18, 2017.[4]  Since Patrick's arrest, he and his family have suffered tremendously. Patrick's reputation—built over a lifetime of good works—has been irrevocably tarnished. Given Patrick's remarkable life history, the nature and circumstances of the offense, and the other factors set forth in Section 3553(a), a sentence of time served is appropriate.

### A.    The Guidelines Do Not Accurately Reflect the Appropriate Sentence

The Sentencing Guidelines fail to provide meaningful guidance about what a just sentence in this case would be.  As this Court and others have recognized, in cases like this one, where the offense level is driven largely by the fraud Guidelines, the Guidelines tend to dramatically overstate the appropriate sentencing range.  *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013) (Underhill, J., concurring) (describing fraud Guidelines as

---

[4]    Taking good-time credit into account, a sentence of time served would be equivalent to a custodial sentence of 18 months.  *See* 18 U.S.C. § 3624(b).

"fundamentally flawed"); Sentencing Tr. at 69:24–70:2, *United States v. Tanner*, No. 17 Cr. 61 (LAP) (S.D.N.Y. Oct. 30, 2018), ECF No. 241 (describing the outsize impact of "financial loss" under the Guidelines as "patently unfair"); Sentencing Tr. at 22:14–16, *United States v. Collins*, No. 17 Cr. 1170 (LAP) (S.D.N.Y. July 15, 2013), ECF No. 244 (finding that "the total offense level far overstate[d] the nature and circumstances of the offense"); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (criticizing the Guidelines for making the sentencing range in fraud cases depend almost entirely on the amount of monetary loss or gain, which leads to sentence recommendations that are "irrational on their face"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (describing the Guidelines for "white-collar crimes" as "a black stain on common sense"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The Guidelines place undue weight on the amount of loss involved in the fraud.").  Simply put, Guidelines calculations driven by the fraud Guideline "do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018).  The Probation Department's recommendation of a sentence well below the applicable Guidelines range is a testament to the failure of the Guidelines to reflect an appropriate sentence in this case.  *See* PSR at 23.

### B.     The Total Offense Level Should Be 37, Not 39

Notwithstanding that the Guidelines may be of less significance in this case than they might be in other cases, we object to one element of the Probation Department's offense level calculations, which accounts for two levels.  The Presentence Investigation Report ("PSR") properly groups all of the counts, pursuant to Section 3D1.2(d).  However, it errs in calculating

the total offense level for the group.  Section 3D1.3(b) provides that when multiple counts are grouped pursuant to Section 3D1.2(d) and "the counts involve offenses of the same general type to which different guidelines apply," the offense level for the group is determined by "the offense guideline that produces the highest offense level."  Because the PSR misapplies the Guideline section applicable to money laundering offenses (U.S.S.G. § 2S1.1), it incorrectly concludes that the money laundering Guideline yields a higher offense level than the Guideline applicable to violations of the Foreign Corrupt Practices Act (U.S.S.G. § 2C1.1).  The problem is that the PSR uses Section 2S1.1(a)(1) when it should have used Section 2S1.1(a)(2).

Section 2S1.1(a)(1) applies to money laundering that involves the proceeds of specified unlawful activity.  *See* U.S.S.G. § 2S1.1(a)(1) (directing that the Guidelines calculation begin by using "[t]he offense level for the underlying offense *from which the laundered funds were derived*" (emphasis added)).  This case did not involve laundering of the proceeds of criminal activity, however; it involved promotional money laundering.  The applicable Guideline section for promotional money laundering is Section 2S1.1(a)(2) rather than Section 2S1.1(a)(1).  *See United States v. Dhafir*, 577 F.3d 411, 414–15 (2d Cir. 2009) (expressly declining to find error with the district court's ruling—which the government defended on appeal—that Section 2S1.1(a)(2), rather than Section 2S1.1(a)(1), is the appropriate Guideline for promotional money laundering).  Application of Section 2S1.1(a)(2) yields an offense level (before any Chapter 3

adjustments) of 22,[5] which is less than the offense level of 34[6] that Section 2C1.1 yields.  We therefore submit that the offense level of the grouped counts should be determined by Section 2C1.1, and that the correct offense level (before any Chapter 3 adjustment) is 34, rather than the level 36 that is contained in the PSR.[7]  Accordingly, the total offense level should be 37, not 39.

