UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                    :          17 Cr. 779 (LAP)

CHI PING PATRICK HO,                          :
  a/k/a "Patrick C.P. Ho,"
  a/k/a "He Zhiping,"                            :

                  Defendant.        :

-------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

ROBERT ZINK
Acting Chief, Fraud Section
Criminal Division

Daniel C. Richenthal
Douglas S. Zolkind
Catherine E. Ghosh
Assistant United States Attorneys
Southern District of New York

Paul A. Hayden
Trial Attorney
Fraud Section
Criminal Division

- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.      The Defendant's Corrupt Schemes ................................................. 2

        1.     The Chad Scheme ......................................................................... 3

        2.     The Uganda Scheme ..................................................................... 4

        3.     The Defendant's Role ................................................................... 6

    B.      The Advisory Guidelines Range ................................................... 7

        1.     The Probation Office's Calculation ............................................. 7

        2.     The Defendant's Objections To The Guidelines Calculation ................................. 8

        3.     The Government's Objections To The Guidelines Calculation........................... 11

    C.      The Probation Office's Recommendation ............................................. 12

DISCUSSION ................................................................................................................ 12

      I.     A Substantial Term Of Imprisonment—Consistent With The Recommendation Of The Probation Office—Is Warranted................................................. 12

      II.    The Defendant's Request For A Sentence of Time Served Is Without Merit ...... 17

      III.   The Court Should Impose A Substantial Fine ..................................... 23

          A.  Applicable Law ................................................................. 23

          B.  Discussion ...................................................................... 24

CONCLUSION................................................................................................................ 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                  :          17 Cr. 779 (LAP)

CHI PING PATRICK HO,                        :
  a/k/a "Patrick C.P. Ho,"
  a/k/a "He Zhiping,"                         :

                 Defendant.          :

------------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Chi Ping Patrick Ho is scheduled to be sentenced next Monday, March 25, 2019, at 11:30 a.m.  The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum dated March 11, 2019, filed on March 12, 2019 (Dkt. No. 223) ("Def. Mem.").

## PRELIMINARY STATEMENT

The defendant, a sophisticated, international businessperson and former public official, repeatedly used his status as the operating head of a non-governmental organization, China Energy Fund Committee ("CEFC NGO"), which was affiliated with the United Nations ("UN"), to seek to corrupt top officials in Africa to profit a massive energy conglomerate.  That warrants substantial punishment.

The defendant could have sought to persuade officials to grant the conglomerate for which he did this corrupt work—CEFC China Energy Company Limited ("CEFC China")—contracts and oil rights on the merits.  But instead, the defendant and his coconspirators cheated, repeatedly.  Hiding behind and misusing a non-governmental organization, registered as a

charity, that he purportedly operated to promote international diplomacy and energy security, the defendant orchestrated and executed two different schemes to offer and pay bribes to senior public officials in both Chad and Uganda.  He executed those schemes over time.  He offered and paid bribes in multiple ways.  And when he was caught, he claimed that he was an innocent humanitarian, whose arrest was both political and wrongful.  It was neither.

The defendant's United States Sentencing Guidelines ("Guidelines") range reflects his extensive, deliberate, and exceedingly serious criminal conduct.  For what he did, the defendant faces an advisory Guidelines range of at least 262 to 327 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR"), in which the Probation Office recommends a sentence of 60 months' imprisonment and a $400,000 fine.  The Government submits that to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, the Court should impose a substantial sentence, consistent with the Probation Office's recommendation.

## BACKGROUND

### A.    The Defendant's Corrupt Schemes

As described in greater detail in the PSR, in Complaint 17 Mag. 8611, and in Indictment 17 Cr. 779—and as overwhelmingly proven at trial—for years, the defendant orchestrated and engaged in two massive, international bribery and money laundering schemes in which he offered and paid more than $2.5 million in bribes, in various forms, to senior African officials to seek to profit the energy conglomerate he served.  (PSR ¶¶ 16-30.)[1]

---

[1]    Because the Court presided over the trial, the Government will not describe all aspects of the scheme herein or cite all relevant evidence herein.

In the first scheme (the "Chad Scheme"), the defendant, on behalf of CEFC China, offered a $2 million cash bribe, hidden within gift boxes, to Idriss Déby, the President of Chad, in an effort to obtain valuable oil rights from the Chadian government.  In the second scheme (the "Uganda Scheme"), the defendant caused a $500,000 bribe to be paid, via wires transmitted through New York, New York, to an account designated by Sam Kutesa, the Minister of Foreign Affairs of Uganda, who had recently completed his term as the President of the UN General Assembly.  The defendant also schemed to pay a $500,000 cash bribe to Yoweri Museveni, the President of Uganda, and offered to provide both Kutesa and Museveni with additional corrupt benefits by "partnering" with them and their families in future joint ventures in Uganda.

### 1.       The Chad Scheme

The Chad Scheme began in or about September 2014 when the defendant flew into New York to attend the annual UN General Assembly.  At that time, CEFC China—a multi-billion dollar energy company based in Shanghai, China—was working to expand its operations to Chad, and wanted to meet with President Déby as quickly as possible.  Through a connection, the defendant was introduced to Cheikh Gadio, the former Minister of Foreign Affairs of Senegal, who had a personal relationship with President Déby.  The defendant and Gadio met at CEFC China's suite at Trump World Tower in midtown Manhattan, where the defendant enlisted Gadio to assist CEFC China in obtaining access to President Déby.  (PSR ¶ 22.)

