J3pdhos                          Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                          17 Cr. 779 (LAP)

CHI PING PATRICK HO,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        March 25, 2019
                                        11:38 a.m.


Before:

                        LORETTA A. PRESKA,
                                        District Judge


                        APPEARANCES

GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York
BY:   DANIEL RICHENTHAL
      DOUGLAS ZOLKIND
      CATHERINE GHOSH
            Assistant United States Attorneys
            – and –
U.S. DEPARTMENT OF JUSTICE (D.C.)
BY:  PAUL A. HAYDEN

KRIEGER KIM & LEWIN LLP
        Attorneys for Defendant
BY:   EDWARD Y. KIM
      JONATHAN BODANSKY
      JONATHAN BOLZ
            – and –
DECHERT, LLP (N.Y.C.)
BY:   BENJAMIN ROSENBERG
      KATHERINE WYMAN

ALSO PRESENT:  S.A. Ryan Carey, F.B.I.

J3pdhos                       Sentence

1              THE COURT:  United States against Chi Ping Patrick Ho.

2              Is the government ready?

3         MR. RICHENTHAL:  Yes.  Good morning, your Honor.

4              Daniel Richenthal, Douglas Zolkind and Catherine Ghosh

5    of the U.S. Attorney's Office and Paul Hayden of the Criminal

6    Division Fraud Section of the government.  With us at counsel

7    table is Special Agent Ryan Carey of the Federal Bureau of

8    Investigation.

9              THE COURT:  Good morning.

10             And is the defense ready?

11        MR. KIM:  Yes, your Honor.  Good morning.

12             Edward Kim, from Krieger Kim & Lewin, on behalf of

13   Dr. Ho, and I'm joined by Jonathan Bolz and Jon Bodansky.

14        MR. ROSENBERG:  Good morning, your Honor.  Benjamin

15   Rosenberg, of Dechert, on behalf of Dr. Ho.  I am joined by

16   Catherine Wyman.

17             THE COURT:  Good morning.

18             Mr. Kim, have you and your client had adequate time to

19   review the presentence report?

20        MR. KIM:  We have, your Honor.

21        THE COURT:  Is there any reason it should not be made

22   part of the record?

23        MR. KIM:  No, your Honor.

24        THE COURT:  All right.  With respect to the offense

25   level computation, I know that the defense has certain

1    objections, but everyone in this case believes that a various

2    should be granted, so far as I can tell, indeed, a large

3    variance, taking the sentence from the guidelines' range of

4    triple digits down to double digits.  So, given that, it seems

5    to me that it is unnecessary for the Court to rule upon the

6    objection, which would make a very small change in the

7    applicable guidelines' rage.

8              Is there any disagreement with that, Mr. Kim?

9              MR. KIM:  No, your Honor.

10             THE COURT:  Very well.  Then the Court finds it

11   unnecessary to resolve the defendant's objection, <u>United States</u>

12   <u>v. Crosby</u>, 397 F.3d 103, 112 (2d Cir. 2005).

13             With respect to the offense level computation, then, I

14   accept the findings of the presentence report set forth at

15   paragraphs 36 through 49, which conclude that a total offense

16   level of 39 is appropriate.

17             With respect to the defendant's criminal history, I

18   accept the findings of the presentence report set forth at

19   paragraphs 50 through 55, which conclude that a Criminal

20   History Category of I is appropriate.

21             I have the defendant's sentencing memorandum, dated

22   March 11, the zillions of letters submitted on behalf of

23   Dr. Ho.  I have the government's sentencing memorandum, which

24   is dated March 18th.

25             Are there any additional written materials I should be

1    looking at?

2              MR. KIM:  Not from the defense, your Honor.

3              MR. RICHENTHAL:  None that I am aware of, your Honor.

4              THE COURT:  Very well, then.

5         Mr. Kim, do you want to speak on behalf of Dr. Ho?

6              MR. KIM:  Very much so, your Honor, and I would like

7    to address the Court from the podium.

8              THE COURT:  Yes, sir.

9              MR. KIM:  Your Honor, thank you for the care and

10   thought that you've already put into this sentencing.  I know

11   that you've read very carefully our memo and the letters that

12   we've submitted.  And I know judges often say that sentencing

13   defendants is among the most difficult responsibilities they

14   have, but I have realized that it is not an easy task for us at

15   this table either, because we're faced with responsibility of

16   somehow conveying to your Honor the essence of this man,

17   Dr. Patrick Ho.

18        Section 3553(a) requires the Court to take account of

19   a defendant's character in imposing sentence, to judge the man

20   as a whole.  And that means considering the entirety of his

21   life, his life beyond just the conduct that was the focus of

22   the trial.  I'm going to speak more about Dr. Ho's character,

23   but before I do that I wanted to just address a couple of

24   points right off the bat.