---

[5]      Under Section 2S1.1(a)(2), the base offense level is "8 plus the number of offense levels from the table in §2B1.1 . . . corresponding to the value of the laundered funds."  Here, the "value of the laundered funds" is $500,000 (the value of the wire payment to the Ugandan foundation).  PSR ¶¶ 18, 26.  The value of the laundered funds should not include any of the money associated with the Chad money laundering count, for which the jury acquitted Patrick.  As made clear during trial, the payments sent to Cheikh Gadio, which came after the two million-dollar payment, were not intended to promote a specified unlawful activity.  The cash payment of two million dollars also should not be included because it does not qualify as "laundered funds" under § 2S1.1(a)(2).  Accordingly, "the number of offense levels from the table in §2B1.1 . . . corresponding to the value of the laundered funds" is 12, which results in a base offense level of 20.  *See* U.S.S.G. §§ 2B1.1(b)(1), 2S1.1(a)(2).  The base offense level is then increased by two levels because Patrick was convicted under 18 U.S.C. § 1956.  *See* U.S.S.G. § 2S1.1(b)(2)(B).  Thus, the total offense level under Section 2S1.1(a)(2) is 22.

[6]      Because Patrick was not a public official at the time of the offense, the base offense level under Section 2C1.1(a) is 12.  Because the offense involved more than one bribe, the offense level is increased by 2.  *See* U.S.S.G. § 2C1.1(b)(1).  Because the amount of the bribes was more than $1,500,000, but less than $3,500,000, the offense level is further increased by 16 points. *See* U.S.S.G. §§ 2B1.1(b)(1), 2C1.1(b)(2).  Finally, because the offense involved elected public officials, the offense level is increased by an additional four levels.  *See* U.S.S.G. § 2C1.1(b)(3). Thus, the total offense level under Section 2C1.1 is 34.

[7]      In a March 4, 2019 letter to the Probation Department on this issue the government argued that Section 2S1.1(a)(1) applied, pointing out that Application Note 1 to Section 2S1.1 defines "laundered funds" to be the "property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957."  That definition does not address the problem with the PSR's application of Section 2S1.1(a)(1) to this case, however.  By its plain terms, Section 2S1.1(a)(1) applies where the laundered funds are derived from an underlying offense.  In contrast to the cases cited by the government in its March 4 letter—*United States v. Blackmon*, 557 F.3d 113 (3d Cir. 2009), and *United States v. Mata*, 409 F. App'x 740 (5th Cir. 2011)—the relevant laundered funds in this case were not derived from an underlying offense.

### C.  When the Offense Is Considered in the Context of Patrick's History and Characteristics, Justice Does Not Require Additional Time

Having presided over the trial, the Court is well aware of the facts of this case.  While the conduct in this case was serious, it is undisputed that the CEFC Company was never awarded any business in either Chad or Uganda.  In addition, the evidence at trial demonstrated that efforts in both Chad and Uganda were designed to benefit the CEFC Company rather than Patrick personally.  *See* PSR ¶¶ 22–27.  And it is clear that Patrick reported to others within the CEFC Company.  *See id.* at 19.  The bribes were not paid on behalf of a U.S. company.  Moreover, no business was awarded in connection with the bribes, and no U.S. company was directly injured as a result of the offense conduct.

In crafting an appropriate sentence, the Court must consider the offense conduct in the context of the history and characteristics of the defendant.  *See* 18 U.S.C. § 3553(a)(1).  Patrick has, by any objective measure, lived a life full of exemplary conduct.  He has no criminal history, and in his 69 years, he already has done several lifetimes' worth of good.  He brought modern ophthalmology to Hong Kong and mainland China, literally giving sight to the blind.  He trained generations of doctors to employ this standard of care with thousands more patients.  He gave up his lucrative medical practice at the peak of his career to serve in Hong Kong's government, working to improve the lives of ordinary people in Hong Kong.  And after he left government service, he sought through his work with the CEFC Think Tank to promote sustainable energy and eliminate energy poverty.  Throughout his life, he consistently devoted his time, money, and talents to the betterment of others.  It is no exaggeration to say that his work has improved the lives of tens of thousands of people.