At the defendant's request, Gadio connected the defendant and CEFC China to President Déby.  In an initial meeting in Chad in November 2014, President Déby described to the defendant and CEFC China executives certain lucrative oil rights that were potentially available for CEFC China to acquire.  Following that meeting, Gadio advised the defendant and CEFC China to send a technical team to Chad to investigate the oil rights and make a corresponding

3

offer to President Déby, grounded in factual data.  Instead, the defendant insisted on a prompt second meeting with President Déby.  The second meeting took place a few weeks later, in December 2014.  The defendant led a CEFC China delegation, which flew to Chad on a corporate jet with $2 million cash concealed within several gift boxes.  At the conclusion of a business meeting with President Déby, the defendant and the CEFC China executives presented President Déby with the gift boxes.  (PSR ¶ 23.)

To the surprise of the defendant and the CEFC China executives, President Déby rejected the $2 million bribe offer, but later agreed to accept the money as a charitable donation to the country.  The defendant subsequently drafted a letter to President Déby falsely claiming that the cash had really been intended as a donation to the people of Chad all along.  The defendant also caused CEFC NGO to compensate Gadio by wiring $400,000, through two separate wire payments, to an account in Dubai, United Arab Emirates, in the name of Gadio's firm.  These wire transfers were transmitted through banks in New York, New York.  (PSR ¶ 24.)

The defendant and CEFC China did not obtain the unfair advantage that they had sought through the unsuccessful bribe offer, and by mid-2015, the defendant had turned his attention to a different so-called "gateway to Africa": Uganda.

### 2.      The Uganda Scheme

The Uganda Scheme began around the same time as the Chad Scheme, when the defendant was in New York for the annual UN General Assembly.  The defendant met with Sam Kutesa, who had recently begun his term as the 69th President of the UN General Assembly ("PGA").  The defendant, purporting to act on behalf of CEFC NGO, met with Kutesa and began to cultivate a relationship with him.  During the year when Kutesa served as PGA, the defendant

and Kutesa discussed a "strategic partnership" between Uganda and CEFC China for various business ventures, to be formed once Kutesa returned to Uganda.  (PSR ¶ 25.)

In or about February 2016—after Kutesa had returned to Uganda and resumed his role as Foreign Minister, and Yoweri Museveni (Kutesa's relative) had been reelected as the President of Uganda—Kutesa solicited a payment from the defendant, purportedly for a charitable foundation that Kutesa wished to launch.  The defendant agreed to provide the requested payment, but simultaneously requested, on behalf of CEFC China, an invitation to Museveni's inauguration, business meetings with Museveni and other high-level Ugandan officials, and a list of specific business projects in Uganda in which CEFC China could participate.  (PSR ¶ 26.)

In May 2016, the defendant and CEFC China executives traveled to Uganda.  Prior to departing, the defendant caused CEFC NGO to wire $500,000 to the account provided by Kutesa in the name of the so-called "foundation," which wire was transmitted through New York, New York.  The defendant also advised his boss, Ye Jianming, the then-Chairman of CEFC China, to provide $500,000 in cash to Museveni, ostensibly as a campaign donation, even though Museveni had already been reelected.  The defendant intended these payments to influence Kutesa and Museveni to use their official power to steer business advantages to CEFC China.

The defendant and CEFC China executives attended President Museveni's inauguration and obtained business meetings in Uganda with Museveni and top Ugandan officials, including with the Department of Energy and Mineral Resources.  After the trip, the defendant requested that Kutesa and Museveni assist CEFC China in acquiring a Ugandan bank, as an initial step before pursuing additional ventures in Uganda.  The defendant also offered to "partner" with Kutesa and Museveni and/or their "family businesses," making clear that both officials would share in CEFC China's future profits.  In exchange for the bribes offered and paid by the

defendant, Kutesa thereafter steered a bank acquisition opportunity to CEFC China.  (PSR
¶ 27.)[2]

### 3.   The Defendant's Role

The defendant did not just engage in these two schemes, but orchestrated them, made
suggestions as to how to execute them, and supervised others to help ensure their success.  (PSR
¶ 30.)  For example, Cheikh Gadio repeatedly testified that he viewed the defendant as the focal
point of CEFC China's engagement in Chad.  The defendant engaged Gadio to broker the
introduction to President Déby, he arranged the meetings in Chad directly through Gadio, and he
served as one of the leaders of the CEFC China delegations to Chad for each visit.  Notably, after
President Déby rejected the $2 million bribe, the defendant, on his own, wrote the initial draft of
the letter purporting to pledge the money for humanitarian purposes.

Similarly, as to the Uganda scheme, emails and testimony made clear that the defendant
directly forged a connection with Kutesa to obtain access for CEFC China in Uganda.  The
emails reflect that the defendant demanded concrete business opportunities in exchange for any
payment to Kutesa, and that once those opportunities were arranged, the defendant caused the
$500,000 to be wired.  The defendant also wrote a memo to the Chairman of CEFC China—one
of several scheme-related updates to the Chairman for which the defendant was responsible—
advising that an additional $500,000 should be paid in cash to President Museveni.