25        The government highlights I think what it says are

financial discrepancies in financial disclosures that were made

to Probation.  There has been a suggestion that there was

millions of dollars worth of assets that were omitted.  That is

not accurate.  The discrepancy between what was reported to the

Probation Office and what was reported to Pretrial Services is

attributable to the value of an apartment held in Dr. Ho's

wife's name.  We actually did submit that in our disclosure

form to Probation and it was inadvertently omitted by the

probation officer, who I believe would confirm that with your

Honor.

        Now, Dr. Ho has given us complete access to his

accountant, who at this point has a better sense of Dr. Ho's

finances than he does, given the fact that most of his accounts

have been frozen or closed, and if there is any lack of clarity

about finances, it is our fault, not Dr. Ho's.

        The second thing I want to say, your Honor, is that

Dr. Ho wholeheartedly accepts responsibility for his actions.

He has not yet had an opportunity to express that to the Court,

but he is remorseful, and you will hear that from him today.

Of course, like any other person would, he has felt a range of

emotions about this prosecution, but his remorse is genuine.

        Now, I'm not going to touch upon everything we

highlighted in our sentencing memo.  I think the Court

understands our perspective about the guidelines.  But I would

like to spend some time talking about Dr. Ho's character, which

shows why a sentence of time served is the right and the just
result here.

Now, I know I cannot possibly communicate everything
about Dr. Ho's character to you, but I would like to try to
give you a sense for who Dr. Ho is as a whole.  One thing is
clear, prior to his service -- or prior to his arrest in this
case, Dr. Ho's story was exceptional.  After a modest
upbringing, he left his home at a young age and came to America
and discovered real success.  And he faced a decision at that
point.  He could have stayed in this country and been
prosperous, like many others leaving Hong Kong during that
time, but he returned home with a sense of mission -- to help
improve standards of medical care.

As Dr. Ho's successor at the Chinese University of
Hong Kong wrote, "Dr. Ho single-handedly established academic
ophthalmology in Hong Kong.  He brought the practice of
ophthalmology in Hong Kong and Mainland China into the modern
era, and he did so with a selfless commitment to the greater
good."

Now, many of the letters detail his efforts to improve
the lives of those around him.  He trained future generations
of doctors, many of whom came from Mainland China to study
under Dr. Ho through a fellowship that he personally funded.
He brought cutting-edge medical techniques to Hong Kong and
China.  He led sight-saving missions in China.

1          Then he eventually decided to leave his lucrative

2     medical practice and serve in government, and he made

3     extraordinary contributions to Hong Kong through public

4     service.  He served on the preparatory committee helping to

5     transition Hong Kong from British to Chinese rule.  As

6     Secretary for Home Affairs, he helped manage Hong Kong's

7     response to SARS and he promoted religious tolerance and

8     diversity.

9          And as to Dr. Ho's work with the NGO, it was obviously

10    a part of his responsibilities to advance the interests of the

11    energy company, and he did that.  That, of course, is what

12    brought him before you, and you're familiar with that part of

13    his story.  But even considering that the conduct at issue here

14    was spread out over time, when looked at in the context of

15    Dr. Ho's full life, that short pattern of behavior at issue is

16    unrepresentative of the whole.

17         And so it's important to consider a full picture of

18    what he did at the NGO.  He worked tirelessly to promote energy

19    development, to strengthen ties between China and other

20    countries.  It is also important to consider why he did those

21    things.  He saw it as another chapter, consistent with his work

22    beforehand.  And to put it simply, over the course of his life,

23    Dr. Ho has thrown himself into service through his medical

24    career, his work with the government, his work with charitable

25    organizations, his work at the NGO, and in the process he has

1   improved the lives literally of thousands or tens of thousands

2   of people.

3           I want to pause and emphasize one other thing, your

4   Honor.  Sometimes people of prominence, they limit themselves

5   to grand public gestures towards service, but that is not

6   Dr. Ho's story.  His life has also been filled with small,

7   private acts of kindness:  Giving his possessions to make sure

8   that a young girl at his clinic in rural China could get

9   medical treatment; anonymously giving money to the elderly man

10  who himself spent everything caring for his sick wife;

11  providing free treatment to poor patients who came to his

12  private medical practice; to the elderly woman whose money Dr.