While less publicly visible alongside his other accomplishments, his contributions to the MCC community—which are consistent with the acts of service he has performed throughout his

entire life—perfectly exemplify his character.  Many individuals in Patrick's situation would have reacted with bitterness and self-pity.  But it is ingrained in Patrick to serve no matter the circumstances.  In good times and in bad, he considers it his duty to leverage his talents and the good fortune he has enjoyed in his life to better the lives of those around him.  Whatever the scale and whatever the context, if Patrick can help, he does.

Patrick's history both contextualizes the offense conduct and shows the Court what kind of life Patrick can be expected to lead when he is released.  Patrick's professional options may be severely limited because of his conviction, and his work in international development is no longer a realistic option.  But throughout his life, Patrick's choices have been motivated by the same principle: doing the most good for the greatest number of people.  This principle inspired him to become a doctor and an educator, brought him home to Hong Kong, drew him to public service, and eventually led him to the CEFC Think Tank.  It inspired Patrick to rise above even the darkest circumstances and help those around him at the MCC.  And it will inspire Patrick to contribute to society in whatever way he can after his release.  Patrick deeply regrets the actions that brought him before this Court, but, as so many letters submitted on his behalf confirm, throughout his life, he has not acted out of greed or a desire for self-aggrandizement.  *See, e.g.*, Ex. 19, Raymond Liang-Ming Hu Letter; Ex. 21, Peter C. Kwok Letter; Ex. 31, Jeffrey Yip Letter.  Patrick has always tried to work in the service of a greater good.

Patrick's family situation also counsels in favor of a sentence of time served.  His family lives half a world away.  He is sorely missed by his wife, Sabrina, and his daughter, Audrey, who has been preparing for college without her confidante.  Ex. 1, Sabrina Hui Chung Hu Letter; Ex. 2; Audrey Ho Ka Chun Letter.  Further incarceration in the United States would unnecessarily prolong the suffering of both Patrick and his family.  Patrick's mother, Chan Ha, is 92 years old,

and traveling to the United States would be exceedingly difficult.  If she and Patrick are to see each other again, it likely will only be after he is released and returns home.  It would be devastating to both of them if they are never reunited.

The Probation Department appropriately considered Patrick's history and characteristics in determining its sentencing recommendation.  *See* PSR at 24 (acknowledging, *inter alia*, Patrick's "laudable personal history" and "life achievements").[8]  As Judge Rakoff observed in *Gupta*, "[t]he Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence."  904 F. Supp. 2d at 354.  In assessing Patrick's character, the Court has before it additional information that was not addressed in the PSR, including Patrick's extraordinary contributions to the MCC community during his incarceration, and the scores of letters that demonstrate how remarkable Patrick's personal history truly is.  Patrick is without question a man whose "personal history and characteristics starkly contrast" with the offense conduct.  *Id.* at 353.  His exceptional record of charity and service, his many contributions to the field of ophthalmology, his age and family situation, and the aberrational nature of the offense conduct justify a sentence of time served.

---

[8]     The Probation Department mentions *United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y.), as a case that it considered to avoid unwarranted sentencing disparities.  *See* PSR at 24.  In *Ng*, the defendant was facing a Guidelines range of 235 to 293 months' imprisonment, the Probation Department recommended a sentence of 72 months, and the defendant received a sentence of 48 months.  Sentencing Tr. at 34:2, 34:25–35:1, 89:18–20, *United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y. May 11, 2018), ECF No. 791.  Insofar as *Ng* demonstrates the unhelpfulness of the Guidelines in the context of a foreign bribery case, it is instructive.  But there are otherwise more differences than similarities between Patrick's case and Mr. Ng's.  Unlike Patrick, Mr. Ng was the organizer and beneficiary of the bribery scheme in his case.  *See* Gov't Sentencing Mem. at 3, *United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y. Mar. 30, 2018), ECF No. 746.  Furthermore, Patrick's record of charity and service is simply one of a kind.