The record at trial, in sum, overwhelmingly showed that the defendant acted with
significant discretion and wielded enormous power within the CEFC China and CEFC NGO
organizations.  To be sure, he had a boss: the Chairman of both organizations, to whom the

---

[2]     The defendant's suggestion that the bribes he paid did not result in any advantage for
CEFC China (Def. Mem. 25) is wrong.  But it is also irrelevant.  The defendant is no less guilty,
and does not deserve lesser punishment, because those to whom he offered bribes rejected them
or did not ultimately provide CEFC China with as much as it wanted.

defendant reported directly.  But while the defendant's actions were intended to serve the

Chairman's and CEFC China's interests, there is no indication that the defendant was merely a

cog in a corporate machine, following orders that he did not fully understand or was not free to

disregard.  To the contrary, the evidence demonstrated that the defendant was determined to

pursue business advantages through bribery, exercised discretion in doing so, and coordinated

and supervised the actions of others to effect the schemes.

**B.      The Advisory Guidelines Range**

**1.       The Probation Office's Calculation**

The Probation Office calculates the defendant's advisory Guidelines range, as follows:

- Pursuant to U.S.S.G. § 3D1.2(d), all counts are grouped.  (PSR ¶ 37.)

- Pursuant to U.S.S.G. § 3D1.3(b), the offense guideline that produces the highest offense level shall be used.  In this case, that offense guideline is U.S.S.G. § 2S1.1, which applies to Counts Six and Eight, conspiracy to commit money laundering and money laundering, respectively.  (*Id.*)

- Pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level is that for the offenses underlying those counts, because the defendant committed the underlying offenses.  In this case, those offenses are conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") and violating the FCPA.  Those offenses are all governed by U.S.S.G. § 2C1.1. (PSR ¶ 38.)

- Pursuant to U.S.S.G. § 2C1.1(a)(2), the base offense level for those offenses is 12.  (*Id.*)

- Pursuant to U.S.S.G. § 2C1.1(b)(1), this base offense level is increased by 2 levels, because the offenses involved more than one bribe.  (PSR ¶ 39.)

- Pursuant to U.S.S.G. § 2C1.1(b)(2), this base offense level is increased by the number of levels from the table in § 2B1.1, because the value of the payments, the benefit received or to be received in return for the payments, and/or the value of anything obtained or to be obtained by the public official or others acting with the public official exceeded $6,500.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the value of the payments exceeded $1,500,000, but did not exceed $3,500,000, the base offense level is increased by 16 levels.  (PSR ¶ 40.)

- Pursuant to U.S.S.G. § 2C1.1(b)(3), the base offense level is increased by 4 levels, because the offenses involved an elected public official and/or a public official in a high-level decision-making or sensitive position, *i.e.*, the President of Chad, the President of Uganda, and the Minister of Foreign Affairs of Uganda.  (PSR ¶ 41.)[3]

- Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), the base offense level is increased by 2 levels, because the defendant was convicted under 18 U.S.C. § 1956.  (PSR ¶ 41.)

- Pursuant to U.S.S.G. § 3B1.1(b), the offense level is increased by 3 levels, because the defendant was a manager or supervisor of the criminal activity, which involved five or more participants and/or was otherwise extensive.  (PSR ¶ 44.)

In accordance with the above, the total offense level is 39.  (PSR ¶ 46.)  The defendant has no known prior convictions, so his Criminal History Category is I.  (PSR ¶ 52.)  Based upon these calculations, the defendant's advisory Guidelines range is 262-327 months' imprisonment.  (PSR ¶ 95.)  Pursuant to U.S.S.G. § 5G1.1(a), for each of the counts of conviction, because the statutorily authorized maximum sentence is less than the minimum of the applicable Guidelines range, the statutorily authorized maximum sentence is the Guidelines sentence.  The Guidelines sentence per count is accordingly: Count One, 60 months; Count Two, 60 months; Count Three, 60 months; Count Four, 60 months; Count Five, 60 months; Count Six, 240 months; Count Seven, 240 months.  (*See* PSR p. 23.)

### 2.     The Defendant's Objections To The Guidelines Calculation

The defendant challenges the Probation Office's calculation, asserting that his total offense level should be 37 rather than 39.  (Def. Mem. 22-24.)  A ruling in the defendant's favor on this point would result in an advisory Guidelines range of 210-262 months' imprisonment, still far above the statutory maximum on all but two counts and far above the sentence recommended by the Probation Office.  It is up to the Court whether it is nevertheless necessary

---

[3]     The offenses also involved the PGA, since Kutesa held that position until his return to Uganda.

to resolve the defendant's objection.  *See United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) ("situations may arise where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies"); *see also United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc).  The Government does not understand the defendant to disagree.  (*See* Def. Mem. 22.)