13  Ho would not accept because he knew she couldn't afford to pay;

14  to the blind monk whose sight he literally restored.  Now,

15  there should be no doubt were it not for this trial, these acts

16  never would have been made public.  They are not acts that were

17  done for reward anywhere on this earth, and certainly not for

18  reward here at a criminal sentencing in Manhattan.

19          The letters we submitted also tell the story of

20  Dr. Ho's kindness to people, both prominent and not.  His

21  driver of many years talks about Dr. Ho never acting superior,

22  giving unconditionally.  His fellow inmates at the MCC,

23  including Christian Perez, writes about how whether they be

24  Spanish, black, white, even gang members, Dr. Ho treats

25  everyone the same.  The most helpful person you could ever

1   meet.

2          Adam Raishani writes that he has changed hearts and

3   minds for the better at the MCC.

4          This is a man who is, and always has been, compelled

5   to serve by an internal sense of duty.

6          And based on everything Dr. Ho did in his life before

7   this case -- and I think any objective person would agree, he

8   has lived an exceptional life, but his story obviously

9   continues.  He was arrested in November of 2017, and that

10  really spelled the end of his life as he had known it until

11  then.  His reputation was destroyed.  He was jailed in a

12  foreign country, separated from family members, none of whom he

13  has been able to see since his arrest.  And I should add, if

14  that doesn't serve the purposes of general deterrence, I don't

15  know what does.  No matter what sentence the Court imposes,

16  Dr. Ho has already and will continue to suffer the consequences

17  of his actions for the rest of his life.

18         Now, this is an unusual white-collar criminal case for

19  many reasons, but for starters, it's unusual for someone of

20  Dr. Ho's prominence to have been detained before trial.  it's

21  the rare case where the Court gets to see what happens when a

22  white-collar defendant is incarcerated and how he responds.

23  And that sets this case apart -- how Dr. Ho responded, how he

24  reacted to this adversity.  And that shines a light on his true

25  character.

1          What did he do when he found himself sitting in a jail

2     cell?  At that moment, Dr. Ho could have retreated into a

3     shell, he could have given himself over to despair, and no one

4     would have begrudged him that.  That is not what he did.

5     Instead, he worked to improve the MCC community.  He gave

6     lectures to the staff and inmates about globalization in

7     business.  He played the violin at graduation and Christmas

8     celebrations.  He spent countless hours on suicide watch

9     looking out for other inmates who have given over to despair.

10          He tutored.  Five inmates have received or will soon

11    receive their GEDs thanks in large part to Dr. Ho's mentoring.

12    But he has also given in quieter ways, ways that cannot be

13    anything other than genuine reflections of kindness.  Now, of

14    course your Honor has sentenced defendants before who have

15    tried to perform good works right before sentencing in order to

16    gain leniency, but the sincere letters written by Dr. Ho's

17    fellow inmates tell a very different story.  This is genuine

18    kindness and decency.  No one else was watching when Dr. Ho

19    reached down into the toilet, plucked another inmate's glasses

20    out and washed them without so much as a word so as not to

21    embarrass him.

22          No one else was watching when Dr. Ho quietly counseled

23    other inmates on how to endure their time in jail; when he

24    encouraged them to see the best parts of themselves; when he

25    told Jonathan Weeks that he saw something different in him,

1    that he saw that Jonathan was bright and had a wonderful heart.

2              I reread many of the letters this weekend, your Honor,

3    and there are common themes spread across Dr. Ho's life.  He is

4    repeatedly described as gentle, kind, thoughtful,

5    compassionate, generous, humble.  It's moving to hear about how

6    he counsels his fellow inmates on how to face adversity.  One

7    inmate, Irfan Amanat, wrote about how Dr. Ho didn't even ask

8    him to write this letter, that he was asked by another inmate;

9    how Dr. Ho never asked for anything in return for his help but

10   instead encouraged a return gesture be given to others, and in

11   small but telling ways demonstrated his humility.  How Dr. Ho

12   insisted on playing the violin as an accompaniment rather than

13   as lead, despite his obvious musical talent.  How he united

14   guitarists, a pianist, a vocalist from different backgrounds,

15   and led other inmates to tears.  One inmate wrote that he has

16   done nothing but to spread goodness and peace and calmness in

17   the MCC.

18             And some of the most powerful words I read came from

19   Jonathan Weeks, who I know your Honor knows.  And he wrote, "I

20   wish I had a father like Dr. Ho."