27

D.     **The Immigration Consequences of Patrick's Conviction Merit Leniency**

Also relevant to the Court's sentencing determination is the fact that after Patrick's release from Bureau of Prisons custody, he will spend additional time in immigration custody awaiting deportation.[9]  *See United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family." (citation omitted)); *United States v. Chong*, No. 13 Cr. 570 (JBW), 2014 WL 4773978, at *4 (E.D.N.Y. Sept. 24, 2014) ("Section 3553 should now be interpreted as *requiring* district courts to weigh the prospect of deportation . . . when imposing a sentence." (emphasis added)).  The conditions of confinement in such facilities likely will be worse than those Patrick has endured at the MCC.  *See generally, e.g.*, Human Rights Watch et al., *Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention* (2018), https://bit.ly/2JbPu8y; Ian Urbina, *Using Jailed Migrants as a Pool of Cheap Labor*, N.Y. Times, May 24, 2014, https://nyti.ms/2VNhS2h; Ian Urbina & Catherine Rentz, *Immigrants Held in Solitary Cells, Often for Weeks*, N.Y. Times, Mar. 24, 2013, https://nyti.ms/2NZEGcN. Additional imprisonment is all the more unnecessary given these facts.

E.     **Additional Time Is Not Necessary to Achieve Specific or General Deterrence**

Additional imprisonment is unnecessary in this case to either "afford adequate deterrence to criminal conduct" (general deterrence) or "to protect the public from further crimes of the defendant" (specific deterrence).  18 U.S.C. § 3553(a)(2)(B), (C).  There can be no serious

---

[9]     As noted in the PSR, a detainer has been lodged against Patrick.  PSR ¶ 61.  While we intend to consent to a judicial order of removal in order to expedite deportation proceedings, Patrick will almost certainly endure additional time in prison while he awaits deportation.

dispute that Patrick needs no further deterrence.  Moreover, a sentence of time served is sufficient for general deterrence.  *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("'[N]ecessary' is the operative word, for section 3553(a) expressly dictates that '[t]he court shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection.'" (alteration in original)).

First, requiring Patrick to serve additional time is not necessary for specific deterrence. This case is an aberration in an otherwise law-abiding and exceptionally productive life. Furthermore, Patrick has already been punished severely.  His prosecution and imprisonment have already exacted a profound toll on him.  His personal life has been entirely upended, his professional reputation and career have been ruined, he faces serious financial penalties, and he has been incarcerated in a foreign country—thousands of miles from his friends and family.  He has been imprisoned for 16 months, but that amount of time does not capture the vast distance he has fallen.  There is simply no reason to believe that Patrick will engage in any future criminal conduct, and no additional punishment is necessary.  *See Gupta*, 904 F. Supp. 2d at 355  ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result."); *Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct.").[10]

Second, imposing a sentence greater than time served is not necessary to deter the public from engaging in criminal conduct.  As has been noted by courts in this district, there is

---

[10]    It is also well-settled that older defendants are much less likely to reoffend than their younger counterparts. *See, e.g.*, U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* 23 (2016), https://bit.ly/2VPgE6Y.

"considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514; *see also Gupta*, 904 F. Supp. 2d at 355 ("[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not.  Thus, a relatively modest prison term should be 'sufficient, but not more than necessary,' for [the purpose of general deterrence].")  This is particularly so here, given Patrick's international visibility.  The international community has witnessed Patrick's descent from international prominence to disgrace.  Patrick's fall from grace has been public and severe, and this case already provides a powerful and more than adequate deterrent.

## IV.    CONCLUSION

For the foregoing reasons, we respectfully ask the Court to impose a sentence of time served.  While the offense in this case was serious, in crafting an appropriate sentence, the Court must "judge the man as a whole."  *Gupta*, 904 F. Supp. 2d at 354.  The 149 letters from Patrick's family, friends, colleagues, students, patients, fellow inmates, and fellow citizens help illuminate who Patrick is "as a whole."  He is a man who puts family and community before self—a man of extraordinary character who has used his talents to do tremendous good.  Patrick and his family have suffered during the past 16 months, and whatever the Court's sentence, Patrick will spend the rest of his life atoning for his actions.  A sentence of time served is a just one.

Dated:   March 11, 2019
         New York, New York

Respectfully submitted,

By: _____

KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550
Edward.Kim@KKLllp.com
Paul.Krieger@KKLllp.com
Jonathan.Bolz@KKLllp.com
Jon.Bodansky@KKLllp.com

DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Tel.: (212) 698-3500
Fax: (212) 698-3599
andrew.levander@dechert.com
benjamin.rosenberg@dechert.com
katherine.wyman@dechert.com

*Attorneys for Chi Ping Patrick Ho*