        In the event that the Court chooses to resolve the defendant's objection, it should reject it. In the defendant's view, U.S.S.G. § 2S1.1(a)(1) does not apply because it speaks of "laundered funds," and the defendant was convicted of promotional money laundering.  (Def. Mem. 23.) But the defendant relegates to a footnote (*id.* 24 n.7) that the Guidelines expressly define "laundered funds" as the "property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957."  U.S.S.G. § 2S1.1 Application Note 1.  The Guidelines thus reject the defendant's position that U.S.S.G. § 2S1.1(a)(1) only applies to offenses involving "the *proceeds* of specified unlawful activity" (Def. Mem. 23 (emphasis added)), rather than money transmitted to promote that activity.  *See United States v. Mata*, 409 F. App'x 740, 743 (5th Cir. 2011) (per curiam) (rejecting argument that defendant convicted of conspiracy to commit promotional money laundering, and who aided and abetted the offense being promoted, should be sentenced under U.S.S.G. § 2S1.1(a)(2) rather than U.S.S.G. § 2S1.1(a)(1)).

        The defendant suggests that, notwithstanding the plain language of the application note, *United States v. Dhafir*, 577 F.3d 411 (2d Cir. 2009), supports his position.  (Def. Mem. 23.)  It does not.  In *Dhafir*, the defendant argued for the opposite of what the defendant here claims the Guidelines purportedly require.  *See* 577 F.3d at 414.  And while not deciding whether that

position was correct, the Second Circuit vacated and remanded, so that the district court could determine whether its sentence would be different if it concluded that the defendant were correct. *See id.* at 515.  If anything, the remand in *Dhafir* supports the Government's position, which is consistent both with the plain language of the application note and the principle that defendants who commit the offense underlying the money laundering should be treated accordingly.  *See United States v. Blackmon*, 557 F.3d 113, 119 (3d Cir. 2009) (the money laundering Guideline "accounts for the culpability of the offender," and thus rests on the offense level of the underlying offense when the defendant was involved in that offense).  Indeed, adopting the defendant's position here would lead to the perverse result that a defendant who *both* commits the underlying offense *and* commits money laundering would have the same Guidelines as one who only committed the underlying offense.  The defendant offers no basis in law or logic to conclude that the Guidelines should be read in such a manner.[4]

---

[4]     The defendant raises two other objections in a footnote, although he appears to concede that those objections, even if accepted, would not affect the Guidelines.  First, the defendant contends that the $400,000 he paid Gadio should not count under the money laundering guideline because he was acquitted of the substantive money laundering charge resting on that payment.  (Def. Mem. 24 n.5.)  But "when determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal."  *United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994).  Nor does the defendant deny having paid Gadio to connect CEFC China with President Déby in an attempt to gain business advantages for CEFC China.  And the Guidelines expressly require that, in calculating the offense level, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" qualify, and for those offenses falling within U.S.S.G. § 3D1.2(d)—which includes all counts of conviction in this case—"all acts and omissions" that "were part of the same course of conduct or common scheme or plan as the offense of conviction" also qualify.  U.S.S.G. §§ 1B1.3(a)(1)(A), (a)(2).  The $400,000 plainly qualifies.  Second, the defendant contends that the $2 million cash he offered to President Déby also should not count, because it was not "laundered funds."  (Def. Mem. 24 n.5.)  To the extent that this is a re-hash of the defendant's principal argument regarding U.S.S.G. § 2S1.1(a)(1), it fails for the same reasons.  To the extent that the defendant means that, in his view, the $2 million does not count because it was cash, and thus was not the basis for a money laundering charge, that objection is baseless.  The defendant is not entitled to have this Court ignore U.S.S.G. § 1B1.3(a)(2).

### 3.     The Government's Objections To The Guidelines Calculation

The Government agrees with the Probation Office's calculation, except that the Government submits that the defendant should be assessed four points as a leader or organizer, rather than three points as a manager or supervisor.  As with the defendant's objections, it is up to the Court whether it is necessary to draw this distinction.  *See Crosby*, 397 F.3d at 112.  But to the extent the Court chooses to do so, it should find that the defendant was a leader or organizer.

The Probation Office explains its decision to the contrary on the principal ground that, "[a]lthough the defendant supervised others, including individuals involved in the CEFC NGO, and exercised some discretion within the scheme, it is reasonable to believe that the offense was initiated and ultimately controlled by high-level officials with CEFC China, particularly its chairman."  (PSR p. 19.)  But a scheme may have more than one leader, *see, e.g.*, *United States v. Duncan*, 42 F.3d 97, 106 n.6 (2d Cir. 1994), and in any event, a defendant must be assessed four points if he serves as an "organizer," regardless of whether he is also a "leader," and regardless of whether others played a similar role, *see, e.g.*, *United States v. Fiumano*, 721 F. App'x 45, 40 (2d Cir. 2018).  Contrary to the Probation Office's analysis, the pertinent question here is not whether the defendant "initiated" or "ultimately controlled" the schemes (PSR p. 19), or even whether he helped lead them (although he did), but whether he *organized* them.  As described above, the evidence at trial overwhelmingly showed that he did, from his drafting of reports and emails setting the schemes into motion and providing his view of how they should be executed (*see, e.g.*, GX 258-TX, 261-TX, 281, 284, 288-TX, 296-TX), to his organizing and leading of multiple meetings with Gadio and the officials whom the defendant sought to and did

11

bribe, to his coordinating the efforts of individuals at CEFC China and CEFC NGO (of which the defendant boasts of his "leadership" (Def. Mem. 14)).[5]

## C.     The Probation Office's Recommendation

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's age and background, the nature and circumstances of his offenses, and the need to avoid unwarranted sentencing disparities, the Probation Office recommends a sentence of 60 months' imprisonment and a $400,000 fine.  (PSR pp. 23, 25.)