21             These are the byproducts of genuine character and

22   kindness.  And I should add this.  No one told Dr. Ho to do

23   these things.  I wish we could claim some credit for advising

24   him to do what he did.  We did not.  And, in fact, we learned

25   about many of them for the first time while preparing for this

J3pdhos                          Sentence

 1    sentencing.  It is consistent with how he has lived his life

 2    and constantly looking for ways to benefit those around him,

 3    and it's consistent with how he will live his life after he is

 4    released.

 5          Now, the many letters of support that people have sent

 6    illustrate all of this better than we ever could.  Your Honor

 7    has seen many more sentencings than I have, but I think it's

 8    safe to say that the kinds of letters that were submitted here

 9    were exceptional.  And I'm not just talking about the sheer

10    volume.  I'm talking about the breadth of those letters, people

11    from every chapter of Dr. Ho's life -- his family, friends,

12    students, medical colleagues, patients, people from his time in

13    public service, others from his time at the NGO, and, of

14    course, letters from his fellow inmates at the MCC.  The

15    content of those letters is remarkable.  There is consistency

16    there.  They speak of a man who has devoted himself to helping

17    others, who has carried himself with humility.

18          Judge, I spent a decade working as a prosecutor.  I

19    spent literally hundreds of hours in my life with people

20    charged with federal crimes.  I have met plenty of defendants

21    who I have respected and liked, and that is not new to me.  But

22    I have no reservation in telling you that Dr. Ho's character

23    truly is exceptional.  That is why I am proud to stand up for

24    Patrick Ho.

25          And I know I speak for everyone at this table when I

1    say that Patrick is a kind man.  He is fundamentally good and

2    decent and honest.  I can attest to how kind and thoughtful he

3    has been to us.  Even during the darkest and most stressful

4    times for him, he has been solicitous of the most junior

5    members of our team, concerned about how they are feeling

6    during trial.  Unfailingly gracious and grateful to us.  Even

7    after the jury's verdict was announced, he went out of his way

8    to thank each and every member of the team.

9             We spent countless hours together at the MCC sometimes

10   just sitting quietly, sometimes talking about this case,

11   politics, life, and the man I've come to know over the last

12   year and a half is a man who has devoted himself, devoted his

13   life to bettering the lives of people around him, a man who has

14   really done an extraordinary amount of good in this world based

15   on his sheer kindness.

16            I recognize that we're asking your Honor for a shorter

17   sentence than the one recommended by Probation, and maybe this

18   is an extraordinary request, but we submit that Patrick is as

19   well.  He is an extraordinary man of exceptional character.  He

20   has been punished enough.

21            Your Honor, we ask that you give him a just

22   sentence -- a sentence of time served.

23            Thank you.

24            THE COURT:  Thank you.

25            Dr. Ho, would you like to speak on your own behalf?

1           THE DEFENDANT:  Yes.  Thank you.

2           THE COURT:  Yes, sir.

3           THE DEFENDANT:  Your Honor, good morning.

4           THE COURT:  Good morning, sir.

5           THE DEFENDANT:  I'm humbled to be here.

6           This is the last place in the world I would have

7   expected to be if you asked me 16 months ago.  I'm 69 years

8   old, born and raised in Hong Kong, China, and all my life I

9   have lived to abridge differences and help people.

10          I have been deeply moved by the numerous letters that

11  have been submitted to you, to the Court, written on my behalf

12  by people that I have known and have touched me at various

13  parts of my life -- from my youth, from my musical and medical

14  training, my medical teaching and clinical practice, my

15  government service in Hong Kong, and my work at the China

16  Energy Fund Committee think tank, and also from my time here at

17  the Metropolitan Correctional Centers, the "MCC."  I have been

18  deeply moved by the letters, and I hope that these letters give

19  you a fair sense of my life work and my life, because these

20  letters speak more thoroughly and deeply than I can here and

21  now.  And I'm extremely grateful to the people who wrote them.

22  I'm also grateful because reading these letters reminded me of

23  the path that I had taken over these many years, that I have

24  been blessed to live through so many different chapters, each

25  one more surprising than the last.

J3pdhos                          Sentence

1          The latest chapter is yet to be the most difficult

2     one.  There have been times when I felt that my life is over;

3     the world around me has collapsed; my reputation, my career and

4     my life's work destroyed; the foundations of my professional,

5     social and personal life have all been shaken and uprooted.

6          I feel great remorse that my actions and my situation

7     have caused so heavy a burden on my family and have caused so

8     much grief to the people around me and closest to me -- my

9     wife, my daughter, my mother, as well as colleagues and friends

10    around the world.  They have suffered as surely as I have, and

11    I want to apologize to each and every one of them.  The actions

12    that have caused this suffering and has brought me to this

13    courtroom today were mine and mine alone.  I accept full

14    responsibility for them, and I'm deeply sorry.