## DISCUSSION

## I.     A Substantial Term Of Imprisonment—Consistent With The Recommendation Of The Probation Office—Is Warranted

Every one of the factors set forth in 18 U.S.C. § 3553(a) strongly weighs in favor of a substantial term of imprisonment.

*First*, the nature and seriousness of the offenses warrants such a sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  In his submission, the defendant states that he has "approached his work and life with a spirit of service."  (Def. Mem. 1.)  Regardless of whether that may have been so at times in the past, it plainly was not so for multiple years.  As the evidence at trial overwhelmingly demonstrated, from his ostensibly charitable perch, the defendant orchestrated and executed schemes to corrupt decision-making at the most senior levels of two different countries to help an energy company—and by extension, himself—get richer and more powerful. That was a choice.  It demands substantive punishment.

---

[5]     There is at least a reasonable argument that the defendant should also be assessed two points for abuse of trust, pursuant to U.S.S.G. § 3B1.3, given that he repeatedly abused his position as the operating head of CEFC NGO, a 501(c)(3) organization, to facilitate and cover-up his offenses.  In short, the Probation Office's Guidelines calculation is a conservative one.

What the defendant agreed to do and did undermines the foundational principle that public officials should act solely in the interest of the public good, not their own financial interest. It discourages honest citizens who would seek out public service from doing so, because it creates the appearance that money, above all, drives outcomes. And it taints those officials who serve the public with integrity, and those non-governmental organizations that are committed to their mission. When the defendant used CEFC NGO to pay and cover-up bribes, he tainted its work and betrayed those employees who genuinely wanted to make a positive difference. When the defendant offered and paid millions of dollars in bribes in return for advancing CEFC China's business interests, he undermined the trust that the citizens of Chad and Uganda placed in their officials—trust that these officials would pursue the interests of their people, not prioritize the interests of a foreign company that could afford to pay bribes. It is difficult to quantify the damage that the defendant did. But the damage caused by corruption is real, and lasting.

To be sure, the defendant may have believed that what was good for CEFC China was also good for Chad or Uganda—although his contemporaneous communications make plain his focus was on CEFC China and himself, not the people of the countries to which he flew on a corporate jet, and whose leaders he sought to pay off. But the decision as to what company should be awarded the right to explore and extract scarce public resources should not be decided by who can afford bribes. The defendant knew that, and he paid bribes anyway.

Indeed, the defendant's submission not only ignores what he repeatedly chose to do, but also suggests that his conduct, while technically criminal, was effectively harmless. But even if one cannot point to a specific person or entity who was "directly injured" by the defendant's bribes (Def. Mem. 25) (an assumption that ignores companies that had been or would be bidding

for the same energy rights, and did not offer bribes), this does not mean that there were no

victims.  As the UN General Assembly explained in 2003:

> Corruption is an insidious plague that has a wide range of corrosive effects on societies.  It undermines democracy and the rule of law, leads to violations of human rights, distorts markets, erodes the quality of life and allows organized crime, terrorism and other threats to human security to flourish.
>
> This evil phenomenon is found in all countries—big and small, rich and poor—but it is in the developing world that its effects are most destructive.  Corruption hurts the poor disproportionately by diverting funds intended for development, undermining a Government's ability to provide basic services, feeding inequality and injustice and discouraging foreign aid and investment. Corruption is a key element in economic underperformance and a major obstacle to poverty alleviation and development.

UN Convention Against Corruption, Forward, *available at*
https://www.unodc.org/documents/treaties/UNCAC/Publications/Convention/08-50026_E.pdf.

*Second*, the history and characteristics of the defendant, the circumstances of the

offenses, and the need for the sentence imposed to promote respect for the law warrant a

substantial sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant did not commit

bribery or money laundering hesitantly, fleetingly, or on a small scale.  He did so for years, in

substantial amounts, and without any apparent hesitation.  And as discussed previously in this

case and below, this was not only time he chose to use his connections and power to seek to

enrich others and himself.

Nor, apart from saying, in the passive voice, that he "deeply regrets the actions that

brought him before this Court" (Def. Mem. 26), has the defendant shown any remorse for what

he did or concern for the victims of his conduct, or even acknowledged that his actions are what

led to his prosecution.  On the contrary, time and again, just as he did before conviction, the

defendant has in communications with friends and family agreed with and sought to fan the

14

baseless view that this case is political, that he is a mere innocent bystander, and that he has not

been treated fairly.  In one email, the defendant refers to himself as a "sacrificial lamb[]" who is

being prosecuted out of "hostility."  (Ex. A.)  In another email, he refers to his treatment as

"inhumane."  (Ex. B.)  In the same email chain, he appears to agree with his friend that it is

"dangerous to be a Chinese these days."  (*Id.*).[6]

Nor does the defendant appear to dispute his wife's assertion that the jury must have

made its decision as a result of "pressure," not on "their own," and that "something else" has

"controll[ed] your case."  (Ex. C.)  But as the defendant knows, in the United States, juries are

independent, and it is apparent that the jury here took its oath seriously, including by acquitting

the defendant of one of the charges against him.  The defendant was convicted of other charges,

in a fair and public trial, because he is guilty, not because of some unidentified, sinister force

"controlling" his case.