15         In particular, I have been half the world away, and

16    not able to comfort my family gives me great pain.

17         Sorry.  It's very cold in here.  I have a runny nose.

18    Excuse me.

19         THE COURT:  Take your time.

20         (Pause)

21         THE DEFENDANT:  That I was not able to comfort my

22    family gives me great pain.  My wife had just lost her mother

23    several months ago, and I was not there to hold her hand and to

24    share her sorrow.  I myself lost my father exactly two years

25    ago, in March of 2017.  And my mother has lost her mate of 68

J3pdhos                         Sentence

years.  My mother, who is now 92 years old, has been living

alone.  And I pray every day that my mother should live a very,

very long life so that she can see her son coming back to her

side to beg for forgiveness and take care of her the remaining

days of her life's journey.

Being incarcerated in a foreign jail for over 16

months has really tested my inner strength and faith.  I tried

very hard to transform despair into something meaningful, to

make something positive about this adversity and predicament.

At the MCC, I had come into close contact with people

that I did not know and would not have met otherwise, and this

experience had opened my eyes, my mind, and my heart to a lot

of things.  At MCC, I lived among the inmates, interacting with

them very closely every day, and through the suicide watch

program I provided companionship to many of them who were in

the most desperate and vulnerable moments in their lives.  And

in the education department, I worked closely with many of them

to prepare them for examination leading to the High School

Equivalency Diploma, the "GED," by giving classes about

geography and world relations, telling them stories of faraway

places, people, and culture.  And I also held discussions with

them on the various aspects and options at the end -- they

could consider at the end of their incarceration, including

discussions on various skill sets that could become useful to

them upon reentry to society, such as how to write a résumé,

J3pdhos                         Sentence

1    how to prepare for a job interview and speak publicly, how to

2    handle one's financial affairs, and about time management,

3    anger management, and about opportunities in working in a

4    health-related environment.

5           Our communications originated from mutual sympathy and

6    commiseration, but later on developed into something that was

7    based on the innate ability to understand and appreciate one

8    another as human beings, what we felt and saw between us, which

9    is simple human kindness and human decency we were able to

10   rekindle in ourselves and in one another.  Together, we found

11   peace, inner peace.  We found strength.  We found hope and

12   promise for the future.

13          Over the course of the last 16 months, I've learned so

14   much from them, and through them, about the world, about life,

15   about human nature, especially about myself, my own

16   temperament, my pride, my frailties, and shortcomings.  It has

17   been such a daunting and yet surprising and enlightening

18   experience for me that I'm certain that no matter where I go,

19   no matter what I do, I will be sharing myself and my life

20   experience with those around me and in my community.

21          Your Honor, at this time, my heart is filled with

22   gratitude.  I'm thankful to the Almighty for not forsaking me,

23   for guiding me and leading me through this very difficult and

24   profound experience of a lifetime.  I'm also very thankful to

25   my family and also thankful to faithful friends for binding

J3pdhos                         Sentence

with me, for their steadfastness, and supporting me with

encouragement.  I'm looking forward every day to my coming back

home to them.

          I'm thankful to the Court and to members of the jury

for your time, your effort and consideration.  I respect your

judgment and decisions.

          And I'm thankful to the officers and inmates at MCC

for keeping me safe, for keeping me educated, and company, and

especially the MCC education department for squeezing from

their already tight budget a small provision to procure a few

musical instruments, including a violin.  The violin has

brought music back to my life and to the life of many at the

MCC.

          Lastly, I would like to thank the American people for

taking care of me for the last 16 months.  So, to all of you, a

very sincere gratitude from the bottom of my heart, and I thank

you all very, very much indeed.

          Also, my mother, who will be 93 years old this summer,

has always reminded me that to convey gratitude in the most

sincere way, a Chinese gentleman should take a bow.  Your

Honor, please accept this token of my respect, my gratitude,

and my appreciation.

          (Defendant bowed)

          THE COURT:  Yes, sir.  Thank you.

          Does the government wish to be heard?

J3pdhos                         Sentence

1          MR. RICHENTHAL:  Briefly, your Honor.

2          We don't quarrel with much of what Mr. Kim said, or

3    even, for that matter, much of what Dr. Ho said.  But we're

4    here because of what he did for years.  And what the defense is

5    asking this Court to do is impose a sentence of less than the

6    time he engaged in multiple bribery offenses.