*Finally*, the need for general deterrence strongly weighs in favor of a substantial

sentence.  *See* 18 U.S.C. § 3553(a)(2)(B).  It is particularly challenging to investigate and

prosecute successfully international corruption schemes, especially where, as here, the scheme

involves individuals and actions in multiple countries, foreign bank accounts, and other evidence

abroad.  This means that when such a scheme is uncovered, and a leading individual is

successfully prosecuted and convicted, a substantial sentence is warranted.  *See, e.g.*, *United*

*States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence

---

[6]     These are similar to statements that the defendant made before trial.  In one email, for
example, he stated: "Please tell SH [*i.e.*, Shanghai, the headquarters of CEFC China] that we
need solidarity most at this time, and cannot be divided. . . . Please tell SH, if we are on the same
line, with their support, I will fight to the very end.  For it is not only HO who is on trial, it is
[CEFC NGO], the Company, Country and Chinese values are on trial."  And in a phone call, he
stated that "they," apparently referring to the Government, are using him to get to the "big tiger,"
and to discredit "The Belt and Road," an initiative of the Chinese government.  (*See* Dkt. No. 73,
at 6-7 & Ex. E, F.)

argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The defendant's suggestion that he need not be sentenced to any additional prison time whatsoever to achieve robust general deterrence (Def. Mem. 29-30)—notwithstanding how difficult it is to detect and prosecute successfully cases such as this—flies in the face of case law, logic, and human experience.  Indeed, the approach for which the defendant advocates would lead to the perverse result that sentences in the largest cases would be the *lowest*, because those are precisely the cases most likely to involve a "fall from grace" that is "public" (*id.* 30).  The defendant does not deserve a lower sentence because what he did has garnered media attention.  If anything, the media attention in this case militates in favor of a more significant sentence, because the case has "international visibility" (*id.*) and thus the sentence imposed by this Court will be known in the very circles in which individuals may be tempted to repeat the defendant's offenses.

Moreover, the approach for which the defendant advocates would lead to similarly short or non-existent custodial sentences in all corruption cases, regardless of their size, scope, or complexity, which would frustrate proportionality, a paramount goal of sentencing.  *See United States v. Booker*, 543 U.S. 220, 264 (2005).

## II.    The Defendant's Request For A Sentence of Time Served Is Without Merit

In his submission, the defendant requests time served, which would effectively be a sentence of approximately 16 months' imprisonment, 94% lower than the bottom of the Guidelines range calculated the Probation Office, 73% lower than what the Probation Office recommends, and far less than any comparable defendant in any comparable case has received. The defendant does not deserve such a shockingly low sentence.  In support of this request, the defendant presses five principal arguments.  Whatever their merits, they do not warrant the extraordinary sentence that he seeks.

*First*, the defendant repeatedly asserts that the conduct for which he stands to be sentenced was an "aberration[]" (Def. Mem. 27; *see also id.* 29), and asks this Court to focus on what he did before he started to serve CEFC China, including what he did long ago (*id.* 5-13). Indeed, the defendant spends far more time discussing what he did in the 1970s and 1980s than the period in which the offenses for which he stands to be sentenced took place.  But those offenses lasted *for years*.  This is not a case where a defendant committed an aberrational act or series of such acts on one day, or in one week, one month, or even one year.  This is also not a case in which a defendant engaged in only one criminal scheme.

Nor is the conduct of which the defendant was convicted the only questionable—if not illegal—conduct in which he has engaged.  As described in the Government's Motions *in Limine*, dated October 2, 2018 (Dkt. No. 129), the defendant repeatedly sought to use his connections and power, and, in particular, his position at CEFC NGO, to enrich CEFC China and himself.  Contrary to the thrust of his sentencing submission, his focus at CEFC NGO was demonstrably not only on "improv[ing] the lives of others" (Def. Mem. 15).  It was on profit, whether legal or illegal.

In October 2014, the defendant sent his assistant an email stating, "I am going to BJ [*i.e.*, Beijing] this Friday to see [the Chairman of CEFC NGO and CEFC China] on Sat afternoon. The documents I want to send him before hand in separate items are: . . . 7. Iranian connection (brief)."[7]  Other items in the numbered list included "[a] few PR items in the US with photo of PGA Kutesa," "Chad President Report (brief)," "Croatia Oil company," "PAZ Oil company," and "Husky Oil team (Canada)."