7          If the life that's been conveyed in the papers before

8    this Court and in the remarks this morning and this afternoon

9    before the Court was accurate, and the defendant quickly and

10   without much thought hit a button, sent a wire, maybe even gave

11   a little cash to someone, what they're asking for might be

12   appropriate, but that's not what happened.  What happened is

13   for years, across continents, across meetings, the defendant

14   chose to cheat, repeatedly, and abuse a charitable organization

15   to do it -- over and again.  And when one failed, he just

16   turned to another.  It is right and appropriate for the Court

17   to consider all the good works he has done, absolutely.  The

18   Court also has to consider why he's here.  That's why he's

19   here.

20         And the Court should give great pause before accepting

21   that that's aberrant not just because it lasted for years, not

22   just because he supervised people, although those factors are

23   important, but because if the Court has learned anything in

24   this trial, that is, the trial that brought us here, the Court

25   has learned there was a private Dr. Ho and a public Dr. Ho.

J3pdhos                        Sentence

1   And in public he did do the things that people write about, but

2   in private he referred to grenade launchers as "toys."  He had

3   no problem evading sanctions with respect to countries to make

4   money.  He had no problem stuffing cash into boxes, flying them

5   on a corporate jet to a poor country, and giving that cash to

6   the president of that country.  Not once in the numerous

7   communications before this Court, while the defendant did these

8   things, did he even show a scintilla of pause.  On the

9   contrary, he did it enthusiastically, just like he sold weapons

10  enthusiastically.

11          Did he do the good things that the Court should

12  consider?  Yes.  Did he do those things, too?  Yes.  And those

13  things violated the trust of the people who worked for that

14  think tank.  They violated the trust of the people, those poor

15  countries he flew to, to bribe their leaders.  They violated

16  the trust of the United Nations.  That is serious.  That's a

17  piece of why we're here.

18          The sentence has to account for the full story, the

19  good and the bad.  The sentence needs to be substantial.

20          THE COURT:  Thank you.

21          Anything else, Mr. Kim?

22          MR. KIM:  No, your Honor.

23          THE COURT:  Thank you, counsel.

24          Ladies and gentlemen, as you've heard, I have

25  calculated the guidelines and certainly have taken them into

J3pdhos                          Sentence

1    account.

2              In my view, the description of the crimes of

3    conviction is accurate as set out in the presentence report.

4              I start with the seriousness of that offense, and I

5    quote from the UN General Assembly Convention against

6    Corruption, which the government pointed out in its brief.  It

7    said:

8              "Corruption is an insidious plague that has a wide

9    range of corrosive effects on societies.  It undermines

10   democracy and the rule of law, leads to violations of human

11   rights, distorts markets, erodes the quality of life, and

12   allows organized crime, terrorism, and other threats to human

13   security to flourish.  This evil phenomenon is found in all

14   countries — big and small, rich and poor — but it is in the

15   developing world that its effects are most destructive.

16   Corruption hurts the poor disproportionately by diverting funds

17   intended for development, undermining a government's ability to

18   provide basic services, feeding inequality and injustice, and

19   discouraging foreign aid and investment.

20             "Corruption is a key element in economic

21   underperformance and a major obstacle to poverty alleviation

22   and development."

23             So there is no question that the crimes at issue here

24   are serious crimes.

25             That said, however, where these sentences driven by

1    the fraud guidelines, particularly at higher numbers, the

2    sentences suggested by the guidelines dramatically overstate

3    the seriousness of the offense and the appropriate guideline

4    range.  Indeed, we hardly give sentences such as the

5    recommended 262 to 327 months to murderers.  So, I agree with

6    the judges who have been quoted in a variety of cases by the

7    defense that the broad guidelines dramatically overstate the

8    seriousness of the offense.

9            With respect to the history and characteristics of

10   this defendant:  As we've heard today, Dr. Ho came from a

11   modest background and through his own work and talent became a

12   very accomplished individual.

13           I note the government talks about some charity being

14   part of such an accomplished individual's life, some charity is

15   expected of a person of Dr. Ho's stature.  However, I do note,

16   particularly from the letters that have been submitted, he's

17   gone above and beyond.  We talk about the grand public gestures

18   such as endowing an ophthalmic scholarship.  There is plenty of

19   that.  But it is the random acts of kindness to so many that in

20   my view point to something extraordinary in Dr. Ho's character.

21           We've heard about people who he literally has returned

22   to sight.  We've heard about donations of money made privately

23   and anonymously, and I personally have looked at the work that

24   Dr. Ho has done at the MCC.  As counsel alluded, I sentenced

25   Jonathan Weeks, who was turned around by Dr. Ho.  Mr. Weeks

1  grew up without parents, essentially, in various foster homes.