On the same date, the defendant sent his assistant another email, attaching a document, which stated, in pertinent part:

> 7) Iranian Connection  . . .  Iran has money in a Bank in china which is under sanction.  Iran wishes to purchase precious metal with this money.  The precious metal is available through a Bank in HK which cannot accept money from the Bank in China which holds the money but is under sanction.  The Iranian agent is looking for a Chinese company acting as a middle man in such transactions and will pay commission. (details to be presented orally)  The Iranian connection has strong urge to establish trading relationship with us in oil and products . . . .

The following year, in June 2015, the defendant received an email that stated, in pertinent part: "The Iranian team will arrive in BJ . . . .  See the attached."  The attachment referenced in the email was a PowerPoint presentation entitled "Presentation to Potential Partners Iran Petroleum Investments."  The next day, the defendant forwarded the email to his assistant, stating, "For writing report to [the Chairman of CEFC NGO and CEFC China]."

The following year, in June 2016, the defendant emailed another individual, blind-copying his assistant, and stated, in pertinent part, "Will get [two executives of CEFC China] to meet with [oil executive at company with operations in Iran] in BJ, and [another individual] also

---

[7]     All emails of the defendant in this section are with CEFC NGO email accounts.  He did not treat the work discussed herein as distinct from his CEFC NGO work.  Rather, as he did in executing the bribery schemes, the defendant used CEFC NGO to effect and to conceal his other work for CEFC China and himself.

on another occasion if he comes. You can start organizing these. . . . Other matters ftf [*i.e.*, face to face]."

The defendant was just as willing to broker arms deals, again seeking to leverage his connections and power.  For example, in March 2015, an individual sent the defendant an email, stating, "I have the list and end user agreement.  Pls advise next step."  On the same day, the defendant replied, in pertinent part, "Find a way to pass them onto me and we can execute that right away[]."  The individual replied, "Attached.  [W]e have the funding and processing mechanisms in place.  If it works nice there will be much more.  Also for S. Sudan."  The attachment to this email was a document entitled "End User Certificate," certifying that the user of the goods in question would be the Ministry of Defense of the Republic of Libya.  The goods listed on the document included numerous arms, including "mortar rounds," "ammunition," "anti-tank . . . launcher," "rocket launchers," and "grenade launchers."

The following month, the defendant sent an email that stated in pertinent part: "It so turns out Qatar also needs urgently a list of toys from us.  But for the same reason we had for Libya, we cannot sell directly to them.  Is there a way you could act as an intermediary in both cases?"  The person whom the defendant emailed replied: "Qatar good chance bc there is no embargo.  Libya is another case bc going against an embargo is tricky."  The defendant responded: "Qatar needs new toys quite urgently.  Their chief is coming to China and we hope to give them a piece of good news.  Please confirm soonest."

Irrespective of whether the foregoing conduct was criminal (*see* 50 U.S.C. §§ 1701 *et seq.*; 22 U.S.C. §§ 2771 *et seq.*), it may be considered by the Court.  *See, e.g.*, *Reese*, 33 F.3d at 174.  These are not the actions of a man who always "puts family and community before self" (Def. Mem. 31).  And they strongly suggest that caution is warranted before accepting the

defendant's assertions that his wrongdoing—despite lasting years and encompassing two schemes—was entirely "aberrational" (*id.* 27), and that his focus at CEFC NGO was entirely on the public good rather than private gain.  In any event, given the length, complexity, and deliberate and repeated nature of the defendant's criminal conduct as demonstrated at trial alone, a substantial term of imprisonment is warranted regardless of what else he has done or not done.

The defendant similarly suggests that even if he engaged in illegal or improper conduct for private gain, it was not *his* gain.  (*See* Def. Mem. 25.)  There is strong reason to doubt this assertion, even for the bribery schemes, given that CEFC NGO was fully funded by CEFC China, the defendant received a salary of $400,000 a year from CEFC NGO (PSR ¶ 76), the defendant's travel and other expenses were covered by CEFC NGO and/or CEFC China (including his use of a corporate jet), and the defendant also received periodic other payments from a foreign bank account of CEFC NGO.  And in any event, it is apparent that the defendant intended to profit—personally—from the connections he made on behalf of CEFC China.  (*See, e.g.*, GX 413-R (defendant stating that he hoped that 2014 would have him "laughing to the banks"); Tr. 118-19 (defendant suggested deals from which he would personally profit).)

*Second*, the defendant describes charitable or public-minded acts in which he has engaged.  (Def. Mem. 8-10, 12-13, 25-26.)  It is appropriate that the Court consider these acts. But the law accords with common sense: Such acts warrant a downward departure only where they are "present to an exceptional degree or in some other way makes the case different from the ordinary case where [they are] present," *United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005), and "more is expected of high-level business executives who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities," *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (internal quotation marks

omitted).  *Cf., e.g.*, *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman").  In any event, while the defendant's good works may be one of the factors that warrant a below-Guidelines sentence, they do not warrant the extraordinarily low sentence of time served that he seeks.