2  So I take all of that into account, and it is indeed

3  extraordinary.

4         With respect to the crime at issue, the government has

5  pointed out correctly that it did go on over some years.  I do

6  note, however, that in a life of close to 70 years, this was a

7  small part, but, nevertheless, as I've noted, it is serious

8  conduct that harms people around the world.

9         With respect to the paragraph 2 factors:  Certainly a

10 period of incarceration is necessary here to reflect the

11 seriousness of the offense.  As I've noted, however, the

12 guidelines called for are beyond all imagination, and,

13 accordingly, everyone agrees, including the government, that a

14 variance is required here.  Of course, there is in my view no

15 need to protect the public from further crimes of this

16 defendant, as the probation officer points out in the

17 presentence report.

18        With respect to public deterrence, the government is

19 correct that that's a very important factor in these kinds of

20 cases, but the sentence called for in the guidelines is not a

21 sentence that is required.  For a person of Dr. Ho's stature

22 and of people who have been sentenced in these kinds of crimes,

23 going to prison for more than a couple of months is indeed

24 public deterrence.

25        The paragraph D factors of providing educational or

J3pdhos                         Sentence

1    vocational care, of course, are not relevant here.  Indeed, as

2    we've all discussed, the opposite has happened, and Dr. Ho has

3    provided vocational, educational and life experience education

4    to folks at the MCC.

5            I have in mind the paragraph 3, 4 and 5 factors.

6            With respect to paragraph 6, the need to avoid

7    unwarranted sentencing disparities:  I've noted the sentences

8    that the government has pointed out in its brief of folks

9    relatively similarly situated, and in my view there will not be

10   a perceived disparity.

11           Taking all of these factors into account, counsel,

12   it's my intention to impose a period of 36 months

13   incarceration.

14           I would like to hear from counsel, please, with

15   respect to supervised release.  As we know, the government has

16   submitted an order of removal, and I think the expectation is

17   that Dr. Ho will immediately return to Hong Kong.

18           I also would like to hear from counsel with respect to

19   the fine.  I note that the Probation Office recommends that the

20   fine be paid within six months of the imposition of sentence.

21           May I hear from you on those topics, counsel, and

22   specifically whether a period of supervised release should be

23   imposed here?

24           MR. RICHENTHAL:  I don't think a period of supervised

25   release is necessary.  Indeed, the guidelines generally counsel

J3pdhos                              Sentence

1   against it in circumstances such as this.  Assuming your Honor

2   intends to enter the judicial order of removal, we expect that

3   the defendant will be promptly removed from the United States.

4           With respect to a fine, I think our position is

5   generally set forth in our papers.  It is not the case that all

6   of his assets were described to either Pretrial or to the

7   Probation Office.  He left out a Swiss bank account.  He left

8   out businesses.  I could keep going with this.  But the reality

9   is this is a man of substantial wealth, much more substantial

10  than the average defendant, even the average defendant who

11  commits these types of crimes.  And particularly because there

12  is no restitution order warranted in this case, not because

13  there aren't victims in a normal sense but simply because the

14  law doesn't view corruption as a crime where victims actually

15  get money, we think that a meaningful fine is absolutely

16  appropriate, as the Probation Officer recommends.

17          THE COURT:  My question also was the Probation

18  Officer's recommendation that the fine be paid within six

19  months of the date of imposition of sentence.  That's not

20  normally what we do, but that was the recommendation and

21  perhaps for good reason.

22          MR. RICHENTHAL:  So I haven't asked Officer Kim why

23  that was his recommendation.  My sense is it was because his

24  view is that the defendant has liquid assets sufficient to

25  satisfy the fine very quickly, and that absolutely seems the

1    case.

2            THE COURT:  Mr. Kim, do you wish to comment?

3            MR. KIM:  May I have one moment, your Honor?

4            THE COURT:  Yes, sir.

5            (Pause)

6            MR. KIM:  Thank you, your Honor.

7            We don't have any comment on the supervised release.

8    I think we agree that it makes sense for the Court to impose

9    that here.

10           As to the fine, your Honor, we think that obviously a

11   fine -- the Court needs to take into account every aspect of

12   the sentence to determine what is an appropriate sentence.  We

13   think a minimal fine should be imposed here, your Honor.

14   Dr. Ho did not reap a windfall from this offense.  We

15   understand one is called for under the guidelines, but we think

16   one at the bottom end of the range be opposed.

17           As to the timing of that fine, your Honor, while

18   Dr. Ho's assets, some of them are liquid, his access to the

19   banking system is a problem because many of his accounts have

20   been frozen or closed.  So, we ask that he be given additional

21   time to pay the fine.