*Third*, the defendant argues that the impact on his family warrants a sentence of time served.  (Def. Mem. 26-28.)  It does not.  The argument that the defendant asks this Court to accept could be made in virtually every case.  It is not unique to the defendant, and is at odds with Section 3553(a), which focuses the Court's attention in imposing sentence on the defendant and his offenses, not the impact of incarceration on the defendant's family.  *See, e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *United States v. Zadora*, 93 F. App'x 305, 306-07 (2d Cir. 2004) (same); *see also Koon v. United States*, 518 U.S. 81, 95 (1996) ("the defendant's family ties and responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)).  There is nothing about the defendant's family circumstances that merits the extraordinary sentence that he seeks.  On the contrary, the defendant and his family have far more resources at their disposal, which may be used to support and to visit the defendant wherever he is located, than the average family dealing with the incarceration of a family member.

*Fourth*, the defendant appears to suggest that the need to "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), warrants a sentence of time served in this case.  (Def. Mem. 27 n.5.)  However, the principal defendant in the only case cited by the defendant (*United States v. Ng*

*Lap Seng*, 15 Cr. 706 (VSB)) was sentenced to 48 months' imprisonment, and, among other things, engaged in a single bribery scheme (not the two in which the defendant engaged), and had multiple potentially serious medical issues.  The defendant also omits the numerous other foreign bribery cases in which defendants received far above what he seeks, including:

- In *United States v. Joel Esquenzi, et al.*, No. 09 Cr. 21010 (S.D. Fla.), the former president and vice-president of a private telecommunications company were sentenced after trial to 180 and 84 months' imprisonment, respectively, for their roles in an FCPA and money laundering conspiracy.  The case involved a scheme in which the company paid approximately $890,000 to shell companies to pay bribes to Haitian officials.

- In *United States v. Jumet*, No. 09 Cr. 397 (E.D. Va.), the defendant was sentenced, after pleading guilty, to 87 months' imprisonment for paying approximately $200,000 in bribes to Panamanian government officials to secure contracts.

- In *United States v. Mahmoud Thiam*, No. 17 Cr. 47 (S.D.N.Y.), the defendant, a former Minister of Mines and Geology of the Republic of Guinea, to 84 months' imprisonment, after he was convicted at trial of laundering bribes paid to him by executives of a Chinese conglomerate.

- In *United States v. Bahel*, No. 06 Cr. 918 (S.D.N.Y.), the defendant, a senior employee at the UN, was sentenced to 97 months' imprisonment after conviction at trial of honest services fraud and accepting bribes.

None of this is to say that this Court should reflexively impose the same or a similar sentence to that imposed in other cases.  The defendant should be sentenced for who he is and what he has done, regardless of the sentences imposed in other cases.  But to the extent that the defendant asks this Court to consider other cases, they do not support his extraordinary request.

*Finally*, the defendant asserts that the alleged fact that "he will spend additional time in immigration custody" after his sentence supports his request for time served.  (Def. Mem. 28.) This assertion should be swiftly rejected.  As the defendant acknowledges in a footnote, he has informed the Government that he will agree to a judicial order of removal (*id.* 28 n.9), thus requiring him to spend little or no additional time in custody beyond his sentence.  That he is subject to deportation is not a basis for a lower sentence, much less the sentence he seeks.

**III.     The Court Should Impose A Substantial Fine**

**A.     Applicable Law**

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment.  18 U.S.C. § 3572(a).  The Guidelines provide that a court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).

In determining the size of any fine, the sentencing court shall consider:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is obligated to make;
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar offense;
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
> (8) any other pertinent equitable considerations.

*Id.* § 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  *Id.*

23

The defendant bears the burden of demonstrating an inability to pay a fine.  *See United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010); *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001).

### B.    Discussion

After he was arrested, the defendant reported to Pretrial Services that he had a net worth of at least $7 million.  (PSR ¶ 91.)  Yet despite the fact that CEFC China has been paying for his legal bills (Dkt. No. 78, at 3), the defendant reported to the Probation Office a net worth of less than $2.4 million (PSR ¶ 90).  The defendant made no attempt to reconcile these figures, and submitted an unsigned and incomplete financial statement, listing no real estate for him or his wife, no business holdings (despite having two business bank accounts) for him or his wife, no bank accounts or other assets of his wife, and no trust (despite having opened and maintained a bank account in Switzerland through a trust in the Channel Islands).  (PSR ¶¶ 91-92; *see also* Dkt. No. 73, at 5 & Ex. D.)

In light of the defendant's failure to provide a proper and complete financial statement, he has failed to carry his burden of demonstrating an inability to pay a fine.  The Probation Office recommends a fine of $400,000 (PSR p. 23), towards the top of the advisory Guidelines fine range as calculated by the Probation Office (PSR ¶ 173).  The Government submits that a higher fine should be ordered, particularly since the defendant is not subject to an order of restitution.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court

impose a substantial term of imprisonment, and a substantial fine, a sentence that is sufficient but

not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
       March 18, 2019

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney

                          By:       s/ Daniel C. Richenthal
                                    Daniel C.  Richenthal
                                    Douglas S. Zolkind
                                    Catherine E. Ghosh
                                    Assistant United States Attorneys
                                    (212) 637-2109/2597/1114

                                    ROBERT ZINK
                                    Acting Chief, Fraud Section
                                    Criminal Division

                          By:       s/ Paul A. Hayden
                                    Paul A. Hayden
                                    Trial Attorney
                                    (202) 353-9370

25