22           MR. RICHENTHAL:  I just want to note one thing on

23   timing.

24           THE COURT:  Yes, sir.

25           MR. RICHENTHAL:  Two things.

J3pdhos                          Sentence

1           First, it's absolutely false he has limited access to

2    the banking system.  He was apparently able to liquidate a

3    multiple hundred-thousand-dollar Swiss bank account owned

4    through a trust while incarcerated.  There is no reason he

5    couldn't continue to do the same to pay a fine.

6           And, second, to the extent there isn't supervised

7    release, it is appropriate that there be a time period for the

8    payment of a fine at least meaningfully less than the time

9    period of incarceration so if he chooses not to exercise

10   discretion to pay the fine, we can go after assets within that

11   time period.

12          THE COURT:  Anything else, Mr. Kim?

13          MR. KIM:  No, your Honor.

14          THE COURT:  All right, then.

15          Counsel, it is my intention to impose the $400,000

16   fine recommended, to require that it be paid within 12 months

17   of the imposition of sentence.

18          And it is my intention to impose the $700 mandatory

19   special assessment.

20          It is not my intention to impose a period of

21   supervised release.

22          Is there any legal reason, counsel, why such a

23   sentence should not be imposed?

24          MR. RICHENTHAL:  I am not aware of any, your Honor.

25          MR. KIM:  No, your Honor.

J3pdhos                         Sentence

1           THE COURT:  Very well, then.

2           Dr. Ho, you are sentenced, sir, to a period of 36

3  months' incarceration.  Following that time, there will be no

4  supervised release.

5           The Court imposes upon you a fine of $400,000, and

6  that should be paid within 12 months of today's date.

7           In addition, sir, I must impose, and do impose, the

8  $700 special assessment, and that should be paid promptly.

9           It is my duty to inform you that unless you have

10  waived it, you have the right to appeal the sentence, and you

11  might have the right to appeal in forma pauperis, which means

12  as a poor person, with the waiver of certain fees and expenses.

13           Mr. Kim, I note that the probation officer recommended

14  FCI Allenwood.  Do you concur in that?

15           MR. KIM:  Your Honor, I think in the first instance we

16  would request that the Court request that the BOP allow Dr. Ho

17  to stay at the MCC potentially to assist with his appeal.  We

18  will submit a proposed order for the Court's consideration.

19  And should the BOP not do that, I think we agree that LFCI

20  Allenwood would make sense in order to facilitate Dr. Ho's

21  removal from the United States.

22           THE COURT:  Very well.  So, include both of those

23  things in the proposed order.

24           MR. KIM:  We will do that, your Honor.

25           THE COURT:  Is there anything further?

J3pdhos                              Sentence

1          MR. RICHENTHAL:  No.

2          Let me just note, though, on those two things:  First,

3    I think it has to be a recommendation, not actually an order,

4    to the BOP.

5          Second, the first request is extremely unusual and I

6    don't think warranted.  The BOP, as your Honor no doubt knows,

7    has limited space at the MCC.  In our judgment, it is not

8    appropriate to permit a defendant to remain there indefinitely

9    regardless of circumstances.

10          And, second, that particular recommendation -- I'm now

11    referring to Allenwood -- was to effect removal if the

12    defendant is contesting it, which he is not.  He may still

13    prefer Allenwood and that's fine, but that is not a basis to

14    make that recommendation.

15          MR. KIM:  Your Honor, I think our hope is that the

16    judicial removal order will facilitate his speedy release.  We

17    are also hoping that if there is any way to expedite that by

18    being at LFCI Allenwood, that that would happen.  If that is

19    not going to have any effect, then that is fine.  We want him

20    to stay as close to New York City as possible.  Our hope was

21    that if there is any degree of speed which we can gain by being

22    at LFCI Allenwood, we would like that to happen.

23          THE COURT:  Yes, sir.

24          All right.  I will take a look at the order.

25          Anything else, gentlemen?

J3pdhos                         Sentence

1          MR. RICHENTHAL:  No, your Honor.

2          MR. KIM:  No, your Honor.  Thank you.

3          THE COURT:  Dr. Ho, people have talked about your age

4    of almost 70 as being old.  Take it from me, it's not.

5          You have a lot to offer.  You've obviously been doing

6    it while you were at the MCC.  You have a lot yet to do in your

7    life.

8          Good luck to you, sir.

9          THE DEFENDANT:  Thank you, your Honor.

10          THE COURT:  Yes, sir.

11          Counsel, thank you for your assistance.

12          (